# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| | ) | |
| **BRIDGET POLLARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1: 07-00692(CKK)** |
| | ) | |
| | ) | |
| **QUEST DIAGNOSTICS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____ )

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant Quest Diagnostics, by and through its undersigned counsel and pursuant to Fed. R. Civ. P. 56 and Local Rules LCvR 7(h) and LCvR 56.1, respectfully file this Motion for Summary Judgment.

In support of this Motion, Defendant is submitting the attached Memorandum of Points and Authorities.

WHEREFORE, Defendant respectfully requests that this Court grant Defendant's Motion in its entirety, enter judgment in Defendant's favor on all counts, and award to Defendant its' reasonable attorneys' fees and costs, and such further relief as the Court may deem proper.

Respectfully submitted,

 /s/ Michael L. Stevens_____
Michael L. Stevens, D.C. Bar No. 384887
ARENT FOX LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339

Telephone: (202) 857-6000
Facsimile:(202) 857-6395
Counsel for Defendant

Dated:  April 21, 2008

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**BRIDGET POLLARD,**                   )
                                                    )
                   **Plaintiff,**               )
                                                    )
          **v.**                                   )        **Case No. 1: 07-00692(CKK)**
                                                    )
                                                    )
**QUEST DIAGNOSTICS,**              )
                                                    )
                   **Defendant.**             )
_____ )

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

Michael L. Stevens
D.C. Bar No. 384887
Arent Fox LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
(202) 857-6000
Counsel for Defendant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iv

I. INTRODUCTION .................................................................................................... 1

II. STATEMENT OF FACTS ....................................................................................... 3

     A.  Background ..................................................................................................... 3

     B.  Plaintiff's Employment ................................................................................. 3

     C.  The IT Project Manager Position ................................................................. 5

     D.  The Selection Process for IT Project Manager
         Position and the EEOC Charge ..................................................................... 7

     E.  Plaintiff's 2005 Performance Evaluation ................................................... 10

     F.  The Amended Complaint ............................................................................. 11

III. ARGUMENT ........................................................................................................ 12

     A.  Standard for Summary Judgment ............................................................... 12

     B.  Quest is Entitled to Summary Judgment with Respect
         To Plaintiff's Discrimination Claims .......................................................... 13

         1.  The McDonnell Douglas Framework .................................................... 14

             (i)  Quest Rejected Plaintiff for Legitimate, Non-
                 Discriminatory Reasons ........................................................... 20

             (ii)  Quest's Rejection of Plaintiff for Project Manager
                 Position is Not a Pretext for Discrimination ............................. 23

         2.  Plaintiff's Title VII and Section 1981 Retaliation Claims ................... 26

             (i)  Plaintiff Cannot Establish a Prima Facie Case ........................ 27

             (ii)  Plaintiff Cannot Rebut Quest's Legitimate, Non-
                 Discriminatory Reason for the 2005 Performance
                 Evaluation ................................................................................. 30

CONCLUSION...................................................................................................................................33

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................................12, 13

*Brady v. Office of the Sergeant of Arms*
  No. 06-5362, 2008 WL 819989 (D.C. Cir. Mar. 28, 2008)
  (attached hereto as Exhibit 21) ................................................................................25, 26

*Brodetski v. Duffey*,
  141 F. Supp. 2d 35 (D.D.C. 2001).................................................................................28

*Burlington N & Santa Fe Ry. Co. v. White*
  548 U.S. 53, 126 S. Ct. 2405 (2006) ........................................................................26, 28

*Carney v. Am. Univ.*,
  151 F.3d 1090 (D.C. Cir. 1998).....................................................................................13

*Carter v. Pena*,
  14 F. Supp. 2d 1 (D.D.C. 1997).....................................................................................14

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................................................12

*Childers v. Slater*,
  44 F. Supp. 2d 8 (D.D.C. 1999), *vacated in part on other grounds*,
  197 F.R.D. 185 (D.D.C. 2000) .......................................................................................23

*Davis v. State Univ. of N.Y.*,
  802 F.2d 638 (2d Cir. 1986) ...........................................................................................22

*Ferrell v. Masland Carpets, Inc.*,
  97 F. Supp. 2d 1114 (S.D. Ala. 2000) ...........................................................................14

*Fudd v. Sec'y of the Treasury*,
  690 F. Supp. 1 (D.D.C. 1986).........................................................................................20

*Greene v. Dalton*,
  164 F.3d 671(D.C. Cir. 1999).........................................................................................13

*Gustave-Schmidt v. Chao*,
  360 F. Supp. 2d 105 (D.D.C. 2004)................................................................................25

*Harding v. Gray*,
  9 F.3d 150 (D.C. Cir. 1993)........................................................................................13

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993) ....................................................................................................13

*\*Henderson v. Rice*,
  407 F. Supp. 2d (D.D.C. 2005)..................................................................................29

*\*Holbrook v. Reno*,
  196 F.3d 255 (D.C. Cir. 1999)...................................................................................27

*\*Horvath v. Thompson*,
  329 F. Supp. 2d 1 (D.D.C. 2004)...............................................................................21

*Howard v. Gutierrez*,
  237, F.R.D. 310 (D.D.C. 2006) .................................................................................27

*Lathram v. Snow*,
  336 F.3d 1085 (D.C. Cir. 2003)................................................................................21

*\*Mbulu v. Bureau of Nat'l Affairs, Inc.*,
  No. Civ. A. 04-1540 (JDB), 2006 WL 469971 (D.D.C. Feb. 28, 2006) ................13, 14, 16
  (attached hereto as Exhibit 20)

*Morgan v. Fed. Home Loan Mortgage Corp.*,
  328 F.3d 647 ( D.C. Cir. 2003)................................................................................26

*\*Obi v. Anne Arundel County*,
  142 F. Supp. 2d 655 (D. Md. 2001)..........................................................................25

*Richardson v. Gutierrez*,
  477 F. Supp. 2d 22 (D.D.C. 2007)............................................................................27

*Saunders v. George Washington Univ.*,
  768 F. Supp. 854 (D.D.C. 1991)...............................................................................13

*Smart v. Ball State Univ.*,
  89 F.3d 437 (7th Cir. 1996) ......................................................................................29

*\*Stewart v. Ashcroft*,
  352 F.3d 422 (D.C. Cir. 2003)..................................................................................20

*\*St. Mary's Honor Ctr. v. Hicks*,
  509 U.S. 502 (1993) ..................................................................................................14

* *Ulloa v. Am. Express Travel Related Servs., Co., Inc*,
  822 F. Supp. 1566, 1571 (S.D. Fla. 1993) ...........................................................................24

*Vance v. Chao*,
  496 F. Supp. 2d 182 (D.D.C. 2007)..........................................................................27, 28

*Waterhouse v. Dist. of Columbia*,
  124 F. Supp. 2d 1 (D.D.C. 2000), aff'd, 298 F.3d 989 (D.C. Cir. 2002) ...........................................20

*Weber v. Battista*
  494 F.3d 179 (D.C. Cir. 2007).........................................................................27, 28

*Wiley v. Glassman*
  511 F.3d 151 (D.C. Cir. 2007)........................................................................26

## Miscellaneous

Fed. R. Civ. P. 56(c) ...........................................................................................12

42 U.S.C. §1981.................................................................................................13

42. U.S. C. §2000e-2.............................................................................................13

*denotes cases chiefly relied upon

Defendant Quest Diagnostics ("Quest"), by and through its undersigned counsel and pursuant to Fed. R. Civ. P. 56, Local Rules LCvR 7(h) and LCvR 56.1, respectfully submits this Memorandum of Points and Authorities in Support of its Motion for Summary Judgment.

## I. __INTRODUCTION__

With admittedly no evidence to support her claims, Plaintiff Bridget Pollard, a former on-call employee of Quest, alleges that she was discriminatorily denied a promotion to an IT Project Manager position based on her race, and that she was thereafter retaliated against by receiving a slightly lower rating on her annual performance evaluation than she had received the year before.

While it is true that Plaintiff was denied a promotion she requested, the undisputed evidence reveals that she lacked the requisite technical experience required for the position. Moreover, the position was first offered to a candidate whom Plaintiff concedes was more qualified than her. After that candidate declined the position, Quest offered it to the second highest rated candidate, whom Plaintiff concedes was more qualified if the experience indicated on his resume was accurate. This candidate accepted the position, and Plaintiff has no evidence that Quest knew that any information on his resume was inaccurate.

Plaintiff's claim that Quest possessed any discriminatory animus against African-Americans is simply inconsistent with the record. Indeed, the following facts are undisputed: (1) neither of the decision-makers knew Plaintiff's race when she applied for the position; (2) unlike the other candidates who were offered the position, Plaintiff lacked experience with the upgrade to the computer system which Quest was installing; (3) Quest's workforce largely consists of African-Americans; and (4) currently, an African-American female holds the position of Project Manager for which Plaintiff applied.

While Plaintiff brings this action under the guise of discrimination, a close examination of the record reveals that her claim is actually based upon an alleged lack of "fairness" in the selection process. Plaintiff contends that it was "unfair" for Quest to offer the Project Manager position to the second ranked candidate rather than reposting it after the top-ranked candidate declined the offer. She also claims that as an "internal candidate," Quest should have afforded her preferential treatment. Although Plaintiff may believe that the process or the decision was unfair, the applicable employment laws do not require fairness; rather they simply mandate nondiscrimination. Quest complied with this mandate in all respects.

Plaintiff's retaliation claim fares no better. The record reveals that Plaintiff's performance evaluation was in no way related to her allegation of discrimination in the promotion process. Indeed, the record establishes that Plaintiff's immediate supervisor, who prepared the evaluation, was unaware of Plaintiff's discrimination claim when she prepared the evaluation. Thus, her supervisor rated her solely based upon her performance, which she believed included some deficiencies. Moreover, the undisputed evidence shows that Plaintiff's supervisor actually increased Plaintiff's ratings at Plaintiff's request. While it may be understandable that Plaintiff is displeased with this alleged "inferior" evaluation, the applicable employment laws were not created to address every perceived workplace slight.

Accordingly, Defendant respectfully submits that there are no genuine issues of material fact, and that the undisputed evidence conclusively establishes that Plaintiff was rejected for the Project Manager position for legitimate, nondiscriminatory reasons--she was not the most qualified candidate. Moreover, Plaintiff's evaluation was not in retaliation for her previous discrimination claim. Thus, the Amended Complaint should be dismissed in its entirety with prejudice.

II.     **STATEMENT OF FACTS**

A.     **Background**

Quest is a national provider of medical laboratory services. Quest operates approximately thirty-four medical laboratories throughout the United States in both hospitals and medical centers as well as its own facilities. Its corporate office is located in Madison, New Jersey. S.J. Ex. 1 [Knapp[1] Declaration "Dec." at ¶ 3]. Quest operates a medical laboratory at Providence Hospital ("Providence") located in Washington, D.C. In 2002, Quest acquired American Medical Laboratories, which formerly operated the medical laboratory at Providence. S.J. Ex. 1 [Knapp Dec. at ¶ 4].

At Providence, Quest currently has 83 employees. S.J. Ex. 1 [Knapp Dec. at ¶6]. Of that number, 83 or 70.24%, are African-American. S.J. Ex. 1 [Knapp Dec. at ¶ 6]. At the time that Plaintiff's employment with Quest was terminated effective as of October 3, 2006, Quest had 84 employees located at Providence. S.J. Ex. 1 [Knapp Dec. at ¶ 6]. Of that number, 54 or 65.06%, were African-American. S.J. Ex. 1 [Knapp Dec. at ¶ 6]. Currently, 100% of Quest's managerial staff at Providence, consisting of 5 employees, is African-American. S.J. Ex. 1 [Knapp Dec. at ¶ 6]. At the time of Plaintiff's termination, 50% of the managerial staff was African-American. S.J. Ex. 1 [Knapp Dec. at ¶ 6]. Candidly, with statistics like these, Plaintiff's allegations of race discrimination are inherently suspect.

B.     **Plaintiff's Employment**

In October of 2002, Plaintiff, an African-American female, was hired by American Medical Laboratories as a Medical Technologist at Providence. S.J. Ex. 2 [Pollard Deposition ("Dep".) 51:9-15; 52:11-15; 54:4-17]. As a Medical Technologist, Plaintiff's responsibilities

---

[1] Michael Knapp is the Director of Employee Services for Quest. S.J. Ex. 1 [Knapp Dec. at ¶2].

included performing assigned medical tests, maintaining laboratory areas and equipment, and ensuring that test systems were in control for each test performed. S.J. Ex. 2 [Pollard Dep. 51:22; 52:1-12]; S.J. Ex. 3 [Medical Technologist Job Description, Pollard Dep. Ex. 8]. The minimum qualifications for a Medical Technologist included a degree in either Medical Technology or a Laboratory Science, one (1) year of laboratory experience and/or training, basic knowledge of computer terminal operations, and ability to deal with client information in a confidential manner. S.J. Ex. 3 [Medical Technologist Job Description, Pollard Dep. Ex. 8]. Plaintiff's responsibilities did not change after Quest acquired American Medical Laboratories, and in fact remained the same throughout her employment. S.J. Ex. 2 [Pollard Dep. 54:15-17].

From 2002 until 2005, Plaintiff worked the third (overnight) shift and reported directly to Isabelita Aglipay. S.J. Ex. 2 [Pollard Dep. 54:18-22; 55: 1-9]. In 2005, Plaintiff requested to work on a "PRN" or on-call as needed basis in order to attend school full-time. S.J. Ex. 2 [Pollard Dep. 38:8-15: 38:21-22; 39:1-4]. Quest granted this request. During this time, her work hours varied and she worked for several different supervisors. S.J. Ex. 2 [Pollard Dep. 38:16-20; 55:13-17].

In or around March 2006, Plaintiff relocated to Raleigh, North Carolina and began full-time employment with Wake Technical Community College. S.J. Ex. 2 [Pollard Dep. 36:22; 37: 1-10]. After relocating to North Carolina, Plaintiff only occasionally worked for Quest on the weekends. S.J. Ex. 2 [Pollard Dep. 37:11-13; 42:13-17].

On October 4, 2006, Plaintiff's employment was terminated because she failed to work for several pay periods. S.J. Ex. 2 [Pollard Dep. 36:3-12]; S.J. Ex. 4 [Termination Letter, Pollard Dep. Ex. 7]; S.J. Ex. 5 [Knapp Deposition ("Dep.") 38: 18-22; 39:1]. This termination was implemented as a result of a routine audit Quest conducts for all PRN employees, and was

consistent with Quest policy.  S.J. Ex. 5 [Knapp Dep. 43:15-18; 44:22; 45:1-4].  Plaintiff is currently employed full-time with INC Research, Inc. in Raleigh, North Carolina.  S.J. Ex. 2 [Pollard Dep. 9:19-22].

### C.     The IT Project Manager Position

In the Spring of 2005, Quest decided to create an Information Technology Project Manager ("Project Manager") position at Providence.  S.J. Ex. 1 [Knapp Dec at ¶ 7].   Quest made the position available to both internal and external applicants by announcing it on the bulletin board in the Providence lab, Quest's intranet and the internet.  S.J. Ex. 1 [Knapp Dec. at ¶ 8]; S.J. Ex. 2 [Pollard Dep. 66:18-22; 67:1-4]; S.J. Ex. 5 [Knapp Deposition ("Dep.") 12:13-15; 21-22; 13:2-11].    The primary responsibility of the Project Manager position was to coordinate and maintain a new upgrade to Quest's old Laboratory Information System ("LIS") that was to be installed in the near future.  S.J. Ex. 6 [Leap Deposition ("Dep.") 27:9-14].  The LIS is the computer system used in the laboratory in conjunction with the laboratory equipment to generate reports of test results.   S.J. Ex. 6 [Leap Dep. 25:4-13]; S.J. Ex. 7 [Vandenburg Dep. 26:11-13; 27:4-8].   The new upgrade to the LIS was a more user friendly program which greatly increased the functionality of the system. S.J. Ex. 7 [Vandenburg Dep. 28:16-21].

Harvey Vandenburg, the Administrative Director of the Providence Laboratory and Richard Leap, Director of Information Technology ("IT"), collaborated in selecting a candidate for the Project Manager position.  S.J. Ex. 7 [Vandenburg Dep. 36:6-9].  According to Quest's policy, a written position description is required before posting an available position.  S.J. Ex. 1 [Knapp Dec. at ¶ 9]; S.J. Ex. 7 [Vandenburg Dep. 30:3-12].  Accordingly, before posting the Project Manager position, Mr. Vandenburg and Mr. Leap composed a position description using the incumbent Project Manager position description as a template.  S.J. Ex. 6 [Leap Dep. 22:14-

22]; S.J. Ex. 7 [Vandenburg Dep. 30:13-21].    In addition to the "Essential Job Duties and Responsibilities" included in the former Project Manager's position description, Mr. Leap included the following technical aspects:

(3) Collaborate with HIS personnel in maintaining database;

(4) Facilitates LIS training and competency for all new and existing staff as new processes or procedures are added;

(6) Provides necessary audit trail documentation of all changes and validations to LIS system to meet or exceed regulatory requirements, including but not limited to, annual calculations review, biannual patient report for Medical Director review, LIS upgrade documentation, LIS backup and transaction documentation;

(9) Monitor LIS performance and report outages or system degradation issues to appropriate channels.

S.J. Ex. 6 [Leap Dep. 24:13-20]; S.J. Ex. 8 [Project Manager Job Description, Pollard Dep. Ex. 9].

The minimum qualifications stated in the Project Manager Description included an educational background in either Computer Science or Medical Technology, strong interpersonal skills, basic knowledge of laboratory skills, and experience testing or troubleshooting new or existing LIS. S.J. Ex. 2 [Pollard Dep. 70:13-22; 71:1-2]; S.J. Ex. 8 [Project Manager Position Description, Pollard Dep. Ex. 9].  However, both Mr. Vandenburg and Mr. Leap agreed that they preferred a candidate with technical experience in LIS/laboratory instrument interfaces, LIS test file development, LIS report maintenance and generation and training LIS users. S.J. Ex. 6 [Leap Dep. 24:8-12, 20-21; 41:5-22; 42:1-14; 44:8-14; 45:1-21; 46:1];S..J. Ex. 7 [Vandenburg Dep. 23:2-7; 36:12-15]; S.J. Ex. 8 [Project Manager Job Description, Pollard Dep. Ex. 9].

**D.    The Selection Process for IT Project Manager Position and the EEOC Charge**

Shortly after Quest posted the IT Project Manager position, Plaintiff applied. S.J. Ex 2 [Pollard Dep. 77:6-18].    Mr. Vandenburg selected Plaintiff along with three other candidates Tuy Le, Jane Kopley, and Sean Townsend, for an interview. S.J. Ex. 1 [Knapp Dec. at ¶ 10]; S.J. Ex. 7 [Vandenburg Dep. 19:13-22].    Tuy Le, like Ms. Pollard, was an internal applicant. S.J. Ex. 1 [Knapp Dec. at ¶ 10];  S.J. Ex. 2 [Pollard Dep. 98:10-12].   Ms. Kopley and Mr. Townsend were the only external candidates as well, as the only white individuals who applied.  S.J. Ex. 1 [Knapp Dec. at ¶ 10]; S.J. Ex. 7 [Vandenburg Dep. 57: 15-18]

When Mr. Vandenburg initially contacted Plaintiff for her interview, she was out of town on vacation. S.J. Ex. 2 [Pollard Dep.  79:15-22]. Therefore, he left a note on the lab bulletin board for Plaintiff to contact him.  S.J. Ex. 2 [Pollard Dep. 79:20-21;  80:1-4]. Because Plaintiff and Mr. Vandenburg worked different shifts, it was difficult for them to coordinate a time for the interview. S.J. Ex. 2 [Pollard Dep. 80:6-8]. Ultimately, Mr. Vandenburg was able to contact Plaintiff at home and thereafter conducted a telephone interview.    S.J. Ex. 2 [Pollard Dep. 82:18-19; 83:2-5, 9-22; 84:1-8].    Before this interview, Plaintiff had never had a formal conversation with Mr. Vandenburg.  In fact, she and Mr. Vandenburg had only occasionally greeted each other, but had never been formally introduced.  S.J. Ex. 2 [Pollard Dep. 61:3-12].

Because it was easier to do so due to their schedules, Mr. Vandenburg conducted face-to-face interviews with the other candidates he had selected for interviews based on their resumes. S.J. Ex. 7 [Vandenburg Dep. 19:20-22; 20:1-3].  During his interviews with all four candidates, Mr. Vandenburg focused on each candidates' interpersonal and communication skills. S.J. Ex. 7 [Vandenburg Dep.  35:19-22; 36: 1-5].  After interviewing the candidates, Mr. Vandenburg forwarded all of their resumes to Mr. Leap. S.J. Ex. 7 [Vandenburg Dep.  21:3-4].    While Mr.

Vandenburg concluded that each candidate displayed good verbal communication skills, he deferred to Mr. Leap's technical knowledge to determine whether the candidates possessed the requisite technical experience.  S.J. Ex. 7 [Vandenburg Dep.  21:3-8; 35:19-22; 36:1-16].

Based upon the candidates' resumes, Mr. Leap concluded that only Ms. Kopley and Mr. Townsend possessed the requisite technical experience and thus decided to only interview them. S.J. Ex. 6 [Leap Dep. 16:9-17; 19:2-6; 20:22; 21:1; 34:22; 35:1-5; 38:14-20]; S.J. Ex. 7 [Vandenburg Dep. 23:8-13]. Mr. Leap conducted both interviews by telephone. S.J. Ex. 6 [Leap Dep. 16:9-15; 19:2-8].  Thus, he did not know their race.  Ms. Kopley had significant LIS experience from her previous position as an Automated Laboratory Services Manager at Holy Cross Hospital.  S.J. Ex. 7 [Vandenburg Dep. 36:17-20].   At Holy Cross, Ms. Kopley helped implement the new LIS upgrade, built new test files into the system and trained users. S.J. Ex. 2 [Pollard Dep.  104:6-9; 105:1-4]; S.J. Ex. 9 [Kopley Resume, Pollard Dep. Ex. 11].

Mr. Townsend was involved in the same project at Holy Cross.  He developed interfaces between the laboratory instruments and the LIS, built the respiratory and clinic care components for Soft Lab, and trained users. S.J. Ex.  2 [Pollard Dep. 112:15-2; 113:2; 114:1-2]; S.J. Ex. 6 [Leap Dep. 41:15-22; 42:1-14]; S.J. Ex. 10 [Townsend Resume, Pollard Dep. Ex. 12].

Mr. Leap declined to interview Plaintiff, as well as Mr. Le, because he believed she lacked significant LIS experience.  S.J. Ex. 6 [Leap Dep. 19:11-19; 20:19-22; 21:1; 44:10-22; 45:1-21; 46:1].  As Mr. Leap had never met Plaintiff, and thus did not know her race, he based this decision solely upon her resume.  S.J. Ex. 2 [Pollard Dep. 63:22; 64:1-4; 160:16-18]; S.J. Ex. 6 [Leap Dep. 20:22; 21:1]. Specifically, according to the resume, Plaintiff did not have experience in "setting up the filing structure of a LIS, managing interfaces for producing or for setting up the laboratory reports"--these were the most important aspects for the job. S.J. Ex. 7

[Vandenburg Dep. 22:20-22; 23:1-7]. Moreover, Plaintiff did not have any experience with the new LIS Quest was going to install. S.J. Ex. 2 [Pollard Dep. 106:20-22; 107:9-12; 131:3-22;132:1-15]; S.J. Ex. 11 [Pollard Resume, Pollard Dep. Ex. 6]. Both Mr. Vandenburg and Mr. Leap concluded that Plaintiff's LIS experience was simply comparable to a user and thus she did not have the requisite experience to manage the new LIS upgrade and train users. S.J. Ex. 6 [Leap Dep. 45:11-21; 46:1]; S.J. Ex. 7 [Vandenburg Dep. 39: 20-22; 40: 1-2; 3-8].

Although both Ms. Kopley and Mr. Townsend were qualified for the position, Mr. Leap felt that Ms. Kopley was the better candidate based on her experience and knowledge. S.J. Ex. 1 [Knap Dec. at ¶11]; S.J. Ex. 6 [Leap Dep. 38: 14-17; 39:1-2]; S.J. Ex. 7 [Vandenburg Dep. 36:17-22; 38:7-9]. Thus, Quest offered Ms. Kopley the position, but she declined. S.J. Ex. 1 [Knapp Dec. at ¶ 12]; S.J. Ex. 6 [Leap Dep. 39: 3-4]; S.J. Ex. 7 [Vandenburg Dep. 36:21-22; 37: 2-4]. Because Mr. Townsend was the second most qualified candidate, Quest subsequently offered him the position. S.J. Ex. 1 [Knapp Dec. at ¶ 12]; S.J. Ex. 6 [Leap Dep. 34: 9-12; 39:21-22; 40:1-3]; S.J. Ex. 7 [Vandenburg Dep. 37:9-13; 38:10-12; 56:5-9]. Indeed, Mr. Townsend had the following experience: (1) a Masters Degree in Business Administration; (2) twenty years of laboratory experience; (3) he helped to bring new LIS system on line at Holy Cross; (4) one year of experience with LIS interfacing; (5) eight years maintaining quality control program; (6) nine years training experience; and (7) good communication and interpersonal skills. S.J. Ex. 6 [Leap Dep. 41:15-22; 42:1-14]; S.J. Ex. 7 [Vandenburg Dep. 36:11-14]; S.J Ex. 10 [Townsend Resume, Leap Dep Ex. 2].

Mr. Townsend accepted the offer and thereafter held the Project Manager position. S.J. Ex. 1 [Knapp Dec. at ¶ 13]. Mr. Townsend, however, is no longer employed by Quest. On or about March 30, 2007, he voluntarily resigned to pursue other career opportunities. S.J. Ex. 1

[Knapp Dec. at ¶ 13]; S.J. Ex. 7 [Vandenburg Dep. 42:6-8].   Currently, Audrey Chambers-Robinson, an African-American female holds the Project Manager position. Ms. Chambers-Robinson was hired on or about December 3, 2007 by Mr. Leap and Robert Levy, Mr. Vandenburg's successor. S.J. Ex. 1 [Knapp Dec. at ¶15].

On November 29, 2005, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging race discrimination with respect to Quest's decision not to promote her to the IT Project Manager position.  S.J. Ex. 2 [Pollard Dep. 108:9-19; 125:16-21]; S.J. Ex. 12 [Amended Complaint at ¶7].

### E.        Plaintiff's 2005 Performance  Evaluation

Quest evaluates its employees annually.   S.J. Ex. 1 [Knapp Dec. at ¶ 17]. Generally, employees are provided written performance reviews which rate their performance in various categories.  S.J. Ex. 1 [Knapp Dec. at ¶  17].  Employees are also provided a numerical score which corresponds to a specific overall performance rating category: Outstanding (1.00 to 1.33); Excellent (1.34 to 2.33); Achieves Expectations (2.34 to 3.25), and Development Needed (3.26 to 4.00). S.J. Ex. 1 [Knapp Dec. at ¶ 17].   Ordinarily, an employee's immediate supervisor performs her evaluation. S.J. Ex. 5 [Knapp Dep. 33: 4-5].

For the 2004 evaluation period, David Meeder, Mr. Vandenburg's predecessor, evaluated Plaintiff because Ms. Aglipay, Plaintiff's then immediate supervisor, was on medical leave.  S.J. Ex. 13 [Aglipay Deposition "Dep.".  43:3-5, 22; 44:1-2, 16-22].  Mr. Meeder gave Plaintiff an overall "Excellent" rating. S.J. Ex. 2 [Pollard Dep. 137:3-12, 18-20; 140:10-15]; S. J. Ex. 14 [Pollard 2004 Annual Performance Development and Review, Pollard Dep. Ex. 15].

Ms. Aglipay prepared Plaintiff's 2005 performance evaluation. S.J. Ex. 13 [Aglipay Dep. 42:18-22; 44:10-11; 45:9-11].  Based upon her overall performance, Ms. Aglipay gave Plaintiff

an overall "Achieves Expectations" rating.  S.J. Ex. 2 [Pollard Dep. 146:21-22; 147:1-7; 154:9-13]; S.J. Ex. 15 [Pollard 2005 Annual Performance Development and Review, Pollard Dep. Ex. 16].

In assessing Plaintiff's performance, Ms. Aglipay considered the following: several complaints regarding Plaintiff's attitude towards nurses, doctors and co-workers, and failure to meet time pressures of the job. S.J. Ex. 13 [Aglipay Dep. 33:7-22; 34:1-13; 34:20-22; 35:1-9; 36:21-22; 37:1-22; 38:1-22; 39:1-7] .    After Plaintiff voiced concerns over her evaluation, Ms. Aglipay improved Plaintiff's rating by .25 points. S.J. Ex. 2 [Pollard Dep. 148: 17-19; 152:19-22; 153: 1-2, 21-22; 154:1-8, 14-22;155:1, 17-21]; S.J.    Ex.    15 [Pollard 2005 Annual Performance Development and Review, Pollard Dep. Ex. 16].    Ms. Aglipay was unaware of Plaintiff's EEOC charge during the evaluation period.    S.J. Ex. 2 [Pollard Dep. 129:16-18; 157:13-17]; S.J. Ex. 13 [Aglipay Dep.  59:3-8].

On February 28, 2006, Plaintiff amended her EEOC charge to include an allegation of retaliation.  S.J. Ex. 12 [Amended Complaint at Ct. 2].  Plaintiff based this allegation upon the differences between her 2004 and 2005 performance evaluations.  On  February 28, 2007, the EEOC issued Plaintiff a Dismissal and Notice of Rights in which it made the following determination: "Based upon its investigation, EEOC is unable to conclude that the information obtained establishes violations of the statute".  S.J. Ex. 2 [Pollard Dep. 163:2-22]; S.J. Ex.  16 [EEOC Dismissal and Notice of Rights, Pollard Dep. Ex. 18].

### F.    The Amended Complaint

Count I of the Amended Complaint charges Quest with race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. §1981 ("Section 1981"). In Count II, Plaintiff alleges that Quest unlawfully retaliated against her under the same statutes.

As will be discussed in detail below, there are no genuine issues of material fact and Defendant is entitled to summary judgment on both counts of the Amended Complaint. Accordingly, Defendant respectfully requests that the Court grant Defendant's Motion for Summary Judgment.

## III.    ARGUMENT

### A.    Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) mandates entry of an order granting summary judgment when there are no material facts at issue and when it is clear that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Summary judgment is not viewed "as a disfavored procedural shortcut, but rather as an integral part of the . . . [court's] Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citation omitted).

When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Issues of material fact are "genuine" only if they might affect the outcome of the lawsuit under governing law and require resolution by a trier of fact. Indeed, a dispute about a material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 247-48.

The nonmoving party cannot simply rely on the allegations of its pleadings when faced with a summary judgment challenge. Instead, the party opposing summary judgment must produce "specific facts showing that there is a genuine issue for trial . . . ." *Celotex*, 477 U.S. at 324, "the mere existence of a scintilla of evidence" or of unsubstantiated conclusory allegations is insufficient to withstand a motion for summary judgment. *Anderson*, 477 U.S. at 252; *Greene*

*v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gra*y, 9 F.3d 150, 154 (D.C. Cir.1993).

If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

As will be discussed in detail below, under this standard, there are no genuine issues of material fact, and Defendant's Motion should be granted.

> **B.      Quest is Entitled to Summary Judgment with Respect to Plaintiff's Discrimination Claims**

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment based upon an individual's race. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993); 42 U.S.C. §2000e-2. Section 1981 prohibits racial discrimination in the "making, performance, modification and termination of contracts and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship."   42 U.S.C. §1981 (b).  Discriminatory refusal to promote claims are actionable under Section 1981.  *See Saunders v. George Washington Univ.*, 768 F. Supp. 854, 863 (D.D.C. 1991).

Title VII and Section 1981 claims are similarly analyzed. *See Carney v. Am. Univ.*, 151 F.3d 1090, 1092-93 (D.C. Cir. 1998).  Thus, with respect to both of her claims, Plaintiff bears the burden of establishing that she was intentionally discriminated against "because of her race". *See Mbulu v. Bureau of Nat'l Affairs, Inc*., No Civ. A. 04-1540 (JDB), 2006 WL 469971, at *6 (D.D.C. Feb. 28, 2006) ("Title VII, after all, does not prohibit all adverse employment actions against members of protected classes, it only prohibits adverse actions in which the employee's protected status played some role in the challenged action.").

Plaintiff can carry this burden only by presenting direct or indirect evidence of discrimination. *See Carter v. Pena*, 14 F. Supp. 2d 1, 5 ( D.D.C. 1997). It is well-settled that direct evidence of discrimination is extremely rare. *Ferrell v. Masland Carpets, Inc*., 97 F. Supp. 2d 1114, 1123 (S.D. Ala. 2000). Direct evidence is "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate". *Id*. (quoting *Clark v. Coats & Clark, Inc*., 990 F.2d 1217, 1223 (11th Cir. 1993)).

The undisputed evidence in this case is clear that the record is void of any comments or remarks which would constitute direct evidence of discrimination.  In fact, Plaintiff explicitly testified that she was unaware of any discriminatory comments or remarks made by either Mr. Vandenburg or Mr. Leap--the decision-makers.  S.J. Ex. 2 [Pollard Dep. 63:15-21; 64:1-11].

Accordingly, Plaintiff's claims must be analyzed under the *McDonnell-Douglas* framework.

### 1.     The McDonnell Douglas Framework

Because Plaintiff cannot present any direct evidence of discrimination, she must first establish a prima facie case to survive Defendant's Motion.  To establish a prima facie of discrimination, Plaintiff must prove that "(1) [s]he is a member of a protected class; (2) [s]he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *See Mbulu*, 2006 WL 469971, at \*3.

If Plaintiff establishes a prima facie case, the burden then shifts to the Defendant to produce evidence that it denied her the position for a legitimate, non-discriminatory reason. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). Once done, the prima facie case is rebutted and the burden shifts to the Plaintiff to prove that Defendant's stated justification is a pretext for discrimination. *Id*. at 507-08. The undisputed evidence in this case makes it clear that

14

(1) Plaintiff cannot establish a prima facie case of discrimination; and (2) Quest rejected Plaintiff for the position for a legitimate, non-discriminatory reason. Thus, as a matter of law, Plaintiff's discrimination claim must fail and Quest is entitled to judgment in its favor.

Plaintiff cannot prove a fundamental element of her prima facie case, namely that she was rejected for the position "under circumstances that give rise to a reasonable inference of discrimination". As a preliminary matter, Plaintiff admitted that there is no evidence that either Mr. Vandenburg or Mr. Leap knew her race. S.J. Ex. 2 [Pollard Dep. 86:5-10, 15-17, 21-22; 87:1-2; 160:16-18]. Because Plaintiff and Mr. Vandenburg worked on different shifts and had difficulty scheduling an interview, Mr. Vandenburg interviewed Plaintiff by phone. S.J. Ex. 2 [Pollard Dep. 80:6-8; 82:18-19; 83:2-5, 9-22; 84:1-8]. Before this telephone interview, Plaintiff stated that she had only greeted Mr. Vandenburg in passing and that they were never introduced. S.J. Ex. 2 [Pollard Dep. 61:3-12]. In fact, Plaintiff acknowledged that there is no evidence that Mr. Vandenburg even knew her name. S.J. Ex. 2 [Pollard Dep.61:17-21]. Plaintiff specifically noted that she had never met Mr. Leap. S.J. Ex. 2 [Pollard Dep. 63:22; 64:1-4]. Additionally, there is no evidence that Mr. Leap--who declined to interview Plaintiff because he considered her unqualified--knew the race of any candidate. S.J. Ex. 2 [Pollard Dep. 159:14-22;160:1,9-22]. Mr. Leap conducted both Ms. Kopley and Mr. Townsend's interviews by telephone. S.J. Ex. 6 [Leap Dep. 16:9-17; 19:2-8]. Having never personally met any of the candidates, Mr. Leap made his hiring recommendations solely upon the candidates' resumes. S.J. Ex. 6 [Leap Dep.20:19-22; 21:1; 34:9-21].

Clearly, race could not have been a factor in the selection process for the Project Manager position. Even assuming that Mr. Vandenburg knew Plaintiff's race--which he did not--he nevertheless selected Plaintiff for an interview and determined that she met Quest's minimal

"predetermined criteria" for the position.  Thus, the fact that Mr. Vandenburg knew the races of both Ms. Kopley and Mr. Townsend is immaterial.  It was Mr. Leap, lacking any knowledge regarding the candidates' races, who ultimately determined that Ms. Kopley and Mr. Townsend were more qualified for the position.  Therefore, no inference of discrimination may arise and Quest is entitled to summary judgment.

Even assuming that either Mr. Leap or Mr. Vandenburg knew Plaintiff's race during the selection process--which they did not--her claim fares no better.  An inference of discrimination may arise where another candidate---outside of Plaintiff's protected class--with similar qualifications received the position.  *See Mbulu*, 2006 WL 469971, at *6 (citing *Taylor v. Small*, 350 F.3d 1286, 1294 (D.C. Cir. 2003).  The record is clear--Plaintiff lacked the requisite technical experience possessed by the two successful candidates--Ms. Kopley and Mr. Townsend.  Accordingly, Ms. Kopley and Mr. Townsend's qualifications were superior, not similar, to Plaintiff's.

Quest concedes that Plaintiff met the minimum qualifications for the position-- educational background, general laboratory and LIS knowledge requirements. S.J. Ex. 7 [Vandenburg Dep. 21:3-4; 36:11-14]; S.J Ex. 8 [Project Manager Position Description, Plaintiff Dep. Ex  9]; S.J. Ex. 11 [Pollard Resume, Plaintiff Dep. Ex. 6].   Plaintiff, however, lacked the significant technical experience with the LIS as preferred by both Mr. Vandenburg and Mr. Leap.   Specifically, as a Medical Technologist, Plaintiff simply used the LIS. S.J. Ex. 7 [Vandenburg Dep. 39:20-22; 40:1-8]; S.J. Ex. 6 [Leap Dep. 45:13-21; 46:1].  However, because the new Project Manager's primary responsibility was to coordinate and maintain a new LIS, both Mr. Vandenburg and Mr. Leap determined that the strongest candidate would possess significant technical experience with the LIS.   Specifically, the candidate would have experience

in LIS/laboratory instrument interfaces, LIS test file development, and LIS report maintenance and generation and training LIS users--all which is beyond the experience of a mere user. S.J. Ex. 7 [Vandenburg Dep. 23:2-7; 36:12-15]; S.J. Ex. 6 [Leap Dep. 24:8-12, 20-21; 41:5-22; 42:1-14; 44:8-14; 45:1-21; 46:1];S.J. Ex. 8 [Project Manager Job Description].

Unlike Plaintiff, Ms. Kopley and Mr. Townsend had such experience. For instance, Ms. Kopley had significant LIS experience from her previous position as an Automated Laboratory Services Manager at Holy Cross Hospital. S.J. Ex. 7 [Vandenburg Dep. 36:17-20]. At Holy Cross, Ms. Kopley helped implement the new LIS, built new test files into the system and trained users. S.J. Ex. 2 [Pollard Dep. 104:6-9; 105:1-4]; S.J. Ex. 9 [Kopley Resume, Pollard Dep. Ex. 11].

Mr. Townsend was involved in the same project at Holy Cross. He developed interfaces between the laboratory instruments and the LIS, built the respiratory and clinic care components for Soft Lab, and trained users. S.J. Ex. 6 [Leap Dep. 34:22; 35:1-5; 41:15-22; 42: 1-14]; S.J. Ex. 10 [Townsend Resume, Leap Dep. Ex. 2].

Plaintiff, however, suggests that she also possessed advanced LIS experience. Plaintiff's argument, however, is wholly disingenuous. In support, Plaintiff references alleged experience not included on her resume. If Plaintiff indeed had experience in "assisting in implementing LIS upgrade and training staff in LIS system," she should have included this experience on her resume. S.J. Ex. 2 [Pollard Dep. 106:13-22; 107: 1-18]; S.J. Ex. 11 [Pollard Resume, Pollard Dep. Ex. 7].[2] Indeed, both Ms. Kopley and Mr. Townsend included all relevant experience on their resumes. Plaintiff, not Quest, should bear responsibility for this omission. Certainly, Quest cannot be held liable when it was unaware of Plaintiff's alleged experience.

---

[2] Plaintiff also allegedly omitted other relevant LIS experience on her resume. Confusingly, she explained that she omitted this information because of her desire to keep her resume at two pages. However, she admitted that Quest did not impose any page limit with respect to resumes. S.J. Ex. 2 [Pollard Dep. 34:3-18].

Nevertheless, even assuming Plaintiff possessed such LIS experience, her claim still fails. Unlike both Ms. Kopley and Mr. Townsend, it is undisputed that Plaintiff lacked experience with the LIS upgrade that Quest was going to install. S.J. Ex. 2 [Pollard Dep. 106:20-22; 107:9-12; 131:3-22; 132:1-15]; S.J. Ex. 11 [Pollard Resume, Pollard Dep. Ex. 6]. In fact, Plaintiff admitted that Ms. Kopley's prior experience with the new LIS upgrade rendered her far more qualified for the Project Manager position and indicated that Quest's offer to Ms. Kopley was not discriminatory. S.J. Ex. 2 [Pollard Dep. 102:22;103:1-15; 104:19-22; 105:1-4]. Plaintiff also admitted that Mr. Townsend's stated qualifications rendered him more qualified. S.J. Ex. 2 [Pollard Dep. 118:7-18; 20-21; 119:1]. Indeed, Mr. Townsend had the following experience: (1) a Masters degree in Business Administration; (2) twenty years of laboratory experience; (3) helped to bring new LIS system on line at Holy Cross; (4) one year of experience with LIS interfacing; (5) eight years maintaining quality control program; (6) nine years training experience; and (7) good communication and interpersonal skills. S.J Ex. 10 [Townsend Resume, Leap Dep Ex. 2]; S.J. Ex. 7 [Vandenburg Dep. 36:11-14]; S.J. Ex. 6 [Leap Dep. 41:15-22; 42:1-14] .

In comparison, Plaintiff had only eight years of laboratory experience, LIS user experience and good communication and interpersonal skills. S.J. Ex. 11 [Pollard Resume, Pollard Dep. Ex. 6]; S.J. Ex. 7 [Vandenburg Dep. 36:11-14; 39:20-2; 40:1-8].

However, Plaintiff contends that Mr. Townsend misrepresented his qualifications and therefore unlike Ms. Kopley, Mr. Townsend's qualifications were not superior. Specifically, Plaintiff contends that Mr. Townsend was not involved in the new LIS upgrade at Holy Cross. S.J. Ex. 2 [Pollard Dep. 113: 15-22; 114:1-4]. Plaintiff's argument lacks merit for several reasons. First, Plaintiff has never met Mr. Townsend and therefore she lacks any personal

knowledge regarding his qualifications and experience.  Instead, she solely relies upon information she allegedly received from another employee, Mr. Tsehay, who also purportedly worked at Holy Cross.  S.J. Ex. 2 [Pollard Dep. 115:9-14]. Plaintiff, however, admitted that she cannot confirm whether Mr. Tsehay in fact had any knowledge of Mr. Townsend's role at Holy Cross.  S.J. Ex. 2 [Pollard Dep. 117:7-18].

Second, the record suggests that Mr. Townsend did in fact possess the LIS experience stated on his resume. After his employment ended with Holy Cross, Mr. Townsend sent a letter to Fernando Fleites, Holy Cross' Senior Vice President of Human Resources, describing his dissatisfaction with not receiving paid time off for his work associated with the new LIS. S.J. Ex. 17 [Stevens Declaration ("Dec.") at ¶ 7]; S.J. Ex. 18 [Townsend Letter].  Specifically, Mr. Townsend indicated that "During this past year I continued to perform to the best of my ability overseeing the Point of Care Testing Program and also working on the new laboratory information system, which included 'building the Point of Care and Respiratory menus and interfacing all of the laboratory instruments.'" S.J. Ex. 18 [Townsend Letter].  Mr. Townsend's letter clearly corroborates the information contained on his resume.  Any suggestion that Mr. Townsend would misrepresent his experience to his own employer would be patently absurd.

Third, after Mr. Townsend was hired, Mr. Vanderburg observed his performance and believed that his LIS knowledge "far exceeded that of  a user".  S.J. Ex. 7 [Vandenburg Dep. 42:2-5].

Clearly, Mr. Townsend's experience was superior, not similar, to Plaintiff's experience. Accordingly, Plaintiff cannot establish a prima face case and Quest is entitled to summary judgment.

**(i)**     **Quest Rejected Plaintiff for Legitimate, Non-Discriminatory Reasons**

Even assuming, arguendo, that Plaintiff could establish a prima facie case--which clearly she cannot do--her claim still fails because Quest decided not to promote her for legitimate, non-discriminatory reasons.

It is well-settled that an employer's decision not to hire an individual based upon inferior qualifications is a legitimate, non discriminatory reason. *Fudd v. Sec'y of the Treasury*, 690 F. Supp. 1, 4 (D.D.C. 1986) (comparative lack of qualifications is a legitimate, nondiscriminatory reason for an employment action). The undisputed evidence reveals that Mr. Vanderburg and Mr. Leap chose Mr. Townsend solely because they believed he possessed the requisite technical background which Plaintiff lacked.  In fact, had Mr. Townsend rejected the position, Quest would have reposted it, because Mr. Townsend and Ms. Kopley were the only candidates with relevant LIS experience.  S.J. Ex. 7 [Vandenburg Dep. 38:8-22].

As the decision-makers, Mr. Vanderburg and Mr. Leap had the sole discretion to determine what qualifications and experience was more valuable. *See Stewart v. Ashcroft,* 352 F.3d 422, 429 (D.C. Cir. 2003) (deferring to Government's decision of what nondiscriminatory qualities it sought in filling a position).    Plaintiff's belief that her general knowledge regarding the LIS and familiarity with Quest made her more qualified, S.J. Ex. 2 [Pollard Dep. 108:12-17], is therefore immaterial.  *See Waterhouse v. Dist. of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000)("It is the perception of the decisionmaker, which is relevant", not Plaintiff's own evaluation of her qualifications.).  Plaintiff simply cannot adduce any evidence that she possessed the requisite technical experience rendering her more qualified than--or just as qualified as--Mr. Townsend and therefore her claim fails. *See Lathram v. Snow*, 336 F.3d 1085 ,

20

1094 (D.C. Cir. 2003) (denying summary judgment where employee adduced evidence that she was more qualified).

In a desperate attempt to salvage her claim, Plaintiff challenges Quest's decision to hire Mr. Townsend based solely upon allegedly false information contained in his resume. Plaintiff essentially contends that absent such false information, Mr. Townsend was less qualified. Again, Plaintiff lacks any credible evidence to dispute Mr. Townsend's qualifications.[3] Moreover, even assuming that Mr. Townsend's resume contained false information, Plaintiff has not--nor could she ever--present any evidence that Quest knew that the information was false. Indeed, Plaintiff specifically testified that there is no evidence that Quest knew that Mr. Townsend's resume allegedly contained false information. S.J. Ex. 2 [Pollard Dep. 117:19-22; 118:1-6]. Nor has Plaintiff adduced any evidence that Quest purposefully failed to verify Mr. Townsend's qualifications or deviated from its standard reference check procedure to hire Mr. Townsend.

In fact, while Quest performs background checks on candidates, it is virtually impossible to verify all aspects of a candidate's resume. S.J. Ex. 5 [Knapp Dep. 48:12-13]. It is, therefore, Quest's practice to assume that a candidate's resume is accurate and then proceed to verify previous employment. S.J. Ex. 5 [Knapp Dep. 48: 16-20].

Accordingly, Quest hired Mr. Townsend based upon its good faith belief that his resume accurately reflected his experience, S.J. Ex. 1 [Knapp Dec. at ¶ 14], and thus should not be held liable even if Mr. Townsend misrepresented himself. *See Horvath v. Thompson*, 329 F. Supp. 2d 1, 6 n.3 (D.D.C. 2004) (noting that employee's attempt to "cast aspersions" on chosen candidate's true qualifications and experience cannot discredit employer's good faith belief in

---

[3] Plaintiff also alleges that Mr. Townsend was not currently enrolled in a Master's of Science Information Systems program as stated on his resume. S.J. Ex. 2 [Pollard Dep. 113:15-21]. However, because Plaintiff conceded that such a degree was neither held by Ms. Kopley nor a requirement for the position, whether Mr. Townsend was enrolled in this degree program is immaterial. S.J. Ex. 2 [Pollard Dep. 114:22; 115:1-3].

candidate's qualifications"). Indeed, Plaintiff conceded that if Mr. Townsend's resume accurately reflected his qualifications, he would have been more qualified. Ex. 2 [Pollard Dep. 118:7-18; 20-21; 119:1].

However, Quest does not even have to establish that Mr. Townsend's qualifications were superior to Plaintiff's--which they were--but simply that its reason for hiring him was nondiscriminatory. *See Davis v. State Univ. of N.Y.,* 802 F.2d 638, 641 (2d Cir. 1986)(the defendant need not prove that the person who was promoted possessed superior objective qualifications, or that the defendant's choice was wisest, but only that the reasons for the decision were nondiscriminatory). Plaintiff cannot adduce any evidence--because none exists--that Quest rejected her because she is an African-American. The record clearly establishes that neither Mr. Vanderburg nor Mr. Leap knew Plaintiff's race during the hiring process. S.J. Ex. 2 [Pollard Dep. 86:5-10, 15-17, 21-22; 87:1-2; 160:16-18]. Moreover, Mr. Leap, who ultimately decided that Mr. Townsend was more qualified than Plaintiff, knew neither Plaintiff's nor Mr. Townsend's race. S.J. Ex. 2 [Pollard Dep. 159:14-22;160:1,9-22].

As Plaintiff was rejected for the Project Manager position solely because she was not the most qualified-a legitimate, non-discriminatory reason, Quest is entitled to summary judgment.

**(ii)    Quest's Rejection of Plaintiff for Project Manager Position is Not a Pretext for Discrimination**

Plaintiff can point to nothing suggesting that Quest's decision not to promote her was a pretext for discrimination.

Absent any reliable evidence to support her position, Plaintiff contends that Quest has a discriminatory animus against African-Americans. Thus, she claims that she did not receive the Project Manager position because of her race. In doing so, Plaintiff utterly ignores the undisputed evidence that she was simply not as qualified for the position. Despite Mr. Townsend's strong LIS experience and laboratory background, Plaintiff believes that if Mr. Townsend were African-American, he probably would not have received the position. S.J. Ex. 2 [Pollard Dep. 158: 22; 159: 1-8]. Plaintiff, however, admitted that she lacked any basis for her opinion. S.J. Ex. 2 [Pollard Dep. 158: 17-21; 159:10-13].

The law is clear--Plaintiff cannot survive summary judgment based upon her unsupported opinion and speculation. *See Childers v. Slater,* 44 F. Supp. 2d 8, 22 (D.D.C. 1999), *vacated in part on other grounds,* 197 F.R.D. 185 (D.D.C. 2000) *(citing Batson v. Powell,* 912 F. Supp. 565, 573 (D.D.C. 1996) (finding that Plaintiff's lone conclusory assertion does not suffice to establish pretext). In fact, Plaintiff's unsupported assertion is utterly belied by the record.

As a preliminary matter, Quest hired Plaintiff in 2002--only three years before she was rejected for the position at issue. If race was not a factor in her hiring, it certainly would not have been a decision to deny her a promotion in 2005. Even assuming that Mr. Vanderburg knew Plaintiff's race during the interview process--which he did not--the fact that he made a persistent effort to schedule her interview and subsequently forwarded her resume to Mr. Leap clearly suggests that her race was irrelevant. Additionally, during his tenure, Mr. Vanderburg promoted

two minority females, one of whom is an African-American.  S.J. Ex. 1 [Knapp Dec. at ¶ 16].  It is also noteworthy that an African-American female currently holds the position as Project Manager.  S.J. Ex. 1 [Knapp Dec. at ¶ 15].

Furthermore, Quest's commitment to equal employment opportunity is evidenced by its comprehensive anti-discrimination policy and mandatory, annual EEO trainings.  S.J. Ex. 1 [Knapp. Dec. at ¶ 5].  Messrs. Vandenburg and Leap each attended these training sessions.  S.J. Ex. 6 [Leap Dep. 12:21-22; 13:1-5]; S.J. Ex. 7 [Vandenburg Dep. 12:10-17 ].  Quest also has a very diverse workforce.   Currently, 70.24% of Quest's employees at  Providence are African-American. S.J. Ex. 1 [Knapp Dec. at ¶ 6].   At the time that Plaintiff's employment with Quest was terminated, 65.06% of Quest's employees at Providence were African-American. S.J. Ex. 1 [Knapp Dec. at ¶ 6].  Currently, 100% of Quest's managerial staff in Providence is African-American.  S.J. Ex. 1 [Knapp Dec. at ¶ 6].  At the time of Plaintiff's termination, 50% of the managerial staff was African-American. S.J. Ex. 1 [Knapp Dec. at ¶ 6].

Plaintiff undoubtedly will argue that both Quest's failure to repost the position and afford her preferential treatment as an internal candidate establishes pretext.  Plaintiff explicitly stated that as  an "in-house employee" she was treated unfairly. S.J. Ex.  2 [Pollard Dep. 108:9-19].  She further alleges that she did not have a fair opportunity because "there may have been a possibility that Mr. Townsend would not have reapplied and [she] would have had the opportunity to have the position". S.J. Ex. 2 [Pollard Dep. 108:22; 109:1-4].  Plaintiff's reliance upon the notion of "fairness" is wholly misplaced.  Employment discrimination laws do not require fairness in employment decisions.  Rather, employment laws only prohibit discriminatory employment practices.  *See Ulloa v. Am. Express Travel Related Servs., Co., Inc*, 822 F. Supp. 1566, 1571 (S.D. Fla. 1993).

Plaintiff cannot adduce any evidence that Quest's failure to repost the position or show her preferential treatment was discriminatory. Unsurprisingly, Quest does not have a policy of reposting positions after a top-ranked candidate declines when there is a second ranked candidate. S.J. Ex. 1[Knapp Dec. at ¶ 12]. Moreover, even if Quest had reposted the position after Ms. Kopley declined, Plaintiff still would have been rejected. S.J. Ex. 7 [Vandenburg Dep. 38:18-22]. The evidence is clear--Plaintiff lacked the requisite technical experience for the Project Manager position.

Quest's rejection of Plaintiff even though it has a policy in which it prefers internal candidates does not constitute discrimination. S.J. Ex. 5 [Knapp Dep. 47:12-16]. *See Obi v. Anne Arundel County*, 142 F. Supp. 2d 655, 688 (D. Md. 2001) (citing *Vaughan v. Metrahealth Cos., Inc.*, 145 F.3d 197, 203 (4th Cir. 1998), ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent ....Federal courts cannot ensure that business decisions are always informed or even methodical."). While Quest may prefer to hire internally, it logically reserves the right to select the most qualified candidate. Certainly, neither Title VII nor Section 1981 requires Quest to select a less qualified applicant simply because she was an internal candidate. Thus, Plaintiff cannot establish pretext.

In essence, Plaintiff is asking this Court to reexamine Quest's selection process. This the Court cannot do. The Court is not a super personnel department that reexamines an entity's business decisions. *Gustave-Schmidt v. Cha*o, 360 F. Supp. 2d 105, 115 (D.D.C. 2004).

A recent decision by the D.C. Circuit is instructive on this case. In *Brady v. Office of the Sergeant of Arms,* No. 06-5362, 2008 WL 819989, at *3 (D.C. Cir. Mar. 28, 2008), the Court stated as follows:

> In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not- *and should not*-decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas.* Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Id.* at *3 (citations omitted).

Quest respectfully submits that after reviewing the record as a whole, the Court will find that Plaintiff simply has failed to produced enough evidence for a reasonable jury to conclude that Quest discriminated against her based on race. For this reason, Quest's Motion should be granted.

## 2.    Plaintiff's Title VII and Section 1981 Retaliation Claims

Plaintiff alleges that Quest gave her an inferior performance evaluation in retaliation for filing her discrimination charge. Plaintiff, however, is just wrong.

Retaliation claims also are analyzed under the *McDonnell Douglas* framework. *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (applying the *McDonnell Douglas* framework to a Title VII retaliation claim). Thus, to survive summary judgment, Plaintiff must establish that: (1) she engaged in protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal connection existed between the two. *See Wiley v. Glassman,* 511 F.3d 151, 155 (D.C. Cir. 2007) (*citing Brown v. Brody,* 199 F.3d 446, 452 (D.C. Cir. 1999) and *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2414-15 (2006) (finding that Title VII's anti-retaliation provision prohibits all materially adverse actions, not merely those harms that are specifically employment-related)).

Quest must then prove that it took the adverse action for a legitimate, non-discriminatory reason. *Holbrook v. Reno,* 196 F.3d 255, 263 (D.C. Cir. 1999*)*.   The ultimate burden rests with Plaintiff to show that Quest's proffered explanation is pretextual.  *See id.*

(i)     **Plaintiff Cannot Establish a Prima Facie Case**

Because Plaintiff cannot establish a prima facie case, her retaliation claim fails as well. Plaintiff cannot adduce any evidence that Quest took any adverse action against her. Instead, Plaintiff rests her retaliation claim solely upon the assertion that she received an "Achieves Expectations" performance rating in 2005, but an "Excellent" rating in 2004.  S.J. Ex. 2 [Pollard Dep. 137:3-12; 138:17-20; 146:21-22; 147:1-7; 154:9-13; 20-22; 155:1-2; 156:19-22]; S. J. Ex. 14 [Pollard 2004 Annual Performance Development and Review, Pollard Dep. Ex. 15]; S.J. Ex. 15 [Pollard 2005 Annual Performance Development and Review, Pollard Dep. Ex. 16]. However, a performance evaluation may constitute a "material adverse action" if it is either negative or causes an employee to suffer a tangible harm.  *See Weber v. Battista*, 494 F.3d 179, 184-85 (D.C. Cir. 2007) (finding that performance evaluation constituted adverse action where evaluation caused employee to lose performance award); *Vance v. Chao,* 496 F. Supp. 2d 182, 185 (D.D.C. 2007) ("a negative evaluation may constitute an adverse action"); *Richardson v. Gutierrez,* 477 F. Supp. 2d 22, 29 (D.D.C.2007) ("[A] jury could find an adverse action based on plaintiff's unfavorable mid-term evaluation."); *Howard v. Gutierrez,* 237 F.R.D. 310, 313 (D.D.C. 2006) ("The defendant [sic] has alleged numerous retaliatory actions taken against her in the workplace, including receiving a poor evaluation...."). Plaintiff's 2005 evaluation, however, does not arise to this level.

Although Plaintiff understandably would have preferred a higher performance evaluation, the fact remains that her 2005 evaluation was wholly satisfactory.  S.J. Ex. 1 [Knapp Dec. at  ¶

18].  Similarly, Plaintiff simply has not adduced any evidence that she has suffered any tangible harm. Plaintiff does not claim--nor could she do so--that an "Achieves Expectations" rating rendered her ineligible for advancement opportunities, bonuses or salary increases.  *See Weber,* 494 F.3d at 184; *Vance,* 496 F. Supp. 2d at 185-86 (performance evaluation may constitute adverse employment action if resulting in employee's denial of bonus and resulted in placement on performance improvement plan).

In 2004, Plaintiff received a 4% merit increase.  S.J. Ex. 14 [Pollard 2004 Annual Performance Development and Review, Pollard Dep. Ex. 15].  And, in 2005, Pollard received a 3% merit increase.   S.J. Ex. 1 [Knapp Dec. at ¶ 18].  Because Plaintiff's 2005 merit increase was only slightly lower than her four percent increase in 2004, Plaintiff's harm, if any, was *de minimis*.  *Burlington*, 126 S.Ct. at 2415 ("actionable retaliation" claims are limited to those where an employer causes "material adversity", not "trivial harm.")

Plaintiff unsurprisingly could not even recall whether her 2005 merit increase was lower than in 2004. S.J. Ex. 2 [Pollard Dep. 161:1-18].  Thus, such an insignificant decrease in Plaintiff's merit raise--which she could not even recall-- was not "harmful to the point that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination" and thus was not retaliatory.  *Id.*

Moreover, as Plaintiff worked on a PRN basis, she consistently worked only a few hours per week.  Thus, whether Plaintiff's salary increased by three percent rather than four percent would have even more of an insignificant impact upon the "terms and conditions" of her employment.  Absent any evidence that she suffered any tangible harm, Plaintiff's claim is solely based upon her dissatisfaction with her evaluation. This, however, is wholly insufficient. *See Brodetski v. Duffey,* 141 F. Supp. 2d 35, 44 (D.D.C. 2001)  ("Courts cannot be wheeled into

action for every workplace slight, even one that was possibly based on protected conduct.")
(quoting *Taylor v. Fed. Deposit Ins. Corp.*, 132 F.3d 753, 765 (D.C. Cir. 1997)); *See also Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action").

Additionally, Plaintiff cannot adduce  any evidence establishing a causal connection between her discrimination charge and her allegedly inferior performance evaluation.  Plaintiff simply alleges that it was "workplace knowledge that she had filed an EEOC complaint".  S.J. Ex. 2 [Pollard Dep. 125:20-21].  This, however, does not meet her burden.  Rather, Plaintiff must establish that those involved with her evaluation knew about her discrimination charge.  *See Henderson v. Rice*, 407 F. Supp. 2d 47, 52 (D.D.C. 2005) ("Causal connection requires that the responsible officials knew of the protected activity and that the adverse action occurred 'shortly after' the protected activity") (citing *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir.1985)). While Mr. Vandenburg  was aware of Plaintiff's charge, he was not involved in her 2005 evaluation.  S.J. Ex  2 [Pollard Dep. 149: 1-9]; S.J. Ex. 7 [Vandenburg Dep. 71:20-22].  It is undisputed that Ms. Aglipay, Plaintiff's supervisor, prepared Plaintiff's 2005 evaluation and lacked any knowledge about her charge.  S.J. Ex. 2 [Pollard Dep. 129:16-18; 157:13-18]; S.J. Ex. 13 [Aglipay Dep. 42: 18-22; 44:10-11; 59:3-8]; S.J. Ex. 7 [Vandenburg Dep. 71:16-19]. Moreover, there is simply no evidence that anyone working in the Providence laboratory--with the exception of Mr. Vandenburg--was aware of Plaintiff's discrimination claim.[4]  S.J. Ex. 2 [Pollard Dep.  130:1-9].

Thus, Plaintiff's retaliation claims fail.  As Plaintiff cannot establish a prima facie case of retaliation, Quest is entitled to summary judgment.

---

[4] Although Mr. Leap was aware of Plaintiff's EEOC charge.  S.J. Ex. 6 [Leap Dep.  46:2-6], as the Director of IT, he was not involved in Plaintiff's evaluation.

(ii)     **Plaintiff Cannot Rebut Quest's Legitimate, Non-Discriminatory Reason for the 2005 Performance Evaluation**

Even assuming that Plaintiff can establish a prima facie case of retaliation--which she cannot--Plaintiff's claims still fail.  Plaintiff simply cannot rebut Quest's legitimate, non-retaliatory reasons for her 2005 evaluation.  Instead, Plaintiff relies upon the differences between her ratings in the 2004 and 2005 evaluations as evidence of retaliation.  This reliance, however, is wholly misplaced.  While it is undisputed that Plaintiff received an "Excellent" rating in 2004 and only an "Achieves Expectations" rating in 2005, it is also undisputed that the 2004 and 2005 evaluations were performed by two different individuals--Mr. Meeder and Ms. Aglipay, respectively. S.J. Ex. 13 [Aglipay Dep.  42:18-22; 43:3-5; 45:9-11]; S.J. Ex. 14 [Pollard 2004 Annual Performance Development and Review, Pollard Dep. Ex. 15]; S.J. Ex. 15 [Pollard 2005 Annual Performance Development and Review, Pollard Dep. Ex. 16].

Mr. Meeder, Mr. Vanderburg's predecessor, was not Plaintiff's immediate supervisor and likely had little direct interaction with Plaintiff. S.J. Ex. 5 [Knapp Dep. 32:15-19].  In contrast, Ms. Aglipay, Plaintiff's direct supervisor, had the benefit of directly observing Plaintiff's performance.  S.J. Ex. 5 [Knapp Dep. 32:15-19].

Plaintiff will likely contend that the fact that Ms. Aglipay evaluated her in 2005, but not in 2004, is inherently suspect.  However, the undisputed evidence reveals that normally the employee's direct supervisor conducts the performance review.  S.J. Ex. 5 [Knapp Dep. 33: 4-5].  However, Ms. Aglipay was absent on medical leave during the 2004 evaluation period.  S.J. Ex. 13 [Aglipay Dep. 43:22; 44:1-2, 16-22].[5]

---

[5] Ms. Aglipay was also involved in an accident in 2003 and thus did not participate in the 2003 evaluation period. S.J. Ex. 13 [Aglipay Dep. 46:17-19].

Although Plaintiff claims--absent any evidence--that she performed her job in a similar manner in both 2004 and 2005, there is substantial evidence that Plaintiff's performance actually diminished during the latter year.  Ms. Aglipay received several complaints regarding Plaintiff's attitude towards Providence nurses and doctors, and her co-workers.  S.J. Ex. 13 [Aglipay Dep. 33:7-22;34:1-13; 36: 21-22; 37:1-22; 38:1-22; 39:1-7] .  Ms. Aglipay also observed that Plaintiff did not work well under the time pressures required by her position.  S.J. Ex. 13 [Aglipay Dep. 34:20-22; 35:1-9]. Ms. Aglipay discussed these problems with Plaintiff.[6] S.J. Ex. 13 [Aglipay Dep. 35:14-21; 36:2-13; 40:8-10].    Unsurprisingly, all of these incidents impacted Plaintiff's performance ratings.  S.J. E. 2 [Pollard Dep. 157:13-17]; Ex. 13 [Aglipay Dep. 33:13-22; 34:1-22; 35: 1-21].

It also is important to note that initially, Mr. Meeder gave Plaintiff an "Achieves Expectations" rating.  S.J. Ex. 2 [Pollard Dep. 140:10-15]; S.J. Ex. 14 [Pollard 2004 Annual Performance Development and Review, Pollard Dep. Ex. 15].  However, Mr. Meeder changed Plaintiff's rating after she expressed dissatisfaction with her evaluation.  S.J. Ex. 2 [Pollard Dep. 138: 21-22; 139: 1-7]; S.J. Ex. 14  [Pollard 2004 Annual Performance Development and Review, Pollard Dep. Ex. 15].   Similarly, Ms. Aglipay also changed Plaintiff's ratings after Plaintiff voiced concerns over her evaluation.  S.J. Ex. 2 [Pollard Dep. 148: 17-19; 152:19-22; 153: 1-2, 21-22; 154:1-8, 14-22; 155:1, 17-21]; S.J.   Ex. 15 [Pollard 2005 Annual Performance Development and Review, Pollard Dep. Ex. 16].   The fact that Ms. Aglipay willingly amended Plaintiff's previous ratings casts serious doubt upon Plaintiff's retaliation claim.  Moreover, after Ms. Aglipay changed Plaintiff's ratings,  Plaintiff did not voice any further objections to either

---

[6] While Ms. Aglipay spoke to Plaintiff about the issues in her performance,  she did not specifically refer to such events in the evaluation.  S.J. Ex. 15 [Pollard 2005 Annual Performance Development and Review, Pollard Dep. Ex. 16].  It, however, was not unusual for Ms. Aglipay to omit references to these issues.  S.J. Ex. 5 [Knapp Dep. 35: 21-22; 36:1-2].

Ms. Aglipay or anyone else at Quest regarding her evaluation. S.J. Ex 2 [Pollard Dep. 152:4-22; 153:1-6]; S.J. Ex. 19 [Pollard Letter to L.Thatcher, Pollard Dep. Ex. 17]. Indeed, Plaintiff admittedly "accepted the rating." S.J. Ex. 19 [Pollard Letter to L.Thatcher, Pollard Dep. Ex. 17]. Thus, for Plaintiff to now claim that her evaluation was unsatisfactory and retaliatory is disingenuous.

Plaintiff's alternative theory regarding why her evaluation was retaliatory is similarly misplaced. She claims that Ms. Aglipay did not give her an accurate evaluation because Mr. Vanderburg instructed her that Quest had implemented a new policy in which "no one would be allowed an excellent rating". S.J. Ex. 2 [Pollard Dep. 153:2-4]. Plaintiff testified that she interpreted this rule to apply to all employees, not just her. S.J. Ex. 2 [Pollard Dep. 153:9-14]. Quest, however, does not have a policy prohibiting supervisors from rating employees as "Excellent". S.J. Ex. 7 [Vandenburg Dep. 72:4-13]. Even if Quest did have such a policy-- which it does not--this would not support Plaintiff's claim. A company-wide policy precluding any employee from receiving an "Excellent" rating merely confirms that Plaintiff's evaluation rating was unrelated to her EEOC charge and was thus not retaliatory.

As Plaintiff's performance evaluation was a result of her diminished performance as observed by a different evaluator, it is clear that Quest had a legitimate, nonretaliatory reason for giving her a slightly lower rating. Thus, Quest is entitled to judgment in its favor.

32

**Conclusion**

For all of the foregoing reasons, Defendant respectfully requests that this Court grant Defendant's Motion for Summary Judgment in its entirety, enter judgment in Defendant's favor, and that it award to Defendant its reasonable attorneys' fees and costs, and such further relief as the Court may deem proper.

Respectfully submitted,

_/s/_ Michael L. Stevens_____
Michael L. Stevens D.C.  Bar No. 384887
ARENT FOX LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
Telephone: (202) 857-6000
Facsimile:(202) 857-6395
Counsel for Defendants

Dated:  April 21, 2008

<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

_____

| | |
|---|---|
| **BRIDGET POLLARD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Case No. 1: 07-00692(CKK)** |
| | ) |
| | ) |
| **QUEST DIAGNOSTICS,** | ) |
| | ) |
| **Defendant.** | ) |

_____  )

<div align="center">

**DEFENDANT'S STATEMENT OF MATERIAL FACTS AS**
**TO WHICH THERE IS NO GENUINE ISSUE**

</div>

Defendant Quest Diagnostics ("Quest"), pursuant to Fed. R. Civ. P. 56 and LCvR 7(h) and 56.1, hereby submits its Statement of Material Facts as to which there is no Genuine Issue in Support of its Motion for Summary Judgment.

1.     Quest is a national provider of medical laboratory services. Quest operates approximately thirty-four medical laboratories throughout the United States in both hospitals and medical centers as well as its own facilities. Its corporate office is located in Madison, New Jersey. S.J. Ex. 1 [Knapp Dec. at ¶ 3].

2.     Quest operates a medical laboratory at Providence Hospital ("Providence") located in Washington, D.C. In 2002, Quest acquired American Medical Laboratories, which formerly operated the medical laboratory at Providence. S.J. Ex. 1 [Knapp Dec. at ¶ 4].

3.     Quest has a comprehensive anti-discrimination policy and conducts mandatory, annual equal employment opportunity ("EEO") training sessions. S.J. Ex. 1 [Knapp. Dec. at ¶

5]. Messrs. Vandenburg and Leap, the decision-makers in this case, each attended these training sessions. S.J. Ex. 6 [Leap Dep. 12:21-22; 13:1-5]; S.J. Ex. 7 [Vandenburg Dep. 12:10-17 ].

3.     At Providence, Quest currently has 83 employees. S.J. Ex. 1 [Knapp Dec. at ¶6]. Of that number, 83 or 70.24%, are African-American. S.J. Ex. 1 [Knapp Dec. at ¶ 6].

4.     At the time that Plaintiff's employment with Quest was terminated effective as of October 3, 2006, Quest had 84 employees located at Providence. S.J. Ex. 1 [Knapp Dec. at ¶ 6]. Of that number, 54 or 65.06%, were African-American. S.J. Ex. 1 [Knapp Dec. at ¶ 6].

5.     Currently, 100% of Quest's managerial staff at Providence, consisting of 5 employees, is African-American. S.J. Ex. 1 [Knapp Dec. at ¶ 6]. At the time of Plaintiff's termination, 50% of the managerial staff were African-American. S.J. Ex. 1 [Knapp Dec. at ¶ 6].

6.     In October of 2002, Plaintiff, an African-American female, was hired by American Medical Laboratories as a Medical Technologist at Providence. S.J. Ex. 2 [Pollard Deposition ("Dep".) 51:9-15; 52: 11-15; 54:4-17].

7.     As a Medical Technologist, Plaintiff's responsibilities included performing assigned medical tests, maintaining laboratory areas and equipment, and ensuring that test systems were in control for each test performed. S.J. Ex. 2 [Pollard Dep. 51:22;52:1-12]; S.J. Ex. 3 [Medical Technologist Job Description, Pollard Dep. Ex. 8]. Plaintiff's responsibilities did not change after Quest acquired American Medical Laboratories and in fact remained the same throughout her employment. S.J. Ex. 2 [Pollard Dep. 54:15-17].

8.     The minimum qualifications for a Medical Technologist included a degree in either  Medical Technology or a Laboratory Science, one (1) year of laboratory experience and/or training, basic knowledge of computer terminal operations, and ability to deal with client

information in a confidential manner.  S. J. Ex. 3 [Medical Technologist Job Description, Pollard Dep. Ex. 8].

9.      From 2002 until 2005, Plaintiff worked the third (overnight) shift and reported directly to Isabelita Aglipay. S.J. Ex. 2 [Pollard Dep. 54:18-22; 55:1-9].

10.     In 2005, Plaintiff requested to work on a  "PRN" or on-call as needed basis in order to attend school full-time. S.J. Ex. 2 [Pollard Dep. 38:8-15; 38:21-22; 39:1-4].   Quest granted this request.   During this time, her work hours varied and she worked for several different supervisors.  S.J. Ex. 2 [Pollard Dep.38:16-20; 55:13-17].

11.     In or around March 2006, Plaintiff relocated to Raleigh, North Carolina and began full-time employment with Wake Technical Community College. S.J. Ex. 2 [Pollard Dep. 36:22; 37: 1-10].   After relocating to North Carolina, Plaintiff only occasionally worked for Quest on the weekends. S.J. Ex. 2 [Pollard Dep. 37:11-13; 42:13-17].

12.     On October 4, 2006, Plaintiff's employment was terminated because she failed to work for several pay periods. S.J. Ex. 2 [Pollard Dep. 36:3-12]; S.J. Ex. 4 [Termination Letter, Pollard Dep. Ex. 7]; S.J. Ex. 5 [Knapp Deposition ("Dep.") 38: 18-22; 39:1].  This termination was implemented as a result of a routine audit Quest conducts for all PRN employees, and was consistent with Quest policy.  S.J. Ex. 5 [Knapp Dep. 43:15-18; 44:22; 45:1-4].

13.      Plaintiff is currently employed full-time with INC Research, Inc. in Raleigh, North Carolina.  S.J. Ex. 2 [Pollard Dep. 9:19-22].

14.     In the Spring of 2005, Quest decided to create an Information Technology Project Manager ("Project Manager") position at Providence.  S.J. Ex. 1 [Knapp Dec at ¶ 7].

15.     Quest made the position available to both internal and external applicants by announcing it on the bulletin board in the Providence lab, Quest's intranet and the internet.  S.J.

Ex. 1 [Knapp Dec. at ¶ 8]; S.J. Ex. 2 [Pollard Dep. 66:18-22;  67:1-4]; S.J. Ex. 5 [Knapp

Deposition ("Dep.") 12:13-15; 21-22; 13:2-11].

16.    The primary responsibility of the Project Manager position was to coordinate and

maintain a new upgrade to Quest's old Laboratory Information System ("LIS") that was to be

installed in the near future.  S.J. Ex. 6 [Leap Deposition ("Dep.") 27:9-14].

17.    The LIS is the computer system used in the laboratory in conjunction with the

laboratory equipment to generate reports of test results.   S.J. Ex. 6 [Leap Dep. 25:4-13]; S.J. Ex.

7 [Vandenburg Dep. 26:11-13; 27:4-8].

18.     The  new upgrade to the LIS was a more user friendly program which greatly

increased the functionality of the system. S.J. Ex. 7 [Vandenburg Dep. 28:16-21].

19    Harvey Vandenburg, the Administrative Director of the Providence Laboratory

and Richard Leap, Director of Information Technology ("IT"), collaborated in selecting a

candidate for the Project Manager position.  S.J. Ex. 7 [Vandenburg Dep. 36:6-9].

20.     According to Quest's policy, a written position description is required before

posting an available position.  S.J. Ex. 1 [Knapp Dec. at ¶ 9]; S.J. Ex. 7 [Vandenburg Dep. 30:3-

12].   Accordingly, before posting the position, Mr. Vandenburg and Mr. Leap composed a

position description using the incumbent Project Manager position description as a template.  S.J.

Ex. 6 [Leap Dep. 22:14-22]; S.J. Ex. 7 [Vandenburg Dep. 30:13-21].

21.    In addition to the "Essential Job Duties and Responsibilities" included in the

former Project Manager's position description, Mr. Leap included the following technical

aspects:

(3) Collaborate with HIS personnel in maintaining database;

(4) Facilitates LIS training and competency for all new and existing staff as new processes or procedures are added;

(6) Provides necessary audit trail documentation of all changes and validations to LIS system to meet or exceed regulatory requirements, including but not limited to, annual calculations review, biannual patient report for Medical Director review, LIS upgrade documentation, LIS backup and transaction documentation;

(9) Monitor LIS performance and report outages or system degradation issues to appropriate channels.

S.J. Ex. 6 [Leap Dep. 24:13-20]; S.J. Ex. 8 [Project Manager Job Description, Pollard Dep. Ex. 9].

22.     The minimum qualifications stated in the Project Manager Description included an educational background in either Computer Science or Medical Technology, strong interpersonal skills, basic knowledge of laboratory skills, and experience testing or troubleshooting new or existing LIS. S.J. Ex. 2 [Pollard Dep. 70:13-22; 71:1-2]; S.J. Ex. 8 [Project Manager Position Description, Pollard Dep. Ex. 9].

23.      However, both Mr. Vandenburg and Mr. Leap agreed that they preferred a candidate with technical experience in  LIS/laboratory instrument interfaces, LIS test file development, LIS report maintenance and generation. and training LIS users. S.J. Ex. 6 [Leap Dep. 24:8-12, 20-21; 41:5-22; 42:1-14; 44:8-14; 45:1-21; 46:1]; S..J. Ex. 7 [Vandenburg Dep. 23:2-7; 36:12-15]; S.J. Ex. 8 [Project Manager Job Description, Pollard Dep. Ex. 9].

24.     Shortly after Quest posted the IT Project Manager position, Plaintiff applied. S.J. Ex 2 [Pollard Dep. 77:6-18].

25.    Mr. Vandenburg selected Plaintiff along with three other candidates Tuy Le, Jane Kopley, and Sean Townsend, for an interview.  S.J. Ex. 1 [Knapp Dec. at ¶ 10]; S.J. Ex. 7 [Vandenburg Dep. 19:13-22].

26.    Tuy Le, like Ms. Pollard, was an internal applicant. S.J. Ex. 1 [Knapp Dec. at ¶ 9];  S.J. Ex. 2 [Pollard Dep. 98:10-12].  Ms. Kopley and Mr. Townsend were the only external candidates as well as the only white individuals who applied.  S.J. Ex. 1 [Knapp Dec. at ¶ 9]; S.J. Ex. 7 [Vandenburg Dep. 57: 15-18] .

27.    When Mr. Vandenburg initially contacted Plaintiff for her interview, she was out of town on vacation. S.J. Ex. 2 [Pollard Dep.  79:15-22].  Therefore, he left a note on the lab bulletin board for Plaintiff to contact him.  S.J. Ex. 2 [Pollard Dep.  7:20-21; 80:1-4]. Because Plaintiff and Mr. Vandenburg worked different shifts, it was difficult for them to coordinate a time for the interview. S.J. Ex. 2 [Pollard Dep.  80:6-8].  Ultimately, Mr. Vandenburg was able to contact Plaintiff at home and thereafter conducted a telephone interview.   S.J. Ex. 2 [Pollard Dep.  82:18-19; 83:2-5, 9-22; 84:1-8].

28.    Before this interview, Plaintiff had never had a formal conversation with Mr. Vandenburg.  In fact, she and Mr. Vandenburg had only occasionally greeted each other, but had never been formally introduced.  S.J. Ex. 2 [Pollard Dep. 61:3-12].

29.    Because it was easier to do so due to their schedules, Mr. Vandenburg conducted face-to-face interviews with the other candidates.  S.J. Ex. 7 [Vandenburg Dep. 19:20-22; 20:1-3].  During his interviews with all four candidates, Mr. Vandenburg focused on each candidate's interpersonal and communication skills.  S.J. Ex. 7 [Vandenburg Dep.  35:19-22; 36: 1-5].

30.    After interviewing the candidates, Mr. Vandenburg forwarded all of  their resumes to Mr. Leap. S.J. Ex. 7 [Vandenburg Dep.  21:3-4].   While Mr. Vandenburg concluded

that each candidate displayed good verbal communication skills, he deferred to Mr. Leap's technical knowledge to determine whether the candidates possessed the requisite technical experience. S.J. Ex. 7 [Vandenburg Dep. 21:3-8; 35:19-22; 36:1-16].

31.     Based upon the candidates' resumes, Mr. Leap concluded that only Ms. Kopley and Mr. Townsend possessed the requisite technical experience and thus decided to only interview them. S.J. Ex. 6 [Leap Dep. 16:9-17; 19:2-6, 20:22; 21:1; 34:22; 35:1-5; 38:14-20]; S.J. Ex. 7 [Vandenburg Dep. 23:8-13]. Mr. Leap conducted both interviews by telephone and therefore he did not know the race of either candidate. S.J. Ex. 2 [Pollard Dep. 159:14-22; 160:1, 9-22]. S.J. Ex. 6 [Leap Dep. 16:9-15; 19:2-8].

32.     Ms. Kopley had significant LIS experience from her previous position as an Automated Laboratory Services Manager at Holy Cross Hospital. S.J. Ex. 7 [Vandenburg Dep. 36:17-20]. At Holy Cross, Ms. Kopley helped implement the new LIS upgrade, built new test files into the system and trained users. S.J. Ex. 2 [Pollard Dep. 104:6-9; 105:1-4]; S.J. Ex. 9 [Kopley Resume, Pollard Dep. Ex. 11].

33.     Mr. Townsend was involved in the same project at Holy Cross. He developed interfaces between the laboratory instruments and the LIS, built the respiratory and clinic care components for Soft Lab, and trained users. S.J. Ex. 6 [Leap Dep. 41:15-22; 42:1-14]; S.J. Ex. 10 [Townsend Resume, Pollard Dep. Ex. 12].

34.     Mr. Leap declined to interview Plaintiff, as well as Mr. Le, because he believed she lacked significant LIS experience. S.J. Ex. 6 [Leap Dep. 19:11-19; 20:19-22; 21:1; 44:10-22; 45:1-21; 46:1]. As Mr. Leap had never met Plaintiff, and thus did not know her race, he based this decision solely upon her resume. S.J. Ex. 2 [Pollard Dep. 63:22; 64:1-4;160:16-18]; S.J. Ex. 6 [Leap Dep. 20:22; 21:1].

35.     Specifically, according to the resume, Plaintiff did not have experience in "setting up the filing structure of a LIS, managing interfaces for producing or for setting up the laboratory reports"--these were the most important aspects for the job. S.J. Ex. 7 [Vandenburg Dep. 22:20-22; 23:1-7].

36.     Moreover, Plaintiff did not have any experience with the new LIS Quest was going to install. S.J. Ex. 2 [Pollard Dep. 106:20-22; 107:9-12; 131:3-22;132:1-15]; S.J. Ex. 11 [Pollard Resume, Pollard Dep. Ex. 6].

37.     Both Mr. Vandenburg and Mr. Leap concluded that Plaintiff's LIS experience was simply comparable to a user and thus she did not have the requisite experience to manage the new LIS upgrade and train users.   S.J. Ex. 6 [Leap Dep. 45:11-21; 46:1];   S.J. Ex.  7 [Vandenburg Dep. 39: 20-22; 40: 1-8].

38.     Although both Ms. Kopley and Mr. Townsend were qualified for the position, Mr. Leap felt that Ms. Kopley was the better candidate based on her experience and knowledge. S.J. Ex. 1 [Knapp Dec. at ¶11]; S.J. Ex. 6 [Leap Dep. 38: 14-17; 39:1-2]; S.J. Ex. 7 [Vandenburg Dep.  36:17-22; 38:7-9]. Thus, Quest offered Ms. Kopley the position, but she declined.  S.J. Ex. 1 [Knapp Dec. at ¶ 12]; S.J. Ex. 6 [Leap Dep. 39: 3-4]; S.J. Ex. 7 [Vandenburg Dep. 36:21-22; 37: 2-4].

39.     Quest does not have a policy of reposting positions after a top-ranked candidate declines when there is a second ranked candidate. S.J. Ex. 1[Knapp Dec. at ¶ 12]. Accordingly, as Mr. Townsend was the second most qualified candidate, Quest subsequently offered him the position. S.J. Ex. 1 [Knapp Dec. at ¶ 12];  S.J. Ex.  6 [Leap Dep. 34: 9-12; 39:21-22; 40:1-3]; S.J. Ex. 7 [Vandenburg Dep. 37:9-13; 38:10-12; 56:5-9].

40.     Mr. Townsend accepted the offer and thereafter held the Project Manager position. S.J. Ex. 1 [Knapp Dec. at ¶ 13].   Mr. Townsend, however, is no longer employed by Quest. On or about March 30, 2007, he voluntarily resigned to pursue other career opportunities. [S.J. Ex. 1 [Knapp Dec. at  ¶ 13];  S.J. Ex. 7 [Vandenburg Dep. 42:6-8].

41.     Plaintiff admitted that Ms. Kopley's prior experience  with the new LIS upgrade rendered her far more qualified for the Project Manager position and indicated that Quest's offer to Ms. Kopley was not discriminatory. S.J. Ex. 2 [Pollard Dep. 102:22;103:1-15; 104:19-22; 105:1-4].

42.     Plaintiff also admitted that Mr. Townsend's stated qualifications rendered him more qualified than she was.  S.J. Ex. 2 [Pollard Dep. 118:7-18; 20-21; 119:1].

43.     Plaintiff lacks any personal knowledge or credible evidence to dispute  the accuracy of Mr. Townsend's qualifications. S.J. Ex. 2 [Pollard Dep. 115:9-14; 117:7-18].

44.     Quest is unaware of any inaccuracies in Mr. Townsend's resume. S.J. Ex. 1 [Knapp Dec. at ¶  14]; S.J. Ex. 2 [Pollard Dep. 117:19-22; 118:1-6]; S.J. Ex. 5 [Knapp Dep. 48:12-13, 16-20].

45.     After his employment ended with Holy Cross, Mr. Townsend sent a letter to Fernando Fleites, Holy Cross' Senior Vice President of Human Resources, describing   his dissatisfaction with not receiving paid time off for his work associated with the new LIS. S.J. Ex. 17 [Stevens Dec. at ¶  7]; S.J. Ex. 18 [Townsend Letter].  Specifically, Mr. Townsend indicated that "During this past year I continued to perform to the best of my ability overseeing the Point of Care Testing Program and also working on the new laboratory information system, which included 'building the Point of Care and Respiratory menus and interfacing all of the laboratory instruments.'" S.J. Ex. 18 [Townsend Letter].

46.     During his tenure as Project Manager, Mr. Townsend's performance reflected LIS experience which "far exceeded that of a user". S.J. Ex. 7 [Vandenburg Dep. 42:2-5].

47.     Currently, Audrey Chambers-Robinson , an African-American female holds the Project Manager position. Ms. Chambers-Robinson was hired on or about December 3, 2007 by Mr. Leap and Robert Levy, Mr. Vandenburg's successor. S.J. Ex. 1 [Knapp Dec. at ¶14].

48.     During his tenure, Mr. Vanderburg promoted two minority females, one of whom is an African-American. S.J. Ex. 1 [Knapp Dec. at ¶ 15].

49.     On November 29, 2005, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging race discrimination with respect to the IT Project Manager position. S.J. Ex. 2 [Pollard Dep. 108:9-19; 125:16-21]; S.J. Ex. 12 [Amended Complaint at ¶7].

50.     Quest evaluates its employees annually. S.J. Ex. 1 [Knapp Dec. at ¶ 16]. Generally, employees are provided written performance reviews which rate their performance in various categories. S.J. Ex. 1 [Knapp Dec. at ¶ 16]. Employees are also provided a numerical score which corresponds to a specific overall performance rating category: Outstanding (1.00 to 1.33); Excellent (1.34 to 2.33); Achieves Expectations (2.34 to 3.25), and Development Needed (3.26 to 4.00). S.J. Ex. 1 [Knapp Dec. at ¶ 16]. Ordinarily, an employee's immediate supervisor performs her evaluation. S.J. Ex. 5 [Knapp Dep. 33: 4-5].

51.     For the 2004 evaluation period, David Meeder, Mr. Vandenburg's predecessor, evaluated Plaintiff while Ms. Aglipay, Plaintiff's then immediate supervisor, was on medical leave. S.J. Ex. 13 [Aglipay Deposition "Dep." 43:3-5, 22; 44:1-2; 44:16-22]. Mr. Meeder gave Plaintiff an overall "Excellent" rating. S.J. Ex. 2 [Pollard Dep. 137:3-12, 18-20; 140:10-15]; S. J. Ex. 14 [Pollard 2004 Annual Performance Development and Review, Pollard Dep. Ex. 15].

52.     As a result of this evaluation, Plaintiff received a 4% merit increase.  S.J. Ex. 14 [Pollard 2004 Annual Performance Development and Review, Pollard Dep. Ex. 15].

53.     Ms. Aglipay prepared Plaintiff's 2005 performance evaluation. S.J. Ex. 13 [Aglipay Dep. 42:18-22; 44:10-11; 45:911].  Based upon her overall performance, Ms. Aglipay gave Plaintiff an overall  "Achieves Expectations" rating.  S.J. Ex. 2 [Pollard Dep. 146:21-22; 147:1-7; 154:9-13]; S.J. Ex. 15 [Pollard 2005 Annual Performance Development and Review, Pollard Dep. Ex. 16].

54.     An "Achieves Expectations" rating reflects a satisfactory performance evaluation. S.J. Ex. 1 [Knapp Dec. at ¶ 17].

55.     In assessing Plaintiff's performance, Ms. Aglipay considered the following: several complaints regarding Plaintiff's attitude towards nurses, doctors and co-workers, and failure to meet time pressures of job. S.J. Ex. 13 [Aglipay Dep. 33:7-22; 34:1-13; 34:20-22; 35:1-9; 36: 21-22; 37:1-22; 38:1-22; 39:1-7] .

56.     After Plaintiff voiced concerns over her evaluation, Ms. Aglipay improved Plaintiff's rating by .25 points. S.J. Ex. 2 [Pollard Dep. 148: 17-19; 152:19-22; 153: 1-2, 21-22; 154:1-8, 14-22;155:1, 17-21]; S.J.  Ex.  15 [Pollard 2005 Annual Performance Development and Review, Pollard Dep. Ex. 16].

57.     Moreover, after Ms. Aglipay changed Plaintiff's ratings,  Plaintiff did not voice any further objections to either Ms. Aglipay or anyone else at Quest regarding her evaluation. S.J. Ex 2 [Pollard Dep. 152:4-22; 153:1-6]; S.J. Ex. 19 [Pollard Letter to L.Thatcher, Pollard Dep. Ex. 17].  Indeed, Plaintiff admittedly "accepted the rating." S.J. Ex. 19  [Pollard Letter to L.Thatcher, Pollard Dep. Ex. 17].

58.     Ms. Aglipay was unaware of Plaintiff's EEOC charge during the evaluation period.  S.J. Ex. 2 [Pollard Dep. 129:16-18; 157:13-17]; S.J. Ex. 13 [Aglipay Dep. 59:3-8].

59.      Pollard received a 3% merit increase for her 2005 evaluation.  S.J. Ex. 1 [Knapp Dec. at ¶ 18].

60.     On February 28, 2006, Plaintiff amended her EEOC charge to include an allegation of retaliation.  S.J. Ex. 12 [Amended Complaint at Ct. 2].  Plaintiff based this allegation upon the differences between her 2004 and 2005 performance evaluations.

61.     On February 28, 2007, the EEOC issued Plaintiff a Dismissal and Notice of Rights in which it made the following determination: "Based upon its investigation, EEOC is unable to conclude that the information obtained establishes violations of the statute".  S.J. Ex. 2 [Pollard Dep. 163:2-22]; S.J. Ex.  16 [EEOC Dismissal and Notice of Rights, Pollard Dep. Ex. 18].

Respectfully submitted,

ARENT FOX LLP


  /s/  Michael L. Stevens
Michael L. Stevens, D.C. Bar 384887
Arent Fox LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5339
Tel. (202) 857-6382
Fax  (202) 857-6395
stevens.michael@arentfox.com

Counsel for Defendant

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRIDGET POLLARD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1: 07-00692(CKK)** |
| ) | |
| **QUEST DIAGNOSTICS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DECLARATION OF MICHAEL KNAPP  IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Michael Knapp, do hereby depose and state as follows:

1.        I am over 18 years of age, I have personal knowledge of all the facts set forth in this Declaration, and I am competent to testify about them.

2.        I am employed as the Director of Employee Services for Defendant Quest Diagnostics ("Quest").  I have been employed with Quest since 1999.  In that capacity, I administer Quest's human resources policies, oversee the hiring selection process, and am a custodian for Quest's personnel records for the Chantilly business unit.

3.        Quest is a national provider of medical laboratory services.  Quest operates approximately thirty-four medical laboratories throughout the United States in hospitals and medical centers as well as its own facilities.  Its corporate office is located in Madison, New Jersey.

4.      Quest operates a medical laboratory at Providence Hospital ("Providence") located in Washington, D.C.  In 2002, Quest acquired American Medical Laboratories, which formerly operated the medical laboratory at Providence.  Quest's Providence lab is a part of the Chantilly Business Unit.

5.      Quest is committed to equal employment opportunity which is evidenced by its comprehensive anti-discrimination policy and mandatory, annual EEO trainings.

6.      At Providence, Quest currently has 83 employees. Of that number, 59 or 70.24%, are African-American.  At the time that Plaintiff's employment with Quest was terminated effective as of October 3, 2006, Quest had 84 employees located at Providence.  Of that number, 54 or 65.06%, were African-American. Currently, 100% of Quest's managerial staff at Providence, consisting of 5 employees, is  African-American.  At the time of Plaintiff's termination, 50% of the managerial staff were African-American.

7.      In the spring of 2005, Quest decided to create an Information Technology Project Manager ("Project Manager") position at Providence.

8.      Quest made the position available to both internal and external applicants by announcing the position on the bulletin board in the Providence lab, Quest's intranet and the internet.

9.      According to Quest's policy, a written position description is required before posting an available position.

10.     Ms. Pollard was among four candidates selected for an interview.  The other three candidates were Tuy Le, Jane Kopley, and Sean Townsend.  Mr. Le, like  Plaintiff, was an internal candidate.  Jane Kopley and Sean Townsend were the only external candidates as well as the only white individuals who applied.

2

11.     Based upon their interviews and resumes, Mr. Vandenburg and Mr. Leap recommended Ms. Kopley as the top-ranked candidate and Mr. Townsend as the second ranked candidate.

12.     Quest initially offered Ms. Kopley the position. She, however, declined. As Quest does not have a policy of reposting positions after a top-ranked candidate declines when there is a second ranked candidate, Quest then offered the position to Mr. Townsend.

13.     Mr. Townsend accepted the offer and thereafter held the Project Manager position. Mr. Townsend, however, is no longer employed by Quest. He voluntarily resigned from his position on or about March 30, 2007 to pursue other career opportunities.

14.     Quest is unaware of any discrepancies in Mr. Townsend's resume.

15.     Currently, Audrey Chambers-Robinson, an African-American female, holds the Project Manager position. Ms. Chambers-Robinson was hired on or about December 3, 2007 by Mr. Leap and Robert Levy, Mr. Vandenburg's successor.

16.     During his tenure, Mr. Vanderburg promoted two minority females. The first was Maria Lara, a Hispanic female who he promoted from Technical Supervisor to Manager on or about December 21, 2003. The second was Jeanette Brown, an African-American female who he promoted from Group Lead, Field Operations to Supervisor, Field Operations on or about July 3, 2005.

17.     Quest evaluates its employees annually. Generally, employees are provided written performance reviews which rate their performance in various categories. Employees are also provided a numerical score which corresponds to a specific overall performance rating category: Outstanding (1.00 to 1.33); Excellent (1.34 to 2.33); Achieves Expectations (2.34 to 3.25), and Development Needed (3.26 to 4.00).

18.     In 2005, Plaintiff received a performance rating of "Achieves Expectations".  An

"Achieves Expectations" rating is a satisfactory evaluation.

19.     As a result of her 2005 performance evaluation, Plaintiff received a 3% merit increase.

I declare under penalty of perjury that this Declaration is true and correct to the best of my knowledge, information and belief.

_____

Michael J. Knapp

Date: <u>April 21, 2008</u>

# EXHIBIT 2
## PART 1

1

1    THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLUMBIA

3

4    _____
                                   )
5    BRIDGET POLLARD,              )    Case No. 1:07-0692 (CKK)
                                   )
6         Plaintiff,               )    ORIGINAL
                                   )
7    vs.                           )
                                   )
8    QUEST DIAGNOSTICS,            )
                                   )
9         Defendant.               )
     _____)

10

11

12    VIDEOTAPED DEPOSITION OF

13    BRIDGET L. POLLARD

14    Washington, D.C.

15    Friday, December 21, 2007

16    8:59 a.m.

17

18

19

20

21    Job No.:   1-119106

      Pages 1 through 169

22    Reported by:   John L. Harmonson, RPR


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW  •  Suite 850, Washington, D.C. 20036
Tel: 202.861.3410  •  800.292.4789  •  Fax: 202.861.3425
Web: ladreporting.com  •  E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD  •  Baltimore, MD  •  Greenbelt, MD  •  McLean, VA

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

9

| | | |
|---|---|---|
| 1 | A.    I actually moved to Raleigh in March | 09:01:49 |
| 2 | of 2006. | 09:01:52 |
| 3 | Q.    Okay.  So prior to your current | 09:01:52 |
| 4 | address, where did you live in Raleigh? | 09:01:55 |
| 5 | A.    I lived on Ashe Avenue. | 09:01:57 |
| 6 | Q.    Can you give us that address, please? | 09:02:01 |
| 7 | A.    I don't have that right now. | 09:02:03 |
| 8 | Q.    Okay.  And Ashe Avenue is spelled | 09:02:04 |
| 9 | A-s-h? | 09:02:08 |
| 10 | A.    A-s-h-e. | 09:02:10 |
| 11 | Q.    A-s-h-e. | 09:02:13 |
| 12 | And that was a Raleigh mailing address? | 09:02:14 |
| 13 | A.    Yes. | 09:02:16 |
| 14 | Q.    Have you ever used any other names | 09:02:16 |
| 15 | besides Bridget Pollard? | 09:02:18 |
| 16 | A.    No. | 09:02:20 |
| 17 | Q.    Are you married? | 09:02:21 |
| 18 | A.    No. | 09:02:22 |
| 19 | Q.    Are you currently employed? | 09:02:25 |
| 20 | A.    Yes. | 09:02:27 |
| 21 | Q.    By whom? | 09:02:28 |
| 22 | A.    INC Research, Inc. | 09:02:29 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

34

| 1 | position? | 09:27:19 |
| 2 | A.    Yes. | 09:27:20 |
| 3 | Q.    Do you think that your experience using | 09:27:24 |
| 4 | the Laboratory Information System with the New | 09:27:28 |
| 5 | Hanover Medical Group and the New Hanover Regional | 09:27:31 |
| 6 | Hospital were relevant to your application for the | 09:27:34 |
| 7 | lab project manager position with Quest? | 09:27:42 |
| 8 | A.    Yes. | 09:27:46 |
| 9 | Q.    And is there a reason why you excluded | 09:27:46 |
| 10 | them from the résumé? | 09:27:49 |
| 11 | A.    Yes. | 09:27:51 |
| 12 | Q.    Why? | 09:27:51 |
| 13 | A.    Because I was trying to keep the résumé | 09:27:52 |
| 14 | at a two-page length. | 09:27:55 |
| 15 | Q.    Okay.  Was there any rule that Quest | 09:27:58 |
| 16 | had that you had to keep a résumé at a two-page | 09:28:00 |
| 17 | length? | 09:28:05 |
| 18 | A.    No. | 09:28:05 |
| 19 | Q.    When did your employment with Quest | 09:28:10 |
| 20 | end? | 09:28:12 |
| 21 | A.    It ended September of this year. | 09:28:13 |
| 22 | Q.    September of '07? | 09:28:17 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

36

1    answer questions about it.                              09:29:36

2         A.    I'm ready.                                   09:29:49

3         Q.    Can you identify that document for me,       09:29:50

4    please?                                                 09:29:52

5         A.    Yes.  This is a letter I received from       09:29:52

6    Quest upon my termination.                              09:29:55

7         Q.    Okay.  When did you receive it?              09:29:59

8         A.    I received it -- The date here is            09:30:01

9    October the 6th, but I don't know when I received       09:30:04

10   it by mail.  I mean October the 4th.                    09:30:07

11        Q.    Of 2006; isn't that correct?                 09:30:11

12        A.    Yes, 2006.                                   09:30:13

13        Q.    Does that refresh your recollection          09:30:14

14   that your employment with Quest ended in 2006           09:30:16

15   rather than 2007?                                       09:30:19

16        A.    Yes.                                         09:30:21

17        Q.    At the time that you received this           09:30:23

18   letter, which I guess would have been sometime          09:30:27

19   after October 4, 2006, you were employed by             09:30:30

20   someone else, weren't you?                              09:30:33

21        A.    Yes.                                         09:30:35

22        Q.    Who were you employed by?                    09:30:36

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

37

| | | |
|---|---|---|
| 1 | A.   I was employed by Wake Tech. | 09:30:37 |
| 2 | Q.   And you were residing in Raleigh, North | 09:30:39 |
| 3 | Carolina; isn't that correct? | 09:30:42 |
| 4 | A.   Yes. | 09:30:44 |
| 5 | Q.   Okay.  When did you move to Raleigh, | 09:30:44 |
| 6 | North Carolina? | 09:30:47 |
| 7 | A.   I moved to Raleigh, North Carolina, | 09:30:49 |
| 8 | actually in March. | 09:30:52 |
| 9 | Q.   Of 2006? | 09:30:53 |
| 10 | A.   Yes. | 09:30:54 |
| 11 | Q.   And did you perform any work for Quest | 09:30:55 |
| 12 | after you moved to Raleigh, North Carolina? | 09:30:57 |
| 13 | A.   Yes, I did. | 09:31:00 |
| 14 | Q.   When did you perform work for Quest? | 09:31:01 |
| 15 | A.   I'm not sure of the dates, but I | 09:31:03 |
| 16 | believe it to be in March, April, June of 2006. | 09:31:07 |
| 17 | Q.   Did you perform any work for Quest | 09:31:19 |
| 18 | after June of 2006? | 09:31:21 |
| 19 | A.   No. | 09:31:24 |
| 20 | Q.   How many hours did you work for Quest | 09:31:27 |
| 21 | in March of 2006? | 09:31:29 |
| 22 | A.   I'm not sure. | 09:31:31 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

38

1    Q.    You weren't working full time; isn't      09:31:33

2    that correct?      09:31:36

3    A.    No, I was not.      09:31:37

4    Q.    In fact, during your entire employment      09:31:38

5    with Quest, you never worked full time; isn't that      09:31:39

6    correct?      09:31:42

7    A.    No, that's not correct.      09:31:43

8    Q.    Well, during -- during the -- well,      09:31:44

9    when did you -- Was there a time when you were      09:31:49

10    working on a PRN or on-call basis?      09:31:52

11    A.    Yes.      09:31:56

12    Q.    When did that start?      09:31:56

13    A.    I'm not sure.      09:31:57

14    Q.    Did it start in 2005?      09:31:58

15    A.    Yes.      09:32:00

16    Q.    Okay.  And do you recall approximately      09:32:01

17    how many hours per week you worked on average      09:32:08

18    after you started working on a PRN basis?      09:32:12

19    A.    It varied.  I couldn't give you an      09:32:16

20    average.      09:32:20

21    Q.    And at whose request was it that -- Who      09:32:20

22    initiated you working on a PRN basis?      09:32:21

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

39

| | | |
|---|---|---|
| 1 | A.    I did. | 09:32:25 |
| 2 | Q.    And why did you do that? | 09:32:25 |
| 3 | A.    Because I went back to school full | 09:32:26 |
| 4 | time. | 09:32:28 |
| 5 | Q.    Okay.  Did you tell anyone at Quest | 09:32:30 |
| 6 | that you had relocated to Raleigh, North Carolina? | 09:32:35 |
| 7 | A.    Yes. | 09:32:39 |
| 8 | Q.    Who did you tell? | 09:32:39 |
| 9 | A.    I told the lab manager. | 09:32:40 |
| 10 | Q.    Who was that? | 09:32:42 |
| 11 | A.    Well, she was a lab supervisor.  Hewitt | 09:32:43 |
| 12 | Leghesse. | 09:32:47 |
| 13 | Q.    Why did you tell Hewitt Leghesse? | 09:32:51 |
| 14 | A.    Because she was the lab supervisor. | 09:33:01 |
| 15 | Q.    Did you tell her why you were | 09:33:03 |
| 16 | relocating to Raleigh, North Carolina? | 09:33:04 |
| 17 | A.    Not that I know of. | 09:33:07 |
| 18 | Q.    Why did you relocate to Raleigh, North | 09:33:08 |
| 19 | Carolina? | 09:33:08 |
| 20 | A.    Because I like North Carolina. | 09:33:08 |
| 21 | Q.    So that was a choice you made | 09:33:08 |
| 22 | voluntarily? | 09:33:10 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

42

| | | |
|---|---|---|
| 1 | Q. Did you ever call Quest to ask for | 09:34:42 |
| 2 | work? | 09:34:45 |
| 3 | A. No. | 09:34:46 |
| 4 | Q. Did you tell Ms. Leghesse that you were | 09:34:46 |
| 5 | working a full-time job in North Carolina? | 09:34:53 |
| 6 | A. No. | 09:34:56 |
| 7 | Q. So it's your testimony that you didn't | 09:34:58 |
| 8 | tell her that you were working a full-time job in | 09:35:00 |
| 9 | North Carolina? | 09:35:04 |
| 10 | A. No. | 09:35:04 |
| 11 | Q. Is there a reason why you didn't tell | 09:35:05 |
| 12 | her that? | 09:35:07 |
| 13 | A. Because usually when I worked for Quest | 09:35:08 |
| 14 | I worked on the weekends, and they would call me | 09:35:10 |
| 15 | if they had some open ends or they needed some | 09:35:13 |
| 16 | extra help. I covered basically weekends and | 09:35:16 |
| 17 | vacations. | 09:35:20 |
| 18 | Q. Was there ever any time when Quest | 09:35:23 |
| 19 | asked you to work some hours and you declined the | 09:35:26 |
| 20 | hours? | 09:35:30 |
| 21 | A. Yes. | 09:35:30 |
| 22 | Q. Okay. And when did that occur? | 09:35:31 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

51

1      Q.    You were PRN?                              09:44:31

2      A.    Yes.                                       09:44:33

3      Q.    Do you recall when you became PRN at       09:44:34

4   Quest?                                              09:44:38

5      A.    No, I don't.                               09:44:38

6      Q.    Do you recall for approximately how        09:44:39

7   long you worked PRN for Quest?                      09:44:41

8      A.    Probably a year.  Maybe a year.            09:44:47

9      Q.    When did you commence employment with      09:44:53

10  Quest?                                              09:44:56

11     A.    I think I started in October of 2002.      09:44:59

12     Q.    And what --                                09:45:05

13     A.    I'll look at my résumé here.  Yes.         09:45:08

14     Q.    Is that what it says, October 2002?        09:45:10

15     A.    Yes.                                       09:45:13

16     Q.    And you worked at Providence Hospital      09:45:13

17  during the entire time?                             09:45:14

18     A.    Yes.                                       09:45:17

19     (Exhibit 8 marked for identification and

20  attached hereto.)

21  BY MR. STEVENS:                                     09:45:25

22     Q.    The court reporter is showing you a        09:45:41

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

52

| | | |
|---|---|---|
| 1 | document marked as Deposition Exhibit 8, which is | 09:45:45 |
| 2 | a two-page document bearing the Bates labels | 09:45:49 |
| 3 | Q00294 and Q00295 in the bottom right-hand corner. | 09:45:52 |
| 4 | Take the time that you need to | 09:45:58 |
| 5 | familiarize yourself with the document and let me | 09:46:00 |
| 6 | know when you're ready to answer questions about | 09:46:02 |
| 7 | it. | 09:46:05 |
| 8 | A.    I'm ready. | 09:46:36 |
| 9 | Q.    Can you identify that document for me, | 09:46:37 |
| 10 | please? | 09:46:39 |
| 11 | A.    This is the job description of the | 09:46:39 |
| 12 | medical technologist at Providence Hospital. | 09:46:42 |
| 13 | Q.    And is that the position you held | 09:46:45 |
| 14 | throughout your employment with Quest? | 09:46:48 |
| 15 | A.    Yes. | 09:46:50 |
| 16 | Q.    And if you look at the second page of | 09:46:50 |
| 17 | the document, is that your signature in the bottom | 09:46:53 |
| 18 | right-hand corner? | 09:46:56 |
| 19 | A.    Yes, it is. | 09:46:57 |
| 20 | Q.    Did you sign this on October 22, 2002? | 09:46:58 |
| 21 | A.    Yes. | 09:47:01 |
| 22 | Q.    Does the job description accurately | 09:47:02 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

54

| | | |
|---|---|---|
| 1 | "Job Description" it refers to American Medical | 09:48:22 |
| 2 | Laboratories, Inc.  Do you see that? | 09:48:24 |
| 3 | A.    Yes. | 09:48:28 |
| 4 | Q.    When you first commenced employment, | 09:48:28 |
| 5 | was the name of your employer American Medical | 09:48:30 |
| 6 | Laboratories? | 09:48:33 |
| 7 | A.    Yes. | 09:48:35 |
| 8 | Q.    Did there come a time when American | 09:48:36 |
| 9 | Medical Laboratories was acquired by Quest? | 09:48:38 |
| 10 | A.    Yes. | 09:48:41 |
| 11 | Q.    When did that occur? | 09:48:41 |
| 12 | A.    I'm not sure.  I was only there | 09:48:42 |
| 13 | probably a month or so.  So maybe in November or | 09:48:44 |
| 14 | December of 2002. | 09:48:50 |
| 15 | Q.    Did your position change after Quest | 09:48:52 |
| 16 | acquired American Medical Laboratories? | 09:48:54 |
| 17 | A.    No. | 09:48:56 |
| 18 | Q.    And the job description indicates that | 09:48:59 |
| 19 | you report to Isabelita Aglipay; is that correct? | 09:49:01 |
| 20 | A.    Yes. | 09:49:07 |
| 21 | Q.    What was her title? | 09:49:07 |
| 22 | A.    She was the third shift supervisor, | 09:49:08 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

55

| | |
|---|---|
| 1 | night shift supervisor. | 09:49:11 |
| 2 | Q. And what was the night shift? | 09:49:13 |
| 3 | A. From 11:00 to 7:00, 11:00 p.m. to | 09:49:14 |
| 4 | 7:00 -- 11:30 p.m. to 7:30 a.m. | 09:49:16 |
| 5 | Q. Is that the shift that you worked? | 09:49:25 |
| 6 | A. Yes. | 09:49:25 |
| 7 | Q. How long did you work that shift? | 09:49:25 |
| 8 | A. I worked that shift until I went -- | 09:49:26 |
| 9 | until my position became PRN. | 09:49:30 |
| 10 | Q. And you made the request for your | 09:49:33 |
| 11 | position to go PRN; is that correct? | 09:49:35 |
| 12 | A. Yes. | 09:49:37 |
| 13 | Q. And did Ms. Aglipay supervise you | 09:49:40 |
| 14 | throughout your employment at Quest? | 09:49:48 |
| 15 | A. When I was PRN I worked various shifts, | 09:49:50 |
| 16 | and that various shifts I worked with various | 09:49:54 |
| 17 | supervisors. | 09:49:58 |
| 18 | Q. What other supervisors did you work | 09:49:59 |
| 19 | with? | 09:50:00 |
| 20 | A. I worked with Elmore Wright. He was | 09:50:01 |
| 21 | the second shift supervisor. And I worked with | 09:50:05 |
| 22 | Hewitt Leghesse and Solomon Tsehay when I worked | 09:50:09 |

# EXHIBIT 2
## PART 2

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

61

| | | |
|---|---|---|
| 1 | of the IT Department of Quest is? | 09:55:32 |
| 2 | A.    No, I do not. | 09:55:35 |
| 3 | Q.    When was the first time you met Harvey | 09:55:49 |
| 4 | Vandenburg? | 09:55:52 |
| 5 | A.    At work, night shift, one morning, I | 09:55:55 |
| 6 | believe he spoke. | 09:56:00 |
| 7 | Q.    Spoke to whom? | 09:56:01 |
| 8 | A.    Said hello, good morning. | 09:56:03 |
| 9 | Q.    Okay.  Did he introduce himself to you | 09:56:05 |
| 10 | or did you introduce yourself to him? | 09:56:09 |
| 11 | A.    No.  I was informed that he was going | 09:56:11 |
| 12 | to be the new lab manager. | 09:56:13 |
| 13 | Q.    Okay.  So do you recall approximately | 09:56:16 |
| 14 | when this occurred? | 09:56:20 |
| 15 | A.    I'm not sure.  I don't -- I don't have | 09:56:23 |
| 16 | a date.  I'm not sure. | 09:56:27 |
| 17 | Q.    At the time that he said hello to you, | 09:56:29 |
| 18 | did he know your name? | 09:56:33 |
| 19 | A.    I don't know. | 09:56:36 |
| 20 | Q.    Okay.  Did you tell him your name? | 09:56:37 |
| 21 | A.    No. | 09:56:38 |
| 22 | Q.    Do you know if anybody told him your | 09:56:39 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

63

| | | |
|---|---|---|
| 1 | predominant position that worked in the lab, | 09:57:53 |
| 2 | medical technologist? | 09:57:57 |
| 3 | A.    The phlebotomists were the other piece | 09:57:58 |
| 4 | of the lab. | 09:58:04 |
| 5 | Q.    Okay. | 09:58:05 |
| 6 | A.    And then we had office personnel, and | 09:58:05 |
| 7 | then we had a slew of part-time personnel. | 09:58:08 |
| 8 | Q.    Were there more than 20 medical | 09:58:11 |
| 9 | technologists who were working at the lab? | 09:58:13 |
| 10 | A.    On any given day or in general? | 09:58:15 |
| 11 | Q.    Yeah. | 09:58:17 |
| 12 | A.    I don't know.  About 20.  Maybe not 20. | 09:58:19 |
| 13 | Q.    More than ten? | 09:58:23 |
| 14 | A.    More than ten. | 09:58:24 |
| 15 | Q.    Okay.  Did you ever hear Mr. Vandenburg | 09:58:25 |
| 16 | say anything to you or to anyone else that you | 09:58:35 |
| 17 | considered to be racist? | 09:58:38 |
| 18 | A.    No. | 09:58:40 |
| 19 | Q.    Did anyone ever tell you that they | 09:58:42 |
| 20 | observed Mr. Vandenburg say anything racist? | 09:58:45 |
| 21 | A.    No. | 09:58:49 |
| 22 | Q.    Prior to yesterday, had you ever seen | 09:58:55 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

64

| | | |
|---|---|---|
| 1 | or met Mr. Leap? | 09:59:03 |
| 2 | A.    No. | 09:59:05 |
| 3 | Q.    Have you ever spoken to him? | 09:59:10 |
| 4 | A.    No. | 09:59:11 |
| 5 | Q.    Have you ever observed him say anything | 09:59:14 |
| 6 | that you consider to be racist? | 09:59:18 |
| 7 | A.    No. | 09:59:20 |
| 8 | Q.    Has anyone ever told you that they | 09:59:21 |
| 9 | observed him say anything or do anything that you | 09:59:23 |
| 10 | considered racist? | 09:59:26 |
| 11 | A.    No. | 09:59:27 |
| 12 | Q.    How about Ms. Aglipay?  At least | 09:59:33 |
| 13 | initially you reported to her when you worked the | 09:59:39 |
| 14 | night shift; isn't that correct? | 09:59:42 |
| 15 | A.    Yes. | 09:59:44 |
| 16 | Q.    Did you ever hear her say anything that | 09:59:45 |
| 17 | you thought was racist? | 09:59:48 |
| 18 | A.    No. | 09:59:50 |
| 19 | Q.    Did anyone ever tell you that they saw | 09:59:51 |
| 20 | her or observed her say or do anything that you | 09:59:54 |
| 21 | considered to be racist? | 09:59:57 |
| 22 | A.    No. | 09:59:59 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

66

| | | |
|---|---|---|
| 1 | Technical Community College, what was your rate of | 10:11:21 |
| 2 | pay? | 10:11:25 |
| 3 | A.    It was 28,000 a year. | 10:11:25 |
| 4 | Q.    What benefits did you have at Wake | 10:11:30 |
| 5 | Technical Community College? | 10:11:32 |
| 6 | A.    Health insurance. | 10:11:34 |
| 7 | Q.    Were there any other benefits that were | 10:11:36 |
| 8 | offered to you? | 10:11:38 |
| 9 | A.    No. | 10:11:40 |
| 10 | Q.    When you worked at Quest on a PRN | 10:11:42 |
| 11 | basis, were there any benefits available to you? | 10:11:47 |
| 12 | A.    I believe just the 401(k). | 10:11:50 |
| 13 | Q.    Did you participate in the 401(k)? | 10:11:53 |
| 14 | A.    Yes. | 10:11:56 |
| 15 | Q.    As a PRN employee, were there any other | 10:11:57 |
| 16 | benefits that you were eligible for? | 10:12:01 |
| 17 | A.    Not that I know of. | 10:12:04 |
| 18 | Q.    Okay.  Did there come a time when you | 10:12:06 |
| 19 | learned about an opening for a project -- LIS | 10:12:08 |
| 20 | project manager position for Quest at Providence | 10:12:14 |
| 21 | Hospital? | 10:12:17 |
| 22 | A.    Yes. | 10:12:19 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

67

| 1 | Q. How did you become aware of that? | 10:12:19 |
| 2 | A. By a posting in the office. | 10:12:22 |
| 3 | Q. And where was the position posted? | 10:12:24 |
| 4 | A. It was posted on a communication board. | 10:12:28 |
| 5 | Q. So was it posted in hard copy? | 10:12:31 |
| 6 | A. Yes, posted in hard copy. | 10:12:34 |
| 7 | Q. What did the posting say? | 10:12:39 |
| 8 | A. I don't remember exactly, just the one | 10:12:44 |
| 9 | line title, and I believe job number and short | 10:12:47 |
| 10 | description. | 10:12:53 |
| 11 | Q. Okay. In the documents that have been | 10:12:53 |
| 12 | produced in discovery in this case, have you seen | 10:12:59 |
| 13 | that posting that you're referring to? | 10:13:02 |
| 14 | A. Yes. | 10:13:05 |
| 15 | Q. Okay. | 10:13:06 |
| 16 | A. Well, let me say something similar. I | 10:13:09 |
| 17 | don't know if it's the exact same one. | 10:13:11 |
| 18 | Q. When you say "something similar," are | 10:13:23 |
| 19 | you referring to the document that was testified | 10:13:25 |
| 20 | about in Mr. Vandenburg's deposition yesterday? | 10:13:33 |
| 21 | A. Yes. | 10:13:36 |
| 22 | Q. I'm just going to show you -- I'm not | 10:13:41 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

70

| | | |
|---|---|---|
| 1 | area. | 10:15:30 |
| 2 | Q.    Okay.  Was a copy of the job | 10:15:30 |
| 3 | description posted on the intranet? | 10:15:34 |
| 4 | A.    Yes. | 10:15:36 |
| 5 | Q.    It was?  Okay. | 10:15:36 |
| 6 | And do you recall how many pages the | 10:15:39 |
| 7 | job description was on the intranet? | 10:15:42 |
| 8 | A.    It may have been like two screens. | 10:15:46 |
| 9 | Q.    Two screens?  Okay. | 10:15:49 |
| 10 | (Exhibit 9 marked for identification and | |
| 11 | attached hereto.) | |
| 12 | BY MR. STEVENS: | 10:16:03 |
| 13 | Q.    The court reporter has placed before | 10:16:31 |
| 14 | you what has been marked as Deposition Exhibit 9, | 10:16:33 |
| 15 | which is a three-page document bearing the Bates | 10:16:36 |
| 16 | labels Q00046 through Q00048. | 10:16:39 |
| 17 | Please take the time you need to review | 10:16:48 |
| 18 | that document and let me know when you're prepared | 10:16:50 |
| 19 | to talk about it. | 10:16:54 |
| 20 | A.    I'm ready. | 10:17:05 |
| 21 | Q.    Okay.  Can you identify that document | 10:17:06 |
| 22 | for me, please? | 10:17:11 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

71

| | | |
|---|---|---|
| 1 | A.    Yes.  This is the position description | 10:17:12 |
| 2 | for the project manager, Providence Hospital. | 10:17:18 |
| 3 | Q.    Okay.  Is this the -- Is this what you | 10:17:26 |
| 4 | understand to be the position description for the | 10:17:30 |
| 5 | position you applied for? | 10:17:32 |
| 6 | A.    No. | 10:17:34 |
| 7 | MR. JOHNSON:  Objection to the form. | 10:17:35 |
| 8 | BY MR. STEVENS: | 10:17:36 |
| 9 | Q.    Did the information on the intranet | 10:17:37 |
| 10 | that you just testified about contain any of the | 10:17:40 |
| 11 | information that's on this position description? | 10:17:44 |
| 12 | MR. JOHNSON:  Objection to the form. | 10:17:48 |
| 13 | Go ahead. | 10:17:49 |
| 14 | BY MR. STEVENS: | 10:17:50 |
| 15 | Q.    You can answer. | 10:17:51 |
| 16 | A.    I haven't had a chance to compare this | 10:17:52 |
| 17 | description to the original job description on the | 10:17:54 |
| 18 | intranet.  The first time I saw this position | 10:17:59 |
| 19 | description was at my EEOC meeting.  I believe | 10:18:03 |
| 20 | that was in March -- | 10:18:08 |
| 21 | Q.    Okay. | 10:18:09 |
| 22 | A.    -- of last year. | 10:18:10 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

77

| | | |
|---|---|---|
| 1 | Department at Quest did not create a position | 10:24:03 |
| 2 | description containing this information, the | 10:24:08 |
| 3 | information that's on Exhibit 9, prior to the job | 10:24:12 |
| 4 | being posted? | 10:24:16 |
| 5 | A.    No. | 10:24:18 |
| 6 | Q.    After you saw the job posted on the | 10:24:20 |
| 7 | bulletin board that you testified about, what, if | 10:24:26 |
| 8 | anything, did you do to express an interest in the | 10:24:29 |
| 9 | position? | 10:24:32 |
| 10 | A.    I went on the intranet for more detail. | 10:24:33 |
| 11 | Then there is a form that you have to fill out to | 10:24:37 |
| 12 | request transfer from one position to another | 10:24:42 |
| 13 | within the company. | 10:24:47 |
| 14 | Q.    Okay.  And did you complete that form? | 10:24:48 |
| 15 | A.    Yes, I did. | 10:24:53 |
| 16 | Q.    Who did you submit that form to? | 10:24:54 |
| 17 | A.    I submitted it to my supervisor, | 10:24:57 |
| 18 | Isabel. | 10:25:00 |
| 19 | Q.    Did she sign it? | 10:25:01 |
| 20 | A.    Yes, she did. | 10:25:02 |
| 21 | Q.    Did she encourage you to apply for the | 10:25:04 |
| 22 | position? | 10:25:08 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

79

| | | |
|---|---|---|
| 1 | which is posted in HR, and I assume that they | 10:26:15 |
| 2 | correspond the job number to the job description | 10:26:21 |
| 3 | and then they'll know what job the employee is | 10:26:28 |
| 4 | trying to transfer to. | 10:26:32 |
| 5 | Q.    Did there come a time when you | 10:26:35 |
| 6 | submitted any other documents besides the request | 10:26:37 |
| 7 | for transfer form that Ms. Aglipay signed? | 10:26:42 |
| 8 | A.    With the request for transfer you | 10:26:46 |
| 9 | submit your latest evaluation and your résumé. | 10:26:48 |
| 10 | I'm not sure if there is anything else. | 10:26:55 |
| 11 | Q.    Okay.  And am I correct that the résumé | 10:26:57 |
| 12 | that you submitted is the résumé that is in front | 10:27:02 |
| 13 | of you as Deposition Exhibit 6? | 10:27:08 |
| 14 | A.    Yes. | 10:27:10 |
| 15 | Q.    After you submitted your application | 10:27:19 |
| 16 | for the position, what, if anything, happened next | 10:27:23 |
| 17 | in the process? | 10:27:27 |
| 18 | A.    I was -- I received a phone call from | 10:27:28 |
| 19 | Mr. Vandenburg in reference to the position. | 10:27:31 |
| 20 | Well, before that, I was left a note on the white | 10:27:33 |
| 21 | board to contact Mr. Vandenburg, and I was on | 10:27:40 |
| 22 | vacation.  When I came back from vacation -- | 10:27:44 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

80

| | | |
|---|---|---|
| 1 | During vacation I had spoken with a friend of mine | 10:27:49 |
| 2 | that worked there, and she informed me that there | 10:27:52 |
| 3 | was a note on the board from Mr. Vandenburg, for | 10:27:55 |
| 4 | me to contact him. | 10:28:00 |
| 5 | Q.   Okay. | 10:28:01 |
| 6 | A.   And so when I got back to work, by me | 10:28:02 |
| 7 | working third shift and him working the day shift, | 10:28:05 |
| 8 | somewhere in there we missed each other.  So I | 10:28:10 |
| 9 | wrote him a note saying that I did get his | 10:28:13 |
| 10 | message, and I contacted him in reference to the | 10:28:16 |
| 11 | job. | 10:28:20 |
| 12 | Q.   Okay. | 10:28:20 |
| 13 | (Exhibit 10 marked for identification and | |
| 14 | attached hereto.) | |
| 15 | BY MR. STEVENS: | 10:28:21 |
| 16 | Q.   The court reporter has placed in front | 10:28:35 |
| 17 | of you what is marked as Deposition Exhibit No. 10 | 10:28:38 |
| 18 | which is a one-page document. | 10:28:41 |
| 19 | Please take the time you need to review | 10:28:43 |
| 20 | that and let me know when you're ready to discuss | 10:28:45 |
| 21 | it. | 10:28:47 |
| 22 | A.   I'm ready. | 10:28:49 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

82

| | | |
|---|---|---|
| 1 | about this position prior to sending him this | 10:29:45 |
| 2 | note? | 10:29:52 |
| 3 | A. No. | 10:29:52 |
| 4 | Q. So prior to July 26, 2005, you had not | 10:29:57 |
| 5 | had any communications with him about this LIS | 10:30:01 |
| 6 | project manager position; is that correct? | 10:30:06 |
| 7 | A. No. Yes, that's correct. | 10:30:10 |
| 8 | Q. When did you see the posting for this | 10:30:13 |
| 9 | position on the bulletin board? | 10:30:18 |
| 10 | A. I believe it was in May of 2005. | 10:30:20 |
| 11 | Q. And how soon after you saw that posting | 10:30:25 |
| 12 | did you submit your application? | 10:30:27 |
| 13 | A. Probably two weeks. | 10:30:30 |
| 14 | Q. Okay. So after you sent this letter, | 10:30:32 |
| 15 | Deposition Exhibit 10, to Mr. Vandenburg, did you | 10:30:41 |
| 16 | and he eventually connect? | 10:30:45 |
| 17 | A. Yes. | 10:30:47 |
| 18 | Q. And how did you connect? | 10:30:47 |
| 19 | A. He called me at home. | 10:30:49 |
| 20 | Q. When did he call you? | 10:30:51 |
| 21 | A. I don't remember the exact date. | 10:30:53 |
| 22 | Q. Okay. | 10:30:55 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

83

| | | |
|---|---|---|
| 1 | A.    I know it was in the morning. | 10:30:56 |
| 2 | Q.    Okay.  And please -- Did you have a | 10:30:57 |
| 3 | telephone conference at that time, a telephone | 10:31:04 |
| 4 | call? | 10:31:07 |
| 5 | A.    Yes. | 10:31:07 |
| 6 | Q.    Please tell me as best you can what he | 10:31:08 |
| 7 | said and what you said during that conversation, | 10:31:11 |
| 8 | and in what order. | 10:31:13 |
| 9 | A.    He called, and he said that he was | 10:31:16 |
| 10 | calling me about the IT position, that they had | 10:31:21 |
| 11 | received several applications, and if I was | 10:31:26 |
| 12 | interested in the position.  And I told him yes. | 10:31:32 |
| 13 | And he questioned me about my | 10:31:38 |
| 14 | experience.  His first question was my school, my | 10:31:45 |
| 15 | bachelor's, what that entailed.  And then what was | 10:31:53 |
| 16 | I taking as far as my IT courses. | 10:32:00 |
| 17 | And I explained to him the curriculum, | 10:32:03 |
| 18 | that I was finishing -- well, which I had just | 10:32:08 |
| 19 | finished in May. | 10:32:11 |
| 20 | And then he asked me prior to that how | 10:32:13 |
| 21 | did I get into the computer field, or what did I | 10:32:16 |
| 22 | do before I became a med tech, and how did I get | 10:32:22 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

84

| | | |
|---|---|---|
| 1 | into the computer field. | 10:32:26 |
| 2 | And I explained to him that in high | 10:32:28 |
| 3 | school I graduated as a certified electronic | 10:32:30 |
| 4 | technician.  I worked for Digital Computer | 10:32:35 |
| 5 | Corporation.  I had some engineering that I had | 10:32:36 |
| 6 | done.  And I also explained to him that when I was | 10:32:44 |
| 7 | in the military I did some -- the system that I | 10:32:48 |
| 8 | worked on was a telephone switching system. | 10:32:54 |
| 9 | And then he informed me that he wasn't | 10:33:03 |
| 10 | the IT person and at some point I would be having | 10:33:06 |
| 11 | an interview with Mr. Leap.  He was going to | 10:33:12 |
| 12 | assist in making the hiring decision for the | 10:33:16 |
| 13 | position. | 10:33:19 |
| 14 | Q.    Okay.  Do you recall you or he saying | 10:33:24 |
| 15 | anything else during that conversation? | 10:33:28 |
| 16 | A.    That's all I recall. | 10:33:30 |
| 17 | Q.    Okay.  And do you recall approximately | 10:33:31 |
| 18 | how long the phone call lasted? | 10:33:33 |
| 19 | A.    Probably about 20 minutes. | 10:33:37 |
| 20 | Q.    Did you request that you have a | 10:33:45 |
| 21 | face-to-face interview with Mr. Vandenburg? | 10:33:47 |
| 22 | A.    No. | 10:33:50 |

# EXHIBIT 2
## PART 3

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

86

| | | |
|---|---|---|
| 1 | and say good morning. | 10:34:42 |
| 2 | Q.    Do you know for a fact that he knew | 10:34:43 |
| 3 | your name was Bridget Pollard? | 10:34:46 |
| 4 | A.    I don't know what he knew. | 10:34:48 |
| 5 | Q.    Okay.  So you don't know if when he | 10:34:49 |
| 6 | spoke to you about this position, whether he knew | 10:34:52 |
| 7 | what your race was, do you? | 10:34:54 |
| 8 | A.    I believe he did. | 10:34:56 |
| 9 | Q.    What evidence do you have that he did? | 10:34:58 |
| 10 | A.    I don't have any evidence.  Except for | 10:35:01 |
| 11 | that he had my records and that sort of | 10:35:03 |
| 12 | information available. | 10:35:09 |
| 13 | Q.    What information in your -- | 10:35:10 |
| 14 | A.    My application, something or another. | 10:35:12 |
| 15 | Q.    Do you have any evidence that anything | 10:35:15 |
| 16 | in your application indicated that you were black? | 10:35:18 |
| 17 | A.    No, I don't. | 10:35:20 |
| 18 | Q.    And I believe you told me that prior to | 10:35:26 |
| 19 | yesterday you never met Mr. Leap; is that correct? | 10:35:28 |
| 20 | A.    That's correct. | 10:35:31 |
| 21 | Q.    Do you have any evidence to suggest | 10:35:31 |
| 22 | that Mr. Leap knew what your race was when you | 10:35:33 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

87

| | | |
|---|---|---|
| 1 | submitted your application? | 10:35:37 |
| 2 | A.    No, I don't. | 10:35:38 |
| 3 | Q.    After you spoke to Mr. Vandenburg about | 10:35:45 |
| 4 | the position, what, if anything, happened next in | 10:35:51 |
| 5 | connection with your application for this | 10:35:56 |
| 6 | position? | 10:35:57 |
| 7 | A.    I was called by HR, and they informed | 10:35:58 |
| 8 | me that the position had been filled. | 10:36:03 |
| 9 | Q.    Do you recall when that was? | 10:36:07 |
| 10 | A.    I want to say maybe in September, | 10:36:13 |
| 11 | October of that year. | 10:36:18 |
| 12 | Q.    Of 2005? | 10:36:22 |
| 13 | A.    Yes, I believe so. | 10:36:24 |
| 14 | Q.    Okay.  I just want to get some of the | 10:36:26 |
| 15 | timing straight.  If you look at Deposition | 10:36:29 |
| 16 | Exhibit 10, your letter to Mr. Vandenburg is dated | 10:36:31 |
| 17 | July 26, 2005, correct? | 10:36:34 |
| 18 | A.    Yes. | 10:36:36 |
| 19 | Q.    Do you recall approximately when he | 10:36:38 |
| 20 | called you in response to this letter?  Would it | 10:36:41 |
| 21 | have been a couple of days after this? | 10:36:46 |
| 22 | A.    It may have been a week later. | 10:36:48 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

98

| | | |
|---|---|---|
| 1 | A.    I didn't know anything about him. | 10:47:53 |
| 2 | Q.    Okay.  Did you know the other people -- | 10:47:55 |
| 3 | Strike that. | 10:48:03 |
| 4 | Except for Mr. Townsend and Ms. Kopley, | 10:48:04 |
| 5 | who are listed on this form, did you know any of | 10:48:08 |
| 6 | the other employees who had submitted | 10:48:13 |
| 7 | applications? | 10:48:16 |
| 8 | A.    I was -- I had seen Tuy Le maybe on | 10:48:17 |
| 9 | occasion. | 10:48:25 |
| 10 | Q.    And who was Tuy Le? | 10:48:25 |
| 11 | A.    He was a support personnel for the IT | 10:48:28 |
| 12 | Department, and he worked out of Chantilly. | 10:48:30 |
| 13 | Q.    And did you think he was qualified for | 10:48:36 |
| 14 | the position? | 10:48:38 |
| 15 | A.    Yes, he could have been qualified. | 10:48:38 |
| 16 | Q.    How about Nicole Alexander, did you | 10:48:42 |
| 17 | know her? | 10:48:49 |
| 18 | A.    No. | 10:48:50 |
| 19 | Q.    Do you know anything about her | 10:48:50 |
| 20 | qualifications for the position? | 10:48:51 |
| 21 | A.    No. | 10:48:53 |
| 22 | Q.    How about Demetress Cheek, do you know | 10:48:54 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

102

| | | |
|---|---|---|
| 1 | race? | 10:52:09 |
| 2 | MR. JOHNSON: Hold on a second. | 10:52:09 |
| 3 | Objection. | 10:52:09 |
| 4 | Answer that if you can. | 10:52:11 |
| 5 | THE WITNESS: Not at the time. | 10:52:13 |
| 6 | BY MR. STEVENS: | 10:52:14 |
| 7 | Q. What do you mean? | 10:52:14 |
| 8 | MR. JOHNSON: Same objection. | 10:52:15 |
| 9 | Go ahead. | 10:52:17 |
| 10 | THE WITNESS: I mean that if after all | 10:52:18 |
| 11 | of this has occurred and then they hired somebody | 10:52:20 |
| 12 | that was black that was a female that was | 10:52:23 |
| 13 | qualified, I don't think that has anything to do | 10:52:25 |
| 14 | with what happened previously. They just found -- | 10:52:28 |
| 15 | After Mr. Townsend left, they just found somebody | 10:52:32 |
| 16 | else that was qualified. | 10:52:37 |
| 17 | BY MR. STEVENS: | 10:52:38 |
| 18 | Q. Now, is it your understanding that | 10:52:38 |
| 19 | prior to Mr. Townsend being offered the position, | 10:52:43 |
| 20 | that Ms. Kopley was offered the position? | 10:52:47 |
| 21 | A. Yes, that's my understanding. | 10:52:50 |
| 22 | Q. And is it your position that you were | 10:52:52 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

103

| 1 | more qualified for the job than Ms. Kopley? | 10:52:54 |
| 2 | A.    That is not my position. | 10:52:57 |
| 3 | Q.    Do you think she was more qualified | 10:52:59 |
| 4 | than you for the job? | 10:53:00 |
| 5 | MR. JOHNSON:  Objection. | 10:53:02 |
| 6 | You can answer that. | 10:53:03 |
| 7 | THE WITNESS:  I believe from -- Yes, | 10:53:04 |
| 8 | that she had more qualifications than I had.  Yes. | 10:53:06 |
| 9 | BY MR. STEVENS: | 10:53:10 |
| 10 | Q.    So is it your belief, then, that the | 10:53:10 |
| 11 | decision to initially offer the position to | 10:53:13 |
| 12 | Ms. Kopley was not a discriminatory decision? | 10:53:16 |
| 13 | MR. JOHNSON:  Objection. | 10:53:20 |
| 14 | Go ahead. | 10:53:20 |
| 15 | THE WITNESS:  I believe that. | 10:53:21 |
| 16 | (Exhibit 11 marked for identification and | |
| 17 | attached hereto.) | |
| 18 | BY MR. STEVENS: | 10:53:38 |
| 19 | Q.    The court reporter has placed before | 10:54:04 |
| 20 | you a document that is marked as Deposition | 10:54:07 |
| 21 | Exhibit 11, which is a one-page document bearing | 10:54:14 |
| 22 | the Bates label in the bottom right-hand corner of | 10:54:19 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

104

| | | |
|---|---|---|
| 1 | Q00120. | 10:54:21 |
| 2 | Please take the time you need to review | 10:54:24 |
| 3 | that document and let me know when you're prepared | 10:54:26 |
| 4 | to answer questions about it. | 10:54:28 |
| 5 | A.    I'm ready. | 10:54:38 |
| 6 | Q.    Can you identify that document for me, | 10:54:39 |
| 7 | please? | 10:54:41 |
| 8 | A.    This looks to be the résumé of Jane L. | 10:54:42 |
| 9 | Kopley. | 10:54:46 |
| 10 | Q.    And have you seen this document before? | 10:54:47 |
| 11 | A.    I may have seen it in some information | 10:54:51 |
| 12 | that was forwarded to me from Quest. | 10:54:56 |
| 13 | Q.    And is this the résumé of, as you | 10:55:01 |
| 14 | understand it, the Jane Kopley who was offered the | 10:55:05 |
| 15 | position prior to Sean Townsend? | 10:55:11 |
| 16 | MR. JOHNSON:  Objection. | 10:55:15 |
| 17 | THE WITNESS:  I believe so. | 10:55:16 |
| 18 | BY MR. STEVENS: | 10:55:16 |
| 19 | Q.    Is there anything on the résumé that | 10:55:17 |
| 20 | suggests to you that Ms. Kopley was more qualified | 10:55:20 |
| 21 | for the project manager position than you were? | 10:55:23 |
| 22 | A.    The fact that she is Sigma Six trained, | 10:55:30 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

105

| | | |
|---|---|---|
| 1 | that's a management thing there, that she may | 10:55:34 |
| 2 | have -- Well, no.  She says she created a | 10:55:46 |
| 3 | database.  She created and graded a post-training | 10:56:09 |
| 4 | of competency evaluation tool. | 10:56:13 |
| 5 | Q.    Is there anything -- I'm sorry.  Is | 10:56:24 |
| 6 | there anything else on the résumé that suggests to | 10:56:27 |
| 7 | you that she was more qualified for the position | 10:56:30 |
| 8 | than you were? | 10:56:33 |
| 9 | A.    There's nothing that really stands out. | 10:56:36 |
| 10 | Q.    Now, do you understand from the résumé | 10:56:43 |
| 11 | that she was a member of the team to build, | 10:56:47 |
| 12 | validate and implement SoftLab IS for the | 10:56:53 |
| 13 | automated lab at Holy Cross Hospital? | 10:56:59 |
| 14 | A.    Yes. | 10:57:02 |
| 15 | Q.    And did you understand that her résumé | 10:57:03 |
| 16 | indicated that she participated in the interface | 10:57:07 |
| 17 | validation of 13 laboratory instruments? | 10:57:10 |
| 18 | A.    Yes. | 10:57:12 |
| 19 | Q.    Did any of that -- Do either of those | 10:57:18 |
| 20 | two experiences, in your mind, make her more | 10:57:25 |
| 21 | qualified for the project manager position than | 10:57:29 |
| 22 | you? | 10:57:31 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

106

| | | |
|---|---|---|
| 1 | MR. JOHNSON:  Objection. | 10:57:32 |
| 2 | THE WITNESS:  As a member of the LIS | 10:57:34 |
| 3 | team, I would probably need more information on | 10:57:37 |
| 4 | her, what she did as a member, to definitely say | 10:57:43 |
| 5 | that that was something. | 10:57:47 |
| 6 | And as far as validation is concerned, | 10:57:50 |
| 7 | that doesn't actually -- from an IT point of view, | 10:57:55 |
| 8 | the validation is basically -- I don't know how to | 10:58:03 |
| 9 | phrase that as far as -- it's not like a big | 10:58:09 |
| 10 | implementation.  That's the final phase, the | 10:58:14 |
| 11 | validation. | 10:58:17 |
| 12 | BY MR. STEVENS: | 10:58:18 |
| 13 | Q.    In any of your prior work experience, | 10:58:19 |
| 14 | have you ever built or implemented any upgrades to | 10:58:23 |
| 15 | an existing LIS system? | 10:58:28 |
| 16 | A.    Probably not to the degree that she | 10:58:42 |
| 17 | had. | 10:58:44 |
| 18 | Q.    Have you ever done it? | 10:58:45 |
| 19 | A.    Yes. | 10:58:46 |
| 20 | Q.    Okay.  When did you build and implement | 10:58:47 |
| 21 | upgrades into an LIS system? | 10:58:50 |
| 22 | A.    I didn't build the upgrade.  I assisted | 10:58:53 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

107

| | | |
|---|---|---|
| 1 | in implementing the upgrade for a Sunquest system | 10:58:56 |
| 2 | at -- I'm getting nervous -- at Southern Maryland. | 10:59:00 |
| 3 | Q.    Who did you work with in doing that? | 10:59:07 |
| 4 | A.    The IT person there was Darlene.  And | 10:59:11 |
| 5 | what we did is we basically downloaded the | 10:59:14 |
| 6 | software and did some entries and ran some | 10:59:17 |
| 7 | specimens to make sure that it was going to be | 10:59:23 |
| 8 | compatible. | 10:59:26 |
| 9 | Q.    Okay.  Did you train any staff in the | 10:59:27 |
| 10 | use of the upgraded LIS system? | 10:59:31 |
| 11 | A.    I trained staff how to use the LIS | 10:59:36 |
| 12 | system but not to upgrade. | 10:59:41 |
| 13 | Q.    Who did you train? | 10:59:43 |
| 14 | A.    Actually, I trained Michelle Coates at | 10:59:44 |
| 15 | Southern Maryland.  She is one of the persons. | 10:59:48 |
| 16 | Q.    Other than Michelle Coates, who did you | 10:59:49 |
| 17 | train? | 10:59:52 |
| 18 | A.    I can't recall. | 10:59:52 |
| 19 | Q.    Okay.  But you don't think it was | 10:59:54 |
| 20 | discriminatory for Quest to offer the position to | 11:00:05 |
| 21 | Jane Kopley? | 11:00:12 |
| 22 | MR. JOHNSON:  Objection. | 11:00:15 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

108

| | | |
|---|---|---|
| 1 | Go ahead. | 11:00:16 |
| 2 | THE WITNESS:  Not knowing what I know | 11:00:17 |
| 3 | now, no, I don't. | 11:00:18 |
| 4 | BY MR. STEVENS: | 11:00:21 |
| 5 | Q.    But you do think it was discriminatory | 11:00:21 |
| 6 | for Quest to offer the position to Mr. Townsend? | 11:00:24 |
| 7 | A.    After finding out what I found out, | 11:00:29 |
| 8 | yes. | 11:00:33 |
| 9 | Q.    Okay.  Why do you think it was | 11:00:33 |
| 10 | discriminatory for Quest to offer the position to | 11:00:35 |
| 11 | Mr. Townsend? | 11:00:37 |
| 12 | A.    Well, I think that it was | 11:00:39 |
| 13 | discriminatory because -- initially because I was | 11:00:41 |
| 14 | an in-house employee who was familiar with the | 11:00:51 |
| 15 | system, and I was aware of some of the needs of | 11:00:55 |
| 16 | the doctors and my co-workers for the system as an | 11:01:00 |
| 17 | upgrade.  And I felt that it was discriminatory | 11:01:08 |
| 18 | because they never reposted the position in order | 11:01:11 |
| 19 | for me to have an opportunity to reapply. | 11:01:16 |
| 20 | From my understanding, out of the | 11:01:21 |
| 21 | applicants, it would have been myself, | 11:01:24 |
| 22 | Mr. Townsend and Mr. Le.  And I don't think that I | 11:01:31 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

109

| | | |
|---|---|---|
| 1 | had a fair opportunity.  There may have been a | 11:01:35 |
| 2 | possibility that Mr. Townsend would not have | 11:01:38 |
| 3 | reapplied and I would have had the opportunity to | 11:01:40 |
| 4 | have the position. | 11:01:44 |
| 5 | Q.    Why did you think the company had to | 11:01:46 |
| 6 | repost the position if they had already posted it | 11:01:49 |
| 7 | and had already gotten applicants for it? | 11:01:54 |
| 8 | A.    I thought that was how they handled | 11:01:57 |
| 9 | their jobs in general, that if somebody doesn't | 11:02:00 |
| 10 | accept it, that it be reposted. | 11:02:05 |
| 11 | Q.    Are you aware of any policy that says | 11:02:08 |
| 12 | if the highest rated applicant doesn't accept an | 11:02:11 |
| 13 | offer, that it's the policy or practice of Quest | 11:02:16 |
| 14 | to repost the position? | 11:02:21 |
| 15 | A.    No, I'm not aware of a policy. | 11:02:22 |
| 16 | Q.    Are you aware of any other situation | 11:02:24 |
| 17 | while you worked at Quest where a candidate | 11:02:27 |
| 18 | declined a position and Quest reposted it? | 11:02:30 |
| 19 | A.    Not exactly. | 11:02:36 |
| 20 | Q.    Okay.  Why not exactly? | 11:02:38 |
| 21 | A.    Because there have been instances where | 11:02:40 |
| 22 | jobs have been -- for technologists or | 11:02:43 |

# EXHIBIT 2
## PART 4

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

112

| | | |
|---|---|---|
| 1 | A.    No, I don't. | 11:10:57 |
| 2 | Q.    Do you know if Mr. Townsend -- Strike | 11:10:58 |
| 3 | that. | 11:11:03 |
| 4 | Do you know if Mr. Leap knew | 11:11:03 |
| 5 | Ms. Kopley's race before she was offered the | 11:11:06 |
| 6 | position? | 11:11:09 |
| 7 | A.    No, I don't. | 11:11:10 |
| 8 | Q.    Do you have any evidence to suggest | 11:11:12 |
| 9 | that Mr. Leap met Ms. Kopley before she was | 11:11:14 |
| 10 | offered the position? | 11:11:19 |
| 11 | A.    No, I don't. | 11:11:21 |
| 12 | (Exhibit 12 marked for identification and | |
| 13 | attached hereto.) | |
| 14 | BY MR. STEVENS: | 11:11:39 |
| 15 | Q.    The court reporter has placed before | 11:11:59 |
| 16 | you what has been marked as Pollard Exhibit 12, | 11:12:02 |
| 17 | which is a four-page document labeled with the | 11:12:07 |
| 18 | Bates numbers Q00057 through Q0060. | 11:12:14 |
| 19 | Please take a look at that document and | 11:12:23 |
| 20 | let me know when you're prepared to talk about it. | 11:12:25 |
| 21 | A.    I'm ready. | 11:12:49 |
| 22 | Q.    Can you identify that document for me, | 11:12:51 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

113

| | | |
|---|---|---|
| 1 | please? | 11:12:53 |
| 2 | A.    This is the résumé of Sean Townsend. | 11:12:53 |
| 3 | Q.    And is it your understanding that this | 11:13:00 |
| 4 | is the résumé he submitted for the project manager | 11:13:02 |
| 5 | position that you also applied for? | 11:13:06 |
| 6 | A.    Yes. | 11:13:08 |
| 7 | Q.    Did you note that his résumé is four | 11:13:09 |
| 8 | pages long? | 11:13:13 |
| 9 | A.    Yes.  Well, actually, the details are | 11:13:14 |
| 10 | only two pages.  The references -- | 11:13:18 |
| 11 | Q.    Are two pages. | 11:13:21 |
| 12 | So the total document is four pages; is | 11:13:23 |
| 13 | that correct? | 11:13:26 |
| 14 | A.    Yes. | 11:13:27 |
| 15 | Q.    Do you have any reason to believe that | 11:13:28 |
| 16 | any information on his résumé is false? | 11:13:31 |
| 17 | A.    Yes. | 11:13:34 |
| 18 | Q.    Which information? | 11:13:34 |
| 19 | A.    At the time of the position being | 11:13:45 |
| 20 | posted, he was not currently enrolled in a | 11:13:49 |
| 21 | master's of science information systems program. | 11:13:54 |
| 22 | "2004 to present, responsible for | 11:14:08 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

114

| | | |
|---|---|---|
| 1 | interfacing all laboratory instruments with the | 11:14:11 |
| 2 | new LIS SoftLab." | 11:14:16 |
| 3 | Q.    That's false, too? | 11:14:21 |
| 4 | A.    I believe that to be false. | 11:14:23 |
| 5 | Q.    Okay.  Anything else you believe to be | 11:14:25 |
| 6 | false? | 11:14:28 |
| 7 | A.    No. | 11:14:35 |
| 8 | Q.    Now, how do you know that it's false | 11:14:38 |
| 9 | that at the time he submitted this résumé that he | 11:14:41 |
| 10 | was currently enrolled in the master's of science | 11:14:46 |
| 11 | information systems program? | 11:14:51 |
| 12 | A.    I believe it was in the EEOC meeting | 11:14:52 |
| 13 | that Mr. Knapp indicated that he had enrolled in | 11:14:56 |
| 14 | this program in September. | 11:15:04 |
| 15 | Q.    Of what year? | 11:15:07 |
| 16 | A.    Of 2005. | 11:15:09 |
| 17 | Q.    Okay.  Do you have any information | 11:15:11 |
| 18 | beyond what you say Mr. Knapp said to suggest that | 11:15:19 |
| 19 | that statement that he was currently enrolled in | 11:15:25 |
| 20 | the program is incorrect? | 11:15:28 |
| 21 | A.    No. | 11:15:29 |
| 22 | Q.    By the way, Ms. Kopley did not have a | 11:15:32 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

115

| | | |
|---|---|---|
| 1 | degree in information systems, did she? | 11:15:39 |
| 2 | A.    No.   And I don't think that was | 11:15:42 |
| 3 | required on the job description. | 11:15:43 |
| 4 | Q.    Okay.   Now, you also said that on | 11:15:45 |
| 5 | the -- under "Work History," that you believe it's | 11:16:00 |
| 6 | false that from 2004 to present he was responsible | 11:16:04 |
| 7 | for interfacing all laboratory instruments with | 11:16:07 |
| 8 | the new LIS. | 11:16:12 |
| 9 | What evidence do you have that that's | 11:16:15 |
| 10 | false? | 11:16:17 |
| 11 | A.    Mr. Tsehay also works at Holy Cross, | 11:16:18 |
| 12 | and I believe he is the one that informed me that | 11:16:24 |
| 13 | that was not his position with the new SoftLab | 11:16:28 |
| 14 | system. | 11:16:31 |
| 15 | Q.    Okay.   When did Mr. Tsehay inform you | 11:16:32 |
| 16 | of that? | 11:16:34 |
| 17 | A.    I believe after Mr. Townsend -- I found | 11:16:37 |
| 18 | out after he was hired. | 11:16:44 |
| 19 | Q.    So Mr. Tsehay told you that after | 11:16:47 |
| 20 | Mr. Townsend was hired? | 11:16:49 |
| 21 | A.    Yes. | 11:16:51 |
| 22 | Q.    And how did he tell that to you? | 11:16:51 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

117

| | | |
|---|---|---|
| 1 | Q.    What -- What position did Mr. Tsehay | 11:18:00 |
| 2 | hold at Holy Cross Hospital? | 11:18:04 |
| 3 | A.    He was the assistant lab supervisor. | 11:18:07 |
| 4 | Q.    So he was -- he worked at both Holy | 11:18:11 |
| 5 | Cross and Providence? | 11:18:15 |
| 6 | A.    Yes. | 11:18:17 |
| 7 | Q.    And do you know what level of | 11:18:19 |
| 8 | interaction he had with Mr. Townsend? | 11:18:21 |
| 9 | A.    No, I don't. | 11:18:24 |
| 10 | Q.    Do you know for a fact whether | 11:18:29 |
| 11 | Mr. Tsehay had personal knowledge as to whether | 11:18:30 |
| 12 | Mr. Townsend did what he said with respect to | 11:18:33 |
| 13 | interfacing all laboratory instruments with the | 11:18:36 |
| 14 | new LIS? | 11:18:40 |
| 15 | A.    I believe he would. | 11:18:41 |
| 16 | Q.    But do you have any personal knowledge | 11:18:42 |
| 17 | to that effect? | 11:18:44 |
| 18 | A.    No, I don't. | 11:18:45 |
| 19 | Q.    Do you know if Mr. Vandenburg or | 11:18:48 |
| 20 | Mr. Leap or anyone in the Human Resources | 11:18:56 |
| 21 | Department at Quest knew that any information on | 11:19:01 |
| 22 | Mr. Townsend's résumé was false at the time they | 11:19:07 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

118

1   made the offer?                                             11:19:11

2        A.    No, I don't know.                                11:19:12

3        Q.    You don't have any evidence that they            11:19:13

4   knew that there was any false information on this           11:19:15

5   application, do you?                                        11:19:18

6        A.    No, I don't have any evidence.                   11:19:19

7        Q.    If it was true that from 2004 to                 11:19:30

8   present Mr. Townsend was responsible for                    11:19:36

9   interfacing all laboratory instruments with the            11:19:40

10  new LIS and for building the respiratory and                11:19:43

11  point-of-care components for SoftLab, that would            11:19:47

12  have made him more qualified for the position than          11:19:51

13  you were --                                                 11:19:54

14            MR. JOHNSON:  Objection.                           11:19:54

15       Q.    -- wouldn't it have?                             11:19:54

16            MR. JOHNSON:  Objection.  Sorry.                   11:19:56

17            THE WITNESS:  Yeah, that would have                11:19:58

18  gave him some more experience.                              11:19:59

19  BY MR. STEVENS:                                             11:20:00

20       Q.    That would have made him more qualified          11:20:00

21  than you; isn't that correct?                               11:20:03

22            MR. JOHNSON:  Same objection.                      11:20:04

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

119

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yes. | 11:20:05 |
| 2 | BY MR. STEVENS: | 11:20:06 |
| 3 | Q.    And do you have any reason to believe | 11:20:08 |
| 4 | that under 1999 to present, the description of | 11:20:11 |
| 5 | what he did at Holy Cross Hospital is incorrect? | 11:20:20 |
| 6 | A.    No. | 11:20:36 |
| 7 | Q.    Do you have any reason to believe that | 11:20:37 |
| 8 | other than what you've already testified about, | 11:20:40 |
| 9 | that there is any other false information on his | 11:20:43 |
| 10 | résumé? | 11:20:46 |
| 11 | A.    Say that again. | 11:20:47 |
| 12 | Q.    Do you have any information to suggest | 11:20:48 |
| 13 | that anything else on his résumé, other than what | 11:20:51 |
| 14 | you've already testified about, is false? | 11:20:54 |
| 15 | A.    No. | 11:20:57 |
| 16 | (Exhibit 13 marked for identification and | |
| 17 | attached hereto.) | |
| 18 | BY MR. STEVENS: | 11:21:15 |
| 19 | Q.    The court reporter has placed before | 11:21:35 |
| 20 | you what has been marked as Deposition Exhibit 13, | 11:21:36 |
| 21 | which is a two-page document with the Bates labels | 11:21:39 |
| 22 | Q00127 and Q00128. | 11:21:44 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

125

| | | |
|---|---|---|
| 1 | position. | 11:27:01 |
| 2 | Q. Did you claim to her that you felt you | 11:27:01 |
| 3 | didn't get the position because of your race? | 11:27:05 |
| 4 | A. I don't know if at that time that I -- | 11:27:10 |
| 5 | Probably I -- Maybe I did, because I had already | 11:27:14 |
| 6 | filed the EEOC complaint. | 11:27:17 |
| 7 | Q. Okay. So it's your testimony that at | 11:27:19 |
| 8 | the time you had this conversation with her you | 11:27:21 |
| 9 | had already filed your EEOC complaint? | 11:27:23 |
| 10 | A. I believe so. | 11:27:26 |
| 11 | Q. Did you tell her you had filed the EEOC | 11:27:27 |
| 12 | complaint? | 11:27:29 |
| 13 | A. I believe I did. | 11:27:30 |
| 14 | Q. You believe you did, or do you know for | 11:27:31 |
| 15 | a fact that you did? | 11:27:33 |
| 16 | A. I don't -- I don't know for a fact that | 11:27:35 |
| 17 | I did. I know it was just that after -- after | 11:27:37 |
| 18 | Michael Knapp, the information got out that | 11:27:43 |
| 19 | Michael Knapp had to come to an EEOC meeting and | 11:27:47 |
| 20 | that I was filing a complaint, it was basically | 11:27:52 |
| 21 | workplace knowledge that the complaint was filed. | 11:27:55 |
| 22 | Q. How do you know it was workplace | 11:28:00 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

129

| | | |
|---|---|---|
| 1 | to -- as I didn't get the position either was how | 11:30:39 |
| 2 | the conversation came about.  But I had already | 11:30:45 |
| 3 | filed the complaint. | 11:30:50 |
| 4 | BY MR. STEVENS: | 11:30:51 |
| 5 | Q.    I understand that's your testimony. | 11:30:51 |
| 6 | But what I'm trying to figure out is you told me | 11:30:53 |
| 7 | you understood from a conversation you had with | 11:30:56 |
| 8 | Isabelita Aglipay that she knew you had filed an | 11:31:00 |
| 9 | EEOC charge.  And I'm trying to find out what was | 11:31:03 |
| 10 | said in that conversation and what led you to | 11:31:06 |
| 11 | believe that she knew you had filed an EEOC | 11:31:10 |
| 12 | charge. | 11:31:13 |
| 13 | A.    Then maybe she didn't know.  Maybe I | 11:31:14 |
| 14 | thought she knew from the conversation that I had | 11:31:16 |
| 15 | filed a complaint. | 11:31:19 |
| 16 | Q.    So sitting here today, you don't know | 11:31:21 |
| 17 | whether she knew you filed an EEOC charge or not? | 11:31:24 |
| 18 | A.    No, I don't. | 11:31:27 |
| 19 | Q.    How about Elmore Wright? | 11:31:28 |
| 20 | A.    I don't know if he knew or not. | 11:31:30 |
| 21 | Q.    How about Hewitt Leghesse? | 11:31:32 |
| 22 | A.    I don't know if she knew or not. | 11:31:35 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

130

1    Q.    Are you aware of anybody else that    11:31:37

2    worked with you at Providence lab besides    11:31:40

3    Mr. Vandenburg that knew you had filed an EEOC    11:31:46

4    charge?    11:31:50

5    A.    I'm sure somebody in HR and Mr. Knapp,    11:31:51

6    because he had to come to the complaint as their    11:31:54

7    representative.    11:31:58

8    Q.    I'm talking about at Providence.    11:31:59

9    A.    No.    11:32:01

10    Q.    Okay.  Mr. Knapp works in Chantilly,    11:32:02

11    doesn't he?    11:32:06

12    A.    Yes, he does.    11:32:07

13    Q.    And the HR Department is in Chantilly,    11:32:08

14    Virginia, also; isn't that right?    11:32:10

15    A.    Yes, it is.    11:32:13

16    MR. JOHNSON:  Are you okay?  Do you    11:32:20

17    need a break?    11:32:22

18    THE WITNESS:  (Shaking head.)  I could    11:32:26

19    use some air.    11:32:29

20    BY MR. STEVENS:    11:32:36

21    Q.    At the time that you applied for the    11:32:36

22    project manager job, how many years had you used    11:32:38

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

131

| | | |
|---|---|---|
| 1 | the LIS system? | 11:32:43 |
| 2 | A.    Probably maybe eight years. | 11:32:52 |
| 3 | Q.    And had you ever worked with the LIS | 11:33:02 |
| 4 | system, the upgraded LIS system that Quest was | 11:33:06 |
| 5 | going to install? | 11:33:12 |
| 6 | A.    No. | 11:33:13 |
| 7 | Q.    And did you have any experience | 11:33:16 |
| 8 | installing the upgrades to the system that Quest | 11:33:18 |
| 9 | was going to install? | 11:33:22 |
| 10 | A.    No. | 11:33:23 |
| 11 | Q.    And did you have any experience | 11:33:25 |
| 12 | building and testing a new system that included | 11:33:28 |
| 13 | the upgrades that Quest was going to install? | 11:33:33 |
| 14 | A.    No. | 11:33:35 |
| 15 | Q.    And had you ever trained any staff on | 11:33:37 |
| 16 | the use of LIS using the upgrades that Quest was | 11:33:40 |
| 17 | about to install? | 11:33:46 |
| 18 | A.    No. | 11:33:47 |
| 19 | Q.    And had you had any experience | 11:33:50 |
| 20 | collaborating with hospital information system | 11:33:53 |
| 21 | personnel in maintaining the LIS database for the | 11:33:57 |
| 22 | upgraded system that Quest was going to install? | 11:34:01 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

132

| | | |
|---|---|---|
| 1 | A.    No. | 11:34:04 |
| 2 | Q.    And had you had any experience in | 11:34:05 |
| 3 | writing LIS standard operating procedures for the | 11:34:08 |
| 4 | LIS system that Quest was going to install? | 11:34:13 |
| 5 | A.    No. | 11:34:16 |
| 6 | Q.    And did you have any experience in | 11:34:17 |
| 7 | providing any audit trail documentation for the | 11:34:19 |
| 8 | upgraded LIS system that Quest was going to | 11:34:22 |
| 9 | install? | 11:34:26 |
| 10 | A.    No. | 11:34:27 |
| 11 | Q.    And did you have any experience in | 11:34:28 |
| 12 | monitoring the performance of the LIS system for | 11:34:30 |
| 13 | the upgraded system that Quest was going to | 11:34:34 |
| 14 | install? | 11:34:38 |
| 15 | A.    No. | 11:34:38 |
| 16 | (Exhibit 14 marked for identification and | |
| 17 | attached hereto.) | |
| 18 | BY MR. STEVENS: | 11:35:15 |
| 19 | Q.    The court reporter has placed before | 11:35:23 |
| 20 | you what's been marked as Deposition Exhibit 14, | 11:35:25 |
| 21 | which is a multi-page document with the Bates | 11:35:28 |
| 22 | label Q00257 through Q00264. | 11:35:32 |

# EXHIBIT 2
## PART 5

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

137

1    attached hereto.)

2    BY MR. STEVENS:

3        Q.    Let me show you -- or the court                11:40:07

4    reporter has placed before you what has been             11:40:36

5    marked as Deposition Exhibit 15, which is a              11:40:39

6    multi-page document bearing the Bates label Q00240       11:40:41

7    through Q00255.                                           11:40:44

8            Can you identify that document for me,           11:40:50

9    please?                                                   11:40:54

10       A.    Yes.  This is the 2004 annual                   11:40:56

11   performance review for me as a medical                   11:40:59

12   technologist at Providence Hospital.                     11:41:03

13       Q.    Okay.  And is that your signature on           11:41:05

14   page 6 of the document?                                   11:41:08

15       A.    Yes, it is.                                     11:41:13

16       Q.    And when did you sign it?                       11:41:14

17       A.    January 7, 2005.                                11:41:18

18       Q.    And under manager's signature, do you          11:41:21

19   recognize that signature?                                11:41:24

20       A.    Yes.  That looks like Dave Meeder.             11:41:25

21       Q.    And does it indicate when he signed it?        11:41:28

22       A.    Yes, January 7, 2005.                           11:41:30

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

138

1        Q.      Now, behind page 6 there are a series         11:41:34

2    of documents that look to be time sheets, and then       11:41:39

3    there's a business ethics pledge, and then there's       11:41:45

4    an employee compensation profile.                        11:41:50

5               Do you recall whether those documents          11:41:53

6    were attached to your review?                            11:41:54

7        A.      This employee compensation profile, I        11:41:58

8    don't believe that was attached to the review.           11:42:02

9        Q.      Okay.  But were the time sheets?             11:42:04

10       A.      And the time sheet wasn't attached to        11:42:06

11   the review.                                               11:42:08

12       Q.      Then I apologize for that.  I think it        11:42:08

13   was a duplicating error.  Something got clipped.          11:42:11

14   So I apologize for that.  But these were all              11:42:14

15   documents that we produced to you in response to          11:42:18

16   your request for production of documents.                 11:42:21

17               Let me turn your attention to page 5 of       11:42:25

18   the document.  And can you see what your average          11:42:29

19   rating is here?                                           11:42:44

20       A.      Yes.  2.0.                                    11:42:45

21       Q.      Now, it looks like some numbers were         11:42:47

22   changed on those ratings.  Do you recall that             11:42:52

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

139

| 1 | happening? | 11:42:57 |
|---|---|---|
| 2 | A.    Yes. | 11:42:57 |
| 3 | Q.    Okay.  Can you tell me what happened | 11:42:58 |
| 4 | and how those were changed? | 11:43:00 |
| 5 | A.    I was in disagreement with some of the | 11:43:01 |
| 6 | scores and some of the areas of performance and | 11:43:04 |
| 7 | duties. | 11:43:11 |
| 8 | Q.    Okay.  Do you remember which ones in | 11:43:11 |
| 9 | particular? | 11:43:13 |
| 10 | A.    I think they have performance factor | 11:43:15 |
| 11 | No. 1 that looks like it was changed from 3 to 2. | 11:43:20 |
| 12 | And work orientation, it looks like that may have | 11:43:26 |
| 13 | been changed from 3 to 2.  I have to look back | 11:43:29 |
| 14 | through here.  It may have been changed over here | 11:43:36 |
| 15 | as well.  No, it wasn't changed in the document. | 11:43:36 |
| 16 | It was changed on this page. | 11:43:39 |
| 17 | Q.    I see.  So Mr. Meeder had originally | 11:43:41 |
| 18 | ranked you as a 3 instead of a 2 in Category 1 and | 11:43:44 |
| 19 | Category 4, and then after some conversation with | 11:43:48 |
| 20 | you he changed those ratings from 3s to 2s? | 11:43:53 |
| 21 | A.    Yes. | 11:43:59 |
| 22 | Q.    And so that changed the average rating, | 11:43:59 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

140

1    correct?                                          11:44:03

2         A.    Yes.                                   11:44:03

3         Q.    Do you know what the average rating was   11:44:04

4    before it was changed to a 2.0?                   11:44:06

5         A.    I don't know.  I would have to do the  11:44:10

6    math.                                             11:44:12

7         Q.    But obviously it would have been higher   11:44:12

8    than 2.0?                                         11:44:14

9         A.    Yes.                                   11:44:16

10        Q.    Okay.  And it looks like it would have  11:44:16

11   placed you in the overall performance rating as  11:44:19

12   achieves expectations, but after he changed those,   11:44:24

13   your average rating went up so that you were rated   11:44:29

14   in the excellent category; is that correct?       11:44:33

15        A.    Yes.                                   11:44:35

16        Q.    Okay.  Now, let's go back to the 2003  11:44:35

17   evaluation, which is Exhibit 14.  And I just want  11:44:40

18   to make -- Do you have Exhibit 14 in front of you?   11:44:50

19        A.    Yes.                                   11:44:53

20        Q.    Can you turn to page 6 of that document   11:44:53

21   for me, please.                                   11:44:55

22        A.    Yes.                                   11:44:57

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

146

| 1 | she said and in what order? | 11:50:53 |
| 2 |     A.    I believe I told her I wasn't happy | 11:50:55 |
| 3 | with the review, and she advised me to speak with | 11:50:56 |
| 4 | David. | 11:51:01 |
| 5 |     Q.    Do you recall anything else about that | 11:51:02 |
| 6 | conversation? | 11:51:03 |
| 7 |     A.    No, I don't. | 11:51:03 |
| 8 |     Q.    Going back to the '04 review, did | 11:51:31 |
| 9 | Mr. Vandenburg have any role in the preparation of | 11:51:37 |
| 10 | that review? | 11:51:41 |
| 11 |     A.    Not that I know of. | 11:51:43 |
| 12 |     Q.    Was he employed at Providence Hospital | 11:51:47 |
| 13 | for the -- during 2003 to 2004? | 11:51:54 |
| 14 |     A.    I don't think so. | 11:51:59 |
| 15 |     Q.    He joined the hospital in 2005; isn't | 11:52:01 |
| 16 | that correct? | 11:52:04 |
| 17 |     A.    I believe so. | 11:52:05 |
| 18 |     (Exhibit 16 marked for identification and | |
| 19 | attached hereto.) | |
| 20 | BY MR. STEVENS: | 11:52:08 |
| 21 |     Q.    The court reporter has placed before | 11:52:09 |
| 22 | you what's been marked as Exhibit 16, which is a | 11:52:11 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

147

| | | |
|---|---|---|
| 1 | multi-page document beginning with the Bates label | 11:52:15 |
| 2 | Q00233 and ending with the Bates label Q00239. | 11:52:18 |
| 3 | Could you identify that document for | 11:52:28 |
| 4 | me, please? | 11:52:29 |
| 5 | A.    This is the annual performance | 11:52:30 |
| 6 | review, 2005, for myself as medical technologist | 11:52:33 |
| 7 | at Providence Hospital. | 11:52:40 |
| 8 | Q.    Okay.  And is that the last review you | 11:52:41 |
| 9 | received before you left? | 11:52:48 |
| 10 | A.    Yes. | 11:52:50 |
| 11 | Q.    And did you sign the document on | 11:52:52 |
| 12 | page 6? | 11:52:56 |
| 13 | A.    Yes, I did. | 11:53:00 |
| 14 | Q.    And when did you sign it? | 11:53:01 |
| 15 | A.    January 13th, '06. | 11:53:03 |
| 16 | Q.    And there are two other signatures on | 11:53:06 |
| 17 | that form on page 6.  Can you identify those other | 11:53:08 |
| 18 | signatures for me, please? | 11:53:12 |
| 19 | A.    Supervisor, Isabelita, and manager, | 11:53:15 |
| 20 | Mr. Vandenburg. | 11:53:21 |
| 21 | Q.    Okay.  When does it indicate that | 11:53:23 |
| 22 | Ms. Aglipay signed it? | 11:53:28 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

148

1        A.     On January 12, '06.                     11:53:29

2        Q.     And when does it indicate that          11:53:32

3    Mr. Vandenburg signed it?                          11:53:34

4        A.     On January 13, '06.                     11:53:35

5        Q.     Did you sign this at the same time that 11:53:38

6    you discussed the review with Ms. Aglipay?        11:53:43

7        A.     Yes.                                     11:53:46

8        Q.     Did you -- So is it your recollection    11:53:50

9    that you signed this on January 13, '06?          11:53:54

10       A.     Yes.                                     11:53:57

11       Q.     And is it your recollection Ms. Aglipay 11:53:57

12   signed it at the same time, or do you think she    11:53:59

13   signed it the day before and then gave it to you   11:54:03

14   on the 13th?                                        11:54:06

15       A.     I thought she signed it the same day    11:54:08

16   that I signed it.                                   11:54:10

17       Q.     So am I correct that you and            11:54:12

18   Ms. Aglipay sat down and discussed this review?   11:54:14

19       A.     Yes.                                     11:54:16

20       Q.     Was Mr. Vandenburg in that              11:54:17

21   conversation?                                       11:54:19

22       A.     No.                                      11:54:20

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

149

| | | |
|---|---|---|
| 1 | Q.     Did you have any conversations with | 11:54:20 |
| 2 | Mr. Vandenburg about this review? | 11:54:23 |
| 3 | A.     No. | 11:54:24 |
| 4 | Q.     Do you know if he played any role in | 11:54:26 |
| 5 | the preparation of this review? | 11:54:28 |
| 6 | A.     No, I don't. | 11:54:31 |
| 7 | Q.     Did Ms. Aglipay tell you he played any | 11:54:34 |
| 8 | role in the preparation of this review? | 11:54:38 |
| 9 | A.     Not the preparation. | 11:54:40 |
| 10 | Q.     If it wasn't the preparation, what did | 11:54:41 |
| 11 | she tell you? | 11:54:44 |
| 12 | A.     She informed me that it was told to her | 11:54:45 |
| 13 | that no employee can have an excellent evaluation | 11:54:48 |
| 14 | without -- according to Mr. Vandenburg. | 11:54:57 |
| 15 | Q.     So did she tell you that Mr. Vandenburg | 11:55:03 |
| 16 | told her that, or did she tell you that she | 11:55:05 |
| 17 | understood that that was the policy? | 11:55:09 |
| 18 | A.     She said Mr. Vandenburg told her that | 11:55:10 |
| 19 | no one can have an excellent evaluation. | 11:55:12 |
| 20 | Q.     Okay.  So is it your testimony that no | 11:55:15 |
| 21 | one who worked at the Providence lab could get an | 11:55:22 |
| 22 | excellent evaluation? | 11:55:26 |

# EXHIBIT 2
## PART 6

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

152

1       (Exhibit 17 marked for identification and

2  attached hereto.)

3  BY MR. STEVENS:

4       Q.    The court reporter has placed before          11:57:05

5  you a document which is marked as Exhibit 17,            11:57:22

6  which is a one-page document.                            11:57:26

7            Please take the time you need to review        11:57:30

8  that document and let me know when you're prepared       11:57:31

9  to answer questions about it.                            11:57:33

10      A.    I'm prepared.                                 11:57:35

11      Q.    Can you identify that document for me,        11:57:36

12  please?                                                 11:57:38

13      A.    Yes.  This is a letter that I had             11:57:38

14  written and submitted to my lawyer at the time,         11:57:46

15  Ms. Thatcher, in reference to my job performance        11:57:51

16  evaluation for 2005.                                    11:57:55

17      Q.    Okay.  And can you read for the record        11:57:57

18  what the letter says?                                   11:58:01

19      A.    It says:  "The job performance               11:58:03

20  evaluation for 2005 was conducted by my working         11:58:05

21  supervisor, Isabelita Aglipay.  I asked that some       11:58:08

22  of the scores be changed because I did not agree        11:58:11

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

153

| | | |
|---|---|---|
| 1 | with them; they did not reflect my quality of | 11:58:13 |
| 2 | work.  Isabelita informed me that no one would be | 11:58:16 |
| 3 | allowed an excellent rating per Harvey Vandenburg, | 11:58:19 |
| 4 | the laboratory director.  I did not want to argue | 11:58:23 |
| 5 | the matter and accepted the rating with some minor | 11:58:26 |
| 6 | changes." | 11:58:29 |
| 7 | Q.    And is what you just read accurate? | 11:58:30 |
| 8 | A.    Yes, it is. | 11:58:33 |
| 9 | Q.    Okay.  Now, when Isabelita told you | 11:58:35 |
| 10 | that no one would be allowed an excellent rating | 11:58:39 |
| 11 | per Harvey Vandenburg, did you understand that | 11:58:43 |
| 12 | Mr. Vandenburg was making that rule for all | 11:58:50 |
| 13 | employees? | 11:58:53 |
| 14 | A.    That's what I understood. | 11:58:55 |
| 15 | Q.    And did Ms. Aglipay tell you why he | 11:59:01 |
| 16 | made that rule? | 11:59:04 |
| 17 | A.    No, she did not. | 11:59:05 |
| 18 | Q.    Let's look back at Exhibit 16, page 5. | 11:59:08 |
| 19 | Are you there? | 11:59:23 |
| 20 | A.    Yes. | 11:59:25 |
| 21 | Q.    Now, it looks like in the performance | 11:59:31 |
| 22 | factor ratings in the top left-hand corner on page | 11:59:39 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

154

| | | |
|---|---|---|
| 1 | Q00237 the rating for No. 2 was changed from a | 11:59:44 |
| 2 | 4 to a 3, and the rating for No. 4 was changed | 11:59:51 |
| 3 | from a 3 to a 2.  Do you see that? | 11:59:58 |
| 4 | A.    Yes. | 12:00:01 |
| 5 | Q.    And that looks like that changed your | 12:00:01 |
| 6 | average rating from a 2.75 to a 2.5.  Do you see | 12:00:03 |
| 7 | that? | 12:00:06 |
| 8 | A.    Yes. | 12:00:07 |
| 9 | Q.    And it looks like that 2.5 rating put | 12:00:08 |
| 10 | you in the achieves expectations box in the | 12:00:11 |
| 11 | overall performance average rating on the | 12:00:15 |
| 12 | right-hand corner; is that correct? | 12:00:18 |
| 13 | A.    Yes. | 12:00:21 |
| 14 | Q.    Now, did you just have one conversation | 12:00:21 |
| 15 | with Ms. Aglipay about this review? | 12:00:25 |
| 16 | A.    Yes. | 12:00:27 |
| 17 | Q.    Please tell me as best as you can | 12:00:29 |
| 18 | recall what you said and what she said during that | 12:00:32 |
| 19 | conversation and in what order. | 12:00:35 |
| 20 | A.    So she informed me that we had to | 12:00:39 |
| 21 | review this, and we reviewed it.  And at the end | 12:00:43 |
| 22 | of the review I told her that I didn't feel like | 12:00:47 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

155

| | | |
|---|---|---|
| 1 | this reflected my job performance.  And I told | 12:00:50 |
| 2 | her -- she pretty much agreed that it didn't. | 12:00:53 |
| 3 | We discussed some other areas as well | 12:00:58 |
| 4 | as the ones that she changed, the 3s basically, | 12:01:01 |
| 5 | that I thought were previously 2s.  And that would | 12:01:07 |
| 6 | have given me the 2.0 or put me in the | 12:01:11 |
| 7 | excellent -- the excellent range. | 12:01:17 |
| 8 | And she seemed to feel that she | 12:01:19 |
| 9 | couldn't give me the proper evaluation because of | 12:01:24 |
| 10 | what she had been told by Mr. Vandenburg.  I felt | 12:01:27 |
| 11 | I did the same job the same way.  Nothing had | 12:01:33 |
| 12 | changed, and I didn't understand why I was getting | 12:01:36 |
| 13 | a lower score than I did before. | 12:01:39 |
| 14 | So she made a few changes with the | 12:01:44 |
| 15 | statement that she was advised by Mr. Vandenburg | 12:01:46 |
| 16 | that no one would get a 2.0. | 12:01:49 |
| 17 | Q.    Okay.  When you say she made a few | 12:01:54 |
| 18 | changes, I see two changes, one to factor two and | 12:01:57 |
| 19 | one to factor four.  Were there any other changes | 12:02:02 |
| 20 | she made? | 12:02:05 |
| 21 | A.    No.  Just the final calculation. | 12:02:06 |
| 22 | Q.    The average rate?  Okay. | 12:02:08 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

156

| | | |
|---|---|---|
| 1 | During the time that you discussed the | 12:02:21 |
| 2 | performance review, did the subject of your EEOC | 12:02:23 |
| 3 | charge come up? | 12:02:26 |
| 4 | A.    I don't -- I don't remember. | 12:02:33 |
| 5 | Q.    Did you have any discussion with her | 12:02:37 |
| 6 | when you were discussing this review about the | 12:02:39 |
| 7 | pending EEOC charge? | 12:02:41 |
| 8 | MR. JOHNSON:  Objection; asked and | 12:02:42 |
| 9 | answered. | 12:02:42 |
| 10 | THE WITNESS:  I'm not -- I'm not sure. | 12:02:49 |
| 11 | I may have said that I felt that this was in | 12:02:53 |
| 12 | reference to my complaint.  I don't know that I | 12:02:57 |
| 13 | said that.  Maybe I told her that; I don't know. | 12:03:01 |
| 14 | BY MR. STEVENS: | 12:03:03 |
| 15 | Q.    You may have said that? | 12:03:03 |
| 16 | A.    Yeah. | 12:03:05 |
| 17 | Q.    But you don't recall if you said that? | 12:03:05 |
| 18 | A.    I don't remember.  I was just upset. | 12:03:08 |
| 19 | Q.    Okay.  You were upset in this meeting? | 12:03:10 |
| 20 | A.    Yeah, I was upset.  I was very | 12:03:13 |
| 21 | disappointed that I had been doing the same job | 12:03:15 |
| 22 | and I got a lower evaluation. | 12:03:19 |

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

157

| | | |
|---|---|---|
| 1 | Q.    Now, this was a review that was | 12:03:23 |
| 2 | conducted by a different supervisor; isn't that | 12:03:25 |
| 3 | correct? | 12:03:28 |
| 4 | A.    No.   Isabelita was always the | 12:03:29 |
| 5 | supervisor. | 12:03:31 |
| 6 | Q.    I understand that.  But she didn't | 12:03:32 |
| 7 | prepare your previous review? | 12:03:34 |
| 8 | A.    I don't know if she prepared it or not. | 12:03:36 |
| 9 | Q.    But you didn't discuss your previous | 12:03:38 |
| 10 | review with her, you discussed it with Mr. Meeder; | 12:03:40 |
| 11 | isn't that right? | 12:03:44 |
| 12 | A.    Yes. | 12:03:45 |
| 13 | Q.    Now, do you have any evidence to | 12:03:46 |
| 14 | suggest that the reason that Ms. Aglipay rated you | 12:03:52 |
| 15 | the way she did was because you had filed an EEOC | 12:03:56 |
| 16 | charge? | 12:04:01 |
| 17 | A.    No. | 12:04:01 |
| 18 | Q.    And during the time that you were | 12:04:04 |
| 19 | employed by Quest, did you ever hear any manager | 12:04:06 |
| 20 | or supervisor discuss the fact that there was a | 12:04:11 |
| 21 | distribution for ratings on the evaluation system? | 12:04:18 |
| 22 | A.    No. | 12:04:21 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

158

1    Q.    So do you have any evidence to suggest          12:04:23

2    that Quest does not require managers and             12:04:28

3    supervisors to give outstanding ratings and         12:04:34

4    excellent ratings to only a limited percentage of   12:04:38

5    employees?                                           12:04:42

6    A.    I know nothing of that.                        12:04:42

7    Q.    Okay.  Do you have any evidence that           12:04:44

8    would dispute that?                                  12:04:51

9    A.    No, I don't.                                   12:04:53

10    Q.    And I think you testified that you            12:04:59

11    never had any conversations with Mr. Vandenburg     12:05:01

12    about this review?                                  12:05:04

13    A.    That's right.                                 12:05:05

14    Q.    Did you have any communications with          12:05:06

15    anyone else besides Ms. Aglipay about this review?  12:05:08

16    A.    Not that I know of.                           12:05:11

17    Q.    Sitting here today, Ms. Pollard, do you       12:05:27

18    have any evidence that Quest would not have         12:05:30

19    selected Mr. Townsend for the project manager       12:05:35

20    position if he were black?                          12:05:38

21    A.    I have no evidence.                           12:05:40

22    Q.    Okay.  Do you think that if he were           12:05:41

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

159

| | | |
|---|---|---|
| 1 | black, Quest would not have selected him? | 12:05:44 |
| 2 | MR. JOHNSON:  Objection. | 12:05:47 |
| 3 | THE WITNESS:  Probably. | 12:05:49 |
| 4 | BY MR. STEVENS: | 12:05:49 |
| 5 | Q.    Why? | 12:05:50 |
| 6 | MR. JOHNSON:  Same objection. | 12:05:52 |
| 7 | THE WITNESS:  Because I feel they're | 12:05:54 |
| 8 | discriminatory. | 12:05:55 |
| 9 | BY MR. STEVENS: | 12:05:56 |
| 10 | Q.    Okay.  Do you have any evidence to | 12:05:57 |
| 11 | suggest that they would not have selected | 12:05:59 |
| 12 | Mr. Townsend -- | 12:06:02 |
| 13 | A.    I have no evidence. | 12:06:04 |
| 14 | Q.    Okay.  And you don't have any evidence | 12:06:05 |
| 15 | that Mr. Leap knew Mr. Townsend's race when he | 12:06:09 |
| 16 | recommended that the offer be given to | 12:06:14 |
| 17 | Mr. Townsend, do you? | 12:06:16 |
| 18 | A.    I believe he had access to that data | 12:06:18 |
| 19 | sheet that says that, his race on there. | 12:06:21 |
| 20 | Q.    What information do you have that | 12:06:24 |
| 21 | Mr. Leap had access to that data sheet? | 12:06:26 |
| 22 | A.    None at all. | 12:06:29 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

160

| | | |
|---|---|---|
| 1 | Q.    None at all. | 12:06:30 |
| 2 | But you believe it anyway, don't you? | 12:06:31 |
| 3 | MR. JOHNSON:  Objection.  Is that a | 12:06:35 |
| 4 | question? | 12:06:37 |
| 5 | BY MR. STEVENS: | 12:06:38 |
| 6 | Q.    You don't have any evidence that he had | 12:06:38 |
| 7 | access to that data sheet, do you? | 12:06:40 |
| 8 | A.    No, I don't. | 12:06:42 |
| 9 | Q.    And you don't have any evidence that | 12:06:43 |
| 10 | Mr. Leap knew what Mr. Townsend's race was, do | 12:06:45 |
| 11 | you? | 12:06:48 |
| 12 | A.    No, I don't. | 12:06:48 |
| 13 | Q.    And you don't have any evidence that | 12:06:49 |
| 14 | Mr. Leap knew what Ms. Kopley's race was, do you? | 12:06:50 |
| 15 | A.    No, I don't. | 12:06:55 |
| 16 | Q.    In fact, you don't have any evidence | 12:06:56 |
| 17 | that Mr. Leap knew what your race was, do you? | 12:06:57 |
| 18 | A.    No, I don't. | 12:07:00 |
| 19 | Q.    And you don't have any evidence that | 12:07:01 |
| 20 | Mr. Leap knew the race of any of the other | 12:07:03 |
| 21 | applicants for the position, do you? | 12:07:05 |
| 22 | A.    No, I don't. | 12:07:07 |

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

161

| | | |
|---|---|---|
| 1 | Q. After you received your '05 evaluation, | 12:07:26 |
| 2 | the one that we just talked about that Ms. Aglipay | 12:07:32 |
| 3 | gave you, did you receive an increase in | 12:07:36 |
| 4 | compensation? | 12:07:38 |
| 5 | A. I believe I did. | 12:07:41 |
| 6 | Q. Okay. Do you know what the increase | 12:07:42 |
| 7 | was? | 12:07:43 |
| 8 | A. No, I don't. | 12:07:44 |
| 9 | Q. Do you know if it was less than | 12:07:46 |
| 10 | 4 percent? | 12:07:48 |
| 11 | A. No, I don't. | 12:07:49 |
| 12 | Q. Do you know if it was more than | 12:07:50 |
| 13 | 4 percent? | 12:07:51 |
| 14 | A. No, I don't. | 12:07:52 |
| 15 | Q. Do you know what effect the evaluation | 12:07:55 |
| 16 | had on your salary? | 12:07:57 |
| 17 | MR. JOHNSON: Objection to the form. | 12:08:02 |
| 18 | THE WITNESS: No. | 12:08:04 |
| 19 | MR. STEVENS: Let's take a break. | 12:08:11 |
| 20 | THE VIDEOGRAPHER: We are going off the | 12:08:14 |
| 21 | record. The time is 12:08 p.m. | 12:08:14 |
| 22 | (A recess was then taken.) | |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

163

| | | |
|---|---|---|
| 1 | A. I'm prepared. | 12:18:29 |
| 2 | Q. Can you identify Exhibit 17, please? | 12:18:30 |
| 3 | A. Yes. This is a letter I received from | 12:18:33 |
| 4 | the EEOC. | 12:18:34 |
| 5 | Q. What's the title of the letter? | 12:18:40 |
| 6 | A. "Dismissal and Notice of Rights." | 12:18:42 |
| 7 | Q. And what did you understand that this | 12:18:47 |
| 8 | notice was giving you notice of? | 12:18:50 |
| 9 | A. This was a letter that was -- that they | 12:18:56 |
| 10 | didn't find any -- they didn't find for either | 12:19:11 |
| 11 | myself or Quest as far as the information in my | 12:19:20 |
| 12 | complaint. | 12:19:28 |
| 13 | Q. Okay. Are you referring to the box | 12:19:30 |
| 14 | marked X at about the middle of the page? | 12:19:33 |
| 15 | A. Yes. | 12:19:38 |
| 16 | Q. And can you read the first sentence to | 12:19:40 |
| 17 | me? | 12:19:42 |
| 18 | A. It says: "The EEOC issues the | 12:19:43 |
| 19 | following determination: Based upon its | 12:19:46 |
| 20 | investigation, EEOC is unable to conclude that the | 12:19:50 |
| 21 | information obtained establishes violations of the | 12:19:53 |
| 22 | statute." | 12:19:57 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

167

1                        REPORTER'S CERTIFICATE

2

3          I, the undersigned Registered Professional

4    Reporter and Notary Public, do hereby certify that

5    BRIDGET L. POLLARD, after having been first duly

6    sworn by me to testify to the truth, did testify as

7    set forth in the foregoing pages, that the testimony

8    was reported by me in stenotype and transcribed

9    under my personal direction and supervision, and is

10   a true and correct transcript.

11          I further certify that I am not of

12   counsel, not related to counsel or the parties

13   hereto, and not in any way interested in the outcome

14   of this matter.

15          SUBSCRIBED AND SWORN TO under my hand and

16   seal this 7th day of January, 2008.

17   *John L. Harmonson*

18   _____

19   JOHN L. HARMONSON, RPR

     Notary Public in and for

20   the District of Columbia

     My Commission Expires:  10/14/2010

21

22

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

# EXHIBIT 3



SSN: 016567074 DOH: 10/21/02    Ben Eff: 11/1/2002
POLLARD, BRIDGET                              2046
34 CLARENDON STREET          3205 Forest Run Dr.
SPRINGFIELD, MA 01109        Forestville MD 20747

## JOB DESCRIPTION

## AMERICAN MEDICAL LABORATORIES, INC.7

**POSITION TITLE:** Medical Technologist

**DEPARTMENT:**    2046    Providence Hospital

**REPORTS TO:**    Isabelita Aglipay

**SUPERVISES:**    None

**HOURS:**    Mon-Fri 11:30PM-7:30AM with varied weekends

### POSITION SUMMARY:

The Medical Technologist performs tests requiring the exercise of independent judgment and responsibility in those specialties in which the Technologist is qualified by education, training and experience. In addition, the Medical Technologist is responsible for assuring that a given test system is operated in accordance with the laboratory's procedure manual and that the applicable quality control requirements are met. The incumbent complies with all company and departmental policies and procedures.

### DUTIES AND RESPONSIBILITIES:

1.    Responsible for performing assigned tests in accordance with the laboratory's procedure manual, ensuring that applicable quality control requirements are met.

2.    Ensures that test systems are "in control" for each test performed.

3.    Ensures that each test is performed according to the schedule outlined by laboratory protocol.

4.    Responsible for informing supervisory personnel of all problems associated with the proper performance of test procedures.

5.    Reports any actual or potential deviation from standard or accepted testing procedures, and cooperates fully with any investigation of same.

6.    May assist supervisor with training of technicians and other laboratory personnel.

7.    Actively supports and complies with laboratory policies and procedures.

8.    Maintains laboratory areas and equipment in a safe, functional and sanitary condition.



EXHIBIT
8

Q 00294

JOB DESCRIPTION:  Medical Technologist

(2)

9.     Adheres to all established laboratory safety requirements.

10.    Required to use (a) personal protective equipment, (b) engineering controls and/or (c) work practice controls as directed by management.

11.    Other job-related/miscellaneous duties as assigned by competent authority.

12.    See Addendum, if applicable.

## QUALIFICATIONS:

Education and Experience:

Graduate of approved school of medical technology.  Bachelor's degree in laboratory science, plus one (1) year of pertinent full-time laboratory experience and/or training "in the specialty" in which the individual performs tests.  Three (3) years academic study (minimum 90 semester hours) plus successful completion of a 12 month course of training at an accredited school of medical technology.  Has passed a properly benchmarked and validated competency examination (HHS) in the designated specialty.

Knowledge, Skills and Abilities:

Basic theoretical and operational job knowledge in designated specialty required.

Interpersonal skills necessary to deal courteously and effectively with supervisors, co-workers and clients.

Communication skills necessary to handle telephone inquiries from clients.

Knowledge of organizational/departmental policies and procedures.

Basic knowledge of computer terminal operations.

Ability to deal with client information in a confidential manner.

Required to handle biological samples and potentially hazardous chemicals.

_Bridget Pollard_        _10/22/02_
Employee's Signature          Date

JD:MedTech
/nlf
08/29/96

Q  00295

# EXHIBIT 4

Quest Diagnostics Incorporated
Nichols Institute
14225 Newbrook Drive
Post Office Box 10841
Chantilly, Virginia 20153-0841
703.802.6900
www.questdiagnostics.com

 Quest
Diagnostics

EXHIBIT
7

October 4, 2006

Bridget L Pollard
2717 Cabochon Diamond Court
Raleigh, NC 27610

Dear Ms. Pollard:

We have been advised of your separation of employment with Quest Diagnostics.
The decision was determined by a recent payroll audit showing you have not
worked during the last few pay periods. Based on this information, and the needs
of the department, your position is no longer available.

To finalize your separation, it is necessary for you to carefully review, and
complete certain forms, and return them to Employee Services as soon as
possible.  A confidential return envelope is provided for your convenience.

You have certain obligations regarding non-solicitation and non-disclosure to
Quest Diagnostics.  These obligations are summarized as follows:

For a period of one (1) year from the date your employment was terminated, you
will not directly or indirectly solicit the business of any customer of Quest
Diagnostics of whom you acquired knowledge and/or had direct or indirect
contact during the term of your employment for any purpose.  For a period of one
(1) year from the date your employment was terminated, you will not, directly or
indirectly, recruit or solicit any employees of Quest Diagnostics to work for you
or any other person or entity.  Finally, you will not divulge to anyone at any time
any proprietary, confidential or trade secret information acquired by you
concerning Quest Diagnostics or any of its affiliates' businesses.  Such
information includes, but is not limited to, business plans, formulas, processes,
methods of manufacture, machines, compositions, lists of customers, sales or
marketing manuals, strategies, special price tables or schedules, and inventions of
Quest Diagnostics or any of its affiliates.  Any such confidential material still in
your possession should be returned immediately.  You may also have additional
obligations regarding not competing with Quest Diagnostics; please refer to any
agreement you signed with our Company for specific details.

If you have not already done so, please return all company property, including
your ID badge, keys and lab coats if applicable, to your supervisor.

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

BRIDGET POLLARD,                    X

                                    :

        Plaintiff,                  :

    vs.                             :Case No. 1:07-0692

QUEST DIAGNOSTICS                   :

                                    :

        Defendant.                  X

---

WASHINGTON, DC
January 28, 20078

DEPOSITION OF:

**MICHAEL KNAPP,**

a witness, called for examination by counsel on behalf of

the Plaintiff, pursuant to notice and agreement of the

parties as to time and date, taken at the Arent Fox, LLP,

1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,

beginning at approximately 2:05 a.m., before Raakeebah L.

Henderson, a Notary Public and court reporter in and for

the District of Columbia, when were present on behalf of

the respective parties:

Raakeebah L. Henderson, Professional Court Reporter
13017 Wisteria Drive, Suite 364
Cell: (301) 717-9468    Fax: (240) 912-7323  E-mail: keebahcr@comcast.net

1    specifically on discrimination?

2        A.    Not recently.  I can't say that I haven't

3    because I certainly have.

4        Q.    You said a handful on average of complaints,

5    formal complaints that was your term.  When you say a

6    handful, on average are we talking four to five a year?

7        A.    Probably not that many.

8        Q.    Let's talk a moment about the hiring and

9    selection process as you indicated moments ago that's a

10   function if you will of the position that you hold; is

11   that correct?

12       A.    Yes.

13       Q.    Quest Diagnostics has an intranet where there

14   is internal posting of job vacancies; is that correct?

15       A.    Yes.

16       Q.    What role if any does your department

17   specifically play as it relates to posting job

18   announcements through the internet?

19       A.    We post the jobs, we take the jobs down after

20   they're filled.

21       Q.    You post them on the internet?

22       A.    We most them in a variety of ways including

1   that internet.

2        Q.    Give me an example of what you mean when you

3   said variety of ways.  I understand of course there's a

4   bulletin board posting, right?

5        A.    Correct.

6        Q.    What are some of the other ways in which to

7   post a job?

8        A.    It's posted on the internet and then there's a

9   paper bulletin that's sent to a distribution list that is

10  posted at various locations in our organization and

11  outside of our organization.

12       Q.    I'm going to --

13                   (Exhibit 1 marked.)

14       Q.    -- I'll give you a moment to review that, sir.

15       A.    Okay.

16            (Pause for document examination.)

17       Q.    Is this what you refer to when you say a paper

18  bulletin?

19       A.    Yes.

20       Q.    And normally what accompanies this paper

21  bulletin as it relates to a job vacancy or a posting of a

22  position?

1    increase pay, if you know; yes or no?

2        A.    Probably.

3        Q.    Just a couple of more questions then I'm going

4    to get you out of here.

5                    (Discussion off the record)

6        Q.    What was the outcome of the investigation of

7    the performance evaluation?

8            MR. STEVENS:  Objection.  You can respond.

9        A.    As I recall what I determined was that the

10   performance evaluations neither of them were related to

11   or the second one was not related to Bridgett's

12   discrimination complaint that Isabelita conducted the

13   performance evaluation and knew nothing about what had

14   occurred.

15           And the variance in the performance from the

16   previous time was that Isabelita was actually the

17   day-to-day supervisor for Bridgett as opposed to

18   Mr. Meter who was -- probably had very little interaction

19   with Bridgett directly.

20       Q.    Well, you sat in on Ms. Aglipay's deposition

21   testimony.  How common was it for a lab director or lab

22   supervisor shall I say to appraise an employee's

1    performance?

2        A.    Which one a lab director or lab supervisor?

3        Q.    I'm sorry.  Lab supervisor.  I'm sorry.

4        A.    The first line supervisor is normally the

5    person that we look to to conduct the performance review.

6        Q.    Any particular reason why up until January 2006

7    Ms. Pollard's performance reviews were conducted by lab

8    directors and not her immediate supervisor?

9            MR. STEVENS:  Objection.  There was only one

10   other review.

11           MR. JOHNSON:  That's not true, Mike.

12           MR. STEVENS:  There's only one other review you

13   put before him.  If you want to show him the others, go

14   ahead.  You can answer.  I'm sorry.

15           THE WITNESS:  Okay.  I've lost the question.

16   What do you want to know?

17       Q.    Any particular reason why for the first time in

18   January 2006 after Quest Diagnostic lab was put on notice

19   of an internal complaint of discrimination October 24th,

20   of a discrimination complaint with EEO January 10th, 2006

21   all of a sudden Ms. Pollard's performance is rated or

22   assessed by her immediate supervisor.  Any particular

1          (Pause for document examination.)

2      Q.   Back to Ms. Aglipay.  Do you know if she

3    conducted employee performance reviews in previous years

4    prior to the 2006, January in which she gave my client a

5    rating of 2.75?

6      A.   I'm sure she did.  I have no personal

7    knowledge -- I haven't reviewed her reviews but she was a

8    supervisor.  She was expected to do that.

9      Q.   You also heard her testimony where she

10   indicated that or testified to Ms. Pollard had so-called

11   complaints received from staff.

12          You heard her testimony this morning,

13   Ms. Aglipay on that subject, correct?

14     A.   I did.

15     Q.   Is it the normal course of practice for a

16   supervisor to include any kind of reference to adverse

17   action, performance conduct issues within the comment

18   section of the performance review of that cycle?

19          MR. STEVENS:  Object to the form of the

20   question.  You can answer.

21     A.   It's not as common as I'd like it to be as the

22   HR director but it happens that supervisors feel like

36

1    they're handling the complaints in the way that they need

2    to be handled.  Usually to the benefit of the employee.

3        Q.    Isn't there a policy within the employee

4    handbook that provides for counseling in the event you

5    have employees who have performance or conduct issues;

6    isn't that correct?

7        MR. STEVENS:  Object to the form of the

8    question.  You can answer.

9        A.    Sure.  We have a disciplinary policy.

10       Q.    Okay.  Don't you think that it would have been

11   appropriate in the event that Ms. Pollard had alleged

12   complaints against her, it would have been appropriate

13   for those comments to be included within the comments

14   section particularly if that was the basis by which

15   Ms. Aglipay contends that she received an achieved

16   expectation rating.

17       Wouldn't that have been the appropriate thing

18   for her to do?

19       MR. STEVENS:  I object to the form and

20   relevance of the question.  You can answer.

21       A.    I don't know that that would be the right thing

22   to do.

38

1   would something like this be distributed to?

2       A.   I think you can get this off the internet.

3       Q.   You say you think.  Would it come from your

4   office?

5       A.   No.

6       Q.   Where would it come from?  Where would it

7   originate from?

8       A.   It appears that it originates from our job

9   site.  The Quest job site on the intranet.

10      Q.   Who manages the job site?

11      A.   It's managed centrally in New Jersey.

12      Q.   You refer to business unit, right?

13      A.   Yes.

14      Q.   All right.  Now, I'm going to -- I'm going to

15  have you go through the document.

16           (Pause for document examination.)

17      A.   Okay.

18      Q.   How did Ms. Pollard come to leave the

19  employment of Quest Diagnostic?

20      A.   She stopped working for us.

21      Q.   What do you mean when you say she stopped

22  working for us?

1    A.    She stopped coming in.

2    Q.    Do you remember her classification, her

3    category as an employee at Quest Diagnostic?

4    A.    She was on-call.

5    Q.    She was on-call?

6    A.    Yes.

7    Q.    Now explain to a layperson.  On-call I'm going

8    to assume means on-call.  In other words based on the

9    need or necessity of Quest Diagnostic or the client; is

10   that correct?

11   A.    Sure.  We call the employee to come in when we

12   need the employee.

13   Q.    Okay.  As they in the employee or PRN was she

14   required to call in for employment?

15        MR. STEVENS:  Objection to the form of the

16   question.  You can answer.

17   A.    She may have been required by her supervisor to

18   check in on occasion but you're not required to call in

19   to get work if that's your question.

20   Q.    That's my question.  Normally when you say an

21   employee is categorized as call-in how does that work?

22        Again, I'm going to make an assumption and

43

1    discussion with Mr. Vandenburg?

2             MR. STEVENS:  Object to the form of the

3    question.  You can answer.

4        A.   Did I -- no.

5        Q.   And Mr. Vandenburg was the subject of

6    Ms. Pollard's discrimination complaint, too; was he not?

7        A.   Yes.

8        Q.   Have you seen any documents something perhaps I

9    just wrote to you memorializing Mr. Vandenburg's comments

10   whereby Ms. Pollard allegedly represented that she was no

11   longer interested in working for Quest Diagnostic after

12   she relocated to North Carolina?

13            MR. STEVENS:  Object to the form of the

14   question.  You can answer.

15       A.   Again, normally I wouldn't even know the

16   circumstances of an on-call employee's termination.  We

17   conduct routine audits.  When they're not active we

18   initiate termination.

19       Q.   As far as the routine audit or audit review is

20   that something that's supported by the written policy of

21   Quest Diagnostic Labs?

22       A.   There's no written policy that talks about

1    that.

2        Q.    Okay.  Let me direct your attention to the page

3    that's dated October 4th, 2006, in the bottom right

4    corner reads 00228.  Do you see that?  It's dated October

5    the 4th.

6        A.    Mm-hmm.

7        Q.    Have you seen this document before today?

8        A.    As it pertains to Bridget, no.

9        Q.    Well, it came from Employee Services; did it

10   not?  That's what's represented on the second page; is

11   that correct?

12       A.    Yes.

13       Q.    And Employee Services is the department which

14   you supervise, correct?

15       A.    Yes.

16       Q.    Did you authorize this document to be sent to

17   Ms. Pollard?

18       A.    They would normally not ask me who to send it

19   to.

20       Q.    They would not normally ask you who to send it

21   to?

22       A.    That's correct.  It's a form letter.  It's

1    generated after we conduct an audit of on-call people.

2        If we didn't audit the number of on-call people

3    that we had working for us, we'd have hundreds and

4    hundreds of inactive employees.

5    Q.    Have you seen anything in writing that will

6    substantiate -- anything in writing from my client, did

7    you ever receive anything in 2006 from my client stating

8    that she was no longer interested in working for Quest

9    Diagnostic?

10   A.    No.

11   Q.    In fact, let me direct you to the next to the

12   last page.  Status Change Form.  Do you she that?

13   A.    Yes, I do.

14   Q.    Do you see any reference in here where it says

15   job abandonment?

16   A.    The status change form changes the supervisor.

17   That's the only thing that's changed on this document.

18   Q.    Was the supervisor, right?

19   A.    Mm-hmm.

20   Q.    Okay.  Let me direct your attention to the

21   fifth page where it reads bottom right corner, 00225.

22   A.    Yes.

1    represent DOS-TOP.  What does that represent?

2        A.   I think it's Date of Service 10/21/02.  And top

3    is a reference to out leave plan.  She's writing that

4    down to make sure that we pay out or not pay out top.

5        Q.   You're familiar with the term Job Quest,

6    correct?

7        A.   Yes.

8        Q.   And that's in simplistic terms there's a

9    preference for internal applicants for a job as opposed

10   to external applicants?

11       A.   Job Quest refers to our job search site.

12       Q.   Well, there is a policy within Quest Diagnostic

13   where there's a preference or there's internal applicants

14   and candidates are encouraged over -- to be selected over

15   external applicants and credentials; is that correct?

16       A.   Generally, yes.

17       Q.   Generally speaking?

18       A.   Yes.

19            MR. STEVENS:  I'm going to object to the form

20   of the question.

21       Q.   How common is it for potential or shall I say

22   applicants or candidates to be interviewed over the

1  telephone for a position?

2      A.   It's increasingly common particularly with

3  regard to initial interviews.

4      Q.   How common is it not to verify a candidate's

5  credentials or qualifications or references when they're

6  applying for a position?

7          MR. STEVENS:  Object to the form of the

8  question.  You can answer.

9      A.   You stated three things there.  Credentials --

10     Q.   All the application, resume materials that one

11  submit in applying for a position?

12     A.   It's not possible to verify all the aspects of

13  every resume that we receive.  It's not possible.

14     Q.   It's not possible?  Is it encouraged to verify

15  one's employment background?

16     A.   Sure.  We start with the proposition that the

17  material that the candidate gives us is accurate.

18     Q.   Okay.  I understand that.

19     A.   And then to the extent that we can we verify

20  previous employment.

21     Q.   When is that information verified; before the

22  position is offered to him or her or after it's offered

THE UNITED STATES OF AMERICA    )
                                )
DISTRICT OF COLUMBIA            )

    I, Raakeebah L. Henderson, the officer before whom the foregoing deposition was taken, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

    I further certify that the examination was recorded stenographically and verbatim by me and this transcript is a true record of the proceedings.

    I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties, nor in any way interested in the outcome of this action.

    As witness my hand and notarial seal this 11th day of February, 2008.


Raakeebah L. Henderson
DISTRICT OF COLUMBIA
Notary Public



MY COMMISSION EXPIRES:

        05/01/08

# EXHIBIT 6
## PART 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

BRIDGET POLLARD,                    X

                                    :

      Plaintiff,              :

   vs.                           :Case No. 1:07-0692

QUEST DIAGNOSTICS                   :

                                    :

     Defendant.              X

---

WASHINGTON, DC
December 20, 2007

DEPOSITION OF:

**RICHARD LEAP,**

a witness, called for examination by counsel on behalf of
the Plaintiff, pursuant to notice and agreement of the
parties as to time and date, taken at the Arent Fox, LLP,
1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,
beginning at approximately 10:35 a.m., before Raakeebah
L. Henderson, a Notary Public and court reporter in and
for the District of Columbia, when were present on behalf
of the respective parties:



1    report?

2         A.   My direct report is the director of -- the

3    exact title I don't know.

4         Q.   Just give me a name.

5         A.   Mary Dawn Miller.

6         Q.   Who was your direct report in 2005?

7         A.   That was Jake Geller.

8         Q.   His title?

9         A.   Jake was vice president of Information Systems.

10        Q.   Have you previously testified or participated

11   in any depositions?

12        A.   No.

13        Q.   So this is your first time?

14        A.   Yes.

15        Q.   Have you previously testified in any litigation

16   of a private or professional matter?

17        A.   No.

18        Q.   Have you previously been charged or alleged to

19   have violated an individual's civil rights?

20        A.   No.

21        Q.   Does Quest provide anti-discrimination training

22   to its employees?

1      A.   Yes.

2      Q.   Have you ever participated?

3      A.   Yes, sir.

4      Q.   How often is the training administered?

5      A.   Yearly.

6      Q.   By who?

7      A.   Our compliance officer.

8      Q.   Who's the compliance officer?

9      A.   Pierrette Strouss.

10     Q.   How is that spelled?

11     A.   P-I-E-R-R-E-T-T-E.

12     Q.   The last name?

13     A.   S-T-O-R-U-S.

14     Q.   I apologize.  I'm assuming that's a female?

15     A.   Yes.

16     Q.   Her race?

17     A.   Caucasian.

18     Q.   What is her title?

19     A.   Compliance Officer.

20     Q.   Where are these yearly or annual

21   anti-discrimination -- where is this administered?

22     A.   Within the facility in Chantilly.

1       A.   Shawn Townsend.

2       Q.   Have you met Mr. Townsend?

3       A.   Yes.

4       Q.   What race is Mr. Townsend?

5       A.   He is white.

6       Q.   Did you know Mr. Townsend prior to his

7   selection for the project manager position?

8       A.   No.

9       Q.   Did you have any role or any input in the

10  selection of Mr. Townsend for the project manager

11  position.

12      A.   Yes.

13      Q.   And what was that, sir?

14      A.   I interviewed him on the phone.  I read his

15  resume.

16      Q.   How many times did you interview Mr. Townsend?

17      A.   Once.

18      Q.   How long did the phone interview last?

19      A.   Probably 45 minutes.

20      Q.   When you said on the phone was it a one-on-one

21  telephone conversation or was it a conference call?

22      A.   One-on-one.

1    candidates as a matter of convenience.

2        Q.    Did you interview anyone for the project

3    manager position?

4        A.    Yes.

5        Q.    Who else?

6        A.    Jane Copley.

7        Q.    How was her interview conducted?

8        A.    Phone.

9        Q.    Anyone else?

10       A.    No.

11       Q.    These were the only two individuals who applied

12   for the position that were interviewed by you?

13       A.    Yes.

14       Q.    Were there any other applicants for the

15   position?

16       A.    Yes.

17       Q.    But you distinctively recall interviewing only

18   these two applicants, correct?

19       A.    Yes.

20       Q.    Who instructed or directed you to interview

21   these applicants?

22            MR. STEVENS: Objection.  You can answer.

20

1       A.    I was given the applications that came through
2   and determined that these were the two that I would phone
3   interview first.
4       Q.    So that was an independent decision?
5       A.    Yes.
6       Q.    Did human resource HR play a role in the
7   selection or the interviewing of candidates for the
8   position?
9             MR. STEVENS:   Objection.   You can answer.
10      A.    Not leading up to me that I knew of.
11      Q.    Perhaps a better question would be prior to you
12  interviewing candidates did the candidates meet or have a
13  discussion with anyone else associated with Quest
14  Diagnostics?
15      A.    No.
16      Q.    Did you have the authority to hire these
17  individuals or just interview?
18      A.    Just interview.
19      Q.    Did you interview Ms. Pollard for the position?
20      A.    I did not.
21      Q.    Any particular reason why you did not?
22      A.    Based on her resume I chose the first the two

1    to interview.

2        Q.    Was there a position description for the

3    position?

4        A.    Yes.

5        Q.    Do you know who drafted the position

6    description?

7        A.    A combination of Harvey, myself and human

8    resources.

9        Q.    Vandenburg?

10        A.    Mm-hmm.  Mr. Vandenburg, I'm sorry.  Yes.

11        Q.    Yourself?

12        A.    Mm-hmm.

13        Q.    Who specifically in HR?

14        A.    That I don't know.  I'm assuming that's who

15    typed it in the paper.  In the form that we have.

16        Q.    But you don't have any personal first-hand

17    knowledge of anyone associated with HR who assisted in

18    the composition of the position description?

19        A.    No, I do not.

20        Q.    Prior to the composition of the position

21    description, did you previously compose any other

22    position descriptions?

1          MR. STEVENS:  Objection.  You can answer.

2     A.   For this job?

3     Q.   For any job.

4     A.   For any job.

5     Q.   Yes, sir.

6     A.   No, actually I have not put together a position

7 description.

8     Q.   This was the very first occasion you had to

9 compose a position description; is that your testimony?

10    A.   Yes.

11    Q.   What about Mr. Vandenburg, if you know?  Was

12 that his first time?

13    A.   I have no idea.

14    Q.   You have no idea.  Okay.  How was the position

15 description composed?  In other words was it in a reading

16 face-to-face between you and Mr. Vandenburg or did he

17 come up with a template; if you know?

18         MR. STEVENS:  Objection.  You can answer.

19    A.   To be honest, I don't recall.  I would assume

20 we either had a phone conversation or we traded an e-mail

21 perhaps saying here's some things I would put in the

22 description.

1        A.    This is the Project Manager job description.

2        Q.    And this is the position description that you

3   referenced a moment ago in your testimony?

4        A.    Correct.

5        Q.    So this is the position description that you

6   assisted in the composition?

7        A.    Mm-hmm.  Yes.

8        Q.    Let's take a moment and go through this, okay.

9   You testified a moment ago that your contribution was

10  some of the technical aspects of the position

11  description, right?

12       A.    Yes.

13       Q.    Tell me specifically on here, on the exhibit,

14  what was your recommendation to be included as far as the

15  position -- for the position description?

16            MR. STEVENS:  Objection.  You can answer.

17            MR. JOHNSON: Let's go off the record for a

18  moment.

19            (Discussion off the record.)

20       A.    I would say I contributed to 3, 4, 6 and 9 form

21  the duties and responsibilities list.

22       Q.    3, 4, 6 and 9?

25

1       A.    Yeah.

2       Q.    Anything else?

3       A.    Not that I recollect.

4       Q.    Okay.  Let's back up for a moment.  All right.

5    Explain to me LIS.  It stands for Laboratory Information

6    System, correct?

7       A.    Yes.

8       Q.    What exactly is it?

9       A.    It's a large computer system that handles the

10    full operation of a laboratory from order entry which is

11    a start process to instrument interfacing which is the

12    testing process to reporting which is either the results

13    or various management that goes through the process.

14       Q.    Now, explain to me how did this concept of

15    bringing the LIS into the system -- I'm sorry, into Quest

16    Diagnostics how did that become formulated?  Whose idea

17    was it?

18            MR. STEVENS:    Objection.  You can answer.

19       Q.    If you know.

20       A.    I'm not quite sure I understand the question.

21       Q.    Help me understand why or how the decision was

22    adopted to incorporate LIS into Quest Diagnostics?

# EXHIBIT 6
## PART 2

 1   would have been operational after the upgrades?

 2        A.   After the upgrades?

 3        Q.   Yes.

 4        A.   Yes.

 5        Q.   What date was that?

 6        A.   That was this past April.

 7        Q.   I'm sorry?

 8        A.   April 2007.

 9        Q.   So help me understand.  What was the purpose of

10   bringing a project manager in 2005?

11        A.   We wanted to position somebody to learn the

12   existing system so that they could transition and help us

13   build the new system as we go through the process.

14   There's a lot of build process that has to go out.

15        Q.   Were you looking -- was the ideal candidate or

16   selectee for the project manager position, would it have

17   been someone who was prepared to commit to a multi-year

18   or long term employment relationship with Quest

19   Diagnostics?

20             MR. STEVENS:  Objection.  You can answer.

21        A.   Yes.

22        Q.   Let's look at Exhibit Number 1.  What is HIS

1   words?

2        A.   No, I did not.

3        Q.   So based upon his resume you made the

4   recommendation that he be selected for the position?

5        A.   I made the recommendation that I interview him.

6        Q.   You made the recommendation that you interview

7   him?

8        A.   Yes.

9        Q.   After the conclusion of the interview did you

10  recommend him for the position?

11       A.   Yes.  I recommended him as one of the people

12  for the position.

13       Q.   You made that recommendation based upon

14  telephonic interview, correct?

15       A.   Mm-hmm.

16       Q.   In addition to reviewing his resume; is that

17  correct?

18       A.   Yes.

19       Q.   Did you review any other documentation or any

20  other materials from his application?

21       A.   No.

22       Q.   Based upon Mr. Townsend's resume you felt

1    confident that he possessed the attributes identified

2    under the essential job duties and responsibilities

3    number 3, number 4, number 6 and number 9, correct?

4              MR. STEVENS:  Objection.  You can answer.

5         A.   Yes.

6              (Exhibits 2 and 3 were marked.)

7         Q.   I'll give you a moment, sir, to review those

8    documents -- exhibits.

9              (Discussion off the record.)

10        Q.   I've just presented you with Exhibits 2 and 3.

11   Exhibit 2 being Shawn Townsend's resume; is that correct?

12        A.   Yes.

13        Q.   Number 3 being Ms. Pollard's resume, correct?

14        A.   Yes.

15        Q.   Now, let's take a moment and discuss Exhibit 2.

16   Shawn Townsend's resume.

17        A.   Okay.

18        Q.   Sir, is this the resume that you reviewed when

19   you interviewed Mr. Townsend?

20        A.   Yes.

21        Q.   Let me back track for a moment.  Back to your

22   previous testimony of the LIS system, okay?

1     A.    Until we posted the position at that point we

2     knew what it is we wanted to do.

3     Q.    Were there any other positions posted for the

4     implementation of LIS?

5           MR. STEVENS:  Objection.  You can answer.

6     A.    No.  This is the only position that I --

7     Q.    Just the project manager?

8     A.    Yes.

9     Q.    Back to Exhibit 2.  And I just want to be

10    certain.  You said previously that based upon your

11    interview and Mr. Townsend's resume I recommended that he

12    be selected for the position, correct?

13          MR. STEVENS:  Objection.

14    A.    Right. We had other resumes in a different

15    interview.  My initial recommendation was somebody else.

16    Q.    Right.  And that was Ms. Becker?

17    A.    Copley.

18    Q.    Copley.  I'm sorry.  That was -- she was your

19    preference --

20    A.    Yes.

21    Q.    -- for the position?

22    A.    Mm-hmm.

39

1    Q.   Because of her qualifications, correct?

2    A.   Yes.

3    Q.   But she declined the position; did she not?

4    A.   Yes.

5    Q.   What reasons or explanations did she give for

6    applying or expressing interest in the position, applying

7    and then subsequently withdrawing her name from

8    consideration?

9         MR. STEVENS:  Objection.  Compound.  You can

10   answer.

11   A.   I do not know.

12   Q.   You were never informed on why she declined the

13   offer -- the position?

14   A.   No, I was not.

15   Q.   You never were?

16   A.   No.

17   Q.   Was the position reposted after she declined

18   it?

19   A.   Not reposted since we already had other

20   candidates.  You know, we posted it traditionally.

21   Q.   You had other candidates, right?  So since you

22   had other candidates did you interview anyone further or

40

1    you just went to the next person who you felt were the

2    second best qualified for the position?

3        A.    Yes.

4        Q.    So you interviewed Mr. Townsend prior to the

5    time that Ms. Copley declined or denied the job offer?

6        A.    Correct.

7        Q.    Can you take a moment and explain to me what

8    exactly is Quest Diagnostics policy relative to posting

9    announcements for job positions?

10           MR. STEVENS:   Objection.   You can answer.

11       A.    I don't know the actual policy.

12       Q.    What is the practice?

13       A.    Traditionally they're posted internally for a

14   couple of weeks and then they're then opened to the

15   outside.

16       Q.    Where are they posted?   Is there like a central

17   location or is there perhaps on the intranet?

18       A.    On the intranet.

19       Q.    Anywhere else job announcements are posted?

20       A.    I don't know if they post them within various

21   facilities or not.   They do in Chantilly.   They post them

22   on a wallboard.

1    Q.    Where is this big wall located?

2    A.    The cafeteria.

3    Q.    I'm going to ask you to look at Exhibit 2.

4    A.    Okay.

5    Q.    Let's start with education.  In fact let's not

6    start with education.  Let's start with the essential

7    duties and responsibilities that you identified

8    previously as your contribution in composing the position

9    description.  Okay?

10    A.    Okay.

11    Q.    Starting with essential job duties and

12    responsibilities, number 3, collaborate with HIS

13    personnel in maintaining the database.  Do you see that?

14    A.    Yes.

15    Q.    Shoe me specifically where Mr. Townsend's

16    resume that you believe he demonstrates his ability to

17    perform that function?

18        MR. STEVENS:  Objection.  You can answer.

19    A.    The 2004 to present area which says,

20    Responsible for interfacing laboratory instruments with

21    the new LIS and building the respiratory and clinic care

22    components for Soft Lab.  That is a large component of

1    doing those functions to the state of I guess payments.

2    Q.   What is point of care?

3    A.   That's the ability to be able to do the testing

4    right within the facility for going to the patient.

5    Q.   What about number 4?

6    A.   Facilitates training?  On the 1999 to present

7    as the point of care coordinator he mentions there that

8    he had gone through some ongoing training to the nursing

9    personnel and medical staff.

10    Q.   What about number 6?

11    A.   Nothing within the resume actually jumps out

12    and says he performed those duties.  Other than the

13    possible again for interfacing is going to require you to

14    do documentation.

15    Q.   What about number 9?

16    A.   There is nothing on his resume that says he

17    monitored in LIS before.

18    Q.   At the time that you interviewed Mr. Townsend

19    did you know anyone who worked at Holy Cross Hospital?

20    A.   No, I did not.

21    Q.   Did you give any consideration to Mr. Townsend

22    because he graduated from Strayer University as yourself?

1    exhibit prior to today?

2         A.   Ms. Pollard's resume?

3         Q.   Yes?

4         A.   Yes, it was in the earlier document.

5         Q.   Other than the litigation documents?

6         A.   Yeah.  I believe I received this as part of the

7    resumes that Harvey forwarded to me.

8         Q.   Now, let me direct your attention to -- again,

9    we're starting in the reverse order.

10        Is there -- looking at her two page resume is

11   there any entry on her resume that is consistent with the

12   duty and responsibility identified in number 9 or for the

13   position description?

14        A.   No.

15        Q.   Nothing?  What about number 6?

16        A.   Under the med tech in her second bullet point

17   where it mentions some record keeping and patient

18   information, perhaps.

19        Q.   You said perhaps?

20        A.   Yeah.  There is a difference between record

21   keeping and providing audit trail documentation, but

22   that's close.

1       Q.   What about number 4?

2       A.   The experience as a biology teacher comes with

3  the teacher, but --

4       Q.   Number 4?

5       A.   Yes.  That's not LIS training but that is a

6  teaching.

7       Q.   And what about number 3?

8       A.   No.

9       Q.   Nothing for number 3?

10      A.   No.

11      Q.   What about her overall experience relative to

12  LIS interfacing?

13      A.   This resume tells me she's a user of the

14  system.

15      Q.   And that's it?

16      A.   That's it.  She's a med tech who uses the

17  system.

18      Q.   But that's not sufficient or should I say it

19  doesn't rise to the level whereby it makes her compared

20  to Mr. Townsend competent in consideration for the

21  position?

22          MR. STEVENS:  Objection.  You can answer.

1    A.    Correct.

2    Q.    We're finishing up here.  You're familiar with

3  Ms. Pollard initiating a discrimination complaint against

4  Quest Diagnostics, correct, while she was employed?

5    A.    While she was employed?

6    Q.    Yes.

7    A.    I didn't realize it occurred while she was

8  employed.

9    Q.    Are you familiar with her initiating a

10  discrimination complaint as a result of not being offered

11  the project manager position?

12    A.    Yes.

13    Q.    How did you become familiar with Ms. Pollard

14  initiating a discrimination complaint?

15    A.    I was informed by our human resource manager.

16    Q.    Who was that?

17    A.    Mike Knapp.

18    Q.    How were you informed?

19    A.    He mentioned it to me and asked me to look for

20  any documentation I had.

21    Q.    He mentioned it to you how?  Over the telephone

22  or in person?

THE UNITED STATES OF AMERICA  )
                                )
DISTRICT OF COLUMBIA            )

     I, Raakeebah L. Henderson, the officer before whom the foregoing deposition was taken, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

     I further certify that the examination was recorded stenographically and verbatim by me and this transcript is a true record of the proceedings.

     I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties, nor in any way interested in the outcome of this action.

     As witness my hand and notarial seal this 7th day of January, 2008.

Raakeebah L. Henderson
DISTRICT OF COLUMBIA
Notary Public

MY COMMISSION EXPIRES:

        5/1/08

# EXHIBIT 7
## PART 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

BRIDGET POLLARD,                    X

                                    :

          Plaintiff,                :

          vs.                       :Case No. 1:07-0692

QUEST DIAGNOSTICS                   :

                                    :

          Defendant.                X

---

WASHINGTON, DC
December 20, 2007

DEPOSITION OF:

**HARVEY VANDENBURG,**

a witness, called for examination by counsel on behalf of

the Plaintiff, pursuant to notice and agreement of the

parties as to time and date, taken at the Arent Fox, LLP,

1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,

beginning at approximately 12:39 p.m., before Raakeebah

L. Henderson, a Notary Public and court reporter in and

for the District of Columbia, when were present on behalf

of the respective parties:

1      A.   Yes.

2      Q.   On behalf of Quest Diagnostics?

3      A.   No.  When I was in the military I was involved

4 in the courts marshall around a drug case and I gave

5 expert witness testimony.

6      Q.   Is that it professionally?

7      A.   Yes, sir.

8      Q.   What about personally?

9      A.   Nothing personally.

10     Q.   Since you've been employed or during your

11 period of employment with Quest Diagnostics were you

12 required to undergo any anti-discrimination training?

13     A.   Yes.  There's training on an annual basis.

14     Q.   Administered by whom?

15     A.   Administered by the compliance officer.

16     Q.   Is it mandatory participation?

17     A.   Yes.

18     Q.   Where is the training administered?

19     A.   While we were at Providence the compliance

20 officer came to Providence and did the training out there

21 and then they also have classes at Chantilly for the

22 people who worked there.

1    A.   Her resume.

2    Q.   Anything else?

3    A.   Not to my recollection.

4    Q.   Would it come as a surprise to you that you did

5    not personally or in-person interview Ms. Pollard?  That

6    she was interviewed over the telephone?

7         MR. STEVENS:  Objection.  You can answer.

8    A.   That's not my recollection.  I'm pretty sure I

9    interviewed her face-to-face.

10   Q.   How many times did you interview her?

11   A.   Once and I also talked to her on the phone to

12   set up her interview.

13   Q.   So there was one interview of Ms. Pollard and

14   it was in-person?

15   A.   Yes.

16   Q.   Did you interview any other candidates for the

17   position?

18   A.   Yes.

19   Q.   Who else?

20   A.   I interviewed a gentleman named Tuy Le.  I

21   interviewed a lady named Jane Copley and I interviewed a

22   gentleman name Sean Townsend.

 1      Q.   And these were -- I want to be sure --
 2   face-to-face interviews, correct?
 3      A.   Yes.
 4      Q.   Did you interview any of the candidates for the
 5   project manager position over the telephone?
 6      A.   I don't recall.
 7      Q.   Is it possible you interviewed candidates over
 8   the telephone?
 9      A.   Of course.
10      Q.   Do you know Mr. Robert Leap?
11      A.   Richard Leap?
12      Q.   Richard Leap?
13      A.   Yes, sir.
14      Q.   How do you know Mr. Leap?
15      A.   He's the director of the information services
16   at Quest Diagnostics in Chantilly.
17      Q.   Did you direct Mr. Leap to interview any of the
18   candidates for the project manager position?
19           MR. STEVENS:  Objection.  You can answer.
20      A.   I don't think direct is the right word.
21      Q.   Did you recommend to Mr. Leap that he interview
22   candidates for the project manager position?

1    A.    That's not entirely accurate either.

2    Q.    Okay.  Then what is accurate?  You tell me.

3    A.    I would send resumes to Rich on people who met

4    our predetermined criteria for filling this position and

5    ask if he thought that their technical skills warranted

6    an interview and then he would come back to me with a

7    determination on that on whether he felt that those

8    people should be interviewed by him.

9    Q.    And, again, that was based upon I believe you

10   said whether or not their technical skills warranted an

11   interview, correct; is that what you said?

12   A.    Yes.

13   Q.    An in-person interview or interview

14   telephonically or -- did you leave that --

15   A.    How Rich conducted his interviews was up to

16   him.

17   Q.    So my follow-up question was for the most part

18   you left the discretion to him on how to interview; in

19   person or over the telephone, correct?

20   A.    Correct.

21   Q.    Is there a Quest Diagnostic policy with respect

22   to interviewing candidates or applicants over the

22

1    telephone versus in person?

2              MR. STEVENS:  Objection.  You can answer.

3        A.   I'm not aware of any.

4        Q.   But that was the practice, was it not, to

5    interview candidates over the telephone or alternatively

6    in person?

7              MR. STEVENS:  Objection.  You can answer.

8        A.   My understanding is some interviews are

9    conducted over the phone, yes, and some are conducted in

10   person.

11       Q.   Is there any particular criteria that's used or

12   factors that are considered when to interview someone in

13   person versus interviewing them telephonically?

14       A.   Not that I'm aware of.

15       Q.   Do you know if Mr. Leap interviewed

16   Ms. Pollard?

17       A.   I don't believe he did.  I'm not sure of the

18   way I recall the incident with her interview.  I don't

19   think that he did.

20       Q.   Do you have any reason or know of any reason

21   why he didn't interview her?

22       A.   Yes.

1    Q.   What's the reason?

2    A.   Because she didn't meet our criteria for having

3    experience in setting up the file structure of a

4    laboratory information system and for managing the

5    interfaces for producing or for setting up the laboratory

6    reports.  And that was one of the most important things

7    we were looking for.

8    Q.   So is it your testimony that Mr. Leap only

9    interviewed individuals as you said whose resume or

10   application demonstrated experience setting up file

11   structure or interfacing with LIS?

12   A.   That's my understanding but I can't speak to

13   his actions.

14   Q.   Okay.  I want to be clear.  That was your

15   understanding?

16   A.   That was my understanding.

17   Q.   During that period of time was Mr. Leap your

18   colleague or was he a subordinate of yours in the overall

19   structure?

20   A.   He's a colleague.

21   Q.   So you couldn't delegate anything to him?

22   A.   No.

1     test results and that gave reports to the doctors.

2          Q.   Take a moment to explain to me as a layperson,

3     all right, the distinction or the difference when you say

4     the old LIS versus the one that ultimately or shall I say

5     the one that was envisioned?

6          A.   Okay.

7          Q.   Take a moment to explain that.  I have no

8     technical background, all right?

9          A.   Sure.

10          MR. STEVENS:  Objection.  You can answer.

11          A.   Okay.  A laboratory information system is the

12     tool that we use in the laboratory that leads to a report

13     that's going to go to the doctor with the test results.

14          Through that system we receive specimens that

15     have been drawn, match them with the patient

16     identification in a unique identifier to that specimen.

17     We track the times they're received.  We track how long

18     it takes to take that sample and run it through an

19     analyzer and produce a result.

20          Run it through, our information system works

21     with in tandem with the laboratory instruments so the

22     instruments will and with the human intervention of a

27

1   medical technology such as Bridgett will with the

2   technologist will perform the analysis usually through an

3   instrument.

4           The instrument and the laboratory information

5   system are interfaced through software instructions and

6   then the information moves back and forth between

7   instrument and the laboratory information system and that

8   yields a form of an electronic report.

9           The medical technologist verifies the accuracy

10  of that report concerning any factors that have anything

11  to do with the specimen like, you know, is it a good

12  specimen, should I really be turning out this result and

13  if the medical technologist in their professional

14  judgement agrees with the result, they will certify that

15  result which triggers the laboratory information system

16  to generate a report.

17          And either electronically or on paper that

18  report goes to the physician and that is what the

19  physician uses as their diagnostic treatment information.

20          Also important in that loop is that the

21  laboratory information system is a billing system.  So it

22  keeps track of the workload and all of the billing codes

1    that we need to have to build the insurance or Medicare

2    or the patient's provide financial statements as well.

3         So essentially it is working the communication

4    piece of laboratory.

5    Q.   And the overall role or the purpose of the

6    project manager was in relation to what you just

7    described this person or the individuals selected for the

8    position would have managed or would have been an

9    overseer if you will of the LIS?

10        MR. STEVENS:  Objection.  You can answer.

11   A.   That role most pertains to, quote, the old LIS

12   because that was system that was in place.  The person

13   who was doing that job did what you described,

14   essentially was managing and troubleshooting the

15   functions of that system.

16        The new LIS essentially was a software upgrade

17   from that old system and greatly increasing the

18   functionality of a system to produce all of those various

19   tasks that I described.  In a much more user friendly,

20   you know, windows based, all that kind of stuff

21   environment.  So this was a new and better thing that we

22   were bringing in.

1        MR. STEVENS:  Objection you can answer.

2    A.    Jointly.

3    Q.    Let me ask the question this way.  After you

4    and Mr. Leap composed the position description what

5    happened to it?  Was it posted for the job announcement?

6    A.    Here's how I recall the process.  And believe

7    me my memory is foggy on this because it's been a long

8    time for me.

9    Q.    Okay.

10   A.    We needed a job description in order to post

11   the position.  This is one of the things that HR wants.

12   It makes sense to me.

13       So not knowing how compose it because I'm not

14   that familiar with the technical aspects of this job, I

15   asked that we have some help in doing so from Rich Leap

16   and his group specifically Gloria Lim who worked for Rich

17   Leap who was the incumbent in that job.

18       And I suggested it might be a good idea to pull

19   out her position description and see what it entailed and

20   if they should modify that and present that as the

21   position description.

22       Those are what I remember in fact.  After that

# EXHIBIT 7
## PART 2

 1    see any language within this position description which

 2    requires a person or a candidate's certification?

 3              MR. STEVENS:  Objection.  You can answer.

 4         A.    Laboratory certification; is that what you're

 5    referring to?

 6         Q.    Anything that could possibly be construed as

 7    requiring certification.

 8         A.    No.

 9         Q.    Eventually did you interview Mr. Townsend?

10         A.    Yes.

11         Q.    How many times did you interview Mr. Townsend?

12         A.    Once.

13         Q.    Was it face-to-face?

14         A.    Yes.

15         Q.    What about Ms. Copley?

16         A.    Yes.

17         Q.    How many times did you interview her?

18         A.    Once.

19         Q.    Mr. Vandenburg, who did you select or recommend

20    for selection for the project manager position?

21         A.    It really didn't work that way.  What I did was

22    I interviewed the applicants and I made my own

1    determination about how I felt their interpersonal

2    communication skills were and whether what they put on

3    their resume was consistent with what they were able to

4    verbalize to me and answer any questions they had about

5    the job.

6              So essentially I was, you know, looking at more

7    of the interpersonal aspect and I was relying on Rich to

8    look at the LIS, the technical aspects, and we agreed

9    that we would decide together.

10             So my conversation to Rich although I don't

11   remember the exact words was like this.  Well, you know,

12   I've talked to all these people, it seems like they could

13   all get along.  They can speak and they have good verbal

14   communications skills, you know, the technical aspects

15   are going to be the deciding factors here.  Who do you

16   think is the best candidate.

17             And the person that he was said was Jane Copley

18   because she had he told me a breadth of laboratory

19   information and experience in her previous job that would

20   essentially prime her for this job.

21             And he recommended that that would be the person

22   that we make the offer to.  And I accepted that

1    recommendation.  It seemed reasonable to me.

2        Q.   And eventually she declined the position,

3    correct?

4        A.   That's correct.

5        Q.   Why did she decline the position?

6        A.   My understanding from the HR people

7    post-interview was that she wanted more money than we

8    were offering.

9        Q.   So after she declined the position or the offer

10   for the position then was the position reposted?

11       A.   No.  Then we went to our second choice because

12   we felt our second choice would be able to perform the

13   job adequately.

14       Q.   Okay.  I'm a little confused.  A moment ago you

15   testified that it was Lee who would make the

16   recommendation based upon the person's technical

17   background and expertise, correct?

18       A.   Mm-hmm.

19       Q.   You have to verbalize your responses, all

20   right?

21       A.   Oh, yes, sir.  Sorry.

22       Q.   You're saying that it was -- now you're saying

1    that it was a collaborative effort or a recommendation?

2         MR. STEVENS:  Objection.  Mischaracterizes the

3    testimony.  You can respond.

4         A.   Rich and I collaborated from the start.

5         Q.   Okay.  I'm talking about in terms of

6    Mr. Townsend.

7         A.   In terms of Mr. Townsend in our conversation

8    about who was most qualified for the position he

9    articulated to me that Jane had the best qualifications.

10   However, Sean's qualifications were adequate and he would

11   be a good second choice.  I agreed with that.  It seemed

12   to make sense to me.

13        Q.   Who would have been the next most qualified

14   individual other than -- well, moving on from

15   Mr. Townsend who would have -- the other candidates?

16        A.   Of those four?

17        Q.   Yes.

18        A.   If Sean would have declined the offer for the

19   position we would have kept looking.

20        Q.   What do you mean kept looking?

21        A.   We would have reposted the position and gotten

22   in more resumes.

1      Q.   Now, is it not Quest Diagnostics' policy to

2    have a preference if you will for internal applicants as

3    opposed to external applicants?

4           MR. STEVENS:  Objection.  You can answer the

5    question.

6      A.   I'm not aware of any such policy.  However in

7    practice I think it's a good idea to try to put your own

8    people's ambitions with the best possible phase and move

9    them forward in the process for promotions.

10     Q.   Did you know Mr. Townsend prior to the time he

11   applied for the position?

12     A.   No.

13     Q.   Did you know Ms. Copley prior to her

14   application for the position?

15     A.   No.  I did not.

16     Q.   Is it your testimony that Ms. Pollard didn't

17   have sufficient technical background and expertise to be

18   seriously considered for the position had Mr. Townsend

19   declined?

20     A.   It's my testimony that Ms. Pollard had

21   sufficient laboratory knowledge as a medical technologist

22   where she lacked knowledge or experience was in the

40

1   behind the scenes functions of the laboratory information

2   system.

3       Q.   But she did work in the laboratory information

4   system for Quest Diagnostics; did she not?

5       A.   She used it.

6       Q.   She used it.

7       A.   She used it. She was a user.  The analogy would

8   be you use e-mail, you don't program e-mail.

9       Q.   Thanks for the extra assistance.  Tell me this.

10  Did you review any other application document for

11  Ms. Copley or for Mr. Townsend other than a resume?

12          MR. STEVENS:  Objection.  You can answer.

13      A.   The only ones I remember reviewing were their

14  resumes.

15      Q.   So you didn't call and verify whether or not

16  these individuals had the expertise in LIS they

17  represented on their resume; is that correct?

18      A.   No, I did not.

19      Q.   So it's possible they didn't have the expertise

20  in LIS that was represented in their resumes; isn't that

21  possible?

22      A.   It's possible.

42

1          MR. STEVENS:  Objection.  You can answer.

2     A.   I don't think that is possible.  I worked with

3  Sean many months after he was hired and he did display

4  knowledge of laboratory information that far exceeded

5  that of a user.

6     Q.   In fact, Mr. Townsend is no longer employed

7  with Quest Diagnostics, correct?

8     A.   That's my understanding.

9     Q.   Do you know why he left the employ of Quest

10  Diagnostics?

11     A.   I do not know.

12     Q.   What kind of employee or manager was he while

13  employed with Quest Diagnostics?

14     A.   He was a good employee.

15     Q.   When you interviewed him did he commit to a

16  multi-year or long-term employment relationship with

17  Quest Diagnostics?

18          MR. STEVENS:  Objection.  You can answer.

19     A.   No, he did not.

20     Q.   Well, if you were implementing an upgrade into

21  LIS wouldn't that have been a factor to consider?

22     A.   Absolutely.

1    A.    Correct.

2    Q.    In fact, let's talk about this list for a

3    moment.

4    A.    Okay.

5    Q.    The two top candidates were Jane Copley and

6    Eric Townsend, correct?

7    A.    Sean Townsend.

8    Q.    Sean Townsend.  I'm sorry.  Correct?

9    A.    Yes.

10    Q.    Let me direct your attention to the second

11    column where it says EEO code.  And one through five

12    represents the person's race or nationality; do you see

13    that?

14    A.    I do.

15    Q.    So Mr. Townsend and Ms. Copley were the only --

16    they were the Caucasians out the group; is that correct?

17    A.    It appears to be so.  I didn't write these

18    codes on here.

19    Q.    Right.  I understand.  Let me direct your

20    attention back to the previous exhibit.  It says eight

21    internal candidates and two external.  That's consistent

22    with this information on the previous exhibit; is it not?

57

1    MR. STEVENS:  Objection.  The document speaks

2    for itself.  Go ahead.

3    A.    I don't recognize the names -- all the names of

4    the people who they say were internal.

5    Q.    But again you don't have any reason to dispute

6    this, the information contained?

7    MR. STEVENS:  Objection.  You can answer.

8    A.    No, I don't have any reason to dispute it

9    because this has refreshed my memory.

10    Q.    Okay.  Let me direct your attention back to the

11    exhibit that talks about Ms. Pollard's discrimination

12    charge.  The top candidate is Jane Copley and Sean

13    Townsend, correct?

14    A.    Yes.

15    Q.    And again they were the only two white

16    candidates who applied for the position based upon

17    representation of this previous exhibit; is that correct?

18    A.    That's correct.

19    Q.    And it also says that Ms. Copley was offered

20    the position August 18th, 2005?

21    A.    I didn't make the offer, I don't know the date.

22    Q.    I understand.  Who made the offer, human

71

```
1          Q.   Now let me direct your attention to Exhibit 13

2    and it's dated 2005, correct?

3               MR. STEVENS:   Objection.  You can answer.

4          A.   Yes, it is.

5          Q.   And it's Ms. Pollard's performance evaluation,

6    correct?

7          A.   It appears to be so.

8          Q.   Let me direct your attention to the fifth page.

9          A.   Okay.

10         Q.   Where previous year Ms. Pollard received a 2.0

11   and here she received initially a 2.75; is that correct?

12         A.   It looks like it, it's crossed through.

13         Q.   But ultimately she received a 2.5; is that

14   correct?

15         A.   It looks like it.

16         Q.   And this was -- the appraiser here is who?

17         A.   Isabalida Aglipay (phonetic).

18         Q.   And that was her immediate supervisor?

19         A.   Correct.

20         Q.   Did you have any input in Ms. Pollard's

21   supervisor giving her a score of 2.75 or the 2.5?

22         A.   No, I did not.
```

1    Q.   So this was strictly independent or strictly

2    the decision and discretion of her immediate supervisor?

3    A.   Correct.

4    Q.   Are you familiar with the existence of a policy

5    or memorandum in 2005, 2006 concurrent with the time

6    period in which this evaluation was produced in which

7    supervisors or management were instructed not to give

8    their employees anything above average for the rating?

9    MR. STEVENS:  Objection.  You can answer.

10    A.   I don't recall that and I know as a matter of

11    fact that we gave excellent employee evaluations during

12    that period and also outstanding ones.  It would seem

13    inconsistent with our overall policy to do that.

14    Q.   Did you have any discussion with her immediate

15    supervisor regarding her decision to rate Ms. Hall a 2.75

16    and then ultimately 2.5?

17    A.   I only had a discussion with her supervisor

18    about this evaluation after we knew that she had filed

19    with the Equal Employment Opportunity Commission.

20    Q.   Okay.  And not before?

21    A.   No.

22    Q.   Quest Diagnostics provided what is known as

THE UNITED STATES OF AMERICA    )
                                )
DISTRICT OF COLUMBIA            )

        I, Raakeebah L. Henderson, the officer before
whom the foregoing deposition was taken, do hereby
certify that the within-named witness personally appeared
before me at the time and place herein set out, and after
having been duly sworn by me, according to law, was
examined by counsel.


        I further certify that the examination was
recorded stenographically and verbatim by me and this
transcript is a true record of the proceedings.

        I further certify that I am not of counsel to
any of the parties, nor an employee of counsel, nor
related to any of the parties, nor in any way interested
in the outcome of this action.

        As witness my hand and notarial seal this
14th day of January, 2008.

                        _____
                        Raakeebah L. Henderson
                        DISTRICT OF COLUMBIA
                        Notary Public




        MY COMMISSION EXPIRES:

                                5/1/08

# EXHIBIT 8



TOWNSEND, SEAN    10/17/05   Ben Eff: 12/1/2005
3310 GUMWOOD DRIVE
HYATTSVILLE ,MD 20783

## Position Des

Quest Diagnostics Nichols Institute, Chantilly

| | | | |
|---|---|---|---|
| **Position Title:** | Manager, Project – Lab | **Job Number:** | 101157 |
| **Department:** | Providence Hospital Lab | **Grade Level:** | 49 |
| **Reports to:** | Harvey Vandenburg | **FLSA Status:** | Exempt |
| **Direct Reports:** | None | **Location:** | Providence Hospital |
| **Work Schedule:** | As scheduled | **Date Written:** | 8/22/05 |

## Position Summary

Oversees and facilitates all functions of the onsite LIS for Providence Hospital including, but not limited to, building, testing and maintaining new test, improving efficiency of laboratory processes, upgrades and interfaces (HIS, Ref Lab, POC and instruments). Position provides LIS training for staff. Integrates project and resource plans with departmental strategies. Understands the strategic business plan and how to navigate within various IT and customer groups to evaluate/plan/design and follow through projects from start to finish. Can apply technology to influence the achievements of hospital operating objectives.

## Essential Job Duties and Responsibilities

1. Possesses overall responsibility for the Providence LIS Database.

2. Supervise all computer related activities at Providence Hospital.

3. Collaborate with HIS personnel in maintaining database.

4. Facilitates LIS training and competency for all new and existing staff as new processes or procedures are added.

5. Writes and maintains LIS SOPs including annual review with appropriate signoff.

6. Provides necessary audit trail documentation of all changes and validations to LIS system to meet or exceed regulatory requirements, including but not limited to, annual calculations review, biannual patient report for Medical Director review, LIS upgrade documentation, LIS backup and transaction documentation.

7. Provides on site coordination and support to Quest Diagnostics network and hardware. Contacts appropriate personnel at Chantilly as issues are identified.



EXHIBIT
89

Q 00046

JOB DESCRIPTION: Manager, PROJECT - LAB                                              (2)

8. Submit request and participate in evaluations and review for enhanced functionalities to LIS.

9. Monitor LIS performance and report outages or system degradation issues to appropriate channels.

10. Plans and provides timelines for projects sanctioned by the laboratory's management team.

11. Requests and obtains the necessary personnel to complete the projects according to the timeline submitted.

12. Adheres to all established laboratory safety requirements.

13. Actively supports and complies with laboratory policies and procedures.

14. Act as liaison between laboratory users and programmers.

15. Run required reports for management.

16. Performs other job-related, miscellaneous duties as assigned by competent authority.

## Physical Demands

- Long periods of sitting/computer use. Approximately 10-15% travel required.
- Ability to lift up to 40 lbs.

## Qualifications

### Experience, Education, and Licensure

- Bachelor's degree in Computer Science or Medical Technology, or AA degree in, Medical Technology. General laboratory knowledge, LIS functionalities, and LIS/HIS interface knowledge.

### Knowledge, Skills and Abilities

- Good written and verbal communication skills

- Ability to make sound decisions

Q 00047



JOB DESCRIPTION: Manager, PROJECT - LAB                                    (3)

- Analytical skills necessary to determine and correct operating problems

- Knowledge or basic laboratory operations.
- Have direct experience testing and/or troubleshooting new or existing LIS products.

- Interpersonal skills necessary to deal courteously and effectively with supervisors, co-workers and clients.

- Ability to deal with client information in a confidential manner.

_____   10/17/05
Employee Signature                 Date


JD Manager, Project - Lab
ig
8/22/05

Q  00048

# EXHIBIT 9

# Jane L. Kopley MPA MT(ASCP) SC

**2004 Baltimore Road C-32   Rockville, MD 20851   301-424-3370 jlkopley@hotmail.com**

**Objective:** To work for a healthcare system where I can use my technical and managerial skills to promote and support quality patient care.

**Experience:**

**2004-2005**    Manager, Automated Laboratory Services
Holy Cross Hospital, Silver Spring, MD 20910

- Generalist with a technical specialty in Chemistry
- Member of the LIS team to build, validate and implement Soft Lab IS for the Automated Lab
- Participated in the interface validation of 13 instruments
- Validation document reviewer
- Established training documentation and trained staff of 49 in the use of the LIS
- Created and graded post training competency evaluation tool
- Established Process and supplied specimens and support for Stress testing and Parallel testing of Soft Lab IS
- Participant in the technical validation of 6 new instruments
- Created instrument specific database for the QC function of the LIS
- Develop and implement the individual scripts for required LIS functions at each bench of the Automated Lab as a go live tool
- Develop and implement technical procedures for a Core Lab of Chemistry, Hematology, Coagulation and Urinalysis
- Monitored QC of 12 instruments, reviewed interlab QAP
- Established and documented annual staff technical competency
- Managed and reviewed CAP testing
- Manufacturer trained in the Vitros Fusion 5,1
- Select new hires and schedule a staff of 49
- Direct training of new staff, review training documentation and competency testing
- Troubleshoot technical problems as needed
- CAP inspector
- Budgetary development and control
- Six Sigma trained

**1980-2004**    Night Shift Technical Specialist, Consolidated Lab Operations Coordinator, Morristown Memorial Hospital,
Morristown, NJ 70690, Atlantic Health System

- Evaluation of system needs, equipment selection, and implementation
- Technical specialist with manufacturer training in V950
- Budgetary development and control
- QC manager for chemistry systems
- Established compliance protocol for industry regulations and maintained effective process checks resulting in consecutive successful agency inspections
- Supervised compliance for all aspects of Point of Care Testing Program participation by nursing units
- Team participant for various clinical trials
- Chair of the Steering Committee to establish Shared Governance as the management method resulting in across the lab team building and the empowerment of staff to lead in specific area as quality improvement
- CAP inspector
- School of Medical Technology Clinical Instructor

**Education:**    Seton Hall University, South Orange, NJ
College of Arts and Science, Center for Public Service

- Master of Public Administration, Health Policy and Management
- Member Phi Alpha Alpha, National Honor Society for Public Administration GPA 3.8
- BS, Biology

Barnert Hospital School of Medical Technology, Paterson, NJ

- 12 month internship

**Reference:** Available upon request



EXHIBIT
11

Q 00120

# EXHIBIT 10

Sean Townsend
3310 Gumwood Drive
Hyattsville, Maryland 20783
Home (301) 422-9133
Cell (301) 996-0472
Work (301) 754-7332

**Career Objective:**  To pursue a career with a progressive company, which can offer continuous challenges, opportunities for personal and professional growth, and utilize both my theoretical education and practical experiences.

**Education:**

- Strayer University, Washington, D.C.; currently enrolled in the Master of Science in Information Systems program.  Courses completed:  Networking, Relational Database Management; presently studying Operating Systems and Programming Logic.  Expected date of degree completion Spring 2006.
- Strayer University, Washington, D.C.; Master of Business Administration: Management, June 2002.  Listed in the 2001 Who's Who Among Students in American Universities and Colleges.
- University of Maryland, University College; Bachelor of Science Business and Management:  Finance, August 1991.  Dean's List 1991 academic year, grade point average 3.600.  Graduating grade point average 3.466.
- University of Maryland, Baltimore City; Bachelor of Science Medical Technology, May 1984.

**Work History:**

Holy Cross Hospital, 1500 Forest Glen Road, Silver Spring, Maryland.

2004 to Present:  Responsible for interfacing all laboratory instruments with the new LIS (Softlab), building the Respiratory and Point of Care components for Softlab.

1999 to Present:  Point of Care Technical Coordinator.  Restructured the point of care testing program, initiated a more stringent quality control program to meet JCAHO and state requirements, provide ongoing training to the nursing personnel and medical staff to perform point of care tests, set up the Precision PCx glucose meter system and expanded the iSTAT system into the OR/Recovery arenas, assist Respiratory Department with troubleshooting blood gas analyzers and instruments' quality control program, coordinated the implementation of the Hemochron Signature from the Hemochron Jr. instrument and oversee its usage in the Cardiac Catheter Lab and

EXHIBIT

12

Q 00057

Angiography, liaison between the medical director, the laboratory director, and the nursing personnel.

1998 to 1999:  Technical Specialist, Automated Laboratory.  Perform hematology, chemistry, coagulation, urinalysis, and limited serology tests; continuously review quality control data, maintain laboratory instruments, and provide technical training to staff.

1990 to 1998:  Section Head, Point of Care Satellite Laboratories (Emergency Department and Mother/Baby).  Initiated and maintained a quality control program that met all regulatory requirements, supervised a twelve member staff, provided staff counseling when needed, investigated potential new laboratory instrumentation, performed correlation studies for new instruments, prepared both yearly non-wage and wage budgets, developed and maintained a positive working relationship between the lab staff and the clinicians, and trained all new employees.

1984 to 1990:  Medical Technologist.  Performed routine hematology, urinalysis, and serology tests, collected testing specimens, and acted as take charge technologist when requested.

Providence Hospital, Varnum Street NE, Washington, D.C.

1984 to 1987:  Medical Technologist.  Performed routine hematology, urinalysis, coagulation, and chemistry tests; collected test specimens through various phlebotomy techniques.

**Instrument Training:**

- Abbott Axsym
- Abbott Cell Dyn 3500
- Dade Paramax Rx
- Dade Paramax Classic
- Dade Stratus II
- IL Phoenix

**Certification:**  American Society of Clinical Pathologists

**Interests include:** traveling with visits throughout Northern, Eastern, and Southern Europe, Australia, New Zealand, Israel, Alaska, British Columbia, and Ontario; reading, and gardening.

**References:**  on request.

JUL 2 0 2005

# REFERENCES

1. Melissa Fury, RN
Clinical Application Project Manager
301-754-7425
(former Nurse Manager Surgical Neuro Orthopedics, Holy Cross Hospital)

2. Diana Broussard, RN
Assistant Manager Neonatal Intensive Care Unit, Holy Cross Hospital
301-754-7602

3. Alida McDonald, RN
Nurse Manager PACU and Ambulatory Surgery Department, Holy Cross Hospital
301-754-7281

4. Cindy Diaz, RN
Senior Clinical Analyst, Holy Cross Hospital
(former Assistant Nurse Manager Maternal Child Health)
home: 301-260-1966
work: 301-754-7821

5. Nancy Nagel, RN
Nurse Manager OB Clinic, Holy Cross Hospital
301-754-7631

6. Linda Nuttall, RN
Diabetes Teaching Specialist, Holy Cross Hospital
301-754-7448

7. Josie Hernandez
Medical Technologist Hematology, Holy Cross Hospital
Home: 301-460-0389
Work: 301-754-7333

8. Nannette Poidven
Medical Technologist Gen Lab, Holy Cross Hospital
(former employee under my supervision in ER STAT Lab)
301-754-7333

9. Soraya Tirbany
former employee under my supervision in ER STAT Lab
301-937-0930

10.  Clay Risk, MD
Chief of Anesthesiology, Holy Cross Hospital
301-754-7265

11.  Robert Snyder, MD
Chief of Pathology, Holy Cross Hospital
301-754-7336

12.  Elaine Oberle
Abbott Diagnostics
1-866-243-1202 ext. 222-2105

13.  Lisa Durish
Lifescan
1-800-722-6036 ext. 5256

14.  Ann Snyder
Point of Care Specialist, Greater Baltimore Medical Center
443-849-2008

15.  Ray Neumann
Laboratory Information System Coordinator, Holy Cross Hospital
301-754-7813

16.  Claudia Schreiber
Laboratory Administrative Secretary, Holy Cross Hospital
301-754-7347

17.  Mary Frances Butler*
Director Laboratory Services, Holy Cross Hospital
current supervisor
301-754-7321
**\*Please only contact if selection for a position is almost certain.  I am
able to provide a copy of my current yearly evaluation as a preliminary
indication of job performance.**

Q  00060

# EXHIBIT 11



**BRIDGET L. POLLARD**
3205 Forest Run Drive
Forestville, MD 20747

Email: bridget3234@hotmail.com                                      (301) 735-1425

## SUMMARY OF QUALIFICATIONS:

Highly motivated professional, works well independently or as part of a team. Always makes a serious commitment to professional growth and development. Currently seeking a Project Management position which will provide career advancements.

Research and technical background, with an organized analytical approach to problem solving and troubleshooting. Technical skills further developed through a Masters curriculum include: database structuring, software design and system design.

Disciplined Medical Technologist in the current laboratory testing methodologies. Ability to evaluate laboratory data, ensure accuracy and reliability, verify quality control procedures and develop solutions to problems concerning test data will prove beneficial in all job settings.

## RELEVENT SKILLS:

* MS Products: Windows 2000, Windows 98, Microsoft Office Suite, SQL, Access * Visual Basic 6.0
* Local Area Networks * Network Protocols: TCP/IP, OSI * TS Clearance Obtained 1985-1987

## PROFESSIONAL EXPERIENCE

Quest Diagnostics Chantilly, VA                         October 2002 - Present
*Medical Technologist*
*Responsibilities include quality testing, instrument troubleshooting, maintenance of analyzers, and reagent preparations.
* Duties of data/result entries, record keeping, and patient information transfer accomplished using Laboratory Information Systems interface.
* Conduct testing of body fluids/ blood products in the area of Chemistry, Hematology, Coagulation, Microbiology, and Urinalysis.

Southern Maryland Hospital Center Clinton, MD           September 2000 – October 2002
*Medical Technologist*
*Responsibilities include quality testing, instrument troubleshooting, maintenance of analyzers, and reagent preparations.
* Duties of data/result entries, record keeping, and patient information transfer accomplished using Laboratory Information Systems interface.
*Duties included testing of blood products/ body fluids in Hematology, Chemistry, Coagulation, Microbiology and Urinalysis.

Prince George's County Public School Upper Marlboro, MD    March 2001 –August 2002
*Biology Teacher*
*Educational instructor in the major areas of Biology: Genetics, Plant and Animal topics, Ecology and Evolution.
*Developed weekly lesson plans in conjunction with the assigned curriculum. Organized and constructed relevant laboratory experiments.
*Curriculum topics supported and reinforced with computer technologies, projects, papers and research of current events.

Con-Test Analytical East Longmeadow, MA

October 1998 - July 2000

*Laboratory Technician*

\*Analyzed chemistry testing for Nitrites, Residual Chlorine, Formaldehyde, Biological Oxygen Demand, and Fecal Coliform.

\*Samples consisted of waste products from manufactures, and environmental elements of air, waters, and soils.

\* Instrumentation and methodologies include distillations, titration, colorimetric evaluations with use of spectrophotometers, and Ph monitoring.

Wright Corporation Riegelwood, NC

June 1997 - June 1998

*Quality Control Analysis / Chemical Laboratory Technician*

\*Quality Analysis on various company produced chemicals using Hewlett Packard Gas Chromatography instruments, Hewlett Packard H.P.L.C. 1100, Infrared Spectroscopy, and monitoring of Ph by titration.

\*Research and development in the production of Silane based chemicals, which includes record keeping of temperatures, monitoring of chemical impurities and chemical purities using chromatography.

## EDUCATION

Master of Science Degree: Management Information Systems, May 2005
Bowie State University, Bowie, MD

MAJOR COURSES OF STUDY

*Software Structures* – An in depth look at software from a design and implementation perspective. Software project management concepts and software quality issues are addressed.

*Data Communication Systems Networks* – Analysis of data communication technology and the applications within public and private sectors; Communications environment, equipment, local and wide area networks considered.

*Information Analysis and Design* – Provided detailed aspects of all phases of information systems development. Requirement methodologies with respect to different application areas, logical design and implementation issues, as well as design methodologies, including structured and objected-oriented designs were discussed.

*Database Management and Decision Systems* – Examined database concepts, practices, design, and implementation as they relate to business environments. Database principles commonly used concentrated on SQL functions for database management and security issues.

*Securities Control* – Introduced Automated Data Processing (ADP) audit and control methods, with emphasis on information systems controls. The course examined risk assessment, auditing and internal control policies and procedures

Bachelor of Science Degree: Biology, Chemistry Minor, May 1997
University of North Carolina at Wilmington, Wilmington, NC

Associates of Science Degree: Medical Laboratory Technology, May 1993
Associates of Science Degree: Engineering and Science Transfer Degree, May 1990
Springfield Technical Community College, Springfield, MA

2

# EXHIBIT 12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**BRIDGET POLLARD**
**2717 Cabochon Diamond Court**
**Raleigh, NC 27610**

        **Plaintiff,**

**v.**

                                           **Civil No. 07-692 (CKK)**

**QUEST DIAGNOSTICS,**
**1150 Varnum Street, N.E.**
**Washington, DC 20620**

                 **Defendant.**

Serve:

**NATIONAL REGISTERED AGENTS, INC.**
**1090 VERMONT AVE NW, SUITE910**
**Washington, DC 20005**

### AMENDED CIVIL COMPLAINT

    **NOW COMES** Plaintiff, Bridget Pollard, by and through undersigned counsel and files this amended civil complaint for damages, pursuant to F.R.C.P. 15. Plaintiff states herein as follows:

### JURISDICTION AND VENUE

    1. This action is authorized and instituted pursuant to Title VII of the 1964 Civil Rights Act, as amended by 1991, hereinafter "Title VII;" this action is also authorized and instituted pursuant to 42 U.S.C. §1981, hereinafter "1981."

    2. This action properly lies in the District Court for the District of Columbia because this judicial district has personal jurisdiction over Defendant. This action is also

1

in accordance with 28 U.S.C. 1331.

## PARTIES

3.   "Plaintiff", Bridget Pollard is a citizen of the United States and resides in the State of North Carolina.

4.   Plaintiff is an employee as defined in accordance with Title VII.

5.   In accordance with the Title VII, she is a member of protected classes based upon her race and color.

6.   "Defendant," Quest Diagnostics is an employer as defined in accordance with Title VII.

## ADMINISTRATIVE PROCEDURES

7.   Plaintiff timely filed her Charges of Discrimination against the Defendant with the U.S. Equal Employment Opportunity Commission-Washington Field Office on November 29, 2005, and amended her complaint on February 28, 2006.

8.   Plaintiff was issued her Notice of Right to Sue on February 28, 2007.

9.   Plaintiff therefore invokes her right to sue under 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 626 in that she has satisfied all administrative and judicial prerequisites to the institution of this action.

## COUNT I

### DISPARATE TREATMENT BASED ON RACE AND COLOR IN VIOLATION OF TITLE VII & 1981

10.   Plaintiff re-alleges the allegations of Paragraphs 1 through 9, and incorporates them by reference herein.

11.   Plaintiff applied for the position of Project Manager in Defendant's IT Department

2

and was denied the position notwithstanding her extensive years of experience and expertise.

12.    Plaintiff avers Defendant initially offered the position to a similarly-situated white female employee but the offer was declined.

13.    Plaintiff avers Defendant then offered the position to a similarly-situated white male employee with lesser experience and qualifications than Plaintiff.

14.    As a direct result of Defendant's discriminatory practices, Plaintiff has sustained economic and non-economic damages.


## COUNT II

### RETALIATION IN VIOLATION OF TITLE VII & 1981

15.    Plaintiff re-alleges the allegations of Paragraphs 1 through 14, and incorporates them by reference herein.

16.    Plaintiff avers that she engaged in protected activity when she filed her Charge of Discrimination with the U.S. EEOC, complaining of disparate treatment against Defendant.

17.    Plaintiff avers that as a result of engaging in protected activity she suffered an adverse action, namely an inferior performance evaluation.

18.    Plaintiff avers that there is a casual connection between her engaging in protected activity and suffering the adverse action of an inferior performance evaluation.

19.    As a direct result of Defendant's retaliatory conduct, Plaintiff has suffered emotional distress , anxiety, insomnia, loss of appetite, hair loss and has sustained

3

economic damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Honorable Court should grant her the following

relief, namely:

(i). That this Court determine the employment practices complained of in this complaint

are unlawful in that they violated the Title VII and 1981.

(ii). That Defendant be enjoined from continuing any and all discriminatory practices;

(iii). That Defendant pay Plaintiff a sum in excess of $100,000 for compensatory damages,

backpay, interests, emotional distress;

(iv). That Defendant pay Plaintiff's costs and expenses and reasonable attorney's fees as

provided in Title VII and 1981 in connection with this action;

(v). That this Court grant other and such further relief to the Plaintiff as it deems just and

proper.

Respectfully submitted on behalf of Plaintiff:

August 16, 2007 _____/s/_____
Nathaniel D. Johnson (Federal #14729 MD)
Richard L. Thompson (Federal #15980 MD)
THE LAW FIRM OF NATHANIEL D. JOHNSON, L.L.C.
3475 Leonardtown Road, Suite 200
Waldorf, Maryland 20602
301-645-9103
301-893-6890 fax

4

**Certificate of Service**

I, Nathaniel D. Johnson, certify that on this date, August 31, 2007, the foregoing Amended Complaint and Order, were sent via, ECF, to the following addressee:

Michael Stevens, Esq.
ARENT FOX LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

/S/: Nathaniel D. Johnson

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| BRIDGET POLLARD, | X |
| | : |
| Plaintiff, | : |
| vs. | :Case No. 1:07-0692 |
| QUEST DIAGNOSTICS | : |
| | : |
| Defendant. | X |

WASHINGTON, DC
January 28, 2008

DEPOSITION OF:

**ISABELITA AGLIPAY,**

a witness, called for examination by counsel on behalf of

the Plaintiff, pursuant to notice and agreement of the

parties as to time and date, taken at the Arent Fox, LLP,

1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,

beginning at approximately 11:12 a.m., before Raakeebah

L. Henderson, a Notary Public and court reporter in and

for the District of Columbia, when were present on behalf

of the respective parties:

COPY

1   the score?

2       A.    This is how I feel how the work orientation and

3   the customer relations that fit her.

4       Q.    I didn't hear that last part and I apologize.

5       A.    The number 2 is crossed out the 3.  This is how

6   I feel to Ms. Pollard in that rating.

7       Q.    Did you point to any specific incident or

8   occurrence which led you to give her the 4 rating before

9   the 3?

10          MR. STEVENS:  Objection.

11      Q.    Under interpersonal and customer relations?

12          MR. STEVENS:  Objection.

13      Q.    In other words, did anything happen that

14  particular rating cycle for the year 2005?

15          MR. STEVENS:  Objection to the form.  You can

16  answer the question.

17      A.    Okay.  Relation with our customers.  What I'm

18  saying that some of our customers some complain about

19  her.

20      Q.    Who were these customers?

21      A.    Nurses, doctors.

22      Q.    Nurses and doctors?

1      A.   Yes.  They complain to me about her being, you

2    know, not giving some information about results or

3    what -- for example, I give you an example for this.

4      Q.   Please do.

5      A.   If the doctor ask for a result or nurse, don't

6    just say, oh, it's in the computer.  Look in the

7    computer.  No, you give the result to your client when

8    they ask it.  That's the complaint of the nurses and

9    doctors about her.

10     Q.   Is that it?  That's the extent of your

11   rationale for giving her that initial score?

12          MR. STEVENS:  Objection.  You can answer.

13     A.   Yes, sir.

14     Q.   What about number 4 under "Work Orientation."

15   Why is it a 3 crossed out and then subsequently it's a 2?

16     A.   Okay.  I explain that to her about work

17   orientation before I crossed it out.  Before I crossed

18   this thing out I explain it to her why I cross it out.

19     Q.   Well, explain to me.

20     A.   Okay.  Work orientation is under pressure or

21   something that -- some work that is too busy sometimes

22   and it's some things that the work should be done in a

1    turn-around time.  We are focusing for turn-around time

2    30 minutes turn-around time and the way she acts she

3    said, oh, that will be done if it will be done.  Our

4    focus is turn-around time.

5            We make the turn-around time that's what I was

6    trying to explain to her and then she say, oh, it will be

7    done.  It will be done.  Something like that.  So this is

8    how I explained it to her about the work orientation.

9        Q.  Anything else -- I'm sorry.

10       A.  Because we deal with the patient.  We had to

11   meet the turn-around time, not to delay the lab work for

12   the patient because they have been treated from emergency

13   room and they needed badly the results.

14       Q.  Tell me this, ma'am.  How many times during the

15   course of this rating cycle did you speak to my client

16   regarding a delay in the turn-around time?

17           MR. STEVENS:  Objection.  You can answer.

18       A.  I cannot remember how many times.

19       Q.  Do you think it was more than five times or

20   less than five times?

21       A.  More than that.

22       Q.  More than that?

```
 1        A.   Yes, sir.

 2        Q.   More than ten times you spoke to her about

 3   delay in turn around time?

 4        A.   I don't remember.  It's more than -- I can't

 5   remember for the duration of that year.   I cannot give

 6   you the exact numbers.

 7        Q.   I understand, but you do recall it was more

 8   than five times?

 9        A.   More than five times.

10        Q.   Is that your testimony?

11        A.   Yes, sir.

12        Q.   Was it less than ten times?

13        A.   Maybe.

14        Q.   What about complaints as you said a moment ago

15   from doctors or just from the staff.  Give me some again

16   some of those specific complaints or concerns raised by

17   the hospital staff as it relates to Ms. Pollard?

18             MR. STEVENS:  Objection.  Asked and answered.

19        Q.   What were you told specifically?

20             MR. STEVENS:  Same objection.  You can answer.

21        A.   Okay.  If the nurse or doctors come into the

22   lab and asking for the result this is what I'm trying to
```

37

1    explain it.  Give the result.  Not just say it's in the

2    computer.  Don't give an attitude to your client because

3    we are here to help our client.  This is how we treat

4    them.

5        Q.    Anything else in terms of complaints against

6    Ms. Pollard brought by the staff or the client?

7        A.    About the staff they complain about some

8    attitude.

9        Q.    Attitude?

10       A.    Yes, sir.

11       Q.    Specifically what allegations were made

12   regarding Ms. Pollard's attitude by the staff?

13       A.    The way she answered them back.

14       Q.    She answered who back, ma'am?

15       A.    Our coworkers.  Some of the staff.

16       Q.    Was it the coworkers or was it the staff?

17       A.    Some of staff, nurses.

18       Q.    We're talking Providence Hospital staff,

19   correct?

20       A.    Yes, sir.

21       Q.    Some of the way you said her attitude how she

22   answered them back?

1    A.   Yes.  It's not professional manner.

2    Q.   It was not professional manner?

3    A.   Yes.

4    Q.   How many times did you receive any complaints

5    from hospital staff regarding her attitude or any

6    instances in which as you said she was not professional?

7         MR. STEVENS:  What year are you talking about?

8         MR. JOHNSON: Specifically 2005, for the 2006

9    rating.

10        THE WITNESS:  That duration?

11        MR. JOHNSON:  Yes, ma'am.  We're still in this

12   exhibit, Exhibit 2.  Performance Evaluation.

13   A.   Okay.  I don't know how many times but there's

14   time she was like that.

15   Q.   Was it more than five times or less than five

16   times?

17   A.   I cannot give you five or six.  I cannot give

18   you numbers.

19   Q.   Was it one time?

20   A.   Times; yes.

21   Q.   It was just one time?

22   A.   No, no.  It wasn't.

```
 1      Q.   It was more than one time?

 2      A.   More than one time.  More than that.

 3      Q.   Was it two times; three times?

 4           MR. STEVENS:  Objection.  Asked and answered.

 5  You can answer.

 6      A.   Just what I said.  So I cannot give you a

 7  number how many times.

 8      Q.   Tell me this, ma'am.  Did anyone make any

 9  complaints regarding Ms. Pollard's lack of

10  professionalism to you in writing?

11      A.   I don't remember if I have anything in writing.

12      Q.   I'm sorry?

13      A.   I don't remember --

14      Q.   You don't remember?

15      A.   -- if I have anything in writing.  It was

16  verbal counseling.

17      Q.   It was all verbal counseling?

18      A.   Yes.

19      Q.   Well, tell me this.  You're familiar with Quest

20  Diagnostic personnel policies; are you not?

21      A.   Yes, sir.

22      Q.   And Quest Diagnostic Personnel policy does
```

1    contain a provision for counseling; does it not?

2    A.   Yes.

3    Q.   For written counseling?

4    A.   Yes.

5    Q.   Did you issue Ms. Pollard a written counseling

6    regarding these alleged complaints from staff or on the

7    issue of her failure to timely return lab results?

8    A.   I remember I have some writing written for

9    those things.  I just talk to her not to, you know, to be

10   nice to the client.

11   Q.   So that's no to my question.  You didn't give

12   her or issue you her anything in writing?

13   A.   I don't remember if I gave her one.

14   Q.   Well, I have a copy of her complete personnel

15   file.  Would it come as a surprise to you that there's

16   nothing in her file from 2005 or in the year 2005 which

17   memorialize any of these alleged complaints?

18   A.   Maybe I do, but if I see I would say yes, if I

19   see it.

20   Q.   My next question to you, ma'am -- let me direct

21   your attention now to the same exhibit.  The bottom of

22   page 5, the bottom of page 6.

42

1   also had the opportunity to reference or include those

2   allegations against my client as far as any

3   nonprofessionalism or nonprofessional conduct on her part

4   here; did you not?

5          MR. STEVENS:  Objection.  You can answer.

6      A.  Yes.

7                  (Exhibits 3-6 marked.)

8          MR. JOHNSON:  You are ready, correct?

9      A.  Yes.

10     Q.  Well, let's start with the last one first.

11  Exhibit 6, which is the Performance or Appraisal Review

12  for 2004.

13     A.  Okay.

14     Q.  You got it?

15     A.  Yes.

16     Q.  You read through that, correct?

17     A.  Correct.

18     Q.  In fact, who directed you to appraise

19  Ms. Pollard's performance in 2005?

20         MR. STEVENS:  Objection.  You can answer.

21         MR. JOHNSON:  For the 2005 cycle, 2006.

22     A.  Mr. Harvey Vandenburg.

1    Q.   Mr. Vandenburg did?

2    A.   Yes, sir.

3    Q.   But the previous year her performance appraisal

4  was conducted by Mr. Meter, was it not?

5    A.   Yes.

6    Q.   And Mr. Meter was the lab director; was he not?

7    A.   Yes.

8    Q.   Do you know if her job duties and

9  responsibilities changed from 2005 as represented in this

10  rating cycle, her performance review, versus the

11  performance review that was conducted by you January

12  2006?

13         MR. STEVENS:  That was for 2005.

14    A.   2005.

15    Q.   Do you know if her -- did her job duties and

16  performance and responsibilities change from the time

17  that Mr. Meter conducted her evaluation?

18         MR. STEVENS: Until when?

19    Q.   Until January 2006 when you presented her with

20  her performance evaluation?

21         MR. STEVENS:  Objection.  You can answer.

22    A.   Okay. I can answer you for 2004.  I wasn't the

1    one who conducted it.  It was David Meter who was at that

2    time I was recovering from brain surgery at that time.

3    That's why I didn't do her evaluation 2002, 2004.  That's

4    why I don't know about this evaluation.

5        Q.   In year 2005, ma'am, if I understand you

6    correctly you missed work due to an injury?

7        A.   I was injured.

8        Q.   For the year --

9        A.   2002, 3 and 4.

10       Q.   In the year 2005 --

11       A.   2005 I was the one who did the evaluation.

12       Q.   Okay.  Let me ask the question.  In the year

13   2005, did you miss any work, extended work or were you

14   absent for any extended period of time in 2005?

15       A.   2005 I didn't miss any work.

16       Q.   Okay.  What about 2004?

17       A.   I was at home recovering for therapy.

18       Q.   How much work did you miss or how many days did

19   you miss in 2004?

20       A.   2004.  Months.

21       Q.   Months?

22       A.   Yes.

1    Q.   What, two months, three months?

2    A.   Maybe about six months.

3    Q.   Six months, 2004?

4    A.   Six or seven months something like that.  I'm

5    not really sure.

6    Q.   I understand.  What about 2003?  Did you miss

7    any work?

8    A.   No.

9    Q.   You only evaluated Ms. Pollard one time and

10   that was January 2005, correct?

11   A.   Yes.

12   Q.   Why was the responsibility given to you in

13   2005 -- I'm sorry.  For the 2005 cycle to assess her

14   performance?

15        MR. STEVENS:  Objection.  Asked and answered.

16   You can answer.

17   A.   Her supervisor should evaluate.

18   Q.   Well, prior to time the lab director, the lab

19   director evaluated her performance, right?

20        MR. STEVENS:  Because she was out of work as

21   she testified to.

22        MR. JOHNSON:  I'm asking her the question.

1          MR. STEVENS:  And it's been asked and answered.

2          MR. JOHNSON:  Well, then you need to make an

3     objection, okay, so I can continue with this line of

4     questioning.

5          MR. STEVENS:  Okay.  Objection, asked and

6     answered.

7     A.   At that time the director conducted the

8     evaluation of my people, my employees because at that

9     time I was sick.

10    Q.   You were sick -- I'm sorry.  I didn't mean to

11    cut you off.

12    A.   You know that.  I already told you at this

13    time.

14    Q.   You were sick in 2004?

15    A.   Yes.

16    Q.   But you weren't sick in 2003; right?

17    A.   2003 when I had the accident.  I wasn't sick

18    from January to something but the evaluation start at

19    certain months.

20    Q.   In any event you have assessed her performance

21    or appraised her performance for the 2005 cycle January

22    2006; is that correct?

1        that time -- you're looking for it.  That's Number 2.

2              A.    That's Number 6.

3              Q.    No, ma'am, not 6.  2002.  The performance

4        appraisal that was conducted by you on Ms. Pollard dated

5        January 2006, right?  At the time you had assessed her

6        performance did anybody mention that Ms. Pollard was

7        complaining of or she raised the issue of discrimination?

8              A.    No.  I didn't hear anything.

9              Q.    Did you have any communication with Ms. Pollard

10       after she relocated to North Carolina?

11             A.    After?

12             Q.    Yes.

13             A.    No.  No.  I don't think so.  I haven't talked

14       to her after North Carolina.

15             Q.    In 2006 -- January 2006, did you evaluate any

16       other subordinates' performance for 2005 cycle or for the

17       year 2005?

18             A.    Yes.  All the employees.

19             Q.    And that was, what, six?

20             A.    It was about three or -- three or four people.

21             Q.    Did any of them receive an excellent rating?

22             A.    Not all of them.

THE UNITED STATES OF AMERICA    )
                                )
DISTRICT OF COLUMBIA            )

      I, Raakeebah L. Henderson, the officer before whom the foregoing deposition was taken, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

      I further certify that the examination was recorded stenographically and verbatim by me and this transcript is a true record of the proceedings.

      I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties, nor in any way interested in the outcome of this action.

      As witness my hand and notarial seal this 11th day of February, 2008.

Raakeebah L. Henderson
DISTRICT OF COLUMBIA
Notary Public

MY COMMISSION EXPIRES:

05/01/08

Raakeebah L. Henderson, Professional Court Reporter
13017 Wisteria Drive, Suite 364
Cell: (301) 717-9468    Fax: (240) 912-7323    E-mail: keebahcr@comcast.net

# EXHIBIT 14
## PART 1

EXHIBIT

15

**Quest Diagnostics**

## 2004 Annual Performance Development and Review
### Laboratory Technical Services – Medical Laboratory Technologist I & II

| | | | |
|---|---|---|---|
| **Employee Name:** | Bridget Pollard | **Employee Title:** | Technologist Medical 1 |
| **Department:** | Providence Hospital | **Location:** | Washington DC |
| **Appraiser Name:** | David W. Meedu | **Appraiser Title:** | Director |
| **Appraisal Period (Calendar Year):** | 1-1-04 | **Appraisal Period (If different from Calendar Year):** | 12-31-04 |

### PURPOSE

The purpose of the annual review is for each employee and their manager to assess performance over the past year in relation to specific responsibilities or objectives. It is an important opportunity for managers to provide aggregate feedback on employee strengths and development areas, summarizing ongoing feedback throughout the year. It is also an important opportunity for employees to provide feedback on how they can best perform and develop. Simply put, a review is a terrific opportunity to communicate as we work together to build a great company. There are three things that Quest Diagnostics strives for in every annual review:

1) <u>Reviews should be based on facts and data</u>. Facts and data can come from established performance metrics, direct observation of job performance, employee self-assessment, external or internal customer or co-worker feedback and other sources. The goal is a thorough and accurate review.

2) <u>Reviews should be completed with a commitment to quality</u>. Review discussions should be held on time. Managers and employees should come prepared. Administration of the review process should be error-free.

3) <u>Reviews should be conducted in the spirit of continuous improvement</u>. No one has cornered the market on good ideas. Both participants should be asking the same question: How can we work together to improve?

There are many resources to help you make the review process a success. Please contact your Human Resources representative if you would like some help.

### INSTRUCTIONS

Follow the procedure below when making your Performance Ratings.

1. Refer to *Section I: Performance Factor Rating Scales* and carefully read and understand each of the Performance Evaluation Factors of the position. Specifically read the Performance Evaluation Factors' definition and Behavioral Evaluation Standards associated with each performance rating. Each rating category is described below:
   **1 = Outstanding**: *Demonstrates a distinguished level of job performance that is reserved for performance that is consistently above and beyond the requirements of the job. Personal commitment to the company's mission, values and goals is consistently evident. Seizes initiative in identifying challenging work goals and in finding solutions. Quality and timeliness of results are not in question, even under challenging circumstances.*
   **2 = Excellent**: *Produces more than required. Requires little direction or supervision. Thinks beyond details of the job. Contributes to the overall objectives of the team. Decisions and actions have paid off to a higher-than-expected degree.*
   **3 = Achieves Expectations**: *Demonstrates a level of job performance that fully meets the requirements of the job. Performance is what is expected of a qualified and experienced individual in the position.*
   **4 = Development Needed**: *Demonstrates a level of performance that requires improvement to meet the requirements of the job. Continuation at this level could lead to job change or termination.*
   **N = New to Company**: *Applies to an individual new to the company for less than six months. If the employee has transferred internally, performance information should be obtained from their former manager.*

2. Using the Behavioral Evaluation Standards, decide which rating best describes the employee's level of performance for the particular Performance Evaluation Factor based on facts and data. Enter the rating in the space at the bottom of each performance factor. Record an "N/A" if you have not observed the employee's performance for a specific performance factor. **It is acceptable to place greater emphasis on a critical bullet point within a performance factor (e.g. attendance, error rate, etc.) as long as the same criteria is applied to all employees who are evaluated via this document.**

3. Refer to *Section II: Overall Performance Rating* to determine the employee's overall performance. First, record all Performance Evaluation Factor ratings in the rating column. Second, if your business unit is equally weighting each performance factor, calculate the average of all Performance Evaluation Factor ratings (i.e., summing all performance factor ratings and then dividing by the total number). If your business unit is using alternative factor weighting, multiply each performance factor rating by its weight and then sum the weighted performance factor ratings. Finally, check the appropriate box that corresponds to the average or weighted rating in the Overall Performance Rating column.

4. Document specific behavioral examples of the employee's performance that support your ratings in *Section IV: Comments and Signatures*. When making comments, focus on specific job-related behavioral examples such as "consistently double checks work to ensure accuracy" and avoid evaluative and personal comments such as "quality of work is awful." Also document employee comments regarding the performance evaluation process in the space provided.

## I. PERFORMANCE FACTOR RATING SCALES

| 1. Following Policies and Procedures | 2. Interpersonal (and Customer) Relations | 3. Communication |
|---|---|---|
| Follows Quest Diagnostics' company and department policies and procedures. This includes Federal, state, and local requirements and regulations; safety policies and procedures; properly storing and disposing regulated medical waste; maintaining a clean and orderly workspace; upholding ethical standards; and maintaining privacy and confidentiality of personal information of patients, clients, and employees. | Interacts effectively with others and actively participates as a committed team member. This includes interacting in a respectful, professional manner; remaining calm in difficult interactions; assisting coworkers; sharing information; listening to and involving others; objectively considering others' ideas and opinions; and interacting effectively with people from varied and diverse backgrounds; creating an environment of positive and professional demeanor for suppliers/customers | Communicates clearly, politely, respectfully, and under control to coworkers, supervisors, managers, and customers. This includes asking questions, giving and receiving information and feedback, explaining ideas or polices, actively listening to responses, and using discretion by not discussing company or departmental problems in public areas. |
| **Outstanding (1)** | **Outstanding (1)** | **Outstanding (1)** |
| • Demonstrates an in-depth knowledge of and complies with Company policies and procedures, including ethical standards, safety, Federal, state, and local requirements and regulations including more complex policies and procedures. <br> • Encourages others to abide by high ethical standards. <br> • Proactively promotes and ensures that the privacy and confidentiality of personal information for customers and employees is maintained in accordance with HIPAA and other guidelines by self and others. <br> • Maintains an exceptionally well-organized and clean workspace that is viewed as a role model by peers and supervisors/group leaders. | • Establishes a trusting, working relationship with others by encouraging and considering others' ideas and opinions; sharing information; and giving proper credit to others. <br> • Identifies conflicts between team members and reports to supervisor/group leader. <br> • Values the importance of diversity and is perceived as a role model for respecting others' similarities and differences. <br> • Engages suppliers and customers to identify potential problems and works to exceed customer expectations. | • Actively seeks to ensure understanding by listening attentively and patiently, soliciting others' viewpoints, clarifying and summarizing conveyed information, and asking questions (i.e. masters active and passive listening). |
| **Excellent (2)** <br> *Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see Instructions)* | **Excellent (2)** <br> *Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see Instructions)* | **Excellent (2)** <br> *Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see Instructions)* |
| **Achieves Expectations (3)** <br> • Follows Company policies and procedures, including ethical standards, safety, Federal, state, and local requirements and regulations. <br> • Accurately follows oral instructions and written procedures from supervisors/group leaders. <br> • Maintains the privacy and confidentiality of personal information for customers and employees in accordance with HIPAA and other guidelines. <br> • Maintains a well-organized and clean workspace. | **Achieves Expectations (3)** <br> • Interacts with others in a professional, friendly, and respectful manner and remains calm in difficult situations. <br> • Values expertise and input of team members by encouraging and soliciting ideas, opinions, and feedback from other members. <br> • Values the diversity of others and treats everyone with respect and dignity. <br> • Demonstrates a positive and professional level of demeanor towards suppliers and customers. | **Achieves Expectations (3)** <br> • Speaks clearly, politely, respectfully, and under control to coworkers, supervisors, managers, and customers. <br> • Listens attentively and patiently and asks questions to clarify information and ensure accurate understanding of message. <br> • Discusses company or department issues or problems only in appropriate areas. <br> • Clearly, thoroughly, and accurately answers others' questions in a timely manner. <br> • Demonstrates proper telephone etiquette and follows procedures when speaking with others on the telephone. |
| **Development Needed (4)** <br> • Fails to consistently follow Quest Diagnostics' policies and procedures, including ethical standards, safety, Federal, state, and local requirements and regulations. <br> • Has shown difficulty following oral instructions or written procedures from supervisors/group leaders. <br> • Inconsistently maintains the privacy and confidentiality of personal information for customers and employees in accordance with HIPAA and other guidelines. <br> • Maintains a disorganized and unclean workspace. | **Development Needed (4)** <br> • Has shown difficulty interacting with others in a professional, friendly, and respectful manner or remaining calm in difficult situations. <br> • Does not encourage and solicit ideas, opinions, and feedback from other members during the course of team meetings and work activities. <br> • Has shown difficulty interacting effectively with others from varied and diverse backgrounds and treating them with respect and dignity. <br> • Demonstrates a less than positive and professional level of demeanor towards suppliers and customers. | **Development Needed (4)** <br> • Has shown several instances of speaking unclearly, impolitely, or disrespectfully to coworkers, supervisors/managers or customers. <br> • Often listens inattentively, impatiently, or does not ask questions to clarify information and ensure accurate understanding of message. <br> • Discusses company or department issues or problems in inappropriate areas. <br> • Answers to others' questions are lacking in detail, unclear, inaccurate, and/or not provided in a timely manner. <br> • Demonstrates improper telephone etiquette and procedures when speaking with others on the telephone. |
| **Comments** <br> Minimal deviation | **Comments** <br> Room for improvement section, abilities to function | **Comments** <br> Excellent in communication. Prefers to administr |
| RATING = 2 | RATING = 3 | RATING = 2 |

Q 00241

*Laboratory Technical Services – Medical Laboratory Technologist I & II PD&R Form*

# PERFORMANCE FACTOR RATING SCALES

## 4. Work Orientation

Ensures work activities are completed thoroughly, accurately, efficiently, and in a timely manner ensuring quality standards are met. This includes taking initiative to complete duties; working without close supervision; being committed, reliable, trusted, and accountable for completing work activities, regularly/dependably being at work (good attendance) and on time (good punctuality); and willingness to accept schedule changes or work additional hours as required by the business.

### Outstanding (1)

- Serves as a role model for productivity, quality, timeliness, accuracy, and efficiency
- Unscheduled absences/punctuality exceed Company/Unit standards.
- Demonstrates an exceptional ability to effectively handle multiple tasks.
- Continuously takes initiative to complete work activities quickly to meet customer demands.
- Shows exceptional commitment and responsibility to the completion and the quality of own and others' work.
- Produces high quality work under changing or stressful conditions.
- Regularly volunteers to work additional hours during normal or busy situations or seeks out additional work.

### Excellent (2)

*Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see Instructions)*

### Achieves Expectations (3)

- Works productively, completing work activities thoroughly, accurately, efficiently, and in a timely manner, ensuring all quality standards are met.
- Unscheduled absences/punctuality meet Company/Unit standards.
- Performs multiple work activities at once, accurately and in a timely manner.
- Consistently works effectively with minimal supervision.
- Quickly/directly completes work activities without being instructed/reminded.
- Is consistently accountable for completion and quality of work activities.
- Works productively and effectively under changing or stressful conditions.
- Works additional hours during busy situations when asked.

### Development Needed (4)

- Completes work that may be unproductive, inaccurate, inefficient, or not completed in a timely manner.
- Unscheduled absences/punctuality do not meet Company/Unit standards and require little rework.
- Has shown difficulty completing multiple work activities at once, accurately and in a timely manner.
- Frequently requires close supervision to complete work activities.
- Frequently has to be instructed or reminded to complete job activities.
- Has shown difficulty demonstrating accountability for completion and quality of work activities.
- Works ineffectively under changing or stressful conditions.
- Unwilling to work additional hours during busy situations when asked.

### Comments

RATING = ⌐2

## 5. Deliver Quality Services

Delivers services that consistently meet or exceed standards with little or no rework required. This includes verifying the accuracy and completeness of all work, identifying missing or inconsistent information or data, asking for assistance when appropriate, documenting and sharing work-related problems and solutions with co-workers, and striving for Six Sigma quality.

### Outstanding (1)

- Serves as a role model who continuously strives to deliver quality services.
- Proactively takes steps or recommends steps to ensure quality problems are prevented.
- Serves as role model for detail orientation.

### Excellent (2)

*Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see Instructions)*

### Achieves Expectations (3)

- Delivers services that meet Quest Diagnostics' quality standards and require little rework.
- Continuously strives to deliver quality services and ensures work quality is at its highest level possible for self and others.
- Quickly and efficiently resolves quality problems when detected and asks for appropriate assistance when needed.
- Accurately documents quality problems.
- Identifies quality problems and shares problems with co-workers and/or supervisors.
- Ensures accuracy by verifying detailed information and checking work.

### Development Needed (4)

- Inconsistently delivers services that meet Quest Diagnostics' quality standards and require little rework.
- Has shown difficulty resolving quality problems when detected or inappropriately asks for assistance.
- Inconsistently documents quality problems.
- Has shown difficulty identifying quality problems or does not share problems with co-workers and/or supervisors.
- Shows inability or unwillingness to verify and check detailed information resulting in inaccurate results.

### Comments

Minimal failures

RATING = 1

## 6. Problem Solving

Identifies problems related to work activities. This includes attempting to resolve the problem, referring the problems/issues to the proper individual(s) when appropriate, and following appropriate Standard Operating Procedures (SOP). This also includes identifying, defining, diagnosing, and resolving problems by: analyzing information; generating alternatives to the problem; making sound, timely, and objective decisions, and committing to action, even when uncertain.

### Outstanding (1)

- Proactively recognizes and defines potential problems and their root causes before they occur and takes necessary steps to prevent their occurrence on a consistent basis.
- Demonstrates an in-depth understanding of the Standard Operating Procedures (SOP) and consistently and accurately uses them when resolving work-related problems.
- Consistently is the "go-to" person to help solve many problems.
- Makes sound, timely, and objective decisions, even in the face of uncertain situations when resolving problems.
- Quickly recognizes, defines, and corrects complex equipment problems/malfunctions when they occur on a consistent basis.
- Proactively identifies specimen/sample problems and prevents them from occurring.

### Excellent (2)

*Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see Instructions)*

### Achieves Expectations (3)

- Quickly and correctly recognizes, identifies, defines, diagnoses, and documents common problems or issues when they occur.
- Consistently follows appropriate Standard Operating Procedures (SOP) when solving work-related problems.
- Effectively resolves common problems on a consistent basis.
- Makes good and timely decisions when resolving problems.
- Quickly recognizes, defines, and accurately corrects common equipment problems/malfunctions when they occur on a consistent basis.
- Searches for/locates missing specimens/samples and resolves specimen/sample problems within established timeframes.

### Development Needed (4)

- Inconsistently recognizes, identifies, and defines potential problems when they occur.
- Demonstrates an insufficient understanding of the Standard Operating Procedures (SOP) or inconsistently uses them when resolving work-related problems.
- Ineffectively resolves common problems.
- Has shown difficulty making good and timely decisions when resolving problems.
- Has shown difficulty correcting common equipment problems/malfunctions when they occur.
- Takes considerable time to locate missing specimens/samples or unable to resolve observed or reported specimen/sample problems.

### Comments

RATING = 3

Q 00242

# I. PERFORMANCE FACTOR RATING SCALES

| 7. Handle Specimens | 8. Perform Tests/Analyses |
|---|---|
| Uses solutions, reagents, filtration, centrifugation, smearing, and/or sectioning techniques to prepare specimens/samples for laboratory delivery, examination, screens, and/or testing. This includes measuring liquid or solid substances to a specified amount using pre-calibrated scales/containers. | Performs a variety of medical laboratory tests, procedures, experiments, analyses, and studies in the diagnosis, treatment, and prevention of disease. Interprets test results or output, and assures test results are accurate and/or acceptable for release. Operates, maintains, and troubleshoots equipment used in the preparation, storage, examination, analysis, and/or testing of specimens/samples. |
| **Outstanding (1)** | **Outstanding (1)** |
| • Identifies and corrects problems associated with the handling of Biohazardous materials and the use of PPE. <br> • Regarded by others as an expert in specimen/sample test preparation procedures using solutions, reagents, filtration, centrifugation, smearing, and/or sectioning techniques. <br> • Demonstrates in-depth knowledge of specimen storage and retrieval processes and is sought by others for expertise. <br> • Consistently double checks measurements of liquid and/or solid substances to ensure proper testing amounts, resulting in minimal or no errors. | • Frequently is asked to assist others in correctly conducting medical laboratory tests, procedures, analyses, and studies or interpreting test results. <br> • Efficiently and consistently double checks test results and confirmation procedures before transferring results to computer mainframe (e.g., LIS/QuestLab) and/or releasing results. <br> • Serves as a resource on the operation of laboratory equipment. <br> • Identifies and troubleshoots complex or hard to identify equipment problems. <br> • Demonstrates an in-depth understanding of the various computer systems and software used to execute testing. |
| **Excellent (2)** | **Excellent (2)** |
| *Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see Instructions)* | *Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see Instructions)* |
| **Achieves Expectations (3)** | **Achieves Expectations (3)** |
| • Safely handles Biohazardous materials (body fluids and tissues) and correctly wears required PPE. <br> • Demonstrates full understanding of specimen/sample testing preparation procedures using solutions, reagents, filtration, centrifugation, smearing, and/or sectioning techniques. <br> • Demonstrates full understanding of specimen storage and retrieval processes. <br> • Accurately measures liquid and/or solid substances for testing using pre-calibrated scales/containers. | • Accurately conducts medical laboratory tests, procedures, analyses, and studies with minimal supervision or assistance. <br> • Interprets test results within an acceptable range of accuracy with minimal supervision or assistance. <br> • Reviews test results, completes confirmation procedures, transfers results to computer mainframe (e.g., LIS/QuestLab) and/or releases results on line. <br> • Correctly operates and maintains all laboratory equipment used in the preparation, storage, examination, analysis, and/or testing of specimens. <br> • Uses various computer systems and software to execute testing programs and analyses with minimal supervision or assistance. <br> • Consistently completes required forms (e.g., quality control logs, preventative maintenance logs, customer records) in an accurate and timely manner. |
| **Development Needed (4)** | **Development Needed (4)** |
| • Safe handling of Biohazardous materials (body fluids and tissues) and correct wearing of required PPE does not consistently meet department and/or Company standards. <br> • Shows insufficient understanding of specimen/sample testing preparation procedures using solutions, reagents, filtration, centrifugation, smearing, and/or sectioning techniques. <br> • Shows insufficient understanding of specimen storage and retrieval processes. <br> • Has shown difficulty accurately measuring liquid and/or solid substances for testing using pre-calibrated scales/containers. | • Requires significant assistance from others when conducting medical laboratory tests, procedures, analyses, and studies. <br> • Has shown difficulty correctly interpreting test results without assistance. <br> • Infrequently reviews test results, inappropriately completes confirmation procedures, has shown difficulty transferring results to computer mainframe (e.g., LIS/QuestLab) and/or releasing results on line. <br> • Needs frequent assistance in the operation and maintenance of laboratory equipment. <br> • Has shown difficulty using some or all of the computer systems and software used to execute testing programs and analyses. <br> • Inconsistently completes required forms (e.g., quality control logs, preventative maintenance logs, customer records) or takes too much time completing them. |
| **Comments** | **Comments** |

RATING = ___/___

RATING = ___2___

Q 00243

## II. OVERALL PERFORMANCE RATING

| Performance Factor | Rating |
|---|---|
| 1. Following Policies and Procedures | 2 |
| 2. Interpersonal (and Customer) Relations | 3 |
| 3. Communication | 2 |
| 4. Work Orientation | 2 |
| 5. Deliver Quality Services | 1 |
| 6. Problem Solving | 3 |
| 7. Handle Specimens | 1 |
| 8. Perform Tests/Analyses | 2 |

| Overall Performance | Average Rating |
|---|---|
| ▶ Outstanding* | 1.00 to 1.33 |
| ▶ Excellent | 1.34 to 2.33 |
| ▶ Achieves Expectations | 2.34 to 3.25 |
| ▶ Development Needed | 3.26 to 4.00 |
| ▶ New to Company | |



*An overall rating of "Outstanding" may not be granted if any individual performance factor is rated "Development Needed".

**Average Rating**
(Sum of all ratings divided by the total number of ratings) 2.0   2.0

## III. DEVELOPMENT PLAN

This section enables the planning of performance improvements based upon the performance evaluation discussion and the employee's interests and aspirations. After considering the employee's ratings on the Performance Evaluation Factors and the employee's interests and aspirations, develop a plan of the work experiences, special assignments, educational activities or training <u>you and the employee</u> have agreed upon to increase the employee's effectiveness.

| Developmental Area | Activities Planned | Targeted Timeframe |
|---|---|---|
| Continuing Education | Complete all mandatory corporate training | 2005 |
| Team Development | Promote an atmosphere of team work within the department. Participate in departmental project and strategic planning when appropriate | 2005 |
| | | |
| | | |

## IV. COMMENTS AND SIGNATURES

*Supervisor Comments: (Use additional pages if necessary)*

Bridget works as an occasional employee, working whenever needed. Has performed her duties in a professional manner, gives constructive comments for improvement and arrives to work on time.

Good Job!

*Employee Comments: (Use additional pages if necessary)*

*Signatures below indicate that the employee and supervisor have met on the date noted and mutually discussed and clarified the employee's performance and final evaluation rating in each of the performance factors, including the employee's overall performance. The employee's signature below does not necessarily indicate agreement with the contents of this appraisal.*

| | | |
|---|---|---|
| **Employee Signature:** *Bridget L. Holland* | **Date:** *Jan 7, 2005* |
| **Supervisor Signature:** | **Date** |
| **Manager Signature:** | **Date:** *1-7-05* |
| **HR Manager Signature:** | **Date:** |

*Laboratory Technical Services – Medical Laboratory Technologist I & II PD&R Form*

Q 00245

6

# EXHIBIT 14
## PART 2

| Date | Day | In Punch | Out Punch | TOP Hrs | Total Hours |
|---|---|---|---|---|---|
| 01/01/04 | THU | Hol | | | 8:00 |
| 01/02/04 | FRI | Vac | | | 8:00 |
| 01/03/04 | SAT | Abs | | 8:00 | |
| Pay Week Sub-Total Hours: | | | | 8:00 | 16:00 |
| 01/04/04 | SUN | Abs | | | |
| 01/05/04 | MON | 11:35 PM | 7:33 AM | | 8:00 |
| 01/06/04 | TUE | 11:28 PM | 7:30 AM | | 8:00 |
| 01/07/04 | WED | 11:29 PM | 7:31 AM | | 8:00 |
| 01/08/04 | THU | Abs | | | |
| 01/09/04 | FRI | 11:30 PM | 7:34 AM | | 8:00 |
| 01/10/04 | SAT | 11:39 PM | 7:38 AM | | 8:00 |
| Pay Week Sub-Total Hours: | | | | | 40:00 |
| 01/11/04 | SUN | 11:31 PM | 7:34 AM | | 8:00 |
| 01/12/04 | MON | 11:30 PM | 7:34 AM | | 8:00 |
| 01/13/04 | TUE | 11:42 PM | 7:34 AM | | 7:45 |
| 01/14/04 | WED | 11:32 PM | 7:30 AM | | 8:00 |
| 01/15/04 | THU | 11:29 PM | 7:30 AM | | 8:00 |
| 01/16/04 | FRI | Abs | | | |
| 01/17/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 39:45 |
| 01/18/04 | SUN | Abs | | | |
| 01/19/04 | MON | 11:26 PM | 7:28 AM | | 8:00 |
| 01/20/04 | TUE | 11:29 PM | 7:36 AM | | 8:00 |
| 01/21/04 | WED | Abs | | | |
| 01/22/04 | THU | Abs | | | |
| 01/23/04 | FRI | 11:28 PM | 7:29 AM | | 8:00 |
| 01/24/04 | SAT | 11:32 PM | 7:29 AM | | 8:00 |
| Pay Week Sub-Total Hours: | | | | | 32:00 |
| 01/25/04 | SUN | Vac | | 8:00 | 8:00 |
| 01/26/04 | MON | 11:26 PM | 7:47 AM | | 8:15 |
| 01/27/04 | TUE | 11:27 PM | 7:27 AM | | 8:00 |
| 01/28/04 | WED | Abs | | | |
| 01/29/04 | THU | Abs | | | |
| 01/30/04 | FRI | 11:24 PM | 7:35 AM | | 8:00 |
| 01/31/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | 8:00 | 32:15 |
| 02/01/04 | SUN | Abs | | | |
| 02/02/04 | MON | 11:31 PM | 7:28 AM | | 8:00 |
| 02/03/04 | TUE | 11:31 PM | 7:33 AM | | 8:00 |
| 02/04/04 | WED | Abs | | | |
| 02/05/04 | THU | Abs | | | |
| 02/06/04 | FRI | 11:30 PM | 7:37 AM | | 8:00 |
| 02/07/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 24:00 |
| 02/08/04 | SUN | 11:28 PM | 7:28 AM | | 8:00 |
| 02/09/04 | MON | Abs | | | |
| 02/10/04 | TUE | 11:27 PM | 7:29 AM | | 8:00 |
| 02/11/04 | WED | Abs | | | |
| 02/12/04 | THU | 11:29 PM | 7:29 AM | | 8:00 |
| 02/13/04 | FRI | 11:28 PM | 7:44 AM | | 8:15 |
| 02/14/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 32:15 |
| 02/15/04 | SUN | Abs | | | |
| 02/16/04 | MON | Abs | | | |
| 02/17/04 | TUE | 11:30 PM | 7:28 AM | | 8:00 |
| 02/18/04 | WED | Abs | | | |

Q 00246

| Date | Day | In Punch | Out Punch | TOP Hrs | Total Hours |
|------|-----|----------|-----------|---------|-------------|
| 02/19/04 | THU | 11:30 PM | 7:36 AM | | 8:00 |
| 02/20/04 | FRI | Abs | | | |
| 02/21/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 16:00 |
| 02/22/04 | SUN | 11:25 PM | 7:32 AM | | 8:00 |
| 02/23/04 | MON | Abs | | | |
| 02/24/04 | TUE | Abs | | | |
| 02/25/04 | WED | Abs | | | |
| 02/26/04 | THU | 11:25 PM | 7:30 AM | | 8:00 |
| 02/27/04 | FRI | Abs | | | |
| 02/28/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 16:00 |
| 02/29/04 | SUN | Abs | | | |
| 03/01/04 | MON | Abs | | | |
| 03/02/04 | TUE | Abs | | | |
| 03/03/04 | WED | Abs | | | |
| 03/04/04 | THU | Abs | | | |
| 03/05/04 | FRI | Abs | | | |
| 03/06/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | |
| 03/07/04 | SUN | Abs | | | |
| 03/08/04 | MON | Abs | | | |
| 03/09/04 | TUE | Abs | | | |
| 03/10/04 | WED | Abs | | | |
| 03/11/04 | THU | 11:27 PM | 7:33 AM | | 8:00 |
| 03/12/04 | FRI | 11:29 PM | 7:56 AM | | 8:30 |
| 03/13/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 16:30 |
| 03/14/04 | SUN | Abs | | | |
| 03/15/04 | MON | Abs | | | |
| 03/16/04 | TUE | Abs | | | |
| 03/17/04 | WED | 11:18 PM | 7:24 AM | | 8:15 |
| 03/18/04 | THU | 11:30 PM | 7:27 AM | | 8:00 |
| 03/19/04 | FRI | 11:25 PM | 7:29 AM | | 8:00 |
| 03/20/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 24:15 |
| 03/21/04 | SUN | Abs | | | |
| 03/22/04 | MON | Abs | | | |
| 03/23/04 | TUE | Abs | | | |
| 03/24/04 | WED | Abs | | | |
| 03/25/04 | THU | Abs | | | |
| 03/26/04 | FRI | Abs | | | |
| 03/27/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | |
| 03/28/04 | SUN | Abs | | | |
| 03/29/04 | MON | Abs | | | |
| 03/30/04 | TUE | Abs | | | |
| 03/31/04 | WED | Abs | | | |
| 04/01/04 | THU | 11:33 PM | 7:28 AM | | 8:00 |
| 04/02/04 | FRI | 11:28 PM | 7:32 AM | | 8:00 |
| 04/03/04 | SAT | 3:46 PM | 12:06 AM | | 7:45 |
| Pay Week Sub-Total Hours: | | | | | 23:45 |
| 04/04/04 | SUN | Abs | Q 00247 | | |
| 04/05/04 | MON | Abs | | | |
| 04/06/04 | TUE | Abs | | | |
| 04/07/04 | WED | 11:29 PM | 7:31 AM | | 8:00 |

| Date | Day | In Punch | Out Punch | TOP Hrs | Total Hours |
|------|-----|----------|-----------|---------|-------------|
| 04/08/04 | THU | 3:19 PM | 7:25 AM | | 15:45 |
| 04/09/04 | FRI | Abs | | | |
| 04/10/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 23:45 |
| 04/11/04 | SUN | Abs | | | |
| 04/12/04 | MON | Abs | | | |
| 04/13/04 | TUE | Abs | | | |
| 04/14/04 | WED | 11:31 PM | 7:32 AM | | 8:00 |
| 04/15/04 | THU | 11:30 PM | 7:34 AM | | 8:00 |
| 04/16/04 | FRI | Abs | | | |
| 04/17/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 16:00 |
| 04/18/04 | SUN | Abs | | | |
| 04/19/04 | MON | Abs | | | |
| 04/20/04 | TUE | Abs | | | |
| 04/21/04 | WED | 8:47 AM | 10:39 AM | | :15 |
| 04/21/04 | WED | 11:26 PM | 8:55 AM | | 9:30 |
| 04/22/04 | THU | Abs | | | |
| 04/23/04 | FRI | Abs | | | |
| 04/24/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 9:45 |
| 04/25/04 | SUN | 11:24 PM | 7:39 AM | | 8:15 |
| 04/26/04 | MON | Abs | | | |
| 04/27/04 | TUE | Abs | | | |
| 04/28/04 | WED | Abs | | | |
| 04/29/04 | THU | 11:26 PM | 7:31 AM | | 8:00 |
| 04/30/04 | FRI | Abs | | | |
| 05/01/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 16:15 |
| 05/02/04 | SUN | 11:28 PM | 7:29 AM | | 8:00 |
| 05/03/04 | MON | Abs | | | |
| 05/04/04 | TUE | Abs | | | |
| 05/05/04 | WED | 11:20 PM | 7:27 AM | | 8:15 |
| 05/06/04 | THU | Abs | | | |
| 05/07/04 | FRI | Abs | | | |
| 05/08/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 16:15 |
| 05/09/04 | SUN | Abs | | | |
| 05/10/04 | MON | Abs | | | |
| 05/11/04 | TUE | Abs | | | |
| 05/12/04 | WED | 11:22 PM | 7:25 AM | | 8:15 |
| 05/13/04 | THU | 11:20 PM | 7:25 AM | | 8:15 |
| 05/14/04 | FRI | Abs | | | |
| 05/15/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 16:30 |
| 05/16/04 | SUN | Abs | | | |
| 05/17/04 | MON | Abs | | | |
| 05/18/04 | TUE | Abs | | | |
| 05/19/04 | WED | Abs | | | |
| 05/20/04 | THU | 11:30 PM | 7:33 AM | | 8:00 |
| 05/21/04 | FRI | Abs | | | |
| 05/22/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 8:00 |
| 05/23/04 | SUN | Abs | | | |
| 05/24/04 | MON | Abs | | | |
| 05/25/04 | TUE | 3:17 PM | 12:06 AM | | 8:45 |

Q 00248

| Date | Day | In Punch | Out Punch | TOP Hrs | Total Hours |
|------|-----|----------|-----------|---------|-------------|
| 05/26/04 | WED | Abs | | | |
| 05/27/04 | THU | 11:30 PM | 8:25 AM | | 8:30 |
| 05/28/04 | FRI | Abs | | | |
| 05/29/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 17:15 |
| 05/30/04 | SUN | Abs | | | |
| 06/01/04 | TUE | Abs | | | |
| 06/02/04 | WED | 3:24 PM | 11:36 PM | | 7:30 |
| 06/03/04 | THU | Abs | | | |
| 06/04/04 | FRI | Abs | | | |
| 06/05/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 7:30 |
| 06/06/04 | SUN | Abs | | | |
| 06/07/04 | MON | Abs | | | |
| 06/08/04 | TUE | Abs | | | |
| 06/09/04 | WED | 11:27 PM | 7:35 AM | | 8:00 |
| 06/10/04 | THU | 11:28 PM | 7:36 AM | | 8:00 |
| 06/11/04 | FRI | Abs | | | |
| 06/12/04 | SAT | 3:34 PM | 12:04 AM | | 8:30 |
| Pay Week Sub-Total Hours: | | | | | 24:30 |
| 06/13/04 | SUN | 3:34 PM | 12:12 AM | | 8:45 |
| 06/13/04 | SUN | 12:13 AM | 7:42 AM | | 7:30 |
| 06/14/04 | MON | 11:27 PM | 7:42 AM | | 8:15 |
| 06/15/04 | TUE | Abs | | | |
| 06/16/04 | WED | 11:24 PM | 7:35 AM | | 8:00 |
| 06/17/04 | THU | Abs | | | |
| 06/18/04 | FRI | Abs | | | |
| 06/19/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 32:30 |
| 06/20/04 | SUN | Abs | | | |
| 06/21/04 | MON | Abs | | | |
| 06/22/04 | TUE | Abs | | | |
| 06/23/04 | WED | 11:30 PM | 7:33 AM | | 8:00 |
| 06/24/04 | THU | 11:33 PM | 7:34 AM | | 8:00 |
| 06/25/04 | FRI | Abs | | | |
| 06/26/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 16:00 |
| 06/27/04 | SUN | 11:28 PM | 7:33 AM | | 8:00 |
| 06/28/04 | MON | 11:30 PM | 7:32 AM | | 8:00 |
| 06/29/04 | TUE | Abs | | | |
| 06/30/04 | WED | Abs | | | |
| 07/01/04 | THU | Abs | | | |
| 07/02/04 | FRI | Abs | | | |
| 07/03/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 16:00 |
| 07/05/04 | MON | Abs | | | |
| 07/06/04 | TUE | Abs | | | |
| 07/07/04 | WED | Abs | | | |
| 07/08/04 | THU | Abs | | | |
| 07/09/04 | FRI | 11:31 PM | 7:33 AM | | 8:00 |
| 07/10/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 8:00 |
| 07/11/04 | SUN | 11:30 PM | 7:34 AM | | 8:00 |
| 07/12/04 | MON | Abs | | | |
| 07/13/04 | TUE | Abs | | | |
| 07/14/04 | WED | Abs | | | |

Q 00249

| Date | Day | In Punch | Out Punch | TOP Hrs | Total Hours |
|------|-----|----------|-----------|---------|-------------|
| 07/15/04 | THU | Abs | | | |
| 07/16/04 | FRI | Abs | | | |
| 07/17/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 8:00 |
| 07/18/04 | SUN | 3:32 PM | 12:12 AM | | 8:15 |
| 07/19/04 | MON | 3:34 PM | 11:33 PM | | 8:00 |
| 07/19/04 | MON | 11:34 PM | 7:32 AM | | 7:30 |
| 07/20/04 | TUE | Abs | | | |
| 07/21/04 | WED | 3:38 PM | 12:19 AM | | 8:00 |
| 07/22/04 | THU | Abs | | | |
| 07/23/04 | FRI | Abs | | | |
| 07/24/04 | SAT | 3:27 PM | 11:45 PM | | 7:45 |
| Pay Week Sub-Total Hours: | | | | | 39:30 |
| 07/25/04 | SUN | 11:30 PM | 7:33 AM | | 8:00 |
| 07/26/04 | MON | 11:31 PM | 7:32 AM | | 8:00 |
| 07/27/04 | TUE | 3:32 PM | 12:11 AM | | 8:15 |
| 07/28/04 | WED | 3:38 PM | 12:22 AM | | 8:00 |
| 07/29/04 | THU | Abs | | | |
| 07/30/04 | FRI | Abs | | | |
| 07/31/04 | SAT | 3:27 PM | 12:12 AM | | 8:15 |
| Pay Week Sub-Total Hours: | | | | | 40:30 |
| 08/01/04 | SUN | Abs | | | |
| 08/02/04 | MON | 11:28 PM | 7:37 AM | | 8:00 |
| 08/03/04 | TUE | 3:28 PM | 12:09 AM | | 8:15 |
| 08/04/04 | WED | Abs | | | |
| 08/05/04 | THU | 11:25 PM | 7:36 AM | | 8:00 |
| 08/06/04 | FRI | 11:30 PM | 7:40 AM | | 8:15 |
| 08/07/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 32:30 |
| 08/08/04 | SUN | 3:32 PM | 11:32 PM | | 7:30 |
| 08/08/04 | SUN | 11:35 PM | 7:28 AM | | 8:00 |
| 08/09/04 | MON | Abs | | | |
| 08/10/04 | TUE | Abs | | | |
| 08/11/04 | WED | 3:26 PM | 12:01 AM | | 8:00 |
| 08/12/04 | THU | Abs | | | |
| 08/13/04 | FRI | Abs | | | |
| 08/14/04 | SAT | 3:21 PM | 11:59 PM | | 8:15 |
| Pay Week Sub-Total Hours: | | | | | 31:45 |
| 08/15/04 | SUN | Abs | | | |
| 08/16/04 | MON | Abs | | | |
| 08/17/04 | TUE | Abs | | | |
| 08/18/04 | WED | Abs | | | |
| 08/19/04 | THU | 3:24 PM | 12:14 AM | | 8:15 |
| 08/20/04 | FRI | 3:28 PM | 12:02 AM | | 8:00 |
| 08/21/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 16:15 |
| 08/22/04 | SUN | 8:08 PM | No Punch | | |
| 08/23/04 | MON | Abs | | | |
| 08/24/04 | TUE | 3:18 PM | 12:01 AM | | 8:15 |
| 08/25/04 | WED | 3:22 PM | 12:05 AM | | 8:15 |
| 08/26/04 | THU | 3:38 PM | 12:20 AM | | 8:00 |
| 08/27/04 | FRI | Abs | | | |
| 08/28/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 24:30 |
| 08/29/04 | SUN | Abs | | | |
| 08/30/04 | MON | 11:27 PM | 7:28 AM | | 8:00 |

Q 00250

Pollard, Bridget L.
(Quest Diagnostics Nichols Institute)

(TABLE)

| Date | Day | In Punch | Out Punch | TOP Hrs | Total Hours |
|------|-----|----------|-----------|---------|-------------|
| 08/31/04 | TUE | Abs | | | |
| 09/01/04 | WED | 3:30 PM | 12:02 AM | | 8:00 |
| 09/02/04 | THU | Abs | | | |
| 09/03/04 | FRI | Abs | | | |
| 09/04/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 16:00 |
| 09/05/04 | SUN | Abs | | | |
| 09/07/04 | TUE | Abs | | | |
| 09/08/04 | WED | Abs | | | |
| 09/09/04 | THU | Abs | | | |
| 09/10/04 | FRI | 3:27 PM | 9:59 PM | | 6:00 |
| 09/11/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 6:00 |
| 09/12/04 | SUN | 3:24 PM | 12:07 AM | | 8:00 |
| 09/13/04 | MON | Abs | | | |
| 09/14/04 | TUE | 3:24 PM | 12:06 AM | | 8:00 |
| 09/15/04 | WED | 3:28 PM | 11:58 PM | | 8:00 |
| 09/16/04 | THU | Abs | | | |
| 09/17/04 | FRI | Abs | | | |
| 09/18/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 24:00 |
| 09/19/04 | SUN | 3:29 PM | 11:25 PM | | 7:30 |
| 09/19/04 | SUN | 11:28 PM | 7:26 AM | | 8:00 |
| 09/20/04 | MON | Abs | | | |
| 09/21/04 | TUE | Abs | | | |
| 09/22/04 | WED | 3:22 PM | 12:10 AM | | 8:30 |
| 09/23/04 | THU | Abs | | | |
| 09/24/04 | FRI | 3:37 PM | 12:11 AM | | 8:15 |
| 09/25/04 | SAT | 3:24 PM | 11:41 PM | | 7:45 |
| Pay Week Sub-Total Hours: | | | | | 40:00 |
| 09/26/04 | SUN | 3:24 PM | 12:11 AM | | 8:15 |
| 09/27/04 | MON | 3:23 PM | 12:27 AM | | 8:30 |
| 09/28/04 | TUE | Abs | | | |
| 09/29/04 | WED | 3:33 PM | 8:30 PM | | 5:00 |
| 09/30/04 | THU | Abs | | | |
| 10/01/04 | FRI | Abs | | | |
| 10/02/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 21:45 |
| 10/03/04 | SUN | Abs | | | |
| 10/04/04 | MON | 1:23 AM | 7:00 AM | | 5:30 |
| 10/05/04 | TUE | 3:31 PM | 12:06 AM | | 8:00 |
| 10/06/04 | WED | 3:27 PM | 12:26 AM | | 8:30 |
| 10/07/04 | THU | Abs | | | |
| 10/08/04 | FRI | Abs | | | |
| 10/09/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 22:00 |
| 10/10/04 | SUN | Abs | | | |
| 10/11/04 | MON | Abs | | | |
| 10/12/04 | TUE | 3:36 PM | 12:11 AM | | 8:15 |
| 10/13/04 | WED | 3:23 PM | 12:01 AM | | 8:00 |
| 10/14/04 | THU | Abs | | | |
| 10/15/04 | FRI | 11:25 PM | 7:35 AM | | 8:00 |
| 10/16/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 24:15 |
| 10/17/04 | SUN | Abs | | | |
| 10/18/04 | MON | Abs | | | |

Q 00251

| Date | Day | In Punch | Out Punch | TOP Hrs | Total Hours |
|------|-----|----------|-----------|---------|-------------|
| 10/19/04 | TUE | 3:23 PM | 12:09 AM | | 8:15 |
| 10/20/04 | WED | 3:27 PM | 12:13 AM | | 8:15 |
| 10/21/04 | THU | Abs | | | |
| 10/22/04 | FRI | 9:45 AM | 2:04 PM | | 4:15 |
| 10/23/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 20:45 |
| 10/24/04 | SUN | Abs | | | |
| 10/25/04 | MON | Abs | | | |
| 10/26/04 | TUE | 3:27 PM | 12:06 AM | | 8:00 |
| 10/27/04 | WED | 2:58 PM | 12:19 AM | | 8:45 |
| 10/28/04 | THU | Abs | | | |
| 10/29/04 | FRI | 3:36 PM | 12:21 AM | | 8:15 |
| 10/30/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 25:00 |
| 10/31/04 | SUN | 11:25 PM | 7:34 AM | | 8:00 |
| 11/01/04 | MON | Abs | | | |
| 11/02/04 | TUE | Abs | | | |
| 11/03/04 | WED | Abs | | | |
| 11/04/04 | THU | Abs | | | |
| 11/05/04 | FRI | 3:30 PM | 11:32 PM | | 8:00 |
| 11/05/04 | FRI | 11:33 PM | 7:35 AM | | 8:00 |
| 11/06/04 | SAT | 11:22 PM | 7:46 AM | | 8:30 |
| Pay Week Sub-Total Hours: | | | | | 32:30 |
| 11/07/04 | SUN | Abs | | | |
| 11/08/04 | MON | Abs | | | |
| 11/09/04 | TUE | Abs | | | |
| 11/10/04 | WED | Abs | | | |
| 11/11/04 | THU | Abs | | | |
| 11/12/04 | FRI | Abs | | | |
| 11/13/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | |
| 11/14/04 | SUN | Abs | | | |
| 11/15/04 | MON | Abs | | | |
| 11/16/04 | TUE | Abs | | | |
| 11/17/04 | WED | 3:31 PM | 11:24 PM | | 8:00 |
| 11/17/04 | WED | 11:25 PM | 7:36 AM | | 8:00 |
| 11/18/04 | THU | 11:14 PM | 7:30 AM | | 8:15 |
| 11/19/04 | FRI | Abs | | | |
| 11/20/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 24:15 |
| 11/21/04 | SUN | Abs | | | |
| 11/22/04 | MON | 3:28 PM | 12:03 AM | | 8:00 |
| 11/23/04 | TUE | 3:25 PM | 12:14 AM | | 8:15 |
| 11/24/04 | WED | Abs | | | |
| 11/26/04 | FRI | Abs | | | |
| 11/27/04 | SAT | 7:01 AM | 3:33 PM | | 8:00 |
| Pay Week Sub-Total Hours: | | | | | 24:15 |
| 11/28/04 | SUN | Abs | | | |
| 11/29/04 | MON | 11:20 PM | 7:34 AM | | 8:15 |
| 11/30/04 | TUE | 11:21 PM | 7:24 AM | | 8:15 |
| 12/01/04 | WED | Abs | | | |
| 12/02/04 | THU | 3:30 PM | 11:25 PM | | 8:00 |
| 12/02/04 | THU | 11:29 PM | 7:36 AM | | 7:30 |
| 12/03/04 | FRI | Abs | | | |
| 12/04/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 32:00 |

Q 00252

| Date | Day | In Punch | Out Punch | TOP Hrs | Total Hours |
|---|---|---|---|---|---|
| 12/05/04 | SUN | 3:33 PM | 12:11 AM | | 8:15 |
| 12/06/04 | MON | 3:17 PM | 6:54 PM | | 3:45 |
| 12/07/04 | TUE | Abs | | | |
| 12/08/04 | WED | 3:18 PM | 12:14 AM | | 8:30 |
| 12/09/04 | THU | 11:22 PM | 7:34 AM | | 7:45 |
| 12/10/04 | FRI | 11:25 PM | 7:31 AM | | 7:30 |
| 12/11/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 35:45 |
| 12/12/04 | SUN | 11:25 PM | 7:26 AM | | 8:00 |
| 12/13/04 | MON | Abs | | | |
| 12/14/04 | TUE | 3:27 PM | 12:13 AM | | 8:15 |
| 12/15/04 | WED | 3:30 PM | 12:21 AM | | 8:15 |
| 12/16/04 | THU | 3:39 PM | 11:25 PM | | 7:45 |
| 12/16/04 | THU | 11:26 PM | 7:26 AM | | 7:30 |
| 12/17/04 | FRI | Abs | | | |
| 12/18/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 39:45 |
| 12/19/04 | SUN | Abs | | | |
| 12/20/04 | MON | 3:31 PM | 12:09 AM | | 8:15 |
| 12/21/04 | TUE | 3:30 PM | 11:32 PM | | 8:00 |
| 12/21/04 | TUE | 11:33 PM | 7:26 AM | | 7:00 |
| 12/22/04 | WED | 11:27 PM | 7:27 AM | | 7:30 |
| 12/23/04 | THU | Abs | | | |
| 12/25/04 | SAT | Abs | | | |
| Pay Week Sub-Total Hours: | | | | | 30:45 |
| Total Hours: | | | | 16:00 | 1153:00 |

Quest Diagnostics will provide an environment of strict compliance with the laws and regulations, not only as a legal obligation, but because it's the right thing to do.

As an employee, I pledge to:

**PROTECT INTEGRITY**
Preserve and protect the integrity of Quest Diagnostics.

**PRIVACY**
Honor the privacy of all health and personal information, including laboratory orders and results, of our clients, patients and employees.

**ACCOUNTABILITY**
Comply with the Integrity Commitment to help ensure quality care to patients.

**TRAINING AND EDUCATION**
Complete all necessary compliance training to help me properly perform my job duties.

**GUIDANCE AND ASSISTANCE**
Seek guidance and assistance whenever I am in doubt about the right thing to do.

**INDUCEMENT**
Not provide anything of value to a client, or potential client, intending to improperly induce their business.

**ORDER, PERFORM, BILL**
Perform my job duties in accordance with all applicable ordering, performing and billing policies and procedures.

**DUTY TO REPORT**
Report to the Company all potential or suspected violations of the Integrity Commitment.

As a supervisor, I also pledge to:

**LEADERSHIP**
Demonstrate leadership in compliance through my actions, including communicating to my employees a clear expectation that all our activities must protect the integrity of Quest Diagnostics.

**TRAINING AND EDUCATION**
Ensure my employees receive the compliance training and education necessary to help them properly perform their job duties.

**ADDRESSING COMPLIANCE CONCERNS**
Ensure an environment of non-retaliation and take timely and appropriate action whenever compliance concerns or potential issues are raised.

### Quest Diagnostics Code of Business Ethics Pledge

The Code of Business Ethics describes the standards of business conduct required of all Quest Diagnostics employees, executive officers and directors. Each employee, officer and director has a personal responsibility to ensure that his or her actions abide by the letter and the spirit of the Code. As an employee, I pledge to honor the key principles set forth below and to comply in all respects with the requirements of the Code.

**CONFIDENTIALITY**
Quest Diagnostics employees, officers and directors must respect and maintain the confidentiality of confidential information regarding the Company, its services, customers and patients.

**NO CONFLICT OF INTEREST**
Quest Diagnostics employees, officers and directors must avoid any conflicts of interest that could inhibit their ability to act or make decisions in the best interests of the Company.

**CORPORATE OPPORTUNITIES**
Quest Diagnostics employees, officers and directors may not use corporate property, information or position for personal gain.

**PROTECTION OF COMPANY ASSETS**
Quest Diagnostics employees, officers and directors must protect the Company's assets and ensure they are used only for legitimate business purposes.

**FAIR DEALING**
Quest Diagnostics employees, officers and directors must deal fairly with other employees, customers, patients, vendors and competitors.

**COMPLIANCE WITH LAWS, RULES AND REGULATIONS**
Quest Diagnostics employees, officers and directors must abide by all applicable laws, rules and regulations.

**FAIR AND TIMELY DISCLOSURE IN PUBLIC REPORTING AND COMMUNICATIONS**
The Company's Chief Executive Officer and Senior Financial Officers are responsible for ensuring that the Company's financial statements, public reports or communications contain disclosure that is full, fair, accurate, timely and understandable

**DUTY TO REPORT**
Quest Diagnostics employees, officers and directors who have knowledge that an applicable law, regulation, policy or ethical guideline has been, or may be violated must promptly report such information to an appropriate person within the Company.

Employee Signature: _Bridget Allard_

Date: _1/7/05_

Q 00254


**Quest**
**Diagnostics**

# Employee Compensation Profile

| | | | |
|---|---|---|---|
| **Name:** | Pollard,Bridget L | **Reports To:** | Meeder,David |
| **Job Title:** | Technologist, Medical I | **Paygroup:** | CHANTILLY (Non-Exempt) |
| **EmplID:** | 092911 | **Service Date:** | 10/21/2002 |
| **Location:** | Washington        DC | | |

| 2005 Merit Review | | | |
|---|---|---|---|
| Current Rate: | 18.76 | Pro-Rate Factor: | 100% |
| Performance Rating: | Excellent | Increase Amount: | 0.75 |
| Increase Percent: | 4.00 | | |

| Effective Date: | 02/20/2005 | New Rate: | $19.51 |
|---|---|---|---|

| 2004 Goalsharing |
|---|

**Goalsharing Effective Date: 01/01/2004-12/31/2004 (100.00% Chantilly)**

**Goalsharing Plan:   Chantilly**

| 2004 Year to Date Earnings | Goalsharing Percent | Goalsharing Bonus Amount |
|---|---|---|
| 27,271.18 | 3.73 | $1,017 |

| Total Bonus Award | $1,017 |
|---|---|

(1 )MIP Eligible Earnings: Eligible base earnings are equal to the weighted average salary based on days worked at each salary rate including lump sum merit award (if applicable) during the 2004 calendar year.

(2) Goalsharing Eligible Earnings:  Payments made through Company payroll for  2004 including base salary, time off with

Q  00255

# EXHIBIT 15

## Annual Performance Development and Review
### *Laboratory Technical Services – Medical Laboratory Technologist I & II*

| | |
|---|---|
| Employee Name: BRIDGET POLLARD | Employee ID: 9211 |
| Employee Title: MEDICAL TECHNOLOGIST | Department: Pathology Clinical Lab |
| Appraiser: Isabelita H. Aglipay | Location: Providence Hospital |
| Appraiser Title: Lab Supervisor | Appraisal Period (From/To): 2005 |

### PURPOSE

The purpose of the annual review is for each manager to assess employee performance over the past year in relation to specific responsibilities or objectives. It is an important process for managers to provide feedback on employee strengths, opportunities for improvement, competencies, and development areas, summarizing ongoing feedback throughout the year. It is also an opportunity for employees to provide input on how they can best perform and develop.

Reviews should be based on facts and data and feedback provided should be specific. Facts and data should come from established performance metrics, employee self-assessment, external or internal customer or co-worker feedback and other sources. The goal is a thorough and accurate review based on an overall performance assessment.

Contact your Human Resources department for more information on making the review process as effective as possible.

### INSTRUCTIONS

Follow the procedure below when making your Performance Ratings.

1. Refer to *Section I: Performance Factor Rating Scales* and carefully read and understand each of the Performance Evaluation Factors of the position. Specifically read the Performance Evaluation Factors' definition and Behavioral Evaluation Standards associated with each performance rating. Each rating category is described below:
   **1 = Outstanding:** *Demonstrates a distinguished level of job performance that is reserved for performance that is consistently above and beyond the requirements of the job. Personal commitment to the company's mission, values and goals is consistently evident. Seizes initiative in identifying challenging work goals and in finding solutions. Quality and timeliness of results are not in question, even under challenging circumstances.*
   **2 = Excellent:** *Produces more than required. Requires little direction or supervision. Thinks beyond details of the job. Contributes to the overall objectives of the team. Decisions and actions have paid off to a higher-than-expected degree.*
   **3 = Achieves Expectations:** *Demonstrates a level of job performance that fully meets the requirements of the job. Performance is what is expected of a qualified and experienced individual commensurate with time in position.*
   **4 = Development Needed:** *Demonstrates a level of performance that requires improvement to meet the requirements of the job. Continuation at this level could lead to job change or termination.*
   **5 = Unsatisfactory** - *Performance continues to fall below required expectations. Continuation at this level will lead to termination*
   **N = New to Company**: *Applies to an individual new to the company for less than six months. If the employee has transferred internally, performance information should be obtained from the former manager.*
2. Using the Behavioral Evaluation Standards, decide which rating best describes the employee's level of performance for the particular Performance Evaluation Factor based on facts and data. Enter the rating in the space at the bottom of each performance factor. Record an "N/A" if you have not observed the employee's performance for a specific performance factor. *It is acceptable to place greater emphasis on a critical bullet point within a performance factor (e.g. attendance, error rate, etc.) as long as the same criteria is applied to all employees who are evaluated via this document.*
3. Refer to *Section II: Overall Performance Rating* to determine the employee's overall performance. First, record all Performance Evaluation Factor ratings in the rating column. Second, if your business unit is equally weighting each performance factor, calculate the average of all Performance Evaluation Factor ratings (i.e., summing all performance factor ratings and then dividing by the total number). If your business unit is using alternative factor weighting, multiply each performance factor rating by its weight and then sum the weighted performance factor ratings. Finally, check the appropriate box that corresponds to the average or weighted rating in the Overall Performance Rating column.
4. Document specific behavioral examples of the employee's performance that support your ratings in *Section IV: Comments and Signatures.* When making comments, focus on specific job-related behavioral examples such as "consistently double checks work to ensure accuracy" and avoid evaluative and personal comments such as "quality of work is awful." Also document employee comments regarding the performance evaluation process in the space provided.

EXHIBIT
16
PENGAD 800-831-6989

Q 00233

## I. PERFORMANCE FACTOR RATING SCALES

### 1. Following Policies and Procedures

Follows Quest Diagnostics' company and department policies and procedures. This includes Federal, state, and local requirements and maintaining safety policies and procedures; properly storing and disposing regulated medical waste; maintaining a clean and orderly workspace; upholding ethical standards, and maintaining privacy and confidentiality of personal information of patients, clients, and employees.

**Outstanding (1)**

- Demonstrates an in-depth knowledge of and complies with Company policies and procedures, including ethical standards, Federal, state, and local requirements and regulations including more complex policies and procedures.
- Encourages others to abide by high ethical standards.
- Proactively promotes and ensures that the privacy and confidentiality of personal information for customers and employees is maintained in accordance with HIPAA and other guidelines by self and others.
- Maintains an exceptionally well-organized and clean workspace that is viewed as a role model by peers and supervisors/group leaders.
- Sets the example for ensuring guideline adherence for injury protection, handling of bio-hazardous materials, and other critical safety initiatives.

**Excellent (2)**

*Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see instructions)*

**Achieves Expectations (3)**

- Follows Company policies and procedures, including ethical standards, safety, Federal, state, and local requirements and regulations.
- Accurately follows oral instructions and written procedures from supervisors/group leaders.
- Maintains the privacy and confidentiality of personal information for customers and employees in accordance with HIPAA and other guidelines.
- Maintains a well-organized and clean workspace.
- Adheres to all company guidelines for injury protection, handling of bio-hazardous materials, and other critical safety initiatives.

**Development Needed (4)**

- Fails to consistently follow Quest Diagnostics' policies and procedures, including ethical standards, Federal, state, and local requirements and regulations.
- Has shown difficulty following oral instructions or written procedures from supervisors/group leaders.
- Inconsistently maintains the privacy and confidentiality of personal information for customers and employees in accordance with HIPAA and other guidelines.
- Maintains a disorganized and unclean workspace.
- Has shown inconsistent adherence to guidelines for injury protection, handling of bio-hazardous materials, and other critical safety initiatives.

**Unsatisfactory (5)**

*Demonstrates a level of performance that is below Development Needed*

Comments

**RATING = 2**

### 2. Interpersonal (and Customer) Relations

Interacts effectively with others and actively participates as a committed team member. This includes interacting in a respectful, professional manner; remaining calm in difficult interactions; assisting coworkers; sharing information; listening to and involving others; objectively considering others' ideas and opinions, and interacting effectively with people from varied and diverse backgrounds; creating an environment of positive and professional demeanor for suppliers/customers.

**Outstanding (1)**

- Establishes a trusting, working relationship with others by encouraging and considering others' ideas and opinions; sharing information, and giving proper credit to others.
- Identifies conflicts between team members and reports to supervisor/group leader.
- Values the importance of diversity and is perceived as a role model for respecting others' similarities and differences.
- Engages suppliers and customers to identify potential problems and works to exceed customer expectations.

**Achieves Expectations (3)**

- Interacts with others in a professional, friendly, and respectful manner and remains calm in difficult situations.
- Values expertise and input of team members by encouraging and soliciting ideas, opinions, and feedback from other members.
- Values the diversity of others and treats everyone with respect and dignity
- Demonstrates a positive and professional level of demeanor towards suppliers and customers.

**Development Needed (4)**

- Has shown difficulty interacting with others in a professional, friendly, and respectful manner or remaining calm in difficult situations.
- Does not encourage and solicit ideas, opinions, and feedback from other members during the course of team meetings and work activities.
- Has shown difficulty interacting effectively with others from varied and diverse backgrounds and treating them with respect and dignity.
- Demonstrates a less than positive and professional level of demeanor towards suppliers and customers.

Comments

**RATING = 3**

Q 00234

### 3. Communication

Communicates clearly, politely, respectfully, and uses control to coworkers, supervisors, managers, and customers. This includes asking questions, giving and receiving information and feedback, explaining ideas or policies, actively listening to responses, and using discretion by not discussing company or departmental problems in public areas.

**Outstanding (1)**

- Actively seeks to ensure understanding by listening attentively and patiently, soliciting others' viewpoints, clarifying and summarizing conveyed information, and asking questions (i.e., masters active and passive listening).

**Achieves Expectations (3)**

- Speaks clearly, politely, respectfully, and under control to coworkers, supervisors, managers, and customers.
- Listens attentively and patiently and asks questions to clarify information and ensure accurate understanding of message.
- Discusses company or department issues or problems only in appropriate areas.
- Clearly, thoroughly, and accurately answers others' questions in a timely manner.
- Demonstrates proper telephone etiquette and follows procedure when speaking with others on the telephone.

**Development Needed (4)**

- Has shown several instances of speaking unclearly, impolitely, disrespectfully to coworkers, supervisors/managers or customers.
- Often listens inattentively, impatiently, or does not ask questions to clarify information and ensure accurate understanding of message.
- Discusses company or department issues or problems in inappropriate areas.
- Answers to others' questions are lacking in detail, unclear, inaccurate, and/or not provided in a timely manner.
- Demonstrates improper telephone etiquette and procedures when speaking with others on the telephone.

Comments

**RATING = 3**

*Laboratory Technical Services – Medical Laboratory Technologist I & II PD&R Form*

# I. PERFORMANCE FACTOR RATING SCALES

## 4. Work Orientation

Ensures work activities are completed thoroughly, accurately, efficiently, and in a timely manner ensuring quality standards are met. This includes taking initiative, completing duties; working without close supervision; being committed, reliable, trusted, and accountable for completing work activities regularly/dependably being at work (good attendance) and on time (good punctuality); and willingness to accept schedule changes or work additional hours as required by the business.

### Outstanding (1)
- Serves as a role model for productivity, quality, timeliness, accuracy, and efficiency.
- Unscheduled absences/punctuality exceed Company/Unit standards.
- Demonstrates an exceptional ability to effectively handle multiple tasks.
- Continuously takes initiative to complete work activities quickly to meet customer demands.
- Shows exceptional commitment and responsibility to the completion and the quality of own and others' work.
- Produces high quality work under changing or stressful conditions.
- Regularly volunteers to work additional hours during normal or busy situations or seeks out additional work.

### Excellent (2)
*Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see instructions)*

### Achieves Expectations (3)
- Works productively, completing work activities thoroughly, accurately, efficiently, and in a timely manner, ensuring all quality standards are met.
- Unscheduled absences/punctuality meet Company/Unit standards.
- Performs multiple work activities at once, accurately and in a timely manner.
- Consistently works effectively with minimal supervision.
- Quickly/directly completes work activities without being instructed/reminded.
- Is consistently accountable for completion and quality of work activities.
- Works productively and effectively under changing or stressful conditions.
- Works additional hours during busy situations when asked.

### Development Needed (4)
- Completes work that may be unproductive, inaccurate, inefficient, or not completed in a timely manner.
- Unscheduled absences/punctuality do not meet Company/Unit standards.
- Has shown difficulty completing multiple work activities at once, accurately and in a timely manner.
- Frequently requires close supervision to complete work activities.
- Frequently has to be instructed or reminded to complete job activities.
- Has shown difficulty demonstrating accountability for completion and quality of work activities.
- Works ineffectively under changing or stressful conditions.
- Unwilling to work additional hours during busy situations when asked.

### Unsatisfactory (5)
*Demonstrates a level of performance that is below Development Needed*

### Comments

RATING = 3

## 5. Deliver Quality Services

Delivers services that consistently meet or exceed standards with little or no rework required. This includes verifying the accuracy and completeness of all work, identifying missing or inconsistent information or date, asking for assistance when appropriate, documenting and sharing work-related problems and solutions with co-workers, and striving for Six Sigma quality.

### Outstanding (1)
- Serves as a role model who continuously strives to deliver quality services.
- Proactively takes steps or recommends steps to ensure quality problems are prevented.
- Serves as role model for detail orientation.

### Achieves Expectations (3)
- Delivers services that meet Quest Diagnostics' quality standards and require little rework.
- Continuously strives to deliver quality services and ensures work quality is at its highest level possible for self and others.
- Quickly and efficiently resolves quality problems when detected and asks for appropriate assistance when needed.
- Accurately documents quality problems.
- Identifies quality problems and shares problems with co-workers and/or supervisors.
- Ensures accuracy by verifying detailed information and checking work.

### Development Needed (4)
- Inconsistently delivers services that meet Quest Diagnostics' quality standards and require little rework.
- Has shown difficulty resolving quality problems when detected or inappropriately asks for assistance.
- Inconsistently documents quality problems.
- Has shown difficulty identifying quality problems or does not share problems with co-workers and/or supervisors.
- Shows inability or unwillingness to verify and check detailed information resulting in inaccurate results.

### Comments

RATING = 3

## 6. Problem Solving

Identifies problems related to work activities. This includes attempting to resolve the problem, referring the problems/issues to the proper individual(s) when appropriate, and following appropriate Standard Operating Procedures (SOP). This also includes identifying, defining, diagnosing, and resolving problems by: analyzing information; generating alternatives to the problem; making sound, timely, and objective decisions; and committing to action, even when uncertain.

### Outstanding (1)
- Proactively recognizes and defines potential problems and their causes before they occur and takes necessary steps to prevent their occurrence on a consistent basis.
- Demonstrates an in-depth understanding of the SOP's and consistently and accurately uses them when solving problems.
- Consistently is the "go-to" person to help solve many problems.
- Makes sound, timely, and objective decisions, even in the face of uncertain situations when resolving problems.
- Quickly recognizes, defines, and corrects complex equipment problems/malfunctions when they occur on a consistent basis.
- Proactively identifies specimen/sample problems and prevents the from occurring.

### Achieves Expectations (3)
- Quickly and correctly recognizes, identifies, defines, diagnoses, an documents common problems or issues when they occur.
- Consistently follows appropriate SOP's when solving problems.
- Effectively resolves common problems on a consistent basis.
- Makes good and timely decisions when resolving problems.
- Quickly recognizes, defines, and accurately corrects common equipment problems/malfunctions when they occur on a consistent basis.
- Searches for/locales missing specimens/samples and resolves specimen/sample problems within established timeframes.

### Development Needed (4)
- Inconsistently recognizes, identifies, and defines potential pro when they occur.
- Demonstrates an insufficient understanding of the SOP's or inconsistently uses them when resolving problems.
- Ineffectively resolves common problems.
- Has shown difficulty making good and timely decisions when resolving problems.
- Has shown difficulty correcting common equipment problems/malfunctions when they occur.
- Takes considerable time to locate missing specimens/samples or unable to resolve observed or reported specimen/sample problems

### Comments

RATING = 2

# I. PERFORMANCE FACTOR RATING SCALES

| 7. Handle Specimens | 8. Perform Tests/Analyses |
|---|---|
| Uses solutions, reagents, filtration, centrifugation, smearing, and/or sectioning techniques to prepare specimens/samples for laboratory delivery, examination, screens, and/or testing. This includes measuring liquid or solid substances to a specified amount using pre-calibrated scales/containers. | Performs a variety of medical laboratory tests, procedures, experiments, analyses, and studies in the diagnosis, treatment, and prevention of disease. Interprets test results or output, and assures test results are accurate and/or acceptable for release. Operates, maintains, and troubleshoots equipment used in the preparation, storage, examination, analysis, and/or testing of specimens/samples. |

### Outstanding (1) — Handle Specimens
- Regarded by others as an expert in specimen/sample test preparation procedures using solutions, reagents, filtration, centrifugation, smearing, and/or sectioning techniques.
- Demonstrates in-depth knowledge of specimen storage and retrieval processes and is sought by others for expertise.
- Consistently double checks measurements of liquid and/or solid substances to ensure proper testing amounts, resulting in minimal or no errors.

### Outstanding (1) — Perform Tests/Analyses
- Frequently is asked to assist others in correctly conducting medical laboratory tests, procedures, analyses, and studies or interpreting test results.
- Efficiently and consistently double checks test results and confirmation procedures before transferring results to computer mainframe (e.g. LIS/QuestLab) and/or releasing results.
- Serves as a resource on the operation of laboratory equipment.
- Identifies and troubleshoots complex or hard to identify equipment problems.
- Demonstrates an in-depth understanding of the various computer systems and software used to execute testing.

### Excellent (2) — Handle Specimens
Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see instructions)

### Excellent (2) — Perform Tests/Analyses
Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see instructions)

### Achieves Expectations (3) — Handle Specimens
- Correctly wears required PPE.
- Demonstrates full understanding of specimen/sample testing preparation procedures using solutions, reagents, filtration, centrifugation, smearing, and/or sectioning techniques.
- Demonstrates full understanding of specimen storage and retrieval processes.
- Accurately measures liquid and/or solid substances for testing using pre-calibrated scales/containers.

### Achieves Expectations (3) — Perform Tests/Analyses
- Accurately conducts medical laboratory tests, procedures, analyses, and studies with minimal supervision or assistance.
- Interprets test results within an acceptable range of accuracy with minimal supervision or assistance.
- Reviews test results, completes confirmation procedures, transfers results to computer mainframe (e.g., LIS/QuestLab) and/or releases results on time.
- Correctly operates and maintains all laboratory equipment used in the preparation, storage, examination, analysis, and/or testing of specimens.
- Uses various computer systems and software to execute testing programs and analyses with minimal supervision or assistance.
- Consistently completes required forms (e.g., quality control logs, preventative maintenance logs, customer records) in an accurate and timely manner.

### Development Needed (4) — Handle Specimens
- Correct wearing of required PPE does not consistently meet department and/or Company standards.
- Shows insufficient understanding of specimen/sample testing preparation procedures using solutions, reagents, filtration, centrifugation, smearing, and/or sectioning techniques.
- Shows insufficient understanding of specimen storage and retrieval processes.
- Has shown difficulty accurately measuring liquid and/or solid substances for testing using pre-calibrated scales/containers.

### Development Needed (4) — Perform Tests/Analyses
- Requires significant assistance from others when conducting medical laboratory tests, procedures, analyses, and studies.
- Has shown difficulty correctly interpreting test results without assistance.
- Infrequently reviews test results, inappropriately completes confirmation procedures, has shown difficulty transferring results to computer mainframe (e.g., LIS/QuestLab) and/or releasing results on time.
- Needs frequent assistance in the operation and maintenance of laboratory equipment.
- Has shown difficulty using some or all of the computer systems and software used to execute testing programs and analyses.
- Inconsistently completes required forms (e.g., quality control logs, preventative maintenance logs, customer records) or takes too much time completing them.

### Unsatisfactory (5) — Handle Specimens
Demonstrates a level of performance that is below Development Needed

### Unsatisfactory (5) — Perform Tests/Analyses
Demonstrates a level of performance that is below Development Needed

Comments

RATING = 3

RATING = 2

Q 00236

## II. OVERALL PERFORMANCE RATING

| Performance Factor | Rating |
|---|---|
| 1. Following Policies and Procedures | 2 |
| 2. Interpersonal (and Customer) Relations | 3 |
| 3. Communication | 3 |
| 4. Work Orientation | 2 |
| 5. Deliver Quality Services | 3 |
| 6. Problem Solving | 2 |
| 7. Handle Specimens | 3 |
| 8. Perform Tests/Analyses | 2 |

| Overall Performance | Average Rating |
|---|---|
| ○ Outstanding* | 1.00 to 1.33 |
| ○ Excellent | 1.34 to 2.33 |
| ● Achieves Expectations | 2.34 to 3.25 |
| ○ Development Needed | 3.26 to 4.25 |
| ○ Unsatisfactory | 4.26 to 5.00 |
| ○ New to Company | |

*An overall rating of "Outstanding" may not be granted if any Performance Factor is rated below "Achieves Expectations".

**Average Rating**
(Sum of all ratings divided by the total number of ratings)   2.15   2.5

## III. DEVELOPMENT PLAN

This section enables the planning of performance improvements based upon the performance evaluation discussion and the employee's interests and aspirations. After considering the employee's ratings on the Performance Evaluation Factors and the employee's interests and aspirations, develop a plan of the work experiences, special assignments, educational activities or training you and the employee have agreed upon to increase the employee's effectiveness.

| Developmental Area | Activities Planned | Targeted Timeframe |
|---|---|---|
| Chem. | RXL (new instrument) Check out (PRN) | June 06 |
| | | |
| | | |
| | | |

Q 00237

5

## IV. COMMENTS AND SIGNATURES

Supervisor Comments: (Use additional pages if necessary)

Employee Comments: (Use additional pages if necessary)

Signatures below indicate that the employee and supervisor have met on the date noted and mutually discussed and clarified the employee's performance and final evaluation rating in each of the performance factors, including the employee's overall performance. The employee's signature below does not necessarily indicate agreement with the contents of this appraisal.

| Employee Signature: *Bridget Dillard* | Date: 1-13-06 |
| Supervisor Signature: *Digray* | Date 01-12-06 |
| Manager Signature: *Vandenbery* | Date: 1/13/06 |
| HR Manager Signature: | Date: |

Laboratory Technical Services – Medical Laboratory Technologist I & II PD&R Form

Q 00238

6

# Quest Diagnostics Integrity Commitment Pledge

Quest Diagnostics will provide an environment of strict compliance with the laws and regulations, not only as a legal obligation, but because it's the right thing to do.

As an employee, I pledge to:

*Protect Integrity*
Preserve and protect the integrity of Quest Diagnostics.

*Privacy*
Honor the privacy of all health and personal information, including laboratory orders and results, of our clients, patients and employees.

*Accountability*
Comply with the Integrity Commitment to help ensure quality care to patients.

*Training and Education*
Complete all necessary compliance training to help me properly perform my job duties.

*Guidance and Assistance*
Seek guidance and assistance whenever I am in doubt about the right thing to do.

*Inducement*
Not provide anything of value to a client, or potential client, intending to improperly induce their business.

*Order, Perform, Bill*
Perform my job duties in accordance with all applicable ordering, performing and billing policies and procedures.

*Duty to Report*
Report to the Company all potential or suspected violations of the Integrity Commitment.

As a supervisor, I also pledge to:

*Leadership*
Demonstrate leadership in compliance through my actions, including communicating to my employees a clear expectation that all our activities must protect the integrity of Quest Diagnostics.

*Training and Education*
Ensure my employees receive the compliance training and education necessary to help them properly perform their job duties.

*Addressing Compliance Concerns*
Ensure an environment of non-retaliation and take timely and appropriate action whenever compliance concerns or potential issues are raised.

# Quest Diagnostics Code of Business Ethics Pledge

The Code of Business Ethics describes the standards of business conduct required of all Quest Diagnostics employees, executive officers and directors. Each employee, officer and director has a personal responsibility to ensure that his or her actions abide by the letter and the spirit of the Code. As an employee, I pledge to honor the key principles set forth below and to comply in all respects with the requirements of the Code.

*Confidentiality*
Quest Diagnostics employees, officers and directors must respect and maintain the confidentiality of confidential information regarding the Company, its services, customers and patients.

*No Conflict of Interest*
Quest Diagnostics employees, officers and directors must avoid any conflicts of interest that could inhibit their ability to act or make decisions in the best interests of the Company.

*Corporate Opportunities*
Quest Diagnostics employees, officers and directors may not use corporate property, information or position for personal gain.

*Protection of Company Assets*
Quest Diagnostics employees, officers and directors must protect the Company's assets and ensure they are used only for legitimate business purposes.

*Fair Dealing*
Quest Diagnostics employees, officers and directors must deal fairly with other employees, customers, patients, vendors and competitors.

*Compliance with Laws, Rules and Regulations*
Quest Diagnostics employees, officers and directors must abide by all applicable laws, rules and regulations.

*Fair and Timely Disclosure in Public Reporting and Communications*
The Company's Chief Executive Officer and Senior Financial Officers are responsible for ensuring that the Company's financial statements, public reports or communications contain disclosure that is full, fair, accurate, timely and understandable.

*Duty to Report*
Quest Diagnostics employees, officers and directors who have knowledge that an applicable law, regulation, policy or ethical guideline has been, or may be violated must promptly report such information to an appropriate person within the Company.

Name/Employee ID: _92911_____   Signature: _Bridget Allard_   Date: _1/31/06_

*Laboratory Technical Services – Medical Laboratory Technologist I & II PD&R Form*   Q 00239

7

# EXHIBIT 16

EEOC Form 161 (10/96)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To: Bridget L. Pollard
    2717 Cabochon Diamond Court
    Raliegh, NC 27610

From: EEOC- Jackson Area Office
      100 West Capitol Street
      Suite 207
      Jackson, MS 39269

[  ]  *On behalf of person(s) aggrieved whose identity is*
      *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 100-2006-00301 | Wilmur McLin, Investigator | 601-948-8407 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[  ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[  ]  Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[  ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[  ]  We cannot investigate your charge because it was not filed within the time limit required by law.

[  ]  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[  ]  While reasonable efforts were made to locate you, we were not able to do so.

[  ]  You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[ X ]  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[  ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[  ]  Other *(briefly state)* _____

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you.  You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** from your receipt of this Notice; otherwise, your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

_____        2/28/07
       Wilma Scott, Area Director                    *(Date Mailed)*

Enclosure(s)

cc:  Mike Knapp
     Director of Employee Service
     Quest Diagnostics
     1150 Varnum Street, NE
     Washington, DC 20017

     Linda Hitt Thatcher
     Thatcher Law Firm, LLC
     Belle Point Office Park
     7849 Belle Point Drive
     Greenbelt, , MD 20770

     Michael L. Stevens
     Arent Fox
     1050 Connecticut Avenue, NW
     Washington, DC 20036-5339



EXHIBIT
F 18
PENGAD 800-631-6989

# EXHIBIT 17

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **BRIDGET POLLARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1: 07-00692(CKK)** |
| | ) | |
| **QUEST DIAGNOSTICS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DECLARATION OF MICHAEL L. STEVENS
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Michael L. Stevens, do hereby depose and state as follows:

1.      I am a partner with the law firm of Arent Fox LLP.

2.      Arent Fox LLP  represents  Quest Diagnostics in the above-captioned action.

3.      On January 11, 2008, Plaintiff served non-party Holy Cross Hospital ("Holy Cross") with a subpoena *duces tecum* (the "Subpoena").  This Subpoena sought  Sean Townsend's complete personnel file. *See* Docket  No. 20, Ex. 1.

4.      On February 4, 2008, Plaintiff filed a Motion for Order to Show Cause  ("Show Cause Motion") against Holy Cross for its alleged failure to comply with the Subpoena.  *See* Docket No. 20   On February 11, 2008, Defendant filed an Opposition to Plaintiff's Show Cause Motion.  *See* Docket No. 21.

5.      On February 21, 2008, Plaintiff withdrew her Show Cause Motion because Holy Cross purportedly produced Mr. Townsend's complete personnel file. *See* Docket No. 22.

6.      On March 7, 2008 at the Court's Status Conference, Plaintiff's counsel provided me with two (2) copies of Mr. Townsend's personnel file produced by Holy Cross.

7.    Exhibit 18 to Defendant's Memorandum of Points and Authorities in Support of

its Motion for Summary Judgment is  a true and correct copy of a letter, dated November 7,

2005, from Sean Townsend to Fernando Fleites, Senior Vice President, Human Resources at

Holy Cross, which was among the documents provided to me by Plaintiff's counsel.

I declare under penalty of perjury that this Declaration is true and correct to the best of
my knowledge, information and belief.

Dated: April 21, 2008                    Michael L. Stevens

# EXHIBIT 18

*Glenn,*
*Fernando is*
*following up on this*
*Carol*

RECEIVED IN
DEC 27 2005
HUMAN RESOURCES

3310 Gumwood Drive
Hyattsville, Maryland 20783

November 7, 2005

Fernando Fleites,
Senior Vice President Human Resources
Holy Cross Hospital
1500 Forest Glen Road
Silver Spring, Maryland 20910

*From Scott Townsend*

Dear Mr. Fleites,

On October 12, 2005 I voluntarily ended my employment at Holy Cross after 21 years of dedicated service. To this day I am still disheartened by the fact that two of my reasons for leaving Holy Cross still remain unaddressed.

Since Mary Frances Butler became my direct supervisor, I had never had an evaluation presented to me in a timely manner as prescribed by JCAHO. The last evaluation I received from Ms. Butler was on May 3, 2004 for the time period from February 24, 2003 to February 24, 2004. Such tardiness, as you are aware, caused delays in me reaping the financial reward for performing my duties.

*correct
later-today
very done
by Feb 12/16*

During this past year I continued to perform to the best of my ability overseeing the Point of Care Testing Program and also working on the new laboratory information system, which included building the Point of Care and Respiratory menus and interfacing all of the laboratory's instruments. Taking on both of these activities was not by choice. Ms. Butler in all essence gave me no option, unlike the other laboratory employees who assisted with the system build, but to take on both responsibilities. For this I did receive an additional $550.00 per pay period.

*chel
No Counter
not up-cap
S-??
at surg*

I would like to mention this compensation should not have given Ms. Butler the right to take PTO away from me in two pay periods when I was reaching the maximum level and only allowed to take the time off when it was convenient to Ms. Butler's schedule weeks later. Please note this activity was done prior to Ms. Butler receiving permission from the Human Resource Department to have employees with nearing maximum amounts set up a PTO bank so no leave time would be lost.

All during the computer project I kept informing Ms. Butler that the Point of Care Program was falling behind and I needed to spend additional time to bring it back to an acceptable level worthy of an inspection. All, both written (copies of which I can provide) and verbal, requests were denied and was instructed to work on the new computer system.

*non afes.*

*12/25/05*

*Joann*
*Is there any way to research
if he lost PTO here or to
verify if we did something wrong
here? Please let me know your
thoughts —
Glenn*

# EXHIBIT 19

Thatcher Law Firm
Belle Point Office Park
7849 Belle Point Drive
Greenbelt, MD 20770

3205 Forest Run Drive
Forestville, MD 20747
February 2, 2006

To: Linda Thatcher
RE: 2005 Evaluation

The Job Performance evaluation for 2005 was conducted by my working supervisor, Isabelita Aglipay. I asked that some of the scores be changed because I did not agree with them, they did not reflect my quality of work. Isabelita informed me that I no one would be allowed an Excellent Rating per Harvey Vandenburg, the Laboratory Director. I did not want to argue the matter, and accepted the rating with some minor changes.

Sincerely,

Bridget Pollard



# EXHIBIT 20
## PART 1

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)**

**H**
Mbulu v. Bureau of National Affairs, Inc.
D.D.C.,2006.
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
Daniel N. MBULU a/k/a Dan N. Godfrey, Plaintiff,
pro se,
v.
BUREAU OF NATIONAL AFFAIRS, INC., Defendant.
**No. Civ.A. 04-1540(JDB).**

Feb. 28, 2006.

Daniel N. Mbulu, Orlando, FL, plaintiff, pro se.
Deborah J. Israel, Louis J. Rouleau, Womble Carlyle Sandridge & Rice, PLLC, Washington, DC, for defendant.

*MEMORANDUM OPINION*

BATES, J.
**\*1** After working for two and a half years without obtaining a promotion, plaintiff Daniel N. Mbulu quit his job as a legal editor and commenced this *pro se* action against his employer, the Bureau of National Affairs, Inc. ("BNA" or "defendant"), alleging that he was subjected to racially discriminatory employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and the District of Columbia Human Rights Act, D.C.Code § 2-1401.01 et seq. ("DCHRA"). Following the completion of discovery, the parties filed motions for summary judgment along with supporting memoranda and exhibits. Upon consideration of the cross-motions and the entire record herein, and for the reasons that follow, the Court concludes that there are no material factual disputes, that all questions of law are ripe for judicial resolution, and that plaintiff either is unable to show that BNA's actions caused him any legally relevant detriment or has failed to produce evidence that would support a determination that race was a factor in the challenged

conduct or that otherwise would rebut BNA's race-neutral explanations for its actions. Accordingly, the Court will grant defendant's motion for summary judgment and order judgment for defendant as a matter of law.

BACKGROUND [FN1]

FN1. The facts summarized in this section are not in dispute. For ease of reference, the Court will use the following citation forms for the parties' briefs on their cross-motions for summary judgment: Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."); Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem."); Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Opp'n"); Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"); and Defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment ("Def.'s Reply"). Pursuant to L. Civ. R. 56.1, each party also submitted a Statement of Material Facts As To Which There Is No Genuine Issue, which the Court will cite herein as "Pl.'s Stmt." and "Def.'s Stmt." Unless otherwise noted, the parties' exhibits were filed with their respective motions for summary judgment.

BNA, a private publisher of law-related newsletters, information services, and reference products, employed plaintiff, an African-American, as a "Tax Law Editor I" in the U.S. Income Group of BNA's Tax Management division from June 18, 2001, through November 27, 2003, when plaintiff tendered his resignation. Pl.'s Stmt. at 1-3; Def.'s

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 2
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)**

Stmt. at 1-3. Plaintiff, who holds a juris doctor de-gree from American University's Washington Col-lege of Law and is a Certified Public Accountant ("C.P.A."), previously had worked for BNA on a temporary full-time basis during a summer break from law school in 1999. Pl.'s Stmt. at 1; Pl.'s Ex. J (plaintiff's résumé). At the time of plaintiff's hiring in 2001, BNA set his compensation at the third step of the Grade 8 or "G8" pay range, which amounted to a weekly salary of $908.62. Def.'s Stmt. at 2; Def.'s Opp'n Ex. 5 (2002 Length-of-Service Re-view); Pl.'s Stmt. at 2.[FN2] His immediate super-visor was, at all times, Eric Rubin, a Caucasian who held the position of assistant managing editor for Tax Management. Pl.'s Stmt. at 2-3. Mr. Rubin su-pervised both the U.S. Income Group, which had six tax law editors (including plaintiff), and the Procedure Group, which had three tax law editors. Of the nine tax law editors under Mr. Rubin's su-pervision, two were African-American (plaintiff and Andre Mander). Pl.'s Stmt. at 2-3; Def.'s Stmt. at 2-3.

> FN2. Plaintiff asserts that his annualized starting salary was $46,350, which would amount to a weekly pay rate of $891.35, rather than $908.62. This $17 discrepancy, however, is of no importance for present purposes.

Plaintiff received two annual reviews during his time at BNA, both of which generally rated his per-formance as "satisfactory" (he received one rating of "above average" for "cooperation" in his 2003 review). Pl.'s Ex. H; Def.'s Opp'n Exs. 15 & 17. The memoranda from Mr. Rubin to plaintiff that ac-companied the reviews contained mostly favorable comments, with a few suggestions for areas of im-provement. Pl.'s Ex. H; Def.'s Opp'n Exs. 16 & 18. At the time of his resignation, plaintiff had received only non-merit pay increases-which, according to plaintiff's own documentation amounted to an in-crease of $87.37 per week (about $4,543 in annual-ized pay) or nearly ten percent over the course of his two-plus years of employment with BNA [FN3].

and his title and pay grade remained the same as when he started: Tax Law Editor I at a G8 level. Def.'s Stmt. at 5; Def.'s Opp'n Exs. 15 & 17. De-fendant does not dispute that plaintiff expressed to his superiors an interest in obtaining a promotion to the position of Tax Law Editor II, which qualified for the higher G9 pay grade, or that defendant im-plicitly rejected that request for promotion as part of plaintiff's annual performance reviews. The parties further agree that a BNA employee who holds the title of Tax Law Editor I performs the same work, in all material respects, as an employee who holds the title of Tax Law Editor II or III, not-withstanding the variances in pay.

> FN3. Plaintiff's pay stub dated December 4, 2003, indicated that his pay rate was "$995.99 weekly," see Pl.'s Ex. L, up from the $908.62 "current base rate" figure re-flected in his Length-of-Service Review from 2002, see Def.'s Opp'n Ex. 15. Plaintiff's 2003 Annual Performance Eval-uation, dated June 17, 2003, indicated that his "current weekly salary" at that time was $964.64. See Def.'s Opp'n Ex. 17.

*2 The parties also do not dispute that Mr. Rubin had frequent daily interactions with plaintiff regard-ing his work or that the two men had some conver-sations about workplace behaviors such as plaintiff's personal use of telecommunications and computer equipment for sending or receiving fac-similes and e-mail-although the parties, naturally, characterize the relevant events in different terms (what plaintiff labels "harassment" and "surreptitious surveillance," Pl.'s Stmt. at 4-5, de-fendant describes as "aggressively uph [olding] BNA's policies," Def.'s Stmt. at 11). Nor do the parties disagree about the fact that Mr. Rubin re-quired plaintiff to submit doctor's notes to validate two sick-leave absences in October 2003.

On September 3, 2004-approximately nine months after plaintiff resigned-plaintiff initiated this pro se action, which alleges that BNA committed unlawful discrimination on the basis of race by failing to pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)

mote plaintiff and through other actions related to the supervision of plaintiff; he also alleges that BNA created a racially hostile work environment, in contravention of federal and D.C. anti-discrimination statutes. Both parties contend that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.

### STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."*Id.* (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. *Celotex,* 477 U.S. at 322."If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."*Anderson,* 477 U.S. at 249-50 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."*Id.* at

252.

*\*3* Although the parties have filed cross-motions for summary judgment, that "does not automatically relieve the court from determining if a genuine issue of material fact exists."*Cartwright v. Dist. of Columbia,* 267 F.Supp.2d 83, 85 (D.D.C.2003) (citing *Krug v. Santa Fe Pac. R.R. Co.,* 158 F.2d 317 (D.C.Cir.1946))."The rule governing cross-motions for summary judgment ... is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."*Sherwood v. Washington Post,* 871 F.2d 1144, 1147 n.4 (D.C.Cir.1989) (quoting *McKenzie v. Sawyer,* 684 F.2d 62, 68 n.3 (D.C.Cir.1982)).

### ANALYSIS

Plaintiff has packaged the alleged incidents of racially discriminatory treatment into four separate counts that essentially raise two distinct Title VII or DCHRA causes of action: disparate treatment and hostile work environment.[FN4]The Court will address each cause of action, in turn.

> FN4. Because claims under the DCHRA are analyzed under the same framework as Title VII claims, all discussion herein of plaintiff's Title VII claims applies with equal force to his DCHRA claims. See*Regan v. Grill Concepts-D.C., Inc.,* 338 F.Supp.2d 131, 134 (D.D.C.2004). Furthermore, in light of the substantive overlap between the two statutes and to avoid redundancy, the Court will treat all the claims as arising under Title VII for purposes of resolving this motion, recognizing that the outcome would be the same under either statute.

I. Disparate Treatment Based on Race

A. Legal Framework

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)**

Under Title VII, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."42 U.S.C. § 2000e-2(a) (2005). Where, as here, there is no *direct* evidence of unlawful discrimination, federal courts apply the burden-shifting framework established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and its progeny.

Pursuant to *McDonnell Douglas,* the plaintiff, as an initial matter, has the burden of establishing a prima facie case of discrimination by a preponderance of the evidence. *Id.* at 802;*Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981). To establish a prima facie case of discrimination, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he suffered an adverse employment action; [FN5] and (3) the unfavorable action gives rise to an inference of discrimination. *Stella v. Mineta,* 284 F.3d 135, 145 (D.C.Cir.2002); *Brody,* 199 F.3d at 452.

> FN5. To establish an adverse employment action, plaintiff must show an action that results in "objectively tangible harm." *Brown v. Brody,* 199 F.3d 446, 457 (D.C.Cir.1999).

Once the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas,* 411 U.S. at 802. The employer's burden, however, is merely one of production. *Burdine,* 450 U.S. at 254-55. The employer "need not persuade the court that it was actually motivated by the proffered reason. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."*Id.*

If the employer produces sufficient evidence of a nondiscriminatory justification, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation.*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000). The plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.' ' *Id.* (quoting *Burdine,* 450 U.S. at 256). But "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination." *Id.* at 147.Thus, the trier of fact may also "consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual." ' *Id.* (quoting *Burdine,* 450 U.S. at 255 n.10).

**\*4** "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors ... includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."*Id.* at 148-49.As the D.C. Circuit has explained:

Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

*Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1289 (D.C.Cir.1998) (en banc); *seealsoWaterhouse v. District of Columbia,* 298 F.3d 989, 992-993

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp2d                                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)**

(D.C.Cir.2002).

Although the "intermediate evidentiary burdens shift back and forth" under the *McDonnell-Douglas* framework, " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." ' *Reeves,* 530 U.S. at 143 (quoting *Burdine,* 450 U.S. at 253). Once the defendant has proffered a legitimate nondiscriminatory reason for its action, then the question is whether that proffered reason is a pretext for discrimination, and at this point the *McDonnell Douglas* burden-shifting framework disappears; the sole remaining issue is discrimination *vel non,* and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow,* 336 F.3d 1085, 1088 (D .C. Cir.2003); *see* *Reeves,* 530 U.S. at 142-43.

**B. Discussion**

There is no doubt that plaintiff is a member of a protected class (African-American), and so, for purposes of determining whether plaintiff has made out a prima facie case of disparate treatment based on race, the only questions the Court must resolve are whether, viewing the evidence in the light most favorable to plaintiff, any of defendant's actions toward plaintiff constitute an "adverse employment action," and, if so, whether the adverse action occurred under circumstances that would give rise to an inference of racial discrimination. Having examined the factual record surrounding each of plaintiff's claims, the Court concludes that there are no material facts in dispute with respect to these issues, and that plaintiff either has failed to establish a prima facie case or has not refuted defendant's proffered nondiscriminatory justification for the questioned employment action. Therefore, as a matter of law, plaintiff cannot prevail on his claims, and judgment will be entered in favor of defendant on all of plaintiff's claims of discriminatory employment actions.

**1. Failure to promote**

**\*5** Plaintiff alleges that he was denied noncompetitive promotions from Tax Editor I (pay-grade level 8) to Tax Editor II and III (pay-grade levels 9 and 10, respectively). This claim is different from an ordinary failure-to-promote claim in that plaintiff did not seek promotion to a vacant position; instead, plaintiff asserts that he should have been promoted simply by virtue of the fact that he met the minimum qualifications for the higher-grade positions.FN6 *See* *Taylor v. Small,* 350 F.3d 1286, 1294 (D.C.Cir.2003).

> FN6. This claim also is atypical in that the status change that plaintiff was denied was not what one ordinarily would consider to be a "promotion." By plaintiff's own admission, someone who held the title of Tax Editor II or III did have any different duties or responsibilities than someone, like plaintiff, who held the title of Tax Editor I. *See* Am. Compl. ¶ 15 ("All editors in the U.S. Income Group performed similar assignments, chose tasks from the same pool of tasks, met [the] same deadlines and submitted to the same standard" regardless of job title or pay grade.); Pl.'s Stmt. ¶ 12 (same) (citing Pl.'s Ex. D., Dep. of Andre Mander, testimony of Tax Editor that his job functions remained the same following his elevation from Grade 8 to Grade 9 and from Grade 9 to Grade 10); Pl.'s Ex. I, Job Descriptions for Tax Editor I, II, and III (listing identical duties for each position). Indeed, by all accounts, the only notable difference in the jobs was the associated salary, which apparently was intended to reflect variations in knowledge, skill, and ability level among editors who perform the same tasks. *See* Pl.'s Ex. I; Pl.'s Ex. B, Dep. of Virginia Shew, at 26-27 ("You cannot quantify the difference between a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)

G8, a G9, and a G10.... It's solely on the quality of your work."). In light of this, it might be more apt to describe the complained-of employment action as a failure to award a pay increase rather than a failure to promote. But since both parties refer to it as a failure to promote, the Court will, as well.

*a. Prima facie case*

As explained above, a prerequisite for any disparate-treatment claim under Title VII is an adverse employment action. To establish that denial of a promotion constitutes an adverse employment action (i.e., an "objectively tangible harm." *Brody,* 199 F.3d at 457), plaintiff must show that he sought a promotion for which he was qualified and that he was denied that promotion. *SeeNurriddin v. Goldin,* 382 F.Supp.2d 79, 103 (D.D.C.2005) ("[F]ailure to be promoted [to a position to which one is qualified] is a tangible harm."). Even when there is no dispute as to whether plaintiff was denied a promotion, as is the case here, it is nonetheless incumbent upon plaintiff to show that he was qualified for the higher-grade position. If plaintiff succeeds in this regard (i.e., he establishes that he suffered an adverse employment action because he was denied promotion notwithstanding his objective qualifications), he must complete the prima facie case by demonstrating that the adverse action occurred under circumstances that would give rise to an inference of unlawful bias. Here, defendant concedes that plaintiff is a member of a protected class and was denied a promotion that he sought, and hence, the Court's analysis of whether plaintiff has made out a prima facie case will focus on the evidence of (1) plaintiff's qualifications for the promotion and (2) the circumstantial evidence of discriminatory motive.

*(1) Plaintiff's qualifications for promotion*

In an effort to establish that he was indeed qualified for promotion, plaintiff provides his own assessment of his qualifications and also points to his supervisor's appraisals of his performance as supporting his view. Put succinctly, plaintiff contends that he was qualified to be a Tax Law Editor II or III because he "met the minimum requirements" for either position, as described by BNA in its internal job listings. Pl.'s Mem. at 5.[FN7]

FN7. Because none of plaintiff's filings in this case have numbered pages, all citations to specific pages in plaintiff's briefs are based on the page numbers provided by the Court's CM/ECF electronic docket. So, for example, "Pl.'s Mem. at 5" refers to page five of the ninety-page main document associated with Docket Entry # 35, even though it is the third page of the memorandum.

As already noted, the functions and duties of a Tax Law Editor II or III are identical to those of a Tax Law Editor I, but there are some notable variations in the "minimum job qualifications" for each position. Whereas a Tax Law Editor I must have "demonstrated knowledge of current Federal, state, or foreign country tax law, plus *some specialized knowledge,* depending on assigned subject area," a Tax Law Editor II must possess "an *intermediate* level of specialized knowledge of at least one subject ... or some specialized knowledge of *at least two subject areas,"* and a Tax Law Editor III must have "an *advanced* level of specialized knowledge of at least one subject ... or an *intermediate* level of specialized knowledge of *at least two subjects,* or some specialized knowledge of *at least three subjects."*Pl.'s Ex. I (emphasis added). Similarly, whereas a Tax Law Editor I need only have some "[a]bility to analyze tax material dealing with a variety of topics," a Tax Law Editor II or III must have a "[d]emonstrated ability to analyze tax materials dealing with topics of *varying complexity."Id.* (emphasis added). The difference, in other words, between an editor who holds the title of Tax Law Editor I and one who occupies a more advanced Tax Law Editor position is reflected in the degree

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 7
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)**

of mastery of the subject matter that the editor demonstrates.

*6 Although plaintiff professes to have attained the level of expertise required for the higher-level positions, conclusory statements to that effect-particularly where, as here, the statements are largely unsupported by documentary or other evidence corroborating plaintiff's assessment of his own abilities [FN8]-are entitled to little weight in the summary-judgment context. *SeeSchamann v. O'Keefe,* 314 F.Supp.2d 515, 525 (D.Md.2004) ( "[Plaintiff's] own opinions and conclusory allegations alone do not have sufficient 'probative force to reflect a genuine issue of material fact." ') (citation omitted). That being said, the Court recognizes that a Title VII plaintiff's burden of making out a prima facie case should not be "onerous." *SeeTeneyck v. Omni Shoreham Hotel,* 365 F.3d 1139, 1149 (D.C.Cir.2004); *Burdine,* 450 U.S. at 253. Therefore the Court concludes that, because the qualifications for the noncompetitive promotions at issue here involve purely subjective judgments, plaintiff's minimal showing with respect to his qualifications (specifically the unchallenged facts contained in his résumé as well as the memoranda accompanying his annual performance appraisals) are sufficient to raise a genuine issue of material fact as to whether he was qualified to be a Tax Editor II. Plaintiff's claim thus will not fail based on the absence of this element of the prima facie case-although, as subsequent analysis will show, the claim is legally insufficient for other reasons.

> FN8. Plaintiff's argument that "[d]efendant provided no reasons, in any of the years under review, for denying [p]laintiff a promotion from Grade 8 to Grade 9," that "[d]efendant presented not even a single [piece of] documentary evidence with regard to any poor performance by [p]laintiff," and that "[d]efendant could not point to any tangible areas of [p]laintiff's work that evinced poor quality" is a mis-

guided attempt to shift onto defendant plaintiff's own evidentiary burden. *See* Pl.'s Mem. at 9. Defendant, in the first instance, has no obligation to prove that plaintiff was *unqualified* for promotion; burden is on plaintiff to prove that he was quali- fied.

*(2) Circumstances giving rise to an inference of discrimination*

The fact that plaintiff has provided some evidence indicating he was minimally qualified for the higher-grade position means only that he has met his initial burden of showing that he suffered an adverse employment action. To make out a prima facie case of discrimination, he still must come forward with some evidence to support a jury finding that race was a factor in defendant's decision to deny him a promotion. Title VII, after all, does not prohibit all adverse employment actions against members of protected classes; it only prohibits adverse actions in which the employee's protected status played some role in the challenged action. At step one of the *McDonnell Douglas* analysis (the prima facie case), plaintiff must produce facts that would support an inference of unlawful discrimination.

Evidence that "other employees of similar qualifications" who fell outside plaintiff's protected class "were indeed promoted at the time the plaintiff's request for promotion was denied," would be sufficient to establish such an inference. *Taylor,* 350 F.3d at 1294;*see alsoHolbrook v. Reno,* 196 F.3d 255, 261 (D.C.Cir.1999). Thus, if plaintiff can show that defendant promoted similarly situated non-African-American co-workers around the same time that defendant did not promote plaintiff, an inference of racial discrimination would arise. If, however, there is no evidence of more favorable treatment of similarly situated employees outside of plaintiff's protected class, plaintiff still may come forward with other evidence that suffices to make out a circumstantial case supporting an inference of bias. *Cf.Stella,* 284 F.3d at 146 ("[A] plaintiff in a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 20
## PART 2

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)**

discrimination case need not demonstrate that she was replaced by a person outside her protected class in order to carry her burden of establishing a prima facie case under *McDonnell Douglas.*" ).[FN9]

> FN9. This makes sense, of course, because Title VII does not require a plaintiff to prove that protected status was the *only* reason for the adverse employment action, as long as it was *a* determining factor in the disputed decision. So, for example, if an employer refused to hire a woman for a job because he thought she was too "aggressive," and instead he chose to hire a woman who he thought was more meek, that fact alone would not be dispositive of a sex-discrimination claim. If the rejected woman could show that the employer hired "aggressive" men for the same position, that might be sufficient to create an inference of sex-based bias on the part of the employer, notwithstanding that he filled the vacancy with a woman.

**\*7** Plaintiff asserts that the undisputed evidence of defendant's promotion practices demonstrates that he was treated differently than similarly situated employees outside of plaintiff's protected class, so as to create an inference of discrimination based on that class status. Specifically, plaintiff points to the promotion of a Caucasian colleague in the U.S. Income Group, Caroline Louis, whom BNA hired at a G8 level in October 2001 (a few months after plaintiff's hiring) and promoted to a G9 Tax Editor II position in October 2002. *See* Pl.'s Mem. at 9-10; *see also* Def.'s Stmt. at 5 (noting Ms. Louis's specific hiring and promotion dates).

To be similarly situated, plaintiff must establish that his employment situation was similar in all relevant regards to those with whom he seeks comparison. *See Holbrook,* 196 F.3d at 261 ("A plaintiff ... must demonstrate that all of the relevant aspects of [his] employment situation were nearly identical to those" of his comparables.); *Phillips v. Holladay Prop. Servs.,* 937 F.Supp. 32, 37 (D.D.C.1996) ("it

is fundamental that to make a comparison of ... plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects"* ). In particular, the co-workers "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it ." *Phillips,* 937 F.Supp. at 37.

Certainly plaintiff and Ms. Louis were similarly situated in several ways, including having the same job responsibilities and reporting to the same supervisor.[FN10] But they are not uniquely comparable in this regard. Seven other tax law editors in the U.S. Income Group and the Procedure Group also shared the same job responsibilities (or, to the extent that the three editors in the Procedure Group dealt with a slightly different subject matter, they shared nearly identical job responsibilities) and reported to the same supervisor, Mr. Rubin, during the period that plaintiff was employed at BNA. *See* Def.'s Stmt. at 4-5. The Court cannot countenance plaintiff's self-serving attempt to create an inference of racial discrimination by cherry-picking from this group of "comparables" a single Caucasian co-worker who was rapidly promoted. Plaintiff has provided no rationale for so narrowly confining the universe of comparable employees other than to argue for exclusion of all similarly situated tax law editors other than Ms. Louis based on the fact that they either were hired "more than one year" before him or that they worked in a distinct editorial group (i.e., they edited materials related to a different area of tax law), Pl.'s Mem. at 11. He has offered no reason for the Court to conclude that an editor's hire date or the precise subject matter of the publications on which an editor works has any bearing on a promotion from Tax Law Editor I(G8) to Tax Law Editor II(G9), which is noncompetitive (i.e., promotion of one employee has no effect on the prospects for promotion of another employee).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)

FN10. If, however, one looks at additional characteristics (as plaintiff himself does-noting that he is a C.P.A. and Ms. Louis allegedly is not and that he has published two law review articles while Ms. Louis allegedly has not published any, *see* Pl.'s Mem. at 9-10), the comparison between plaintiff and Ms. Louis becomes much weaker. Specifically, one possibly relevant point of comparison is history of job performance; upon review of Ms. Louis's annual appraisals-the same type of performance evaluation that plaintiff uses to establish his own qualification for promotion-it is evident that Ms. Louis substantially outperformed plaintiff, at least in the eyes of their mutual supervisor. *See* Def.'s Stmt. at 5-7. Nevertheless, the Court concludes that, for purposes of plaintiff's prima facie case, plaintiff and Ms. Louis were in fact "similarly situated," because it would be counterintuitive to find, at this stage of the *McDonnell Douglas* analysis, that plaintiff and Ms. Louis were dissimilarly situated based on the subjective evaluations of the very supervisor plaintiff alleges was motivated by racial bias.

**\*8** Once all similarly situated employees are included in the comparison, it is apparent that plaintiff cannot show he received disparate treatment vis-à-vis his counterparts. Indeed, the undisputed evidence is that, of the four Caucasian tax law editors in plaintiff's U.S. Income Group, two (Louis and Pfenninger) were promoted to the G9 position after about one year at the G8 level, one (Fickes) waited more than three years for her promotion to G9, and one (Brewer) was not promoted above G8 in the three-and-a-half years he worked in the group. *See* Def.'s Stmt. at 4-5. Thus, plaintiff-having not been promoted after his two-year anniversary-was treated somewhat differently than two of his Caucasian colleagues but also was treated more or less the same as two others. Moreover, when the three Caucasian members of

the Procedure Group are added to the comparison, the pattern remains the same: one (Hadley) was promoted to G9 after his first anniversary, another (Masri) was promoted after three years at the G8 level, and the third (Wells) waited five years to be promoted from G8 to G9 and another four years to be promoted from G9 to G10. Add to this evidence the undisputed fact that a similarly situated African-American employee in the U.S. Income Group (Mander) was promoted to G9 after a year-and-a-half at the G8 level, *see* Def.'s Stmt. at 5, and it is clear that plaintiff has failed to establish any inference of racial discrimination based on the promotional patterns for similarly situated employees.

Although the thrust of plaintiff's prima facie case is a comparison with other employees, a prima facie claim of race discrimination based on failure to promote-as noted above-need not rest on proof that the employer promoted similarly situated persons who were outside plaintiff's protected class, so long as plaintiff can establish an inference of racial bias through other evidence. In this regard, however, plaintiff fares no better. The record is devoid of even the slightest indication that defendant, through managers such as Mr. Rubin, used race in any way to differentiate among employees. Plaintiff attempts to create an inference of racial bias by alleging that Mr. Rubin directed "harassment and hostility" toward the only other African-American editor in the U.S. Income Group, Mr. Mander. *See* Pl.'s Mem. at 11. But the deposition testimony that plaintiff cites as supporting this charge indicates only that Mr. Mander complained to Mr. Rubin and to the union shop steward about a lack of promotions within the group, not that Mr. Mander believed that he or any other employee had been treated differently based on race. *See* Pl.'s Ex. D, Deposition of Andre Mander, at 16-17; Pl.'s Ex. E, Deposition of Gwen Holmes, at 8-13. Similarly, although plaintiff advances a litany of complaints regarding the manner in which Mr. Rubin supervised him, there is nothing in the evidence plaintiff presents that would lead a jury to conclude that Mr. Rubin applied a different set of standards to plaintiff than to other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)

employees, such that an inference of racial bias might arise. Quite the contrary, all of the evidence plaintiff offers actually indicates that Mr. Rubin closely supervised all his employees, whether they were Caucasian or African-American. *See* Pl.'s Ex. D., Deposition of Scott Wells, at 9-10, 20-21 (testimony of a Caucasian tax law editor that Mr. Rubin exhibited a "lack of editorial discretion," was "deeply concerned with minutia," tended to "focus on the inconsequential, such as what time you came back from lunch, whether you are on the phone, whether you received a personal fax," and that other Caucasian employees, including Ms. Louis and Ms. Pfenninger, had complained about Mr. Rubin's "pettiness" and "control issues"). Plaintiff's unsupported contention that Mr. Rubin "took his indiscretions and actions much further with regards to" plaintiff, Pl.'s Mem. 13, and that the only plausible explanation is plaintiff's race, amounts to nothing but the barest conjecture. Mere suspicions about motive will not suffice to create an inference of discrimination. Consequently, plaintiff has failed to make out a prima face case of disparate treatment based on the denial of promotions.

*b. Defendant's non-discriminatory justification and plaintiff's rebuttal*

**\*9** Even if the Court were to conclude that plaintiff had established a prima facie case of discrimination based on the failure to promote-which it does not-defendant has offered a legitimate non-discriminatory justification for the failure to promote plaintiff during the relevant time period. Specifically, defendant asserts that plaintiff did not meet its criteria for a merit-based grade increase. BNA contends-through the deposition testimony of Mr. Rubin and Mr. Rubin's superior, Virginia Shew-that plaintiff's performance evaluations (the validity of which plaintiff does not directly dispute) effectively precluded him from receiving a non-competitive promotion to Tax Law Editor II or III upon his first or second anniversary:

An employee is not eligible for a promotion or a merit increase by virtue of demonstrating the minimum knowledge, skills, abilities, education, and experience listed in the job descriptions for Tax Law Editor I, II, and III. Rather, an employee's eligibility for promotion (and merit increase) is primarily based on the quality of the work product that he or she produces in the course of employment. An employee may possess the minimum qualifications to be considered a candidate for promotion or to receive a merit increase but neither receive a promotion nor a merit increase due to the quality or quantity of his or her work. In other words, BNA does not promote an employee to the next higher grade solely because that employee is doing an adequate or satisfactory job at his or her current grade. To the contrary, employees who are promoted are employees who have earned overall ratings of above average or exceptional in the requisite job performance categories.

Def.'s Mem. at 7. Defendant further produced evidence demonstrating that those employees who did receive more rapid promotions from the G8 position to the G9 position-specifically Ms. Louis and Mr. Hadley-received at least an "above average" rating (and often an "exceptional" rating) for every measure of job performance during the annual review that immediately preceded their respective promotions. This is in marked contrast to the "satisfactory" ratings that plaintiff received during his reviews. Thus, defendant has offered a legitimate, non-discriminatory reason for the challenged employment action: plaintiff's work performance fell short of the standards required for a merit-based promotion.

Because defendant has met its burden of production under the *McDonnell-Douglas* framework, the burden shifts back to plaintiff to produce evidence from which a rational fact-finder could nonetheless infer that defendant intentionally discriminated against him because of his race, such as by showing that defendant's justification for non-promotion was merely a "pretext for discrimination." *See* *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515 (1993).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 11
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)**

Plaintiff must establish "that a reasonable jury could conclude from all the evidence that the adverse employment decision was made for a discriminatory reason."*Lathram,* 336 F.3d at 1088. Resolution of that issue may entail consideration of all relevant evidence including the strength of the prima facie case, any direct evidence of discrimination, circumstantial evidence of the falsity of the proffered explanation, and evidence supporting the employer's case. *SeeReeves,* 530 U.S. at 147-48;*Teneyck,* 365 F.3d at 1151;*Lathram,* 333 F.3d at 1089. One way in which a Title VII plaintiff can attempt to rebut an employer's proffered non-discriminatory justification is to demonstrate that the rationale fails to counter adequately the inference of discrimination that plaintiff established in his prima facie case. For example, plaintiff might demonstrate that the proffered non-discriminatory justification only explains why some similarly situated employees outside the protected class received more favorable treatment than plaintiff, but fails to explain all instances of disparate treatment. *SeeBurdine,* 450 U.S. at 256 (rebuttal evidence may include "showing that the employer's proffered explanation is unworthy of credence").

*10 Plaintiff makes a feeble effort to challenge defendant's race-neutral explanation for the promotion decision, primarily by parsing the language used by Mr. Rubin in the memoranda that accompanied plaintiff's 2002 evaluation and Ms. Louis's 2002 evaluation. *See* Pl.'s Opp. at 11-17. Although plaintiff points out some similarities in the phrasing, there are, without question, numerous differences in the two narrative documents-differences that are entirely consistent with the variation between plaintiff's performance ratings and those of Ms. Louis. Indeed, plaintiff highlights many of these differences in his opposition brief, but proceeds to discount their significance in light of his personal evaluation of Ms. Louis's work (an evaluation for which he asserts no basis in personal knowledge) as compared with his evaluation of his own work. *Seeid.*This attempt at rebuttal, however, is patently deficient, as it in no way tends to show

that plaintiff and Ms. Louis had such similar qualifications that a jury might thereby find BNA's rationale for their different treatment to be incredible. And, in any event, plaintiff also fails to refute defendant's evidence demonstrating that many Caucasian tax law editors similarly were denied promotions after one or two years at the G8 level.

Thus, beyond plaintiff's failure to carry his prima facie case burden, he also has not shown that the proffered non-discriminatory reason for the denial of his promotion is a pretext for discrimination. There simply are no facts in dispute that would undermine defendant's race-neutral justification for plaintiff's non-promotion. *SeeBroderick v. Donaldson,* 338 F.Supp.2d 30, 45 (D.D.C.2004) (plaintiff's unsubstantiated allegations of racism regarding the reason for a letter of reprimand were insufficient to establish that the letter was pretextual).

*c. Conclusion*

Considering "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, [as well as the] evidence that supports the employer's case," the Court concludes that there is insufficient evidence for a jury to conclude that the adverse employment decision was made for a discriminatory reason. *SeeReeves,* 530 U.S. at 148-49;*Lathram,* 336 F.3d at 1088. Therefore, the Court finds that defendant is entitled to judgment as a matter of law on the claim of disparate treatment for failure to promote.

*2. Other suggested adverse employment actions*

It is unclear from plaintiff's complaint and briefs if he is advancing additional claims of disparate treatment based on other actions taken by his supervisor during his employment. As referenced in his papers, these include confronting plaintiff about the use of e-mail during lunch and break periods, imposing limitations on plaintiff's personal use of BNA's telecommunications and computer equipment, requesting documentation to support

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 12
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)**

plaintiff's use of sick leave, and engaging in what plaintiff describes as "surveillance" of him during the workday. *See, e.g.,* Pl.'s Mem. at 26-30, 39-43. Because plaintiff brings this action *pro se,* the Court will assume that he is raising separate disparate-treatment claims with respect to these alleged actions.

**\*11** Insofar as these claims are independent of the allegations related to the denial of promotion, they fail to satisfy an essential element of a prima facie case of disparate treatment under Title VII. That is because, even if all factual findings were made in plaintiff's favor, none of the challenged conduct constitutes an actionable adverse employment action. Plaintiff suffered no legally significant detriment whatsoever as a result of Mr. Rubin's close (and perhaps overbearing) supervision. He has not even *alleged,* let alone established, that these actions resulted in any loss of benefits,[FN11] any reduction of hours of work or salary, or any significant diminishment of work responsibilities-all of which could be deemed an adverse employment action. *See Baloch v. Norton,* 355 F.Supp.2d 246, 256-57 (D.D.C.2005) (discussing ways in which a plaintiff could establish an adverse employment action). Moreover, courts in this Circuit have held that purely psychic injuries such as embarrassment do not qualify as adverse employment actions. *See Brodetski v. Duffey,* 141 F.Supp.2d 35, 47 (D.D.C.2001) ("Criticism of an employee's performance unaccompanied by a change in position or status does not constitute adverse employment action."); *Al-Mahdi v. D.C. Pub. Schs.,* No. 01-CV-1014, 2005 WL 3272075 at \* 5 (D.D.C. Dec. 2, 2005) (humiliation alone does not rise to the level of an adverse employment action) (citing *Forkkio v. Powell,* 306 F.3d 1127, 1130-1131 (D.C.Cir.2002)); *Childers v. Slater,* 44 F.Supp.2d 8, 20 (D.D.C.1999), *vacated in part on other grounds,* 197 F.R.D. 185, 191 (D.D.C.2000) (a reprimand that "amounts to a mere scolding, without any [subsequent] disciplinary action" is not an adverse action); *see also Stewart v. Evans,* 275 F.3d 1126, 1136 (D.C.Cir.2002) ("This Court has held

that formal criticisms or reprimands, without any additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions.").

> FN11. The assertion that he "forfeited 58.25 hours of sick leave to BNA" when he resigned in November of 2003-for which the only evidence is a pay stub dated December 4, 2003, that reflects a balance of 58.25 hours of accrued sick leave, Pl.'s Ex. L-cannot constitute a loss of benefits for Title VII purposes because any loss of that time (or its cash equivalent) would be the result of plaintiff's resignation, not any action taken by BNA-and plaintiff has not alleged that he was constructively discharged.

Drawing all inferences in favor of plaintiff, the Court concludes that there is no material fact in dispute on this issue and that, as a matter of law, plaintiff did not suffer a tangible adverse employment action from any of the conduct by Mr. Rubin described above. Moreover, even if he did, none of the incidents contain any racial overtones that might give rise to an inference of unlawful discrimination; as already noted, plaintiff's own evidence demonstrates that many of his Caucasian co-workers were subjected to similar treatment. *See* Pl.'s Ex. D., Deposition of Scott Wells at 9-10, 20-21. Either way, plaintiff cannot establish a prima facie case of discrimination. Finally, even if plaintiff could establish a prima facie case, defendant has offered a legitimate nondiscriminatory reason for Mr. Rubin's actions-that is, that close scrutiny of plaintiff's activities was warranted because of his frequent tardiness and unexplained absences-and plaintiff has in no way shown that this rationale is a pretext for racial discrimination.

## II. Hostile Work Environment

**\*12** Plaintiff separately alleges that the same incidents discussed above, in the aggregate, created a ra-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)**

cially hostile work environment in contravention of Title VII. This cause of action, however, likewise cannot survive defendant's motion for summary judgment because plaintiff has produced no evidence to support a finding that he was subjected to racial hostility.

To establish a prima facie hostile work environment claim based on race, plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment occurred because of his race; (4) the harassment affected a term, condition or privilege of his employment; and (5) the employer knew or should have known of the harassment, but failed to take any action to prevent it. *See Jones v. Billington,* 12 F.Supp.2d 1, 11 (D.D.C.1997). The workplace environment becomes "hostile" for purposes of Title VII only when the offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."*Oncale        v.        Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998); *accord Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993); *see also Pa. State Police v. Suders,* 542 U.S. 129, 133-34 (2004); *Holbrook v. Reno,* 196 F.3d at 262.

The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct constitutes an actionable hostile work environment. Under *Faragher v. Boca Raton,* 524 U.S. 775, 787-88 (1998), in order to determine whether a work environment is sufficiently hostile to be actionable under Title VII, a court should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employee's performance.

These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, this will filter out complaints attacking "the ordin-

ary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."

*Id.* at 787 (citations omitted). Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status. As the Second Circuit has explained:
Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

**\*13** *Alfano v. Costello,* 294 F.3d 365, 377 (2d Cir.2002). Thus "to sustain a hostile work environment claim ... [plaintiff] must produce evidence that she was discriminated against because of her [status]."*Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 440 (2d Cir.1999); *see also Jones v. Billington,* 12 F.Supp.2d at 12 (hostile work environment claim failed where plaintiff had "not demonstrated that any of the conduct of which he complains was related to his race, or that his workplace was permeated with racially discriminatory behavior").

Plaintiff has utterly failed to establish a prima facie hostile work environment claim. As discussed above, the evidence in this case does not even support an *inference* of racial animosity in the workplace, and certainly it falls far short of showing that "severe," "pervasive," or "abusive" racial harassment permeated plaintiff's work environment at BNA. Aside from plaintiff's insinuation and speculation, there is nothing in the record that would in any way link the complained-of conduct here to plaintiff's race. Indeed, as already noted, the undisputed evidence is that the aggressive supervision that plaintiff describes was experienced by African-American and Caucasian editors alike. Hence, the Court, having considered the totality of the evidence proffered and having drawn all possible infer-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 469971)**

ences in favor of plaintiff, concludes that there are no genuine issues of material fact and that no reasonable jury could find that plaintiff established a hostile work environment claim.

## CONCLUSION

For the foregoing reasons, and upon consideration of the entire record herein, the Court will grant defendant's motion for summary judgment. An order entering judgment for defendant has been issued on this date.

## *ORDER*

Upon consideration of the parties' cross-motions for summary judgment and the entire record herein, and for the reasons stated in the memorandum opinion issued on this date, it is this *28th* day of *February,* 2006, hereby

ORDERED that [35] plaintiff's motion is DENIED; it is further

ORDERED that [36] defendant's motion is GRANTED; and it is further

ORDERED that judgment is entered in favor of defendants on all claims.

D.D.C.,2006.
Mbulu v. Bureau of National Affairs, Inc.
Not Reported in F.Supp.2d, 2006 WL 469971 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 21

Westlaw.

--- F.3d ----                                                                                          Page 1
--- F.3d ----, 2008 WL 819989 (C.A.D.C.)
**(Cite as: --- F.3d ----, 2008 WL 819989)**

**H**
Brady v. Office of Sergeant at Arms
C.A.D.C.,2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,District of
Columbia Circuit.
Standley BRADY, Appellant
v.
OFFICE OF the SERGEANT AT ARMS, United
States House of Representatives, Appellee.
No. 06-5362.

Argued Nov. 19, 2007.
Decided March 28, 2008.

**Background:** Demoted African-American super-
visory employee of United States House of Repres-
entatives' Office of the Sergeant at Arms sued Of-
fice, alleging employment discrimination and hos-
tile work environment in violation of Title VII. The
United States District Court for the District of
Columbia, 456 F.Supp.2d 1,Leon, J., granted sum-
mary judgment for Sergeant at Arms, and employee
appealed.

**Holdings:** The Court of Appeals, Kavanaugh, Cir-
cuit Judge, held that:
(1) on summary judgment in Title VII disparate-
treatment case, existence of prima facie case is ir-
relevant if employer has proffered non-
discriminatory reason for adverse action, and
(2) employer's proffered reason for demotion, that
employee had violated employer's sex harassment
policy, was not pretext for race discrimination.

Affirmed.

**[1] Civil Rights 78 €══1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1534 Presumptions, Inferences, and Bur-
den of Proof
            78k1536 k. Effect of Prima Facie Case;

Shifting Burden. Most Cited Cases

**Federal Civil Procedure 170A €══2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most
Cited Cases
On motion for summary judgment or judgment as a
matter of law in Title VII disparate-treatment em-
ployment discrimination action governed by *Mc-
Donnell Douglas* burden-shifting analysis, if em-
ployer has asserted legitimate, non-discriminatory
reason for challenged decision, question whether
employee actually made out prima facie case is no
longer relevant; federal district court need not, and
should not decide question, but rather needs to de-
cide only whether employee has produced sufficient
evidence that employer's proffered reason was not
real reason and that prohibited intentional discrim-
ination occurred. Civil Rights Act of 1964, §
703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[2] Civil Rights 78 €══1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1555 k. Questions of Law or Fact. Most
Cited Cases

**Federal Civil Procedure 170A €══2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most
Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 819989 (C.A.D.C.)
**(Cite as: --- F.3d ----, 2008 WL 819989)**

When determining whether summary judgment or judgment as a matter of law is warranted for employer in Title VII employment discrimination action, court considers all relevant evidence presented by employer and employee. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[3] Civil Rights 78 ⚖1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
Employer's proffered reason for demoting African-American supervisor, that he grabbed his crotch in front of employees thereby violating employer's sex harassment policy, was not pretext for race discrimination, regardless of whether incident had not actually occurred, as supervisor contended; employer honestly and reasonably believed that incident had occurred, given three employees' accounts of it, followed by thorough and independent investigation that confirmed its probability. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

Appeal from the United States District Court for the District of Columbia (No. 02cv00802).
Lenore C. Garon argued the cause for appellant. With her on the briefs were Joseph D. Gebhardt and Charles W. Day, Jr.
Victoria L. Botvin, Attorney, Office of House Employment Counsel, argued the cause for appellee. With her on the brief was Gloria J. Lett, Attorney, Office of House Employment Counsel.

Before: GINSBURG and KAVANAUGH, Circuit Judges, and EDWARDS, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge KAVANAUGH.

KAVANAUGH, Circuit Judge:
*1 Seeking to punish and deter sexual harassment, the U.S. House Office of the Sergeant at Arms demoted Brady, a supervisor within the office, be-

cause it concluded that Brady grabbed his crotch in front of three employees. Brady sued under federal anti-discrimination laws, contending that he was demoted because of his race. The District Court granted summary judgment to the Sergeant at Arms on the ground that Brady had not made out a prima facie case of racial discrimination. In the alternative, the District Court ruled that Brady failed to present evidence sufficient for a reasonable jury to find that the Sergeant at Arms' stated reason for demoting Brady was not the actual reason and that the Sergeant at Arms intentionally discriminated against Brady on account of his race. We affirm based on that alternative ground. In doing so, we emphasize that the question whether the plaintiff in a disparate-treatment discrimination suit actually made out a prima facie case is almost always irrelevant when the district court considers an employer's motion for summary judgment or judgment as a matter of law. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 514-15, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714-16, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

I

Brady worked as an assistant shift supervisor in House Garages & Parking Security, an entity within the Office of the Sergeant at Arms of the U.S. House of Representatives. In early 2001, two employees-one man and one woman-accused Brady of improper behavior in the workplace. They alleged that Brady grabbed his crotch in front of the two of them and another female employee. After learning of the incident, House Sergeant at Arms Wilson Livingood asked two supervisors to investigate. In the ensuing internal investigation, the two accusers claimed that Brady grabbed his crotch while discussing his need to use the restroom. The other employee who was present initially refused to discuss the incident, saying she did not want to be involved. After being required to give a statement, she said that Brady did not "present any offensive actions towards [her]." Joint Appendix ("J.A.")

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 819989 (C.A.D.C.)
**(Cite as: --- F.3d ----, 2008 WL 819989)**

214. She explained that Brady had acted "in a very joking manner," but she did not deny that Brady had grabbed his crotch in the way described by the other two employees. *Id.*

The two investigating supervisors found that the crotch-grabbing incident had likely occurred and that Brady violated the office's sexual harassment policy. One supervisor recommended demoting Brady. The other recommended firing him. Sergeant at Arms Livingood then determined that Brady "might have done it jokingly, but ... even in a joking manner, it offended two of his employees."Livingood Deposition Transcript (Nov. 10, 2005), J.A. 92. Particularly because Brady was a supervisor, Livingood concluded that "some action needed to be taken."*Id.* Livingood demoted Brady but did not fire him.

Brady asked Livingood to reconsider his decision. Livingood agreed to do so and hired a Washington, D.C., law firm to investigate. The law firm reviewed documents produced during the original investigation and interviewed 13 current and former employees. The firm concluded that it was "likely that an incident occurred that was most accurately described" by Brady's two initial accusers. Relman Report (June 28, 2001), J.A. 199. After receiving the law firm's report, Livingood affirmed Brady's demotion.

*2 Brady sued, alleging racial discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, a law that applies to offices in the Legislative Branch as a result of the Congressional Accountability Act, 2 U.S.C. §§ 1302(a), 1311(a). The District Court granted summary judgment to the Office of the Sergeant at Arms, finding that Brady failed to make out a prima facie case of racial discrimination because he could not show that a similarly situated employee outside his racial group was treated differently.*Brady v. Livingood,* 456 F.Supp.2d 1, 7-8 (D.D.C.2006). In the alternative, the District Court stated that "even if plaintiff were able to establish a prima facie case of discrimination, defendant's Motion for Summary Judgment

would still be granted because defendant's personnel actions were in fact undertaken for legitimate, non-discriminatory reasons."*Id.* at 9 n. 9.

Brady appeals; our review of the summary judgment is de novo.

II

Title VII of the Civil Rights Act makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."42 U.S.C. § 2000e-2(a)(1). This statutory text establishes two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin.

The District Court concluded that Brady had not made out a "prima facie case" under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).FN1 The court's focus on the prima facie case was not atypical: When resolving an employer's motion for summary judgment or judgment as a matter of law in employment discrimination cases, district courts often wrestle with the question whether the employee made out a prima facie case.

[1] But judicial inquiry into the prima facie case is usually misplaced. In the years since *McDonnell Douglas,* the Supreme Court's decisions have clarified that the question whether the employee made out a prima facie case is almost always irrelevant. At the motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a prima facie case. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510-11, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). And by the time the district court considers an employer's motion for summary judgment or judgment as a matter

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 819989 (C.A.D.C.)
**(Cite as: --- F.3d ----, 2008 WL 819989)**

of law, the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision-for example, through a declaration, deposition, or other testimony from the employer's decisionmaker. That's important because once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is "no longer relevant" and thus "disappear[s]" and "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). As the Supreme Court explained a generation ago in *Aikens:*"Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff."*U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (internal quotation marks omitted). The *Aikens* principle applies, moreover, to summary judgment as well as trial proceedings. *See Dunaway v. Int'l Bhd. of Teamsters,* 310 F.3d 758, 762 (D.C.Cir.2002); *Wells v. Colorado Dep't of Transp.,* 325 F.3d 1205, 1227-28 (10th Cir.2003) (Hartz, J., concurring); *see also Vickers v. Powell,* 493 F.3d 186, 195 (D.C.Cir.2007); *Holcomb v. Powell,* 433 F.3d 889, 896-97 (D.C.Cir.2006); *George v. Leavitt,* 407 F.3d 405, 411-12 (D.C.Cir.2005); *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1289 (D.C.Cir.1998) (en banc).

**\*3** Much ink has been spilled regarding the proper contours of the prima-facie-case aspect of *McDonnell Douglas.*But as we read the Supreme Court precedents beginning with *Aikens,* the prima facie case is a largely unnecessary sideshow. It has not benefited employees or employers; nor has it simplified or expedited court proceedings. In fact, it has done exactly the opposite, spawning enormous confusion and wasting litigant and judicial re-

sources.

Lest there be any lingering uncertainty, we state the rule clearly: In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not-*and should not*-decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas.*Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin? *See Hicks,* 509 U.S. at 507-08, 511, 113 S.Ct. 2742;*Aikens,* 460 U.S. at 714-16, 103 S.Ct. 1478.FN2

### III

**[2]** In this case, the employer Sergeant at Arms asserted a legitimate, non-discriminatory reason for the adverse employment action-namely, that Brady committed sexual harassment. Under *Aikens* and related Supreme Court precedents, the question whether Brady actually made out a prima facie case is therefore irrelevant. So we turn directly to the central issue: whether Brady produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated against Brady based on his race. When determining whether summary judgment or judgment as a matter of law is warranted for the employer, the court considers all relevant evidence presented by the plaintiff and defendant. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148-49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Czekalski v. Peters,* 475 F.3d 360, 364 (D.C.Cir.2007); *Aka v. Washington Hosp. Ctr.,* 156

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 819989 (C.A.D.C.)
**(Cite as: --- F.3d ----, 2008 WL 819989)**

Page 5

F.3d 1284, 1289 (D.C.Cir.1998) (en banc).

The employer produced deposition testimony from its decisionmaker Livingood that Brady was demoted because he grabbed his crotch in front of three other employees. The employer submitted additional supporting evidence: that two employees saw and complained about the incident; that the initially reluctant third witness did not deny that Brady had grabbed his crotch; that the incident was thoroughly and independently investigated; and that Brady's actions violated the office's sexual harassment policy.

A plaintiff such as Brady may try in multiple ways to show that the employer's stated reason for the employment action was not the actual reason (in other words, was a pretext). Often, the employee attempts to produce evidence suggesting that the employer treated other employees of a different race, color, religion, sex, or national origin more favorably in the same factual circumstances. *See* 1 LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 8.04, at 8-66 (2d ed. 2007) ("Probably the most commonly employed method of demonstrating that an employer's explanation is pretextual is to show that similarly situated persons of a different race or sex received more favorable treatment."); 1 BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 73 (4th ed. 2007) ("In most cases the key to proving pretext is comparative evidence."). Alternatively, the employee may attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision. If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts. *See George v. Leavitt,* 407 F.3d 405, 415 (D.C.Cir.2005) ( "[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Fischbach v. D.C. Dep't of Corr.,* 86 F.3d 1180, 1183

(D.C.Cir.1996) (employer prevails if it "honestly believes in the reasons it offers"); 1 LARSON § 8.04, at 8-73 ("[A]n employer's action may be based on a good faith belief, even though the reason may turn out in retrospect to be mistaken or false.").[FN3]

**\*4** [3] Brady's only argument for discrediting the employer's asserted non-discriminatory reason is his contention that the underlying sexual harassment incident never occurred; he raises the specter that the original accusers were racially motivated and made up the incident. Brady further says it's the jury's job to decide factual and credibility questions of this kind. But Brady misunderstands the relevant factual issue. The question is not whether the underlying sexual harassment incident occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying sexual harassment incident occurred. *See George,* 407 F.3d at 415;*Fischbach,* 86 F.3d at 1183.Brady himself acknowledges that Livingood believed the incident occurred. *See* Brady Deposition Transcript, J.A. 70 ("Q: Is it your understanding that Mr. Livingood believed that you grabbed yourself? A: Yes."). Although Brady asserts that the accusations and ensuing investigation were racially tainted and the incident did not occur, he did not produce evidence sufficient to show that the Sergeant at Arms' conclusion was dishonest or unreasonable. *Cf. Mastro v. Potomac Elec. Power Co.,* 447 F.3d 843, 855-57 (D.C.Cir.2006). Therefore, summary judgment for the Sergeant at Arms was proper.[FN4]

Allowing Brady to end-run summary judgment in these circumstances would create significant practical problems. Employers obviously have to resolve factual disagreements all the time in order to make employment decisions regarding hiring, promotion, discipline, demotion, firing, and the like. In many situations, employers must decide disputes based on credibility assessments, circumstantial evidence, and incomplete information. But Brady's argument would mean that every employee who is disciplined, demoted, or fired for alleged miscon-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 819989 (C.A.D.C.)

Page 6

**(Cite as: --- F.3d ----, 2008 WL 819989)**

duct could sue for employment discrimination based on race, color, religion, sex, or national origin and-merely by denying the underlying allegation of misconduct-*automatically* obtain a jury trial. Brady cites no support for that proposition, which would wreak havoc on district courts' orderly resolution of employment discrimination cases and improperly put employers in a damned-if-you-do, damned-if-you-don't posture when addressing disciplinary issues in the workplace.

Brady also implies that the Office of the Sergeant at Arms overreacted and adopted a hair-trigger approach to the reported incident. But many employers today aggressively react to sexual harassment allegations; an employer does not engage in discrimination on the basis of *race* by strictly and uniformly enforcing a policy against any remote hint or suggestion of sexual harassment in the workplace. It is not the Judiciary's place to micro-manage an employer's sexual harassment policies when resolving a claim of racial discrimination. As the Supreme Court has stated, "[c]ourts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it."*Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

**\*5** In sum, the Office of the Sergeant at Arms produced evidence of a legitimate, non-discriminatory reason for Brady's demotion: that Brady engaged in sexual harassment in the workplace in violation of office policy. Brady failed to put forward sufficient evidence for a reasonable jury to find that the employer's legitimate, non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against him on the basis of race.

\* \* \*

We affirm the judgment of the District Court granting summary judgment to the Office of the Sergeant at Arms.

*So ordered.*

FN1. In a refusal-to-hire or refusal-to-promote discrimination case, the *McDonnell Douglas* prima facie factors are that: (i) the employee "belongs to a racial minority" or other protected class; (ii) the employee "applied and was qualified for a job for which the employer was seeking applicants"; (iii) despite the employee's qualifications, the employee "was rejected"; and (iv) after the rejection, "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In firing, demotion, or other adverse-action cases, the factors sometimes have been articulated as: (i) the employee belongs to a protected class; (ii) the employee was still qualified for the position; (iii) despite still being qualified, the employee was fired, demoted, or otherwise adversely acted upon; and (iv) if the employee was removed, either someone else filled the position or the employer sought other applicants. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Some of our decisions have allowed or required plaintiffs to present other evidence to satisfy the test and occasionally phrased the test more generally to require evidence that "the unfavorable action gives rise to an inference of discrimination."*Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999); *see also Czekalski v. Peters,* 475 F.3d 360, 364 (D.C.Cir.2007); *George v. Leavitt,* 407 F.3d 405, 412 (D.C.Cir.2005). Disagreement and uncertainty over the content, meaning, and purpose of the *McDonnell Douglas* prima facie factors have led to a plethora of problems; as we underscore today, however, the factors are usually ir-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relevant.

FN2. For those rare situations where it still matters whether the employee made out a prima facie case-namely, those cases in which the defendant does not assert *any* legitimate, nondiscriminatory reason for the decision-establishing a prima face case is "not onerous." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). For example, to make out a prima facie case, a plaintiff need not demonstrate that he or she was treated differently from a similarly situated employee or that the position was filled by a person outside the plaintiff's group. *See O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312-13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Wiley v. Glassman,* 511 F.3d 151, 156 (D.C.Cir.2007); *Czekalski,* 475 F.3d at 365-66;*Mastro v. Potomac Elec. Power Co.,* 447 F.3d 843, 850-51 (D.C.Cir.2006); *Chappell-Johnson v. Powell,* 440 F.3d 484, 488 (D.C.Cir.2006); *George,* 407 F.3d at 412-13;*Teneyck v. Omni Shoreham Hotel,* 365 F.3d 1139, 1150-51 (D.C.Cir.2004); *Dunaway v. Int'l Bhd. of Teamsters,* 310 F.3d 758, 762-63 (D.C.Cir.2002); *Stella v. Mineta,* 284 F.3d 135, 145-46 (D.C.Cir.2002). Rather, such evidence (or the lack of such evidence) may be relevant to the determination at summary judgment or trial whether intentional discrimination occurred.

FN3. Employees often try to cast doubt on an employer's asserted reason in other ways as well, such as pointing to: changes and inconsistencies in the stated reasons for the adverse action; the employer's failure to follow established procedures or criteria; the employer's general treatment of minority employees; or discriminatory statements by the decisionmaker. *See* 1 LARSON § 8.04, at 8-74 to -75; 1 LINDEMANN & GROSSMAN at 89; 1 ABIGAIL COOLEY MODJESKA, EMPLOYMENT DISCRIMINATION LAW § 1.9, at 1-134 to -39 (3d ed.2007).

FN4. Even if Brady showed that the sexual harassment incident was not the actual reason for his demotion, he still would have to demonstrate that the actual reason was a racially discriminatory reason. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 514, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Of course, discrediting an employer's asserted reason is often quite probative of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

C.A.D.C.,2008.
Brady v. Office of Sergeant at Arms
--- F.3d ----, 2008 WL 819989 (C.A.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
)
**BRIDGET POLLARD,**                               )
                                                   )
        **Plaintiff,**                      )
                                                   )
    **v.**                                 )     **Case No. 1: 07-00692(CKK)**
                                                   )
                                                   )
**QUEST DIAGNOSTICS,**                             )
                                                   )
        **Defendant.**                      )
_____ )


<u>**ORDER**</u>

      **UPON CONSIDERATION** of Defendant's Motion for Summary Judgment, the

memoranda of points and authorities in support thereof and in opposition thereto and the

arguments of the parties, it is this ___ day of _____, 2008 hereby

      **ORDERED,** that Defendant's Motion is granted in its entirety; and it is hereby

      **FURTHER ORDERED,** that the Complaint is dismissed in its entirety with

prejudice and judgment is entered in Defendant's favor on all counts.


                      _____
                      Judge Colleen Kollar-Kotelly
                      United States District Court for
                       the District of Columbia

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 21st day of April 2008, a true and correct copy of the foregoing Defendant's Motion for Summary Judgment, Memorandum of Points and Authorities in Support thereof, Statement of Material Facts as to Which There Is No Genuine Issue, Proposed Order and exhibits were served via the Court's electronic filing system.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. mail, postage prepaid, upon:

        Nathaniel D. Johnson, Esquire
        Richard L. Thompson, Esquire
        THE LAW FIRM OF NATHANIEL D. JOHNSON, L.L.C.
        3475 Leonardtown Road
        Suite 200
        Waldorf, MD  20602

                /s/  Michael L. Stevens_____
                Michael L. Stevens