## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**BRIDGET POLLARD,**                    )
                                        )
                **Plaintiff,**          )
                                        )
        **v.**                          )    **Case No. 1: 07-00692(CKK)**
                                        )
                                        )
**QUEST DIAGNOSTICS,**                  )
                                        )
                **Defendant.**          )
_____ )

## <u>DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Michael L. Stevens
D.C.  Bar No. 384887
Arent Fox LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5339
(202) 857-6000
Counsel for Defendant

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ...........................................................................................................1

II. ARGUMENT……………………………………………………………………..2

      A.     The Court Should Assume the Facts in Defendant's Statement of
            Material Facts are Admitted  …………………………………………………..2

      B.     Most of The Documentary Exhibits Submitted By Plaintiff Are Not
            Authenticated…………………………………………………………………...4

      C.     The Court Should Grant Summary Judgment for Defendant on the
            Discrimination Claim …………………………..………………………….. 5

      D.     The Court Should Grant Summary Judgment for Defendant on the Retaliation
            Claim………………………………………………………………………… 11

III. CONCLUSION..............................................................................................................14

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..........……………………………………………2

*\*Burlington N & Santa Fe Ry. Co. v. White*
548 U.S. 53 (2006) ......................……………………………………………………..14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......……………………………………………………2

*Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999) .......……………………………………………………2

*Greer v. Paulson*, 505 F.3d 1306
 (D.C. Cir. 2007) ......................……………………………………………………4, 5

*\*Hamilton v. Paulson,* 542 F. Supp.2d 37 (D.D.C. 2008)…………………………………………9, 10, 11

*Harding v. Gray*,
 9 F.3d 150 (D.C. Cir. 1993)...................................................................................2

*\*Jackson v. Finegan, Henderson, Farabow, Garrett & Dunner, et al.*,
 101F.3d 145 (D.C. Cir. 1996)…………………………………………………………4

*Shaw v. Boorstin*, 517 F. Supp. 336 (D.D.C.1981)……………………………………………8

**Miscellaneous**

Fed. R. Civ. P. 56(c) .....................................................................................................4

Local Rule LCvR 7(h) ..........……………………………………………………...3, 4

Local Rule LCvR 56.1 ...…………………………………………..…………………3, 4

*denotes cases chiefly relied upon

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                )
**BRIDGET POLLARD,**                            )
                                                )
                    **Plaintiff,**              )
                                                )
          **v.**                                )          **Case No. 1: 07-00692(CKK)**
                                                )
                                                )
**QUEST DIAGNOSTICS,**                          )
                                                )
                    **Defendant.**              )
_____         )

**DEFENDANT'S  REPLY TO PLAINTIFF'S OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

  Defendant Quest Diagnostics ("Quest"), by and through its undersigned counsel and

pursuant to Fed. R. Civ. P. 56, Local Rules LCvR 7(h) and LCvR 56.1, respectfully submits this

Reply to Plaintiff's Opposition to its Motion for Summary Judgment.

**I.**  **INTRODUCTION**

  Plaintiff's Opposition was filed one day late, even after Plaintiff requested and received

an extension of time to file it.  The Court nonetheless granted Plaintiff's Motion to file the

Opposition "Out Of Time" *nunc pro tunc.*

  More importantly, Plaintiff ignored the Court's March 7, 2008 Order and failed to

comply with Local Rules LCvR 7(h) and 56.1 by submitting a statement of material facts as to

which she contends there exists a genuine issue.[1]  Thus, all of the facts in Defendant's Statement

of Material Facts should be deemed admitted.

But even if Plaintiff is given a pass and this critical deficiency is overlooked, Plaintiff's

Opposition still falls far short.  Plaintiff essentially argues that Defendant's Motion should be

denied simply because Plaintiff speculates, without any evidentiary support in the record, that the

job description for the position in question was prepared after Mr. Townsend was interviewed

and tailored to his qualifications, and that the performance evaluation she received was in

retaliation for her complaints about failing to get the promotion.  As will be discussed below,

however, Plaintiff's mere speculation is not sufficient to defeat Defendant's Motion, because

based on the undisputed facts, no reasonable juror could conclude that discrimination or

retaliation occurred.

Indeed, as the nonmoving party, Plaintiff cannot simply rely on the allegations of her

pleadings.  Instead, she must produce "specific facts showing that there is a genuine issue for

trial . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). (citation omitted). "[T]he mere

existence of a scintilla of evidence" or of unsubstantiated conclusory allegations is insufficient to

withstand a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154

(D.C. Cir.1993).

## II.    <u>ARGUMENT</u>

### A.    <u>The Court Should Assume the Facts in Defendant's Statement of Material Facts are Admitted.</u>

Plaintiff failed to submit a statement of material facts as to which she contends there is a

---

[1]  Although the cover page of the Opposition indicates that the document was "accompanied by" a "Statement of
Material Facts in Dispute," such a Statement was not attached.  Plaintiff also failed to submit a table of cases and
other authorities in violation of the March 7 Order.

genuine issue.  This alone should result in the granting of Defendant's Motion.

The Court's March 7, 2008 Order stated in pertinent part that "the parties shall comply **fully** with Local Rule LCvR 7(h) . . . and 56.1.  The Court strictly adheres to the dictates of Local Civil Rules 7(h) and 56.1 and may strike pleadings not in conformity with these rules." (emphasis in original, citation omitted).

The Order went on to state in significant detail the following:

A party responding to a statement of material facts must respond to each paragraph with a correspondingly numbered paragraph, indicating whether that paragraph is admitted or denied.  The responding party should include any information relevant to its response in that paragraph.  If the responding party has additional facts that are not addressed in the corresponding paragraphs, the responding party should include these at the end of its responsive statement of facts.  At all points, parties must furnish precise citations to the portion of the record on which they rely.

If there was any doubt about the consequences of failing to submit a responsive statement of material facts, the Court answered it in the concluding sentence of its Order:  "[t]he Court assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  (emphasis added).

The Court's Order clearly arises out of, and is authorized by, Local Rules 7(h) and 56.1. Indeed, both rules state in pertinent part as follows:

An opposition to such a motion [for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended that there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement. . . . In determining a motion for summary judgment, the court may assume the facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

*Local Rule LCvR 7(h) and 56.1*

In its March 7, 2008 Order, the Court "strongly encouraged" the parties to "carefully

review" *Jackson v. Finegan, Henderson, Farabow, Garrett & Dunner, et al.,* 101F.3d 145 (D.C. Cir. 1996) "on the subject of Local Rule LCvR 7(h)."  In that case, the D.C. Circuit affirmed the grant of summary judgment against a plaintiff who made a claim of race discrimination, where the plaintiff failed to file a timely statement of material facts in opposition and the district court deemed as admitted the material facts set forth in the defendant's statement.  In *Jackson,* as in this case, all of the material facts in Defendant's statement are adequately supported by references to the record. Thus, the Court should deem those facts as admitted and for the reasons discussed in Defendant's Motion, enter summary judgment against Plaintiff.

### B.    Most of the Documentary Exhibits Submitted By Plaintiff Are Not Authenticated.

Plaintiff attached several documents as exhibits to her Opposition, but many of them are not identified or authenticated by any testimony from a witness with personal knowledge whose deposition testimony or affidavit was included in the Opposition.  *See* Exhibit A (Opposition p. 5); Exhibit C (Opposition p.5); Exhibit D (Opposition at p. 8); Exhibit E (Opposition p.13); Exhibit G (not even cited in Opposition); Exhibit H (Opposition p. 10).

Rule 56, and Local Rules 7(h) and 56.1 require that evidence submitted in an opposition to a motion for summary judgment be appropriately referenced to the record in the case with sworn testimony from competent witnesses.  Because these documents are not properly identified and authenticated by witnesses with personal knowledge, they should not be considered by the Court.

To survive summary judgment the non-moving party must "produce evidence ... capable of being converted into admissible evidence." *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir.2007) (citing *Gleklen v. Democratic Cong. Campaign Comm.,* 199 F.3d 1365, 1369

(D.C.Cir.2000)). Because Plaintiff's evidence concerning these exhibits is "sheer hearsay," it "counts for nothing on summary judgment." *Greer,* 505 F.3d at 1315 (citation omitted).

   **C.   The Court Should Grant Summary Judgment for Defendant on the Discrimination Claim.**

   Without a scintilla of record evidence to support her, Plaintiff alleges that Defendant's Motion should be denied because (1) she was qualified for the Project Manager position; (2) the job description for the position was created after Mr. Townsend was interviewed; and (3) the job description was used to exclude Plaintiff and all other minority applicants.

   The record evidence is undisputed that Plaintiff lacked the experience that Messrs. Vandenburg and Leap were seeking in the successful candidate.  Although she claims to have met the minimum qualifications set forth in the very cursory job posting, she clearly lacked the technical experience that was considered essential by Messrs. Vandenburg and Leap.  The job posting she included in her Opposition clearly does not include the full job description for each of the numerous positions posted.  Rather, it only allows for two or three lines to summarize job requirements. According to Michael Knapp, Director of Employee Services for Quest, the job posting bulletin relied upon by Plaintiff "does not and could not contain all of the elements of the job description for each position posted."  Reply Ex. 1 [Second Declaration of Michael Knapp ("Knapp Sec. Dec.")] at ¶ 4.

   In this case, the posting stated:  "BS or AA in Medical Technology or Computer Science. General laboratory knowledge.  LIS functionalities.  LIS/HIS interface knowledge." Significantly, Plaintiff concedes that Defendant's initial selection of Jane Kopley for the position was not discriminatory, because she acknowledges that Ms. Kopley had superior qualifications for the job.  It is inconsistent for Plaintiff to then argue that Defendant's subsequent selection of Mr. Townsend was discriminatory, when he assisted Ms. Kopley with the implementation of the

5

new LIS system at Holy Cross Hospital and Plaintiff admitted that if his resume was correct, Mr. Townsend was more qualified than she was.

Concerning the date of the position description, Plaintiff offers absolutely no evidence that it was created in August 2005, after Mr. Townsend was interviewed, and to conform to his qualifications, other than the fact that in a section entitled "Date Written," the description states "August 22, 2005." Every witness with personal knowledge who testified, except Mr. Vandenburg, confirmed that the job description was completed prior to the job being posted in May 2005. Considered in its entirety, Mr. Vandenburg's testimony confirms his belief that the position description was at least started and tentatively completed before the job was posted, and there is no evidence that he or Mr. Leap made any changes to the description after Mr. Townsend was interviewed. Indeed, both Mr. Vandenburg and Mr. Leap have confirmed that they made no changes to the job description after Ms. Kopley or Mr. Townsend or Plaintiff were interviewed. Reply Ex. 2 [Vandenburg Declaration ("Vandenburg Dec." at ¶ 3)]; Reply Ex. 3 [Leap Declaration ("Leap Dec." at ¶ 3)].

Mr. Knapp confirmed that a job cannot be posted until and unless a job description is prepared. The Human Resources Department is instructed not to post jobs unless a job description is prepared, and he is not aware of any instances where a job was posted before the job description was completed. Reply Ex. 1 [Knapp Sec. Dec. at ¶ 3].

In addition to this evidence, other indisputable evidence suggests that the job description was prepared prior to its posting. Indeed, the electronic properties for the document indicate that it was derived from a September 17, 2004 job description for a Project Manager position at Washington Adventist Hospital and Shady Grove Adventist Hospital that is substantially similar in many respects. Reply Ex. 1 [Knapp Sec. Dec. at ¶ 5 and Ex. 1 attached thereto]. In fact, one

could argue that in many respects, the prior job description was more demanding than the description for the job for which Plaintiff applied.[2]  This conclusively shows that Messrs. Vandenburg and Leap did not conspire to revise the position description to put the job out of Plaintiff's reach, as she alleges.  No reasonable juror could conclude otherwise.

Moreover, the electronic properties show that the job description was printed on June 24, 2005, around the time the job was posted.   Reply Ex. 1 [Knapp Sec. Dec. at ¶ 5 and Ex. 2 attached thereto].  Finally, each time a job description is revised or updated in any manner, no matter how slight, the date in the "Date Written" section is overwritten to reflect the then current date.  Reply Ex. 1 [Knapp Sec. Dec. at ¶ 6].[3]

Furthermore, even if the job description was prepared on August 22, 2005, which it was not, it also would have been prepared after Ms. Kopley was interviewed, and Plaintiff concedes that the selection of Ms. Kopley was not discriminatory.

Plaintiff's final argument that the job description was used to exclude other minority applicants is the most specious of all.  She does not offer any record evidence, because none exists, that any other minority applicant was qualified for the position and was discriminatorily denied the position.  In fact, she admits that Tuy Le, another internal applicant who was not selected, was not as qualified for the job as Mr. Townsend or Ms. Kopley. Reply Ex. 4 [Pollard Deposition ("Pollard Dep.") at P. 122 L. 1 to L. 6].

In her Opposition, Plaintiff asserts that Mr. "Vanderburg" [sic] was the sole deciding official.  The reality is, and the record is undisputed that, Mr. Vandenburg focused only on the candidates' interpersonal skills and deferred to Mr. Leap on the more important technical skills

---

[2] For example, the Shady Grove/Washington Adventist Hospital Position Description had 24 "Essential Job Duties and Responsibilities" and the Providence Hospital Position Description had only 16.  Moreover, the "Experience, Education and Licensure" and "Knowledge, Skills and Abilities Requirements" were slightly more demanding.
[3] Plaintiff's reliance on a job posting (not a full blown position description) in January 2006 by a different supervisor for a different position in New Jersey is misplaced.  *See* Plaintiff's Opposition at p. 10.

because as the Director of IT, Mr. Leap had more knowledge about the technical aspects of the job.  Reply Ex. 5 [Vandenburg Deposition ("Vandenburg Dep.") at P. 35 L. 19 to P. 37 L.1].   It is undisputed that Mr. Leap did not know Ms. Pollard's race when he made the decision.  Indeed, Plaintiff has no evidence that he knew her race or the race of Ms. Kopley or Mr. Townsend or anyone else who applied for the job.  Reply Ex. 4 [Pollard Dep. at P. 160 L. 9 to 22]  Plaintiff offered no evidence beyond her conclusory allegation that Mr. Vandenburg knew her race.  Her suggestion that he should have known she was African-American because most of Quest's employees are African-American and she spoke on the telephone with Mr. Vandenburg is so meritless that it does not warrant a response.  *See* Opposition at pp. 7-8.

Plaintiff's reliance on *Shaw v. Boorstin*, 517 F. Supp. 336 (D.D.C. 1981) is misplaced.  In *Shaw,* a case decided more than 27 years ago, the Court ruled that the plaintiff was discriminatorily denied a promotion because, among other things, it found that that she had equivalent background and experience to satisfy the requirement of  "one year at the GS-14 level or the equivalent"; that "the successful applicant's credentials were strikingly less impressive"; that the successful candidate was pre-selected because he was a friend of a decision-maker; and because there was no evidence to support the Library's subjective assertions that the plaintiff was "domineering, abrupt and abrasive."  *Id.* at 338-341(internal quotations omitted).

In contrast, in this case there is no dispute that Plaintiff lacked technical experience training users in the new LIS system and in interfacing with the Hospital ("HIS") system.  She even admitted that she had no experience with the upgrade to the LIS system that was being installed at the Providence Hospital laboratory.  Reply Ex. 4   [Pollard Dep. at P. 131 L. 3 to 132 L.15].  There is no assertion by Plaintiff or evidence in the record that Mr. Townsend's credentials were less impressive than hers.  In fact, she admits that if his resume was true, they

8

were more impressive.  Mr. Townsend was not pre-selected; neither Mr. Vandenburg nor Mr.

Leap knew him before he applied for the job.  Reply Ex. 5 [Vandenburg Dep. P. 39 L. 10 to 15];

Reply Ex. 6 [Leap Deposition ("Leap Dep.") at P. 16 L. 6 to 8].  Finally, there is no evidence that

Messrs. Vandenburg or Leap considered any subjective factors in making their decisions.

A much more relevant case is *Hamilton v. Paulson,* 542 F. Supp. 2d 37 (D.D.C. 2008),

decided less than three months ago, where the Court granted the defendant summary judgment

on the plaintiff's claim that he was not selected for a safety manager position because of his race

and sex.  In that case, as here, the plaintiff could not show that his qualifications were vastly

superior to the employee selected.  In such a situation, the court reasoned as follows:

> . . . "[i]n a close case, a reasonable juror would usually assume that the employer
> is more capable of assessing the significance of small differences in the
> qualifications of the candidates, or that the employer simply made a judgment
> call."  . . . Thus, "in order to justify an inference of discrimination, the
> qualifications gap must be great enough to be inherently indicative of
> discrimination."  . . . Otherwise, the court "must assume that a reasonable juror
> who might disagree with the employer's decision, but would find the question
> close, would not usually infer discrimination on the basis of a comparison of the
> qualifications alone."

*Id.* at 44-45 (citations omitted).

After comparing the qualifications of the candidates, the court concluded as

follows:

> . . . there is no factual basis whatsoever for a jury to conclude that there
> are disparities in the relative qualifications of the plaintiff and Burrell "so
> apparent as to virtually jump off the page and slap [them] in the face." …
> If anything, the record suggests that Burrell, who had previously worked
> as a Safety Manager and performed some of the same duties while on her
> detail in 2002, …was more qualified for the position than the plaintiff.  At
> a minimum, the question is an extremely close one.  "[T]herefore[,] the
> Court must respect the employer's unfettered discretion to choose among
> qualified candidates."

*Id.* at 47-48 (citations omitted).

Plaintiff freely admitted that if the information on Mr. Townsend's resume was true, he was more qualified for the position than she was.  She also admitted that she had no evidence that Quest knew that any of the information he provided on his resume was false.  Finally, she admitted she has no evidence that Mr. Leap knew M. Kopley's race, Mr. Townsend's race or any other candidate's race.  Reply Ex. 4 [Pollard Deposition ("Pollard Dep.") at P. 117 L. 19 to P. 119 L. 15; P. 159 L. 14 to P. 160 L.22].

The plaintiff in *Hamilton* also pointed to an alleged "litany" of irregularities in the defendant's selection process, similar to Plaintiff's assertion in this case that the job description was written after the job was posted.  The Court made the following relevant observations:  " . . . [a]n employer's failure to follow its own regulations and procedures, alone, may not be sufficient to support the conclusion that its explanation for the challenged employment action is pretextual." . . . Rather, the "irregularities, even if proven," must "indicate discriminatory hiring practices."  *Id.* at 47.  In this case, even if the Court believes that Quest strayed from its normal practice and did not prepare the job description until after the job was posted, there is not a scintilla of evidence that there was any discriminatory motive behind this delay.

Finally, Plaintiff's reliance on some minor inconsistencies between the deposition testimony of Messrs. Vandenburg and Leap should also be viewed in the same manner as the *Hamilton* Court analyzed similar inconsistencies:

> To recapitulate, the assorted alleged inconsistencies between the deposition testimony of Burns, Mitchell, and Huston, and other evidence in the record advanced by the plaintiff fall into one of two camps. On the one hand, several of these supposed "inconsistencies" are in reality the product of the plaintiff's selective use of the record. The remaining discrepancies, while authentic, could not serve as a basis for a reasonable jury to infer pretext on the part of the interviewing panel. None of the contradictions asserted by the plaintiff create a genuine dispute of material fact with respect to the authenticity of the defendant's explanation for the selection of Burrell over the plaintiff for the Safety Manager

10

position; consequently, none of these contradictions suffices to defeat the
defendant's motion for summary judgment.

*Id.* at 56.

Thus, the fact that Mr. Leap and Mr. Vandenburg had slightly different
recollections of how the job description was prepared and what role Quest's Human
Resources Department played is immaterial and of no consequence.  Given all of the
other undisputed evidence in the record, including the fact that Mr. Townsend was
replaced by an African-American female, no reasonable juror could conclude that
discrimination occurred.

> **D.** **The Court Should Grant Summary Judgment for Defendant on the
> Retaliation Claim.**

Citing selectively from the record, Plaintiff argues that Defendant should not prevail on
her retaliation claim.  Like the discrimination claim, however, no reasonable juror could
conclude that Plaintiff was a victim of retaliation.

It is undisputed that Ms. Aglipay, not Mr. Vandenburg, prepared Plaintiff's evaluation at
issue.  Although Plaintiff's counsel asked Ms. Aglipay numerous times, there is absolutely no
evidence that Ms. Aglipay knew about Ms. Pollard's complaint of discrimination when she
prepared the evaluation:

> Q.  Did you know of Ms. Pollard complaining of discrimination at the
> time you assessed her performance from that evaluation?
> A.  No.  She didn't mention anything.
> Q.  What about Mr. Vandenburg?  Did he mention it to you?
> MR. STEVENS:  At the time?
> MR. JOHNSON:  At the time or before that time?
> A.  I don't remember.
> Q.  Is it possible that he did mention that Ms. Pollard was considering or
> she had filed a discrimination complaint at the time that you provided her
> performance appraisal?  Is it possible?
> MR. STEVENS:  Objection.

> A. No. I don't know.
> Q. Is it possible?
> MR. STEVENS: Same objection.
> A. No. It's not possible.
> Q. But you don't know; is that correct?
> A. Yeah.
> Q. So it could be possible?
> A. Yes
> . . .
> Q. . . . The performance appraisal that was conducted by you on Ms. Pollard dated January 2006, right? At the time you had assessed her performance did anybody mention that Ms. Pollard was complaining of or she raised the issue of discrimination?
> A. No. I didn't hear anything.

Reply Ex. 7 [Aglipay Deposition ("Aglipay Dep.") at P. 55 L. 16 to P. 56 L.16; P. 59 L. 3 to L. 8].

For his part, Mr. Vandenburg's recollection was absolutely clear that he did not have any input into Plaintiff's evaluation. Reply Ex. 5 [Vandenburg Dep. P. 71 L. 20 to L. 22].

There is no significance to the fact, even if true, that Mr. Vandenburg instructed Ms. Aglipay to appraise Plaintiff's performance. This would have been perfectly appropriate for Mr. Vandenburg to do, because she was Plaintiff's supervisor. In fact, Plaintiff's argument would perhaps be more compelling if Mr. Vandenburg himself strayed from Quest policy and evaluated Plaintiff's performance himself.

Plaintiff's testimony that Ms. Aglipay told her that "Michael [*sic*] Vandenburg" instructed Ms. Aglipay to only give "2.0" to her subordinates is indeed curious. Although Mr. Vandenburg denied this, even if it is true, it is harmful, and not helpful, to Plaintiff's case. Indeed, if Mr. Vandenburg told Ms. Aglipay to evaluate all of her subordinates in the same manner, then Plaintiff could not possibly have been singled out as a victim of retaliation.

It is also important to note that Plaintiff's testimony is inconsistent on this point. Although in her Opposition she stated that Mr. Vandenburg instructed Ms. Aglipay to give all of her subordinates a "2" on their evaluations, her earlier testimony and a letter to her former lawyer told quite a different story:

>           Q.  The court reporter has placed before you a document which is marked as Exhibit 17, which is o one-page document.  Please take the time you need to review that document and let me know when you're prepared to answer questions abut it.
>           A.  I'm prepared.
>           Q.  Can you identify the document for me, please?
>           A.  Yes.  This is a letter that I had written and submitted to my lawyer at the time, Hs. Thatcher, in reference to my job performance evaluation for 2005.
>           Q.  Okay.  And can you read for the record what the letter says?
>           A.  It says:  "The job performance evaluation for 2005 was conducted by my working supervisor, Isabelita Aglipay.  I asked that some of the scores be changed because I did not agree with them; they did not reflect my quality of work.  Isabelita informed me that no one would be allowed an excellent rating per Harvey Vandenburg, the laboratory director.  I did not want to argue the matter and accepted the rating with some minor changes."
>           Q.  And is what you just read accurate?
>           A.  Yes, it is.
>           Q.  Okay.  Now, when Isableita told you that no one would be allowed an excellent rating per Harvey Vandenburg, did you understand Mr. Vandenburg was making that rule for all employees?
>           A.  That's what I understood.

Reply Ex. 4  [Pollard Dep. P. 152 L. 4 to P. 153 L. 14 and Exhibit 17 referenced therein].

At the end of the day, Plaintiff had to admit she had no evidence to support her retaliation claim:

>           Q.  Now, do you have any evidence to suggest the reason that Ms. Aglipay rated you the way she did was because you had filed an EEOC Charge?
>           A.  No.

Reply Ex. 4   [Pollard Dep. P. 157 L. 13 to L. 17].

Furthermore, Plaintiff failed to refute the record evidence that any harm she suffered as a result of the evaluation was *de minimis*.  Given the slight difference in the raise she may have received, the minimal number of hours she worked, and the short period of time she worked after the evaluation, this issue simply does not rise to the level of conduct that is covered by the anti-retaliation provisions of Title VII.  *Burlington N & Santa Fe Ry. Co. v. White* 548 U.S. 53, 67-68 (2006) ("actionable retaliation" claims are limited to those where an employer causes "material adversity," not "trivial harm.")

Finally, although Plaintiff claims in the Declaration submitted with her Opposition that Ms. Aglipay never told her about complaints or criticisms about her work, she does not and cannot dispute that Ms. Aglipay actually received such complaints and criticisms.  *See* Ex. B to Plaintiff's Opposition at ¶ 4.  And, because Plaintiff did not submit a statement of material facts in dispute, the Court must accept as true Ms. Aglipay's testimony that she received such complaints and criticisms.  *See* Defendant's Statement of Material Facts as to Which There is No Genuine Issue at ¶ 55.

There simply is no genuine issue of material fact with respect to Plaintiff's retaliation claim. And, no reasonable juror could find that Plaintiff was the victim of retaliation.

III.    <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant respectfully requests that this Court grant Defendant's Motion for Summary Judgment in its entirety, enter judgment in Defendant's favor,

and that it award to Defendant its reasonable attorneys' fees and costs, and such further relief as

the Court may deem proper.

Respectfully submitted,

 _/s/  Michael L. Stevens_____
Michael L. Stevens D.C.  Bar No. 384887
ARENT FOX LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
Telephone: (202) 857-6000
Facsimile:(202) 857-6395
Counsel for Defendants

Dated:  June 24, 2008

15

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of June, 2008, a true and correct copy of the

foregoing Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary

Judgment was filed electronically.  Notice of this filing will be sent to all parties by operation of

the Court's electronic filing system and copies will be mailed via U.S. mail, postage prepaid to:

> Nathaniel D. Johnson, Esq.
> Richard L. Thompson, Esq.
> The Law Firm of Nathaniel D. Johnson, L.L.C.
> 201 Centennial Street, Suite #A-2
> P.O. Box 1857
> LaPlata, MD 20646

> _____/s/ Michael L. Stevens_____
> Michael L. Stevens

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BRIDGET POLLARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1: 07-00692(CKK) |
| ) | |
| QUEST DIAGNOSTICS, ) | |
| ) | |
| Defendant. ) | |

## SECOND DECLARATION OF MICHAEL KNAPP
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Michael Knapp, do hereby depose and state as follows:

1.        I am over 18 years of age, I have personal knowledge of all the facts set forth in this Declaration, and I am competent to testify about them.

2.        I am employed as the Director of Employee Services for Defendant Quest Diagnostics ("Quest").  I have been employed with Quest since 1999.  In that capacity, I administer Quest's human resources policies, oversee the hiring selection process, and am a custodian for Quest's personnel records for the Chantilly business unit, which includes the laboratory at Providence Hospital where Bridget Pollard worked.

3.        It has been the consistent policy and practice of Quest's Human Resources Department to require the preparation of a job description before posting a job vacancy.  I have consistently instructed all members of the Human Resources Department not to post vacant jobs unless a job description has

been prepared. I personally am not aware of any position that was posted before a job description was prepared for it.

4.      The Job Posting Bulletin attached as Exhibit A to Plaintiff's Opposition to Defendant's Motion for Summary Judgment does not and could not contain all of the elements of the job description for each position posted. Indeed, every job description for every job contains more requirements than the job posting does. The job posting simply contains a summary of some of the major requirements for the positions listed.

5.      I reviewed the electronic properties of the job description for the Project Manager position for which Ms. Pollard applied. I determined that the original document was created on September 17, 2004, and was for a Project Manager position at Shady Grove Adventist and Washington Adventist Hospitals. A copy of this job description is attached as Exhibit 1 to this Declaration. This job description is substantially similar in many respects to the job description for the position for which Ms. Pollard applied, and it is clear to me that the job description used for the position she sought was derived from the 2004 description.

6.      I also learned that each time a job description is revised or updated on the computer system in any way, the date in the "Date Written" section is updated to reflect the then current date.

7.      Attached as Exhibit 2 to this Declaration is a screen print of the electronic properties of the Job Description for the Project Manager position for which Ms. Pollard applied, and it shows that the document was printed on June 24, 2005, shortly after the job was posted in May 2005.

I declare under penalty of perjury that this Declaration is true and correct to the best of my knowledge, information and belief.

Michael Knapp                                    Date: June 20, 2008



EXHIBIT

_____/_____

## Position Description

Quest Diagnostics Nichols Institute, Chantilly

| | | | |
|---|---|---|---|
| **Position Title:** | Project Manager, Laboratory | **Job Number:** | 101157 |
| **Department:** | Shady Grove Adventist Hospital. Washington Adventist Hospital | **Grade Level:** | 49 |
| **Reports to:** | Director of Field Operations | **FLSA Status:** | Exempt |
| **Direct Reports:** | LIS Coordinator | **Location:** | Chantilly |
| **Work Schedule:** | As scheduled | **Date Written:** | 09/17/04 |

### Position Summary

Oversees and facilitates all function of the onsite LIS for the Washington Adventist and Shady Grove Adventist Hospital including, but not limited to, building, testing and maintaining new tests, improving efficiency of laboratory processes, upgrades and interface (HIS, Ref lab, POC and instruments). Position provides LIS training for staff. Also oversees the activities of all onsite LIS personnel. Integrates project and resource plans with departmental strategies. Understands the strategic business plan and how to navigate within various IT and customer groups to evaluate/plan/design and follow-through projects from start to finish. Can apply technology to influence the achievements of hospital operating objectives.

### Essential Job Duties and Responsibilities

1. Possesses overall responsibility for the WAH and SGAH LIS database.

2. Facilitates LIS training and competency for all new and existing staff as new processes or procedures are added.

3. Supervises all computer related activities at the WAH and SGAH sites.

4. Directly supervisors all on-site LIS personnel at the Adventist Contracted laboratory sites.

5. Plans and provides timeline for projects sanctioned by the Laboratory's Management Team.

6. Requests and obtains the necessary personnel to complete the projects according to the each timeline created.

7. Working with Adventist Healthcare's (AHC) third party vendor, provides in house computer support (currently PHNS) to develop, maintain or enhance services

provided by PHNS. Delineates the proper responsibilities between entities. Coordinates implementation of new equipment interfaces, software and hardware.

8.   Coordinates new software testing and works with appropriate parties to rectify any problems identified.

9.   Provides necessary audit trail documentation of all changes and validations to LIS system to meet or exceed regulatory requirements, including but not limited to, annual calculations review, biannual patient report for Medical Director review, LIS upgrade documentation, LIS backup and transaction documentation.

10.  Arranges and coordinates system access for new LIS/HIS users.

11.  Provides on site coordination and support to Quest Diagnostics network and hardware. Contacts appropriate personnel at Chantilly as issues are identified.

12.  Working with laboratories supervisors, creates tools to capture key operation metrics or to examine data to identify areas of improvement.

13.  Working with AHC billing department, maintains current CDM (Charge Description Master) to allow proper billing, with CPT codes, to allow AHC to correctly bill for laboratory tests. Obtains and maintains the appropriate signed review from AHC.

14.  Monitors LIS computer functions, including but limited to, review of background jobs, system errors, site instrument interface status, print scheduler, processor, hardware and printers within the laboratory and its related sites, and investigates HIS lab order resulting issues. In addition, monitors creation of monthly Transave tapes by IT operator by the 15th of each month.

15.  Oversees computer maintenance functions, including but not limited to, reconciliation of rejected charges.

16.  Primary contact for Chantilly interface including, but not limited to, making appropriate changes to database in response to a Quest Diagnostics Lab Update by the stated effective date (including the initiation of a Lab Update to our own customers.

17.  Provides weekly on call schedule for coverage for LIS related problems to include nights, weekends and holidays.

18.  Creates, runs and provides training on Crystal Reports and other reports, including, but not limited to, TAT, outlier reports to identify those specimens that did not meet TAT. Provides daily accession reports to Chantilly's Finance group by 9 am.  Provides Ad-Hoc Crystal reports upon demand. Reconciles monthly Discharged pre-admit patients report from HIS. Collates data for contract performance metrics by the 9th of each month for each hospital.

19.  Writes and maintains LIS SOPs including annual review with appropriate sign off.

JOB DESCRIPTION: Project Manager –Laboratory Adventist                        (3)

20.    Defines Service Master and CRMFs in HIS.

21.    Actively supports and complies with laboratory policies and procedures.

22.    Adheres to all established laboratory safety requirements.

23.    Required to use (a) personal protective equipment, (b) engineering controls and/or (c) work practice controls as directed by management, when necessary.

24.    Other job-related, miscellaneous duties as assigned.


**Physical Demands**

Ability to sit for extended periods

Ability to lift up to 40 lbs.

**QUALIFICATIONS:**

Experience, Education, and Licensure:
1.  Graduate of approved school of medical technology –or-

2.  Bachelor's degree in laboratory science, plus one (1) year of pertinent full-time laboratory experience and/or training "in the specialty" in which the individual performs tests. –or-

3.  Three (3) years academic study (minimum 90 semester hours) plus successful completion of a 12-month course of training at an accredited school of medical technology –or-

4.  Has passed a properly benchmarked and validated competency examination (HHS/ ASCP) in the designated specialty.

Knowledge, Skills, Abilities:
Five years or greater in-house experience and fully trained in the current computer system.

Have a Medical Technologist/Hospital Laboratory background.

Have direct experience testing and/or troubleshooting new or existing LIS products.

Basic theoretical and operational job knowledge necessary to perform assigned tasks.

Interpersonal skills necessary to deal courteously and effectively with supervisors, co-worker and clients.

Attention to detail.

JOB DESCRIPTION: Project Manager –Laboratory Adventist                    (4)

Ability to follow procedures.

Good verbal communication skills.

Knowledge of basic laboratory operations.

Ability to deal with client information in a confidential manner.

_____    _____
Employee Signature                                      Date

JD Mgr, Project – Lab Adventist
/js
9/17/04





EXHIBIT
2

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BRIDGET POLLARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1: 07-00692(CKK) |
| | ) |
| | ) |
| QUEST DIAGNOSTICS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

DECLARATION OF HARVEY VANDENBURG
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Harvey Vandenburg, do hereby depose and state as follows:

1.     I am over 18 years of age, I have personal knowledge of all the facts set forth in this Declaration, and I am competent to testify about them.

2.     I was employed by Quest Diagnostics as the Administrative Director of the laboratory at Providence Hospital at all relevant times prior to, during and after the selection process for the Project Manager position for which Bridget Pollard applied.  Richard Leap, Quest's Director of Information Technology, and I prepared the position description for this job with assistance from Quest's Human Resources Department.

3.     I did not make any changes to the position description after Jane Kopley or Sean Townsend or Ms. Pollard interviewed for the Project Manager position.  In addition, to my knowledge, no one else, including without limitation Mr. Leap, made any changes to the position description after Ms. Kopley or Mr. Townsend or Ms. Pollard interviewed for the Project Manager position.

I declare under penalty of perjury that this Declaration is true and correct to the best of my knowledge, information and belief.

Harvey Vandenburg

Date: 6/23/08

# **EXHIBIT 3**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRIDGET POLLARD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1: 07-00692(CKK)** |
| ) | |
| ) | |
| **QUEST DIAGNOSTICS,** ) | |
| ) | |
| **Defendant.** ) | |

## DECLARATION OF RICHARD LEAP
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Richard Leap, do hereby depose and state as follows:

1.  I am over 18 years of age, I have personal knowledge of all the facts set forth in this Declaration, and I am competent to testify about them.

2.  I was employed by Quest Diagnostics as the Director of Information Technology at all relevant times prior to, during and after the selection process for the Project Manager position for which Bridget Pollard applied. Harvey Vandenburg, Quest's Administrative Director at the Providence Hospital laboratory, and I prepared the position description for this job with assistance from Quest's Human Resources Department.

3.  I did not make any changes to the position description after Jane Kopley or Sean Townsend or Ms. Pollard interviewed for the Project Manager position. In addition, to my knowledge, no one else, including without limitation Mr. Vandenburg, made any changes to the position description after Ms. Kopley or Mr. Townsend or Ms. Pollard interviewed for the Project Manager position.

I declare under penalty of perjury that this Declaration is true and correct to the best of my knowledge, information and belief.

Richard Leap

Date: 4/23/08

**EXHIBIT 4**

1

1       THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3

4       _____

                               )

5   BRIDGET POLLARD,            )      Case No. 1:07-0692 (CKK)

                               )

6          Plaintiff,          )    ORIGINAL

                               )

7   vs.                        )

                               )

8   QUEST DIAGNOSTICS,          )

                               )

9          Defendant.          )

    _____   )

10

11

12       VIDEOTAPED DEPOSITION OF

13        BRIDGET L. POLLARD

14         Washington, D.C.

15     Friday, December 21, 2007

16          8:59 a.m.

17

18

19

20

21  Job No.:  1-119106

    Pages 1 through 169

22  Reported by:   John L. Harmonson, RPR


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

2

1

2

3                        Videotaped Deposition of

4                          BRIDGET L. POLLARD

5

6

7    Held at the offices of:

8              ARENT FOX, PLLC

9              1050 Connecticut Avenue, N.W.

10             Washington, D.C.   20036

11

12

13

14        Taken pursuant to the Federal Rules of Civil

15   Procedure, before John L. Harmonson, Registered

16   Professional Reporter, Notary Public in and for the

17   District of Columbia, who officiated in administering

18   the oath to the witness.

19

20

21

22

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

3

1                       APPEARANCES

2

3    ON BEHALF OF PLAINTIFF:

4             NATHANIEL D. JOHNSON, ESQ.

              Law Firm of Nathaniel D. Johnson, LLC

5             3475 Leonardtown Road, Suite 200

              Waldorf, Maryland  20602

6             (301) 645-9103

7

8

     ON BEHALF OF DEFENDANT:

9

              MICHAEL L. STEVENS, ESQ.

10            AKIA ROANE, ESQ.

              Arent Fox, PLLC

11            1050 Connecticut Avenue, N.W.

              Washington, D.C.  20036

12            (202) 857-6000

13

14

15   ALSO PRESENT:

16            CALI DAY, Videographer

17

18

19

20

21

22

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

4

1                    EXAMINATION INDEX

2                                                    PAGE

3    EXAMINATION BY MR. STEVENS                        7

4                   *   *   *   *   *

5

6                    EXHIBIT INDEX

7           (Exhibits attached to transcript.)

8    EXHIBIT            DESCRIPTION            PAGE

9    1       Letter from INC Research to B.       10

10           Pollard; August 9, 2007

11   2       INC job description for research     11

12           associate

13   3       Tender of Employment and Contract,   14

14           Wake Tech Community College

15   4       Job description, Wake Tech Community  16

16           College, for lab technician

17   5       Plaintiff's Responses to             21

18           Interrogatories

19   6       Résumé of Bridget Pollard            25

20   7       Letter from Quest Employee Services to  35

21           B. Pollard; October 4, 2006

22

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

5

EXHIBIT INDEX (Cont.'d)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 8 | American Medical Laboratories job description for medical technologist | 51 |
| 9 | Quest job description for project lab manager | 70 |
| 10 | Letter from B. Pollard to H. Vandenburg; July 26, 2005 | 80 |
| 11 | Résumé of Jane Kopley | 103 |
| 12 | Résumé of Sean Townsend | 112 |
| 13 | Résumé of Tuy Le | 119 |
| 14 | 2003 Annual Performance Development and Review | 132 |
| 15 | 2004 Annual Performance Development and Review | 136 |
| 16 | 2005 Annual Performance Development and Review | 146 |
| 17 | Letter from B. Pollard to L. Thatcher; February 2, 2006 | 152 |
| 18 | EEOC Dismissal and Notice of Rights | 162 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

117

1       Q.      What -- What position did Mr. Tsehay      11:18:00

2   hold at Holy Cross Hospital?                          11:18:04

3       A.      He was the assistant lab supervisor.      11:18:07

4       Q.      So he was -- he worked at both Holy       11:18:11

5   Cross and Providence?                                 11:18:15

6       A.      Yes.                                      11:18:17

7       Q.      And do you know what level of             11:18:19

8   interaction he had with Mr. Townsend?                 11:18:21

9       A.      No, I don't.                              11:18:24

10      Q.      Do you know for a fact whether            11:18:29

11  Mr. Tsehay had personal knowledge as to whether       11:18:30

12  Mr. Townsend did what he said with respect to         11:18:33

13  interfacing all laboratory instruments with the       11:18:36

14  new LIS?                                              11:18:40

15      A.      I believe he would.                       11:18:41

16      Q.      But do you have any personal knowledge    11:18:42

17  to that effect?                                       11:18:44

18      A.      No, I don't.                              11:18:45

19      Q.      Do you know if Mr. Vandenburg or          11:18:48

20  Mr. Leap or anyone in the Human Resources             11:18:56

21  Department at Quest knew that any information on       11:19:01

22  Mr. Townsend's résumé was false at the time they      11:19:07

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

118

1    made the offer?                                          11:19:11

2        A.    No, I don't know.                              11:19:12

3        Q.    You don't have any evidence that they          11:19:13

4    knew that there was any false information on this        11:19:15

5    application, do you?                                     11:19:18

6        A.    No, I don't have any evidence.                 11:19:19

7        Q.    If it was true that from 2004 to               11:19:30

8    present Mr. Townsend was responsible for                 11:19:36

9    interfacing all laboratory instruments with the         11:19:40

10   new LIS and for building the respiratory and            11:19:43

11   point-of-care components for SoftLab, that would         11:19:47

12   have made him more qualified for the position than      11:19:51

13   you were --                                              11:19:54

14            MR. JOHNSON:  Objection.                        11:19:54

15       Q.    -- wouldn't it have?                           11:19:54

16            MR. JOHNSON:  Objection.  Sorry.                11:19:56

17            THE WITNESS:  Yeah, that would have             11:19:58

18   gave him some more experience.                           11:19:59

19   BY MR. STEVENS:                                          11:20:00

20       Q.    That would have made him more qualified       11:20:00

21   than you; isn't that correct?                            11:20:03

22            MR. JOHNSON:  Same objection.                   11:20:04

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

119

| 1 | THE WITNESS:  Yes. | 11:20:05 |
| 2 | BY MR. STEVENS: | 11:20:06 |
| 3 | Q.    And do you have any reason to believe | 11:20:08 |
| 4 | that under 1999 to present, the description of | 11:20:11 |
| 5 | what he did at Holy Cross Hospital is incorrect? | 11:20:20 |
| 6 | A.    No. | 11:20:36 |
| 7 | Q.    Do you have any reason to believe that | 11:20:37 |
| 8 | other than what you've already testified about, | 11:20:40 |
| 9 | that there is any other false information on his | 11:20:43 |
| 10 | résumé? | 11:20:46 |
| 11 | A.    Say that again. | 11:20:47 |
| 12 | Q.    Do you have any information to suggest | 11:20:48 |
| 13 | that anything else on his résumé, other than what | 11:20:51 |
| 14 | you've already testified about, is false? | 11:20:54 |
| 15 | A.    No. | 11:20:57 |
| 16 | (Exhibit 13 marked for identification and | |
| 17 | attached hereto.) | |
| 18 | BY MR. STEVENS: | 11:21:15 |
| 19 | Q.    The court reporter has placed before | 11:21:35 |
| 20 | you what has been marked as Deposition Exhibit 13, | 11:21:36 |
| 21 | which is a two-page document with the Bates labels | 11:21:39 |
| 22 | Q00127 and Q00128. | 11:21:44 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

122

1    Q.    Okay.  And do you think Mr. Le was more          11:24:23

2    qualified than Mr. Townsend for the position?          11:24:25

3    A.    No, I don't.                                      11:24:27

4    Q.    Do you think Mr. Le was more qualified            11:24:28

5    than Ms. Kopley for the position?                       11:24:31

6    A.    No, I don't.                                       11:24:34

7    Q.    Do you think Mr. Le was discriminated             11:24:36

8    against based on his race because he didn't get         11:24:38

9    this position?                                          11:24:41

10    A.    I think he was discriminated against            11:24:42

11    because of his accent.                                  11:24:44

12    Q.    Because of his accent?                            11:24:46

13    A.    Yes.                                              11:24:48

14    Q.    Okay.  Why do you think he was                   11:24:48

15    discriminated against because of his accent?           11:24:50

16    A.    Because I believe that it was said that         11:24:53

17    that was the reason he didn't get the position,        11:24:55

18    because -- he was hard to understand verbally.         11:24:58

19    Q.    Is that true?  Was he hard to                    11:25:03

20    understand verbally?                                    11:25:06

21    A.    I don't have a problem with accents.             11:25:07

22    Q.    Do you know of anyone who had a problem          11:25:10

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

131

| | | |
|---|---|---|
| 1 | the LIS system? | 11:32:43 |
| 2 | A.    Probably maybe eight years. | 11:32:52 |
| 3 | Q.    And had you ever worked with the LIS | 11:33:02 |
| 4 | system, the upgraded LIS system that Quest was | 11:33:06 |
| 5 | going to install? | 11:33:12 |
| 6 | A.    No. | 11:33:13 |
| 7 | Q.    And did you have any experience | 11:33:16 |
| 8 | installing the upgrades to the system that Quest | 11:33:18 |
| 9 | was going to install? | 11:33:22 |
| 10 | A.    No. | 11:33:23 |
| 11 | Q.    And did you have any experience | 11:33:25 |
| 12 | building and testing a new system that included | 11:33:28 |
| 13 | the upgrades that Quest was going to install? | 11:33:33 |
| 14 | A.    No. | 11:33:35 |
| 15 | Q.    And had you ever trained any staff on | 11:33:37 |
| 16 | the use of LIS using the upgrades that Quest was | 11:33:40 |
| 17 | about to install? | 11:33:46 |
| 18 | A.    No. | 11:33:47 |
| 19 | Q.    And had you had any experience | 11:33:50 |
| 20 | collaborating with hospital information system | 11:33:53 |
| 21 | personnel in maintaining the LIS database for the | 11:33:57 |
| 22 | upgraded system that Quest was going to install? | 11:34:01 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

132

| | | |
|---|---|---|
| 1 | A.    No. | 11:34:04 |
| 2 | Q.    And had you had any experience in | 11:34:05 |
| 3 | writing LIS standard operating procedures for the | 11:34:08 |
| 4 | LIS system that Quest was going to install? | 11:34:13 |
| 5 | A.    No. | 11:34:16 |
| 6 | Q.    And did you have any experience | 11:34:17 |
| 7 | providing any audit trail documentation for the | 11:34:19 |
| 8 | upgraded LIS system that Quest was going to | 11:34:22 |
| 9 | install? | 11:34:26 |
| 10 | A.    No. | 11:34:27 |
| 11 | Q.    And did you have any experience in | 11:34:28 |
| 12 | monitoring the performance of the LIS system for | 11:34:30 |
| 13 | the upgraded system that Quest was going to | 11:34:34 |
| 14 | install? | 11:34:38 |
| 15 | A.    No. | 11:34:38 |
| 16 | (Exhibit 14 marked for identification and | |
| 17 | attached hereto.) | |
| 18 | BY MR. STEVENS: | 11:35:15 |
| 19 | Q.    The court reporter has placed before | 11:35:23 |
| 20 | you what's been marked as Deposition Exhibit 14, | 11:35:25 |
| 21 | which is a multi-page document with the Bates | 11:35:28 |
| 22 | label Q00257 through Q00264. | 11:35:32 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

152

1          (Exhibit 17 marked for identification and

2    attached hereto.)

3    BY MR. STEVENS:                                   11:57:05

4          Q.    The court reporter has placed before  11:57:20

5    you a document which is marked as Exhibit 17,     11:57:22

6    which is a one-page document.                     11:57:26

7          Please take the time you need to review     11:57:30

8    that document and let me know when you're prepared 11:57:31

9    to answer questions about it.                     11:57:33

10         A.    I'm prepared.                         11:57:35

11         Q.    Can you identify that document for me, 11:57:36

12   please?                                           11:57:38

13         A.    Yes.  This is a letter that I had      11:57:38

14   written and submitted to my lawyer at the time,   11:57:46

15   Ms. Thatcher, in reference to my job performance  11:57:51

16   evaluation for 2005.                              11:57:55

17         Q.    Okay.  And can you read for the record 11:57:57

18   what the letter says?                             11:58:01

19         A.    It says:  "The job performance        11:58:03

20   evaluation for 2005 was conducted by my working   11:58:05

21   supervisor, Isabelita Aglipay.  I asked that some 11:58:08

22   of the scores be changed because I did not agree   11:58:11

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

153

| | | |
|---|---|---|
| 1 | with them; they did not reflect my quality of | 11:58:13 |
| 2 | work.  Isabelita informed me that no one would be | 11:58:16 |
| 3 | allowed an excellent rating per Harvey Vandenburg, | 11:58:19 |
| 4 | the laboratory director.  I did not want to argue | 11:58:23 |
| 5 | the matter and accepted the rating with some minor | 11:58:26 |
| 6 | changes." | 11:58:29 |
| 7 | Q.    And is what you just read accurate? | 11:58:30 |
| 8 | A.    Yes, it is. | 11:58:33 |
| 9 | Q.    Okay.  Now, when Isabelita told you | 11:58:35 |
| 10 | that no one would be allowed an excellent rating | 11:58:39 |
| 11 | per Harvey Vandenburg, did you understand that | 11:58:43 |
| 12 | Mr. Vandenburg was making that rule for all | 11:58:50 |
| 13 | employees? | 11:58:53 |
| 14 | A.    That's what I understood. | 11:58:55 |
| 15 | Q.    And did Ms. Aglipay tell you why he | 11:59:01 |
| 16 | made that rule? | 11:59:04 |
| 17 | A.    No, she did not. | 11:59:05 |
| 18 | Q.    Let's look back at Exhibit 16, page 5. | 11:59:08 |
| 19 | Are you there? | 11:59:23 |
| 20 | A.    Yes. | 11:59:25 |
| 21 | Q.    Now, it looks like in the performance | 11:59:31 |
| 22 | factor ratings in the top left-hand corner on page | 11:59:39 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

157

1      Q.    Now, this was a review that was          12:03:23

2   conducted by a different supervisor; isn't that   12:03:25

3   correct?                                          12:03:28

4      A.    No.   Isabelita was always the           12:03:29

5   supervisor.                                       12:03:31

6      Q.    I understand that.  But she didn't        12:03:32

7   prepare your previous review?                     12:03:34

8      A.    I don't know if she prepared it or not.  12:03:36

9      Q.    But you didn't discuss your previous     12:03:38

10  review with her, you discussed it with Mr. Meeder; 12:03:40

11  isn't that right?                                 12:03:44

12     A.    Yes.                                      12:03:45

13     Q.    Now, do you have any evidence to         12:03:46

14  suggest that the reason that Ms. Aglipay rated you 12:03:52

15  the way she did was because you had filed an EEOC  12:03:56

16  charge?                                           12:04:01

17     A.    No.                                       12:04:01

18     Q.    And during the time that you were        12:04:04

19  employed by Quest, did you ever hear any manager  12:04:06

20  or supervisor discuss the fact that there was a   12:04:11

21  distribution for ratings on the evaluation system? 12:04:18

22     A.    No.                                       12:04:21

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

159

| | | |
|---|---|---|
| 1 | black, Quest would not have selected him? | 12:05:44 |
| 2 | MR. JOHNSON:  Objection. | 12:05:47 |
| 3 | THE WITNESS:  Probably. | 12:05:49 |
| 4 | BY MR. STEVENS: | 12:05:49 |
| 5 | Q.    Why? | 12:05:50 |
| 6 | MR. JOHNSON:  Same objection. | 12:05:52 |
| 7 | THE WITNESS:  Because I feel they're | 12:05:54 |
| 8 | discriminatory. | 12:05:55 |
| 9 | BY MR. STEVENS: | 12:05:56 |
| 10 | Q.    Okay.  Do you have any evidence to | 12:05:57 |
| 11 | suggest that they would not have selected | 12:05:59 |
| 12 | Mr. Townsend -- | 12:06:02 |
| 13 | A.    I have no evidence. | 12:06:04 |
| 14 | Q.    Okay.  And you don't have any evidence | 12:06:05 |
| 15 | that Mr. Leap knew Mr. Townsend's race when he | 12:06:09 |
| 16 | recommended that the offer be given to | 12:06:14 |
| 17 | Mr. Townsend, do you? | 12:06:16 |
| 18 | A.    I believe he had access to that data | 12:06:18 |
| 19 | sheet that says that, his race on there. | 12:06:21 |
| 20 | Q.    What information do you have that | 12:06:24 |
| 21 | Mr. Leap had access to that data sheet? | 12:06:26 |
| 22 | A.    None at all. | 12:06:29 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

160

| | | |
|---|---|---|
| 1 | Q.    None at all. | 12:06:30 |
| 2 | But you believe it anyway, don't you? | 12:06:31 |
| 3 | MR. JOHNSON:  Objection.  Is that a | 12:06:35 |
| 4 | question? | 12:06:37 |
| 5 | BY MR. STEVENS: | 12:06:38 |
| 6 | Q.    You don't have any evidence that he had | 12:06:38 |
| 7 | access to that data sheet, do you? | 12:06:40 |
| 8 | A.    No, I don't. | 12:06:42 |
| 9 | Q.    And you don't have any evidence that | 12:06:43 |
| 10 | Mr. Leap knew what Mr. Townsend's race was, do | 12:06:45 |
| 11 | you? | 12:06:48 |
| 12 | A.    No, I don't. | 12:06:48 |
| 13 | Q.    And you don't have any evidence that | 12:06:49 |
| 14 | Mr. Leap knew what Ms. Kopley's race was, do you? | 12:06:50 |
| 15 | A.    No, I don't. | 12:06:55 |
| 16 | Q.    In fact, you don't have any evidence | 12:06:56 |
| 17 | that Mr. Leap knew what your race was, do you? | 12:06:57 |
| 18 | A.    No, I don't. | 12:07:00 |
| 19 | Q.    And you don't have any evidence that | 12:07:01 |
| 20 | Mr. Leap knew the race of any of the other | 12:07:03 |
| 21 | applicants for the position, do you? | 12:07:05 |
| 22 | A.    No, I don't. | 12:07:07 |

Thatcher Law Firm
Belle Point Office Park
7849 Belle Point Drive
Greenbelt, MD 20770

3205 Forest Run Drive
Forestville, MD 20747
February 2, 2006

To: Linda Thatcher
RE: 2005 Evaluation

The Job Performance evaluation for 2005 was conducted by my working supervisor, Isabelita Aglipay. I asked that some of the scores be changed because I did not agree with them, they did not reflect my quality of work. Isabelita informed me that I no one would be allowed an Excellent Rating per Harvey Vandenburg, the Laboratory Director. I did not want to argue the matter, and accepted the rating with some minor changes.

Sincerely,

Bridget Pollard



EXHIBIT

17

PENGAD 800-631-6989

# **<u>EXHIBIT 5</u>**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

BRIDGET POLLARD,                    X

                                    :

          Plaintiff,                :

     vs.                            :Case No. 1:07-0692

QUEST DIAGNOSTICS                   :

                                    :

          Defendant.                X

                         WASHINGTON, DC
                         December 20, 2007


DEPOSITION OF:

**HARVEY VANDENBURG,**

a witness, called for examination by counsel on behalf of

the Plaintiff, pursuant to notice and agreement of the

parties as to time and date, taken at the Arent Fox, LLP,

1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,

beginning at approximately 12:39 p.m., before Raakeebah

L. Henderson, a Notary Public and court reporter in and

for the District of Columbia, when were present on behalf

of the respective parties:

2

```
 1    APPEARANCES BY COUNSEL:

 2       FOR THE PLAINTIFF:

 3          NATHANIEL D. JOHNSON & ASSOCIATES, LLC

 4          BY: NATHANIEL D. JOHNSON, ESQUIRE
            3475 Leonardtown Road, Suite 105
 5          Waldorf, Maryland 20602
            301.893.0807
 6

 7       FOR THE DEFENDANT:

 8          ARENT FOX, LLP

 9          BY: MICHAEL L. STEVENS, ESQUIRE
            1050 Connecticut Avenue, NW, Suite 600
10          Washington, D.C. 20036-5339
            (202) 857-6000
11          stevens.michael@arentfox.com

12

13    ALSO PRESENT:  Bridget Pollard, Plaintiff

14

15

16                  -   -   -   -   -   -   -

17

18            (Index appears following the transcript.)

19

20

21

22
```

Raakeebah L. Henderson, Professional Court Reporter
13017 Wisteria Drive, Suite 364
Cell: (301) 717-9468   Fax: (240) 912-7323  E-mail: keebahcr@comcast.net

1    see any language within this position description which

2    requires a person or a candidate's certification?

3         MR. STEVENS:  Objection.  You can answer.

4    A.    Laboratory certification; is that what you're

5    referring to?

6    Q.    Anything that could possibly be construed as

7    requiring certification.

8    A.    No.

9    Q.    Eventually did you interview Mr. Townsend?

10   A.    Yes.

11   Q.    How many times did you interview Mr. Townsend?

12   A.    Once.

13   Q.    Was it face-to-face?

14   A.    Yes.

15   Q.    What about Ms. Copley?

16   A.    Yes.

17   Q.    How many times did you interview her?

18   A.    Once.

19   Q.    Mr. Vandenburg, who did you select or recommend

20   for selection for the project manager position?

21   A.    It really didn't work that way.  What I did was

22   I interviewed the applicants and I made my own

1    determination about how I felt their interpersonal

2    communication skills were and whether what they put on

3    their resume was consistent with what they were able to

4    verbalize to me and answer any questions they had about

5    the job.

6            So essentially I was, you know, looking at more

7    of the interpersonal aspect and I was relying on Rich to

8    look at the LIS, the technical aspects, and we agreed

9    that we would decide together.

10           So my conversation to Rich although I don't

11   remember the exact words was like this.  Well, you know,

12   I've talked to all these people, it seems like they could

13   all get along.  They can speak and they have good verbal

14   communications skills, you know, the technical aspects

15   are going to be the deciding factors here.  Who do you

16   think is the best candidate.

17           And the person that he was said was Jane Copley

18   because she had he told me a breadth of laboratory

19   information and experience in her previous job that would

20   essentially prime her for this job.

21           And he recommended that that would be the person

22   that we make the offer to.  And I accepted that

1    recommendation.  It seemed reasonable to me.

2         Q.   And eventually she declined the position,

3    correct?

4         A.   That's correct.

5         Q.   Why did she decline the position?

6         A.   My understanding from the HR people

7    post-interview was that she wanted more money than we

8    were offering.

9         Q.   So after she declined the position or the offer

10   for the position then was the position reposted?

11        A.   No.  Then we went to our second choice because

12   we felt our second choice would be able to perform the

13   job adequately.

14        Q.   Okay.  I'm a little confused.  A moment ago you

15   testified that it was Lee who would make the

16   recommendation based upon the person's technical

17   background and expertise, correct?

18        A.   Mm-hmm.

19        Q.   You have to verbalize your responses, all

20   right?

21        A.   Oh, yes, sir.  Sorry.

22        Q.   You're saying that it was -- now you're saying

1     Q.   Now, is it not Quest Diagnostics' policy to

2    have a preference if you will for internal applicants as

3    opposed to external applicants?

4         MR. STEVENS:  Objection.  You can answer the

5    question.

6     A.   I'm not aware of any such policy.  However in

7    practice I think it's a good idea to try to put your own

8    people's ambitions with the best possible phase and move

9    them forward in the process for promotions.

10     Q.   Did you know Mr. Townsend prior to the time he

11    applied for the position?

12     A.   No.

13     Q.   Did you know Ms. Copley prior to her

14    application for the position?

15     A.   No.  I did not.

16     Q.   Is it your testimony that Ms. Pollard didn't

17    have sufficient technical background and expertise to be

18    seriously considered for the position had Mr. Townsend

19    declined?

20     A.   It's my testimony that Ms. Pollard had

21    sufficient laboratory knowledge as a medical technologist

22    where she lacked knowledge or experience was in the

1        Q.    Now let me direct your attention to Exhibit 13

2    and it's dated 2005, correct?

3              MR. STEVENS:  Objection.   You can answer.

4        A.    Yes, it is.

5        Q.    And it's Ms. Pollard's performance evaluation,

6    correct?

7        A.    It appears to be so.

8        Q.    Let me direct your attention to the fifth page.

9        A.    Okay.

10       Q.    Where previous year Ms. Pollard received a 2.0

11   and here she received initially a 2.75; is that correct?

12       A.    It looks like it, it's crossed through.

13       Q.    But ultimately she received a 2.5; is that

14   correct?

15       A.    It looks like it.

16       Q.    And this was -- the appraiser here is who?

17       A.    Isabalida Aglipay (phonetic).

18       Q.    And that was her immediate supervisor?

19       A.    Correct.

20       Q.    Did you have any input in Ms. Pollard's

21   supervisor giving her a score of 2.75 or the 2.5?

22       A.    No, I did not.

# **<u>EXHIBIT 6</u>**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

BRIDGET POLLARD,               X

                               :

        Plaintiff,             :

    vs.                        :Case No. 1:07-0692

QUEST DIAGNOSTICS             :

                               :

        Defendant.            X

---

WASHINGTON, DC
December 20, 2007

DEPOSITION OF:

**RICHARD LEAP,**

a witness, called for examination by counsel on behalf of
the Plaintiff, pursuant to notice and agreement of the
parties as to time and date, taken at the Arent Fox, LLP,
1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,
beginning at approximately 10:35 a.m., before Raakeebah
L. Henderson, a Notary Public and court reporter in and
for the District of Columbia, when were present on behalf
of the respective parties:



```
1    APPEARANCES BY COUNSEL:

2       FOR THE PLAINTIFF:

3          NATHANIEL D. JOHNSON & ASSOCIATES, LLC

4          BY: NATHANIEL D. JOHNSON, ESQUIRE
           3475 Leonardtown Road, Suite 105
5          Waldorf, Maryland 20602
           301.893.0807
6

7       FOR THE DEFENDANT:

8          ARENT FOX, LLP

9          BY: MICHAEL L. STEVENS, ESQUIRE
           1050 Connecticut Avenue, NW, Suite 600
10         Washington, D.C. 20036-5339
           (202) 857-6000
11         stevens.michael@arentfox.com

12

13   ALSO PRESENT:  Bridget Pollard, Plaintiff

14

15

16              -    -    -    -    -    -

17

18         (Index appears following the transcript.)

19

20

21

22
```

1       A.   Shawn Townsend.

2       Q.   Have you met Mr. Townsend?

3       A.   Yes.

4       Q.   What race is Mr. Townsend?

5       A.   He is white.

6       Q.   Did you know Mr. Townsend prior to his

7   selection for the project manager position?

8       A.   No.

9       Q.   Did you have any role or any input in the

10  selection of Mr. Townsend for the project manager

11  position.

12      A.   Yes.

13      Q.   And what was that, sir?

14      A.   I interviewed him on the phone.  I read his

15  resume.

16      Q.   How many times did you interview Mr. Townsend?

17      A.   Once.

18      Q.   How long did the phone interview last?

19      A.   Probably 45 minutes.

20      Q.   When you said on the phone was it a one-on-one

21  telephone conversation or was it a conference call?

22      A.   One-on-one.

Raakeebah L. Henderson, Professional Court Reporter
13017 Wisteria Drive, Suite 364
Cell: (301) 717-9468   Fax: (240) 912-7323  E-mail: keebahcr@comcast.net

# **<u>EXHIBIT 7</u>**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

BRIDGET POLLARD,                    X

                                    :

        Plaintiff,                  :

    vs.                             :Case No. 1:07-0692

QUEST DIAGNOSTICS                   :

                                    :

        Defendant.        _____  X

---

WASHINGTON, DC
January 28, 20078

DEPOSITION OF:

**ISABELITA AGLIPAY,**

a witness, called for examination by counsel on behalf of

the Plaintiff, pursuant to notice and agreement of the

parties as to time and date, taken at the Arent Fox, LLP,

1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,

beginning at approximately 11:12 a.m., before Raakeebah

L. Henderson, a Notary Public and court reporter in and

for the District of Columbia, when were present on behalf

of the respective parties:

```
 1    APPEARANCES BY COUNSEL:

 2       FOR THE PLAINTIFF:

 3            NATHANIEL D. JOHNSON & ASSOCIATES, LLC

 4            BY: NATHANIEL D. JOHNSON, ESQUIRE
              3475 Leonardtown Road, Suite 105
 5            Waldorf, Maryland 20602
              301.893.0807
 6

 7       FOR THE DEFENDANT:

 8            ARENT FOX, LLP

 9            BY: MICHAEL L. STEVENS, ESQUIRE
              1050 Connecticut Avenue, NW, Suite 600
10            Washington, D.C. 20036-5339
              (202) 857-6000
11            stevens.michael@arentfox.com

12

13    ALSO PRESENT:  Bridget Pollard, Plaintiff

14                   Michael Knapp

15

16              -   -   -   -   -   -   -

17

18        (Index appears following the transcript.)

19

20

21

22
```

1    Q.   When in 2006?

2    A.   Before Mr. Vandenburg -- I think.  I don't know

3    if that's -- I cannot answer you what month was that

4    because I might give you wrong month.

5    Q.   All right.  I appreciate that.  At the time

6    that you had evaluated my client's performance, and we're

7    going back to January 2006, that would be Exhibit 2,

8    right?  Exhibit 2.  The performance evaluation in which

9    you conducted?

10    A.   Yes.

11    Q.   Do you have it?

12    A.   Yes.

13    Q.   The appraisal period -- let's go to the last

14    page.  It says January 2006, correct?

15    A.   Yes, 2006.

16    Q.   Did you know of Ms. Pollard complaining of

17    discrimination at the time that you assessed her

18    performance from that evaluation?

19    A.   No.  She didn't mention anything.

20    Q.   What about Mr. Vandenburg?  Did he mention it

21    to you?

22         MR. STEVENS:  At the time?

1          MR. JOHNSON:  At the time  or before that time?

2     A.   I don't remember.

3     Q.   Is it possible that he did mention that

4  Ms. Pollard was considering or she had filed a

5  discrimination complaint at the time that you provided

6  her performance appraisal?  Is it possible?

7          MR. STEVENS:  Objection.

8     A.   No.  I don't know.

9     Q.   Is it possible?

10         MR. STEVENS:  Same objection.

11    A.   No.  It's not possible.

12    Q.   But you don't know; is that correct?

13    A.   Yeah.

14    Q.   So it could be possible?

15    A.   Yes.

16    Q.   I'll move on.  You testified previously

17  Mr. Vandenburg directed you to appraise Ms. Pollard's

18  performance by Exhibit 2, correct?

19         MR. STEVENS:  Objection.  Asked and answered.

20  You can answer.

21    A.   Yes.

22    Q.   Did he tell you not to give her an excellent

1    that time -- you're looking for it.  That's Number 2.

2         A.    That's Number 6.

3         Q.    No, ma'am, not 6.  2002.  The performance

4    appraisal that was conducted by you on Ms. Pollard dated

5    January 2006, right?  At the time you had assessed her

6    performance did anybody mention that Ms. Pollard was

7    complaining of or she raised the issue of discrimination?

8         A.    No.  I didn't hear anything.

9         Q.    Did you have any communication with Ms. Pollard

10   after she relocated to North Carolina?

11        A.    After?

12        Q.    Yes.

13        A.    No.  No.  I don't think so.  I haven't talked

14   to her after North Carolina.

15        Q.    In 2006 -- January 2006, did you evaluate any

16   other subordinates' performance for 2005 cycle or for the

17   year 2005?

18        A.    Yes.  All the employees.

19        Q.    And that was, what, six?

20        A.    It was about three or -- three or four people.

21        Q.    Did any of them receive an excellent rating?

22        A.    Not all of them.