## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**BRIDGET POLLARD**

     **Plaintiff,**

**v.**

**QUEST DIAGNOSTICS**

    **Defendant.**

**Civil Action 07-692 (CKK)**

---

### PLAINTIFF'S MOTION TO OPPOSE DEFENDANT'S SUMMARY JUDGEMENT

**NOW COMES** Plaintiff Bridget Pollard, by and through undersigned counsel, hereby Opposes Defendant's Motion for Summary Judgment. In Support of this Motion, Plaintiff brings a Memorandum of Points and Authorities, Statement of Facts in Dispute, Authorities and Order.

July 23, 2008          On behalf of Plaintiff:

_____/s/_____

Nathaniel D. Johnson (Federal #14729 MD)
Richard L. Thompson (Federal #15980 MD)
201 Centennial Street, A-2
P.O. Box 1857
LaPlata, Maryland 20646

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIDGET POLLARD

    PLAINTIFF,

    v.                              Civil Action No.:  07-0692 (CKK)

QUEST DIAGNOSTICS

    DEFENDANT.

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
HER OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

July 23, 2008                  On behalf of Plaintiff:

                  /s/
               Nathaniel D. Johnson (Federal #14729 MD)
               Richard L. Thompson (Federal #15980 MD)
               201 Centennial Street, A-2
               P.O. Box 1857
               LaPlata, Maryland 20646
               (301) 645-9103/(301) 893-6890 (fax)

## INTRODUCTION

Plaintiff has brought forth her civil action on April 4, 2007 against Defendant for violation of her civil rights pursuant to 42 U.S.C. § 2000e et. seq., "Title VII" and 42 U.S.C. §1981. More specifically, Plaintiff's Complaint raises a claim of disparate treatment based on race and color due to a failure to promote and a claim of retaliation.

Defendant filed its Motion for Summary Judgment on April 21, 2008 (Dkt. 25). This motion follows. Plaintiff filed her Opposition to Defendant's Motion on June 10, 2008. (Dkt. 28). By the Court's Order, Plaintiff now brings her Revised Opposition. (Dkt. 34)

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255, 106 S.Ct. 2505; see also *Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C.Cir.1989).

To escape summary judgment the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C.Cir.1987).

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. March 31, 1998) (internal citation omitted), aff'd, No. 99-5126, 1999 WL 825425, at *1 (D.C.Cir. Sept.27, 1999).

## ARGUMENT

I.    **Summary Judgment Should Be Denied With Respect to Count I**

   **A. Failure to Promote**

Plaintiff asserts a claim for failure to promote based upon her race and color in violation of Title VII and 42 U.S.C. §1981 in Count I of her Amended Complaint.   See Plaintiff's Amended Complaint. (Dkt. 12).   Plaintiff can set forth evidence sufficient to establish a prima facie case that she was denied promotion because of her race and/or color.

The requirements for a prima facie case of discrimination are flexible and vary depending on the type of case. *McDonnell Douglas Corp. v. Green*, 411 U.W. 792, 804, 36 L.Ed. 2d 668, 93 S. Ct. 1817 (1973). Plaintiff can establish a prima facie case of discriminatory failure to promote, in the instant case, by demonstrating that: (1) she is a member of a protected class; (2) *she applied for and was qualified for a promotion*; (3) despite her qualifications, she was rejected; and (4) other employees not of the same protected class were promoted while she was not. (Emphasis added). See *Stella v. Mineta,* 350 U.S. App. D.C. 300, 284 f.3D 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 339 U.S. App. D.C. 233 199 F. 3d 123, 145 (D.C. Cir.

1999).  Among the specific contentions of Defendant is the question of material fact in dispute of whether Plaintiff was qualified for the position which she sought. Defendant's Motion at 8:¶4.

Plaintiff can establish a prima facie case of discriminatory failure to promote based upon the fact that (1) she is a member of a protected class based on her race, African-American, and color, Black. (2) She applied for the position of Project Manager which was posted in a job announcement in May 2005; and Plaintiff met the qualifications of that job announcement.   (3) She suffered adverse employment actions when her request for promotion was denied. (4) Sean Townsend, who is a white male, was selected for the position after an interview which was conducted on July 20, 2005.  (See Plaintiff's Amended Complaint. Dkt. 12).

### B. Non-Selection

Once Plaintiff has established a p*rima facie* case, *McDonnell Douglass* analysis presents that Defendant my rebut this prima facie case by asserting a legitimate, non-discriminatory reason for the management decision. Defendant contends that Plaintiff cannot prove a fundamental elements of her prima facie case, namely, (1) that she possessed the requisite qualifications for the Project Manager position (See Defendant's Motion at 8: ¶4) and, (2) that the deciding official, Harvey Vanderburg, was not aware of Plaintiff's race at the time of her non-selection. (Defendant's Statement of Facts at ¶28)**.**  Plaintiff contends, however, that she was qualified for the position as posted, and thereby rejected for the Project Manager position under circumstances that give rise to a reasonable inference of discrimination.  *Stella*.

Plaintiff's Qualifications for the Project Manager Position:

The Project Manager position for Providence Hospital was posted on May 13, 2005. (Plaintiff's Exh. A, "Vacancy Announcement"). The vacancy announcement stated "Job Requirements" as follows:

*"BS or AA in Medical Technology or Computer Science. General laboratory knowledge. LIS functionalities. LIS/HIS interface knowledge."* (Emphasis added). (See Plaintiff's Exhibit A, Vacancy Announcement).

Plaintiff was a Medical Technologists and operated the Laboratory Information System (LIS) in the course of her employment. (See Exh.B, "Plaintiff's Declaration" at ¶2). Moreover, Plaintiff applied for the Project Manager position based upon her prior experience and expertise as a Medical Technologist. Id. Therefore, at the time the Plaintiff applied for the position, she fully met all of the qualifications sufficient to be promoted into the position based upon her resume and vacancy announcement**.** See Plaintiff's Ex. A.

Defendant's failure to promote Plaintiff gives rise to an inference of discrimination. *Stella.* Defendant's analysis falters, and an inference of discrimination is raised, since Defendant attempts to argue that Plaintiff was not qualified for the position of Project Manager, which was posted by announcement set forth above in May 13, 2005 by comparison to a position description that was created at least three months after the vacancy announcement was posted in August, 2005. Defendant's Exh. 8, Project Manager Position Description. (See Vanderburg's Deposition at 24:4-15). It is undisputed that Mr. Vanderburg and Mr. Leap collaborated on a position description in August 2005. Id. It is also undisputed that during Mr. Vanderburg's deposition testimony, reading from Defendant's investigative document produced in response to Plaintiff's discovery, the position description was composed after Sean Townsend's interview to which Plaintiff infers that the position description was tailored[1]. (Id. at 58: 10-17; Exhibit C, "Defendant's Investigative Information").

Nonetheless, it is undisputed that the position description consists of additional technical requirements that were serendipitously excluded from the vacancy announcement, but were

---

[1] Plaintiff's failure to promote claim only challenges Defendant's selection of Sean Townsend, not Jane Kopley, the other white comparator.

utilized as a basis to exclude Plaintiff and all other minority interview applicants.   (See Defendant's Exhibit 8, "Project Manager Position Description").   Thus, it is at best a question of material fact in dispute as to whether Plaintiff was qualified for the position to which she applied, at worst it is evidence of an intent to discriminate.   At this juncture, Plaintiff is entitled to all reasonable inferences. *Stella.*

In support of Defendant's argument that Plaintiff was not otherwise qualified for the position to which she applied, the deciding official, Harvey Vanderburg, testified that he and Richard Leap, Information Technician, collaborated the position description that was consistent with the requisite technical needs for the Project Manager position, which was posted May 2005. (Vanderburg's Deposition at 24:4-15). However, what is conveniently absent in Defendant's argument is, again, the uncontroverted evidence that the position description referenced by Vanderburg and Leap was actually composed in August 2005 <u>after</u> the interview of the selected white candidate, Sean Townsend that was conducted on July 20, 2005. (Emphasis added). (Vanderburg's Deposition at 58: 10-17).    For instance, again, the Project Manager Position Description reads in pertinent part, "Date Written: 8/2005." See Defendant's Exh. 8.

In the case of *Shaw v. Boorstin*, 517 F. Supp. 336 (1981), the Court held that a female Plaintiff established non-selection based upon her gender in violation of Title VII when she was denied a promotion, notwithstanding her meeting the qualifications that were included in the vacancy announcement.   Exh. A, "Vacancy Announcement." The Court in *Shaw* took extreme care in assessing the legitimacy of management's subjective evaluation of the skills required for the position as set forth in the job's qualifications, in question, against the objective factors when determining whether these skills were job related.   In *Shaw*, the Court further stated:

> "It is true that as defendant argues, 'when the job clearly requires a high degree of skill…,' the employer bears a correspondingly lighter burden to show that his employment criteria are job-related. *Spurlock v. United Airlines, Inc.*  475 F.2d 216 (10th Cir 1972).  Nevertheless, under the circumstances of this case, the Court finds that the requirements of one year time in-grade at the GS-14 level were not mandatory but was used as an artificial barrier to prevent plaintiff from being interviewed and appointed to the position." *Shaw* at 340.

With respect to the question of whether Defendant's reliance upon the August position description is reasonably job related, Defendant's assertion is without credibility for a number of reasons.  *McDonnell Douglas.* Contrary to Defendant's representation, the LIS was not a newly installed system, but, instead an upgrade from the previous position. (See Plaintiff's Declaration at ¶4). The relevance of this fact is significant because after the upgrade of the LIS, Plaintiff demonstrated proficiency in its operation and interaction. (Id. at ¶2)**.** Moreover, Defendant has not put forth any scintilla of evidence that disputes Plaintiff's proficiency in the operation or interaction of the LIS after it was upgraded.

The position description composed in August, after Sean Townsend's interview, and well after the vacancy announcement was posted in May, consists of additional requirements that were excluded from the vacancy announcement. (See Defendant's Exhibit 8.) Plaintiff contends that *Shaw* is indistinguishable here, since Mr. Vanderburg's discretionary role in the composition of the position description are facts sufficient to provide an inference of discrimination to rebut Defendant's alleged non-discriminatory basis for its actions. *Shaw.*

Vanderburg's Knowledge of Plaintiff's Race:

Second, Defendant's motion asserts Plaintiff's race could have not been a factor in Defendant's decision for her non-selection since she and Mr. Vanderburg were never formally introduced. See Defendant's Statement of Facts at ¶28. Defendant's reliance upon Vanderburg never having formally met Plaintiff is not determinative as a matter of fact on the issue of

whether Plaintiff's race was a factor in Defendant's decision not to promoter her. Plaintiff testified that she would often see Vanderburg at the laboratory and would often speak to him in passing. (Plaintiff's Deposition 61:32).  Further, both Plaintiff and Vanderburg testified they had a number of telephone discussions regarding her availability for the interview. Id. at ¶27. Defendant does not discount the likelihood that Vanderburg suspected or identified Plaintiff's racial classification from the telephone interview. Also, by its own admission, Defendant employed a predominant number (65.06%) of African-American employees alone at the Providence Hospital location. (See Defendant's Knapp's Declaration at 6).  Moreover, it is uncontroverted that Plaintiff and the internal applicants for the Project Manager position were all minorities.  (See Plaintiff's Exhibit C, "Defendant's Investigative Information"; and Exh. D, "Applicant Workflow Data Chart").  Therefore, even assuming, *arguendo*, that Mr. Vanderburg never formally met Plaintiff, it is undisputed that only the white applicants were permitted second level interviews.  Defendant's Statement of Facts ¶31. These facts should suffice to establish that the trier of facts could find material issues sufficient to deny Defendant's motion. *Shaw.*

## II.    <u>Defendant's Non-Discriminatory Explanations Are A Pretext For Discriminatory Conduct</u>

Once the defendant articulates a sufficient reason for its non-selection decision, the presumption raised by the prima facie case is rebutted, and the burden shifts back to the plaintiff to produce some evidence, either direct or circumstantial, to show that the defendant's proffered reason for its actions is a mere pretext for discrimination or retaliation.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08, 125 l. Ed. 2d 407, 113 S. Ct. 2742 (1993). Although intermediate evidentiary burdens shift back and forth under this framework, "the ultimate burden of persuading the trier of fact that the defendant intentionally discrimination against the plaintiff

remains at all time with the plaintiff." See *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, (1981) at 253,"And, in attempting to satisfy this burden, the plaintiff, once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision, must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but a pretext for discrimination." *St. Mary's Honor Center Supra* at 507-508.

As the Supreme Court has explained, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeve v. Sanderson Plumbing Products, Inc.*, 530 U.S. at 147, 120 S.Ct. at 2108. In "appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Id. Thus, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148, 120 S.Ct. at 2109; see *Aka v. Washington Hospital Center*, 156 F.3d at 1290 (C.A.D.C.1998) (en banc) (holding that "a plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight").  Defendant's non-discriminatory explanations are replete with the appearance of what the *Reeves Court* called "mendacity," as set forth below. *Reeves* at 530 U.S. 133, 147, 120 S.Ct. 2097.

As noted previously, Defendant has argued as its non-discriminatory explanation for its decision to not promote Plaintiff that plaintiff lacked the "minimum" qualifications for the position and, not withstanding, that race could not be a factor as he was not aware of his face. (Defendant's Motion at 20:3 and 21:12).   The appearance of mendacity is raised with the

proposition that the position outlined "minimum qualifications" for the position. However, has not put forth any evidence in support of the proposition of minimum qualifications. See Plaintiff's Exhibit A. Further, an examination of how Plaintiff and other minorities were disqualified for further consideration for the position of Project Manager, by reason of a Position Description that did not even exist at the time of the job announcement. Defendant's Exh. 8. Here, it is undisputed that a position description was composed in August 2005, three months after the vacancy announcement that contained the qualifications was posted on May 13, 2005. (Plaintiff's Exh. A, "Vacancy Announcement").

Moreover, it is disingenuous for Defendant to argue as its non-discriminatory explanation that, in effect, Plaintiff failed to meet qualifications based upon a position description that did not exists at the time she was denied a second interview and promotion to the Project Manager position. Id. Accordingly, whether Defendant's creation of a position description after the interview of certain candidates outside of Plaintiff's protected class, was a means of excluding certain candidates is a question of fact which is material to a determination of whether this was a legitimate non-discriminatory act. It presents facts from which a trier of fact could reasonably reach a conclusion of pretext or falsity. *Reeves.* Plaintiff submits that Defendant's argument that she lacked qualifications for the Project Manager position is no more than a pretext to discrimination. There is no reason to believe from the May 2005 vacancy announcement that the considerations established in the August 2005 position description were reasonably job related. *Shaw*

With respect to Defendant's second non-discrimination explanation, *that neither Mr. Leap or Mr. Vanderburg were ever made aware of Plaintiff's race*, Plaintiff asserts that this is not a material fact that is undisputed. (Defendant's Motion at 21:12). Plaintiff presents that this

too can be evaluated as a pretext for discrimination. *Reeves*. Assuming, *arguendo,* Defendant's proffered reason is based upon Plaintiff's deposition testimony that she never formally met Mr. Vanderburg, it is undisputed that Plaintiff and the other internal applicants denied interviews with Mr. Leap were all non-white. Defendant's Statement of Facts at ¶31. In fact, as previously stated, only the white applicants, Kopley and Townsend, were afforded second interviews. Id.

Here, the composition of specifically tailored position description after interviewing the only two white candidates is sufficient to create an inference of discrimination and a material issue of fact that should deny Defendant's motion for summary judgment. (See *Stodola v. Finley & Co., Inc*. Slip Copy, 2008 WL 835709 N.D.Ind.,2008 at *13, a wrongful termination case, "[t]he timing of events, combined with the inadequate explanations for Stodola's termination, are such that a reasonable jury could conclude that Stodola's disability was the cause of adverse employment actions taken against her. Thus, the Court finds that the circumstances surrounding Stodola's employment with Defendants raises factual issues that cannot be resolved at the summary judgment stage.")

Next, during deposition, in an effort to undermine any evidence that the second position description was composed specifically with the intent to select the only white applicants (Jane Kopley and Sean Townsend), Harvey Vanderburg testified that the position description was collaborated with Richard Leap and the assistance of Gloria Lim, who at one time held a similar IT Project Manager position which was used as a template to compose the position description. (Vanderburg's Deposition at 30:13-21). However, Mr. Leap contradicted Mr. Vanderburg's testimony stating that only he [Leap] and Mr. Vanderburg composed the position description without the assistance of others, and, more importantly, without use of another position description as a template. (Mr. Leap's Deposition at 21). Further, Mr. Leap discounted Mr.

Vanderburg's deposition testimony that Defendant's human resource department pre-authorized the position description. Id. at 16-19.  These conflicts in the testimony provide a sufficient basis to deny Defendant's summary judgment. *Reeves.*

Again, the only material facts that are undisputed are that the position of Project Manager was posted by vacancy announcement on May 13, 2005. (See Plaintiff's Exh. A, "Vacancy Announcement.") Contrary to Defendant, however, this vacancy announcement sets forth the only qualifications for this position, and not the minimum qualifications. Id.  Further, both Harvey Vanderburg and Robert Knapp testified during their depositions that it is Defendant's customary policy and practice to have position descriptions available at the same time that vacancy announcements are posted. (Vanderburg's Deposition at 49: 13-19). As previously noted, Michael Knapp, Defendant's Human Resources official, testified during his deposition that it was the practice to post position descriptions before the vacancy announcement. (See Knapp's Deposition at 16:7-11).  Thus, Defendant deliberately disregarded its policy when it posted the position in May 2005 and created a subsequent position description in August 2005.

The evidence shows that only white candidates were afforded second interviews and, thereafter, a position description was composed that was inconsistent with the vacancy announcement.  Defendant's Statement of Facts at ¶31. Whether the new position description was reasonably related to the Project Manager position is a material question of fact. *See Shaw supra,* 517 F. Supp 336. Accordingly, based upon this uncontroverted evidence, Plaintiff believes that given the inconsistencies in Defendant's explanations, a reasonable juror could determine that her race was a consideration for the denial of the promotion to the Project Manager position.

12

**A.     Plaintiff Can Set Forth Evidence To Establish That
        Her Adverse  Performance Review Was Retaliatory Conduct**

Plaintiff's Amended Complaint, Count II includes a claim for Retaliatory Conduct, based upon Defendant issuing her an adverse performance review two days after it was made aware of her Charge of Discrimination. See Plaintiff's Amended Complaint at 2.  In order to prevail on a retaliation claim, Plaintiff is required to establish as follows:

1) she engaged in protected behavior;

2) the employer took an action against plaintiff that a reasonable employee would believe was designed to dissuade a reasonable worker from making or supporting a charge of discrimination; and

3) there is a causal link between the adverse action and the protected activity.  See

*Rochon v. Gonzales*, 438 F.3d 1211, 1219-20 (D.C.Cir.2006).

In the instant action, Plaintiff initially complained of discriminatory treatment as a result of her denial of promotion to the Project Manager position in October 2005. (See Plaintiff's Exhibit E, "Knapp's E-Mail to Vanderburg").  According to Michael Knapp**,** Defendant was informed of Plaintiff's Charge of Discrimination on January 10, 2006.  (See Knapp's Deposition at 27). Moreover, two days' later, January 12, 2006, Plaintiff  was subjected to a performance review which she argues  constituted an adverse action. Id.

It is well-settled precedent in this Circuit that a negative performance evaluation that is directly related to salary or compensation is an adverse employment action.  See *Brown v. Brody* 199 F.3d 446 C.A.D.C., 1999. Plaintiff contends that she has suffered adverse action in the form of a reduced merit performance. Plaintiff's Amended Complaint. Id.  Moreover, Plaintiff's immediate supervisor admitted during deposition that there was an impact upon Plaintiff's merit increase:

Q: Do you know anything about the merit increase pay for Quest Diagnostic Laboratories?
A. Excuse me?

Q: Merit increase pay.
A: It depends on your evaluation.

Q: And if an employee is given an excellent versus achieved expectation does that have an impact on their merit increase pay, if you know?
A: Yes.   (Aligapay's Deposition 49: 9-18).

Defendant further argues that Plaintiff cannot establish her retaliation claim because her immediate supervisor was not aware of the Charge of Discrimination.  Defendant's Motion at 27. First, Ms. Aglipay testified she was informed of Plaintiff's discrimination complaint directly from Mr. Vanderburg:

Q: When were you first informed that she was discussing filing a complaint or that she was going to follow though with  filing a complaint of discrimination?

A: When I notice the complaint it was Mr. Harvey called me in his office at that time that Ms. Pollard complain about not getting that position. (Aligpay's Deposition 54:8-15). Therefore, consistent with Ms. Aligpay's testimony, Plaintiff initially made complaints regarding the denial of her promotion in October 2005. (See Plaintiff's Exh. E, "Knapp's E-Mail  to Vanderburg). According to her deposition testimony, and contrary to Defendant's argument, it is undisputed that Ms. Aglipay was aware of Plaintiff's discrimination complaint at the time that she presented Plaintiff her performance evaluation. Id.

 Next, Defendant's motion fails to give the true meaning to the application of *Burlington Northern and Santa Fe Ry. Co. v. White* 126 S.Ct. 2405 (2006) notwithstanding, Plaintiff's lost compensation was related to her well documented protected activity.  Specifically, Defendant contends that Plaintiff's harm is *de minimis*. Defendant's Motion at 28:¶2. Accordingly, it is undisputed that Plaintiff's suffered adverse employment action in the form of monetary loss as a

14

direct result of her placement on the rankings and has resulted in material adverse consequences in the form of denial of monetary compensation. *White.* Further, the alleged retaliatory actions took place after the Plaintiff initiated her Charge of Discrimination. The record contains evidence that the alleged retaliator, Harvey Vanderburg, knew of the formal Charge of Discrimination at the time of these events and exercised direction over Plaintiff's immediate supervisor. <u>See</u> *Hazward v. Runyon* 14 F.Supp.2d 120 D.D.C.,1998.

It is a question of material fact whether Plaintiff can establish the performance review was a retaliatory action as a result of Plaintiff engaging in protected activity. When Ms. Aglipay was questioned during her deposition on why she gave Plaintiff a lesser score, she retorted that her decision was prompted by complaints and criticisms of Providence Hospital staff. (See Aglipay's Deposition at 37:11-20). However, when pressed for the identities of these phantom staffers and the quantify of the purported criticisms, Ms. Aglipay was mysteriously unable to respond. Id. Defendant's pretext of retaliation is further underscored as it has failed to produce any alleged staff complaints and/or criticisms of Plaintiff's performance in response to discovery requests consistent with F.R.C.P. 26[2].

Further, in the absence of Isabelita Aglipay providing Plaintiff with documentation in support of purported criticisms of her work performance or prescribing her for a performance plan, Defendant's proffered non-retaliatory explanation must fail. See. *Reeves*.

---

[2]  For instance, Plaintiff's Document Requests specifically asks Defendant to produce: "All documents reflecting all communications made to any of the Defendant's agents and/or in response to inquires pertaining to the Plaintiff, work performance or other employment-related circumstances." Plaintiff also requested and received her complete personnel files, and there was no information included that support criticisms or complaints during the relevant time period. (See Defendant's Responses to Plaintiff's Request for Documents, Nos. 8 and 12). See Plaintiff's Exh. H.

## **CONCLUSION**

Plaintiff has established that Defendant's aforementioned proffered or assumed legitimate non-discriminatory reasons for denying her promotion to the Project Manager position because of her lack of qualifications and purportedly the selecting official was not aware of her race, are pretexts for discrimination. It is undisputed that Plaintiff met the qualifications for the position as advertised by the vacancy announce in May 2005. See Plaintiff's Exh. A.  It is further undisputed that only white applicants were afforded a face to face interview in which their technical qualifications were examined. Defendant's Statement of Facts at ¶31. Finally, it is undisputed that Defendant composed additional qualifications for the position in August 2005 in contravention to its policy. See Defendant's Exh. 1, Knapp's Declaration at 9.

With respect to her retaliation claim, Plaintiff has established that she suffered an adverse action after engaging in protected activity, namely, complaining of discrimination to the Defendant and the U.S. EEOC. Plaintiff contends that she has sustained adverse action sufficient to meet the legal standard for this Circuit, namely, *Rochin* and *White*. Thus, for the foregoing reasons, Plaintiff respectfully asks this Court to deny Defendant's motion for summary judgment in its entirety.

July 23, 2008                          On behalf of Plaintiff:


                                    _____/s/_____
                                    Nathaniel D. Johnson (Federal #14729 MD)
                                    Richard L. Thompson (Federal #15980 MD)
                                    201 Centennial Street, A-2
                                    P.O. Box 1857
                                    LaPlata, Maryland 20646
                                    (301) 645-9103/(301) 893-6890 (fax)



## **Certification**

I, Nathaniel D. Johnson, certify that on this date, July 23, 2008, the foregoing motion was forwarded, via ECF, to the following addressee:

Michael Stevens, Attorney for Defendant



                                                    /s/
                                                    Nathaniel D. Johnson

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**BRIDGET POLLARD**

    **Plaintiff,**

**v.**

**QUEST DIAGNOSTICS**

    **Defendant.**

**Civil Action 07-692 (CKK)**

### PLAINTIFF'S STATEMENT OF FACTS IN GENUINE DISPUTE

**NOW COMES** Plaintiff Bridget Pollard, by and through undersigned counsel, hereby files Plaintiff's Statement of Facts in Genuine Dispute, and responds to Defendants' Statement of Facts Not in Genuine Issue as follows:

1.     Admit.
2.     Admit.
3.     Admit.
4.     Admit.
5.     Admit.
6.     Admit.
7.     Admit. However, Plaintiff also performed LIS duties and responsibilities during the course of her employment. (See Plaintiff's Ex. B at ¶2 "Plaintiff's Declaration").
8.     Admit.
9.     Admit.
10.     Admit.
11.     Admit.
12.     Admit.
13.     Admit.
14.     Admit.
15.     Admit.

16.    Admit.

17.    Admit.

18.    Admit.

19.    Admit.

20.    Denied. The position was posted in May 2005 (See Plaintiff's Ex. A, "Vacancy Announcement"); conversely, the position description was composed in August 2005, which reads in pertinent part, "Date Written: 8/22/05." (See Defendant's Ex.        8 "Project Manager Position Description," see also, Vanderburg's Deposition at 49:5-6).

21.    Admit.

22.    Deny. The Vacancy Announcement does not reference "minimum qualifications." See Plaintiff's Exh. A, "Vacancy Announcement."

23.    Admit.

24.    Admit.

25.    Admit.

26.    Admit.

27.    Admit.

28.    Admit. However, whether or not Plaintiff had a "formal conversation with Vanderburg" is immaterial. According to Plaintiff's Ex.D, "Applicant Flow Data," which provides the racial and gender composition of the applicants for the position in question, Vanderburg was fully aware of Plaintiff and the other applicants' protected classifications during the selection process.

29.    Admit.

30.    Admit.

31.    Admit.

32.    Admit.

33.    Admit.

34.    Admit.

35.    Admit.

36.    Admit.

37.    Admit.

38.    Admit.

39.    Admit.

40.    Admit.

41.    Admit.

42.    Admit.

43.    Admit.

44.    Admit.

45.    Admit.

46.    Admit.

47.    Admit. However, it is not material to this litigation.

48.    Admit. However, it is not material to this litigation.

49.    Admit.

50.    Admit.

51.    Admit.

52.    Admit.

53.    Admit.

54.    Admit.

55.    Denied. Plaintiff has requested and Defendant has not produced any documentation in support of alleged complaints regarding Plaintiff's performance. (See Plaintiff's Exhibit H, "Defendant's Responses to Plaintiff's Document Requests" at Nos. 8 and 12).

56.    Admit.

57.    Admit, but not material.

58.    Denied. According to her deposition testimony, Ms. Aglipay was first informed of Plaintiff's complaint when Vanderburg called her into his office to discuss Plaintiff's failure to promote claim, which could have occurred as early as October 2005.  (See Aglipay's Deposition 54:8-15).  Plaintiff initially made complaints regarding the denial of her promotion in October 2005. (See  Plaintiff's Ex. E, "Knapp's E-mail to Vanderburg," dated October 2005).

59.    Admit.

60.    Admit.

61.    Admit. However, not material to this litigation.

July 23, 2008                          On behalf of Plaintiff:


_____/s/_____
Nathaniel D. Johnson (Federal #14729 MD)
Richard L. Thompson (Federal #15980 MD)
201 Centennial Street, A-2
P.O. Box 1857
LaPlata, Maryland 20646

## <u>Table of Cases and Authorities</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………………..………………..2.3

*Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*,

865 F.2d 320 (D.C.Cir.1989). ………………………………………………….…......…2

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)……………………………….…………2

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C.Cir.1987)…………………………………2

*Calhoun v. Johnson*, 1998 WL 164780, at *3 (D.D.C. March 31, 1998)………………....….3

*McDonnell Douglas Corp. v. Green*, 411 U.W. 792 (1973)……………………………..3,4,7

*Stella v. Mineta*, 350 U.S. App. D.C. 300 (D.C. Cir. 2002)……………………………....3,4,6

*Brown v. Brody*, 339 U.S. App. D.C. 233 (D.C. Cir. 1999)…………………….…….....3,13

*Shaw v. Boorstin*, 517 F. Supp. 336 (1981)……………………………………6,7,8, 10, 12

*Spurlock v. United Airlines, Inc.* 475 F.2d 216 (10th Cir 1972)………..………...7

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)……………………………...…8,9

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981)……………………………9

*Reeve v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000) …..…………9, 10,11,12, 15

*Aka v. Washington Hospital Center*, 156 F.3d at 1290 (C.A.D.C.1998) (en banc)…………...9

*Stodola v. Finley & Co., Inc.*, Slip Copy, 2008 WL 835709 N.D.Ind.,2008 at *13…………...11

*Rochon v. Gonzales*, 438 F.3d 1211 (D.C.Cir.2006)…………………………………13, 16

*Burlington Northern and Santa Fe Ry. Co. v. White* 126 S.Ct. 2405 (2006)……………14, 15, 16

*Hazward v. Runyon*,  14 F.Supp.2d 120 D.D.C.,1998………………………………………15


Miscellaneous

42 U.S.C. § 2000e et. seq., "Title VII"..........................................................................2

42 U.S.C. §1981……………………………………………………………………………2

F.R.C.P. 56…………………………………………………………………………………2

**Plaintiff's Exhibit List**

A       Vacancy Announcement

B       Plaintiff's Declaration

C       Defendant's Investigative Summary

D       Applicant Workflow Data Chart

E       Knapp E-Mail to Vanderburg

F       Plaintiff's Performance Eval. 2005

G       Plaintiff's EEOC Charge of Discrimination

H       Defendant's Responses to Plaintiff's Document Requests

        Plaintiff's Deposition Transcript

        Vanderburg's Deposition Transcript

        Leap's Deposition Transcript

        Knapp's Deposition Transcript

        Aglipay's Deposition Transcript

# PLAINTIFF'S EXHIBIT

# A

## Technical Depts

### Lahora

| Dept Name | Dept# | Location | Title | Posted Date(s) | Grade | Hours | Position(s) Available | Schedule | Job Requirements | Replaced |
|---|---|---|---|---|---|---|---|---|---|---|
| Sample Preparation | 16000 | Chantilly, VA | Technician, Specimen Processing | 4/22/2005 | E-49 | | 1 | Mon-Fri 11:00AM-7:30PM, Weekends as Needed | BSMT preferred or biological science degree and 3 years experience. Minimum of 5 years experience may be considered in lieu of a degree. Minimum of 2 year supervisory experience required. | Warren-0695 (49444) |
| Sample Preparation | 16000 | Chantilly, VA | Technician, Specimen I | 4/29/2005 | | 40 | 2 | Mon-Fri 11:00AM-7:30PM Weekends | High School graduate, 3,000 ks/hr. | Brooks-2122 (50030); Bailey-0789 (50031) |
| Sample Preparation | 16000 | Chantilly, VA | Technician, Specimen I | 4/29/2005 | | | 1 | Tues-Sat 11:00AM-7:30PM Training Schedule 8:00AM-4:30PM | High School graduate, 3,000 ks/hr. | Derks-1582 (50033) |
| Sample Preparation | 16001 | Chantilly, VA | Technician, Specimen I | 3/18/2005 | N-28 | | 1 | Tues-Sat 11:00PM-7:00AM Training Schedule Mon-Fri | High School graduate. | Mosuela-0747 (48187) |
| Sample Preparation | 16001 | Chantilly, VA | Technician, Specimen I | 3/31/2005 | N-26 | | 1 | Sun-Thurs 11:00PM-7:00AM Training Schedule Mon-Fri 8:00AM-4:30PM | High School graduate. | White-0779 (48798) |
| Sample Preparation | 16001 | Chantilly, VA | Technician, Specimen I | 3/31/2005 | N-26 | | 1 | Tues-Sat 11:00PM-7:00AM Training Schedule Mon-Fri | High School graduate. 3,000 ks/l r. | Gortayo-1610 (48799) |
| Sample Preparation | 16001 | Chantilly, VA | Technician, Specimen I | 3/4/2005 | N-26 | | 1 | Mon-Fri 11:00PM-7:00AM, Alt. Weekends | High School graduate, 3,000 ks/hr. | Bates-0778 (47605) |
| Sample Preparation | 16001 | Chantilly, VA | Technician, Specimen I | 4/15/2005 4/15/2005 | 4/15/2005 N-26 | | 3 | Tues-Sat 11:00PM-7:00AM Training Schedule Mon-Fri | High School graduate. 3,000 ks/hr. | Desai-0757 (49048); Truong-0777 (49046); Andrada-0781 (49045) |
| Sample Preparation | 16108 | Chantilly, VA | Group Lead, Specimen Processing | 3/25/2005 | E-49 | 40 | 1 | Mon-Fri 4:00PM-12:00AM, Alt. Weekends | High School graduate. Minimum typing skills of 3,000 ks/hr with a maximum error rate of 10%. | Aranijo-0836 (48421) |
| Sample Preparation | 16115 | Chantilly, VA | Asst. Specimen Prep | 3/31/2005 | N-25 | 40 | 1 | Tues-Sat 11:00AM-7:30PM Training Schedule Mon-Fri | Must be able to lift 25 pounds. Ability to lift 25 pounds. | Sukunaran-0755 (48797) |
| Sample Preparation | 16115 | Chantilly, VA | Asst. Specimen Prep | 4/22/2005 | N-25 | | 1 | Tues-Sat 10:00AM-6:30PM Training Schedule 8:00AM-4:30PM | Must be able to lift 25 lbs | Kaur-0767 (49985) |

### Providence Hospital, Washington, DC

| Dept Name | Dept# | Location | Title | Posted Date(s) | Grade | Hours | Position(s) Available | Schedule | Job Requirements | Replaced |
|---|---|---|---|---|---|---|---|---|---|---|
| Providence Hospital | 13800 | Washington, DC | Technologist, Medical II | 3/25/2005 | T-13 | | 1 | Mon-Fri 7:00AM-3:30PM, All Weekends | BS or AA in Medical Technology or Computer Science. General laboratory knowledge. LIS functionalities. LIS/HIS interface knowledge. BS in Medical Technology. ASCP or eligible. | Vicente-1149 (48516) |

EXHIBIT 1

EXHIBIT 2
Vandenbor
12/20/07

Q 00108

PENGAD 800-631-6989

PLAINTIFF'S EXHIBIT

B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BRIDGET POLLARD

    PLAINTIFF,

v.

QUEST DIAGNOSTICS

    DEFENDANT.

Civil Action No.: 07-692 (CKK)

## DECLARATION OF BRIDGET POLLARD

1. I, Bridget Pollard, am over 18 years of age, and in accordance with 28 U.S.C. § 1746, testify truthfully to the following:

2. During my employment with Defendant I consistently performed functions related to the Laboratory Information Systems (LIS).

3. My managers were aware of my proficiency and at no time was I counseled regarding my performance related to my operation and interphase with the LIS.

4. I was present during the deposition of Isabelita Aglipay's deposition. Contrary to Ms. Aglipay's representation, at no time did she inform me that I was the subject of complaints or criticisms from Providence Hospital staff.

5. Additionally, during the year 2005, we were informed that the midnight shift in which I was assigned, had the greatest efficiency compared to the two remaining shifts. I declare under penalty of perjury that the foregoing is true and correct.

_Bridget Pollard_                                    _June 9, 2008_
Bridget Pollard, Affiant                                    Date

# PLAINTIFF'S EXHIBIT

# C

Pollard, Bridget L. DISCRIMINATION CHARGE
1/10/06

Project Manager, Lab (position located at Providence Hospital) posted on
job board 5/13/05.

Position filled on 9/21/05
Saw 10 candidates, 8 internal, 2 external.

Top candidates:

Jane Kopley, external candidate, offered position 8/18/05 and she rejected
our offer.

Sean Townsend, external candidate interviewed 7/20/05, offer accepted
9/24/05

Bridget Pollard, internal candiate, works at Providence Hospital as an On-
call Medical Technologist. She completed a Request for Transfer form, met
the requirements for the position and we received her form on 5/31/05. A
copy of his Request for Transfer was forwarded to Harvey Vandenburg,
Director of Field Operations. He did a telephone interview with Bridget
Pollard.

Atrtached are copies of:

- Resumes, applications  and/or Transfer Request forms for these three
  candidates
- Job posting
- Requisition
- Harvey Vandenburg's rational for hiring

Job description

TRAINING/MENTORING PROGRAM
HELP TO GET ENTRY LEVEL POSITION



EXHIBIT
3
Knapp
1/21/08

EXHIBIT
4
Vandenberg
12/20/07

Q 00102

# PLAINTIFF'S EXHIBIT

# D

# Quest Diagnostics

## Nichols Institute, Chantilly

## APPLICANT FLOW DATA

Requisition # 50426

| | Title | Mgr Project Spec |
| Recruiter | Department | Resource Hospital |
| Grade | Hiring Mgr | Harvey Vanderberg |

Vanders

| Interview Date | Candidate Name | Sex (M/F) | EEO Code | Source Code | Disposition Code | Reason/Comments |
|---|---|---|---|---|---|---|
| | Michelle Cates | F | 2 | internal | 3 | initial |
| | Tefera Kassahan | M | 2 | 1 | 3 | |
| | Tuy Le | M | 4 | 1 | 3 | |
| | Nicole Alexander | F | 2 | 1 | 3 | |
| | Berihan Tage | F | 2 | 1 | 3 | |
| | Bridgett Pollard | F | 2 | 1 | 3 | |
| | Sean Britt Townsend | M | 1 | 1 | 2 | 10/17/05 |
| | Simce Hopland | M | 1 | internal | 1 | with deve at least |
| | Desmatres Clark | F | 2 | 2 | 3 | with deve at least |
| | Elease Wright | M | 2 | external | 3 | |

### EEO Code

1 = White
2 = Black
3 = Hispanic
4 = Asian/Pacific Islander
5 = American Indian/Alaskan Native

### Source Codes

1 = Ad
2 = Agency
3 = Client Referral
4 = College Recruitment
5 = Employee Referral

6 = Internet
7 = Job Fair
8 = Job Posting
9 = Rehire

### Disposition Codes

1 = Hired (date)
2 = Offer Extended, but rejected
3 = Interviewed, No Offer

last updated: 9/16/03

Q 00104

PLAINTIFF'S EXHIBIT

E

**Leap, Rich A**

om:          Vandenburg, Harvey L
.ent:        Monday, October 24, 2005 1:07 PM
To:          Knapp, Michael J
Cc:          Leap, Rich A
Subject:     RE: Compliance Line Complaint


Rich, you can chime in here.

I conducted a phone interview with Ms. Pollard. Before the interview, I discussed her resume with Rich Leap, our IT manager. We both agreed that although Ms. Pollard had a master's degree in computer science, she lacked practical experience in many vital aspects of laboratory systems management. During the interview, I verified her lack of experience. I informed Ms. Pollard that I had candidates with much more experience than her in Laboratory Information Systems, and that those candidates were more suited to this position. Given that I clearly stated that we were going to hire someone with more IT experience, I am suprised that Ms. Pollard states that "she does not know why she was not offered the postion."

    -----Original Message-----
    From:        Knapp, Michael J
    Sent:        Monday, October 24, 2005 12:41 PM
    To:          Vandenburg, Harvey L; Leap, Rich A
    Cc:          Hughes, Edna G
    Subject:     Compliance Line Complaint

    Harvey: Can you take the lead in answering this employee concern?  Thanks.

    Ms. Pollard stated she is upset because she interviewed in August 2005, for an available position as an IT project manager. Ms. Pollard was later informed that she had not been hired for this position by Maryann Posey, human resource representative. Ms. Pollard discovered that even though she interviewed twice, another candidate with less qualifications was hired for the position. Ms. Pollard stated she has been employed with Quest for three years and has the required qualifications for the position. Ms. Pollard stated she does not know why she was not offered the position and will file a claim with the Equal Opportunity Commission.





Q  00003

# PLAINTIFF'S EXHIBIT

# F

## Annual Performance Development and Review
### Laboratory Technical Services – Medical Laboratory Technologist I & II

| | |
|---|---|
| Employee Name: BRIDGET POLLARD | Employee ID: 9291 |
| Employee Title: MEDICAL TECHNOLOGIST | Department: Pathology Clinical Lab |
| Appraiser: Isabelita H. Aglipay | Location: Providence Hospital |
| Appraiser Title: Lab Supervisor | Appraisal Period (From/To): 12/31/ 2005 |

### PURPOSE

The purpose of the annual review is for each manager to assess employee performance over the past year in relation to specific responsibilities or objectives. It is an important process for managers to provide feedback on employee strengths, opportunities for improvement, competencies, and development areas, summarizing ongoing feedback throughout the year. It is also an opportunity for employees to provide input on how they can best perform and develop.

Reviews should be based on facts and data and feedback provided should be specific. Facts and data should come from established performance metrics, employee self-assessment, external or internal customer or co-worker feedback and other sources. The goal is a thorough and accurate review based on an overall performance assessment.

Contact your Human Resources department for more information on making the review process as effective as possible.

### INSTRUCTIONS

Follow the procedure below when making your Performance Ratings.

1. Refer to *Section I: Performance Factor Rating Scales* and carefully read and understand each of the Performance Evaluation Factors of the position. Specifically read the Performance Evaluation Factors' definition and Behavioral Evaluation Standards associated with each performance rating. Each rating category is described below:
   **1 = Outstanding:** *Demonstrates a distinguished level of job performance that is reserved for performance that is consistently above and beyond the requirements of the job. Personal commitment to the company's mission, values and goals is consistently evident. Seizes initiative in identifying challenging work goals and in finding solutions. Quality and timeliness of results are not in question, even under challenging circumstances.*
   **2 = Excellent:** *Produces more than required. Requires little direction or supervision. Thinks beyond details of the job. Contributes to the overall objectives of the team. Decisions and actions have paid off to a higher-than-expected degree.*
   **3 = Achieves Expectations:** *Demonstrates a level of job performance that fully meets the requirements of the job. Performance is what is expected of a qualified and experienced individual commensurate with time in position.*
   **4 = Development Needed:** *Demonstrates a level of performance that requires improvement to meet the requirements of the job. Continuation at this level could lead to job change or termination.*
   **5 = Unsatisfactory -** *Performance continues to fall below required expectations. Continuation at this level will lead to termination*
   **N = New to Company:** *Applies to an individual new to the company for less than six months. If the employee has transferred internally, performance information should be obtained from the former manager.*

2. Using the Behavioral Evaluation Standards, decide which rating best describes the employee's level of performance for the particular Performance Evaluation Factor based on facts and data. Enter the rating in the space at the bottom of each performance factor. Record an "N/A" if you have not observed the employee's performance for a specific performance factor. *It is acceptable to place greater emphasis on a critical bullet point within a performance factor (e.g. attendance, error rate, etc.) as long as the same criteria is applied to all employees who are evaluated via this document.*

3. Refer to *Section II: Overall Performance Rating* to determine the employee's overall performance. First, record all Performance Evaluation Factor ratings in the rating column. Second, if your business unit is equally weighting each performance factor, calculate the average of all Performance Evaluation Factor ratings (i.e., summing all performance factor ratings and then dividing by the total number). If your business unit is using alternative factor weighting, multiply each performance factor rating by its weight and then sum the weighted performance factor ratings. Finally, check the appropriate box that corresponds to the average or weighted rating in the Overall Performance Rating column.

4. Document specific behavioral examples of the employee's performance that support your ratings in *Section IV: Comments and Signatures.* When making comments, focus on specific job-related behavioral examples such as "consistently double checks work to ensure accuracy" and avoid evaluative and personal comments such as "quality of work is awful." Also document employee comments regarding the performance evaluation process in the space provided.

EXHIBIT 2
Aglipay
12/28/07

EXHIBIT 3
Vandenbussche
12/20/07

## I. PERFORMANCE FACTOR RATING SCALES

### 1. Following Policies and Procedures

Follows Quest Diagnostics company and department policies and procedures. This includes Federal, state, and local requirements and regulations; safely policies and procedures; properly storing and disposing regulated medical waste; maintaining a clean and orderly workspace; upholding ethical standards; and maintaining privacy and confidentiality of personal information of patients, clients, and employees.

**Outstanding (1)**

- Demonstrates an in-depth knowledge of and complies with Company policies and procedures, including ethical standards, Federal, state, and local requirements and regulations including more complex policies and procedures.
- Encourages others to abide by high ethical standards.
- Proactively promotes and ensures that the privacy and confidentiality of personal information for customers and employees is maintained in accordance with HIPAA and other guidelines by self and others.
- Maintains an exceptionally well-organized and clean workspace that is viewed as a role model by peers and supervisors/group leaders.
- Sets the example for ensuring guideline adherence for injury protection, handling of bio-hazardous materials, and other critical safety initiatives.

**Excellent (2)**

*Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see instructions)*

**Achieves Expectations (3)**

- Follows Company policies and procedures, including ethical standards, safety, Federal, state, and local requirements and regulations.
- Accurately follows oral instructions and written procedures from supervisors/group leaders.
- Maintains the privacy and confidentiality of personal information for customers and employees in accordance with HIPAA and other guidelines.
- Maintains a well-organized and clean workspace.
- Adheres to all company guidelines for injury protection, handling of bio-hazardous materials, and other critical safety initiatives

**Development Needed (4)**

- Fails to consistently follow Quest Diagnostics policies and procedures, including ethical standards, Federal, state, and local requirements and regulations.
- Has shown difficulty following oral instructions or written procedures from supervisors/group leaders.
- Inconsistently maintains the privacy and confidentiality of personal information for customers and employees in accordance with HIPAA and other guidelines.
- Maintains a disorganized and unclean workspace.
- Has shown inconsistent adherence to guidelines for injury protection, handling of bio-hazardous materials, and other critical safety initiatives

**Unsatisfactory (6)**

*Demonstrates a level of performance that is below Development Needed*

**Comments**

RATING = [ 2 ]

### 2. Interpersonal (and Customer) Relations

Interacts effectively with others and actively participates as a committed team member. This includes interacting in a respectful, professional manner; remaining calm in difficult interactions; assisting coworkers; sharing information; listening to and involving others; objectively considering others' ideas and opinions, and interacting effectively with people from varied and diverse backgrounds; creating an environment of positive and professional demeanor for suppliers/customers.

**Outstanding (1)**

- Establishes a trusting, working relationship with others by encouraging and considering others' ideas and opinions; sharing information; and giving proper credit to others.
- Identifies conflicts between team members and reports to supervisor/group leader.
- Values the importance of diversity and is perceived as a role model for respecting others' similarities and differences.
- Engages suppliers and customers to identify potential problems and works to exceed customer expectations.

**Achieves Expectations (3)**

- Interacts with others in a professional, friendly, and respectful manner and remains calm in difficult situations.
- Values expertise and input of team members by encouraging and soliciting ideas, opinions, and feedback from other members.
- Values the diversity of others and treats everyone with respect and dignity.
- Demonstrates a positive and professional level of demeanor towards suppliers and customers.

**Development Needed (4)**

- Has shown difficulty interacting with others in a professional, friendly, and respectful manner or remaining calm in difficult situations.
- Does not encourage and solicit ideas, opinions, and feedback from other members during the course of team meetings and work activities.
- Has shown difficulty interacting effectively with others from varied and diverse backgrounds and treating them with respect and dignity.
- Demonstrates a less than positive and professional level of demeanor towards suppliers and customers.

**Comments**

RATING = [ 4 ] [signature]

### 3. Communication

Communicates clearly, politely, respectfully, and under control to coworkers, supervisors, managers, and customers. This includes asking questions, giving and receiving information and feedback, explaining ideas or policies, actively listening to responses, and using discretion by not discussing company or departmental problems in public areas.

**Outstanding (1)**

- Actively seeks to ensure understanding by listening attentively and patiently, soliciting others' viewpoints, clarifying and summarizing conveyed information, and asking questions (i.e., masters active and passive listening).

**Achieves Expectations (3)**

- Speaks clearly, politely, respectfully, and under control to coworkers, supervisors, managers, and customers.
- Listens attentively and patiently and asks questions to clarify information and ensure accurate understanding of message.
- Discusses company or department issues or problems only in appropriate areas.
- Clearly, thoroughly, and accurately answers others' questions in a timely manner.
- Demonstrates proper telephone etiquette and follows procedures when speaking with others on the telephone.

**Development Needed (4)**

- Has shown several instances of speaking unclearly, impolitely, or disrespectfully to coworkers, supervisors/managers or customers.
- Often listens inattentively, impatiently, or does not ask questions to clarify information and ensure accurate understanding of message.
- Discusses company or department issues or problems in inappropriate areas.
- Answers to others' questions are lacking in detail, unclear, inaccurate, and/or not provided in a timely manner.
- Demonstrates improper telephone etiquette and procedures when speaking with others on the telephone.

**Comments**

RATING = [ 3 ]

# I. PERFORMANCE FACTOR RATING SCALES

## 4. Work Orientation

Ensures work activities are completed thoroughly, accurately, efficiently, and in a timely manner ensuring quality standards are met. This includes taking initiative to complete duties; working without close supervision; being committed, reliable, trusted, and accountable to completing work activities, regularly/dependably being at work (good attendance) and on time (good punctuality); and willingness to accept schedule changes or work additional hours as required by the business.

### Outstanding (1)

- Serves as a role model for productivity, quality, timeliness, accuracy, and efficiency.
- Unscheduled absences/punctually exceed Company/Unit standards.
- Demonstrates an exceptional ability to effectively handle multiple tasks.
- Continuously takes initiative to complete work activities quickly to meet customer demands.
- Shows exceptional commitment and responsibility to the completion and the quality of own and others' work.
- Produces high quality work under changing or stressful conditions.
- Regularly volunteers to work additional hours during normal or busy situations or seeks out additional work.

### Excellent (2)
*Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see instructions)*

### Achieves Expectations (3)

- Works productively, completing work activities thoroughly, accurately, efficiently, and in a timely manner, ensuring all quality standards are met.
- Unscheduled absences/punctually meet Company/Unit standards.
- Performs multiple work activities at once, accurately and in a timely manner.
- Consistently works effectively with minimal supervision.
- Quickly/directly completes work activities without being instructed/reminded.
- Is consistently accountable for completion and quality of work activities.
- Works productively and effectively under changing or stressful conditions.
- Works additional hours during busy situations when asked.

### Development Needed (4)

- Completes work that may be unproductive, inaccurate, inefficient, or not completed in a timely manner.
- Unscheduled absences/punctuality do not meet Company/Unit standards.
- Has shown difficulty completing multiple work activities at once, accurately and in a timely manner.
- Frequently requires close supervision to complete work activities.
- Frequently has to be instructed or reminded to complete job activities.
- Has shown difficulty demonstrating accountability for completion and quality of work activities.
- Works ineffectively under changing or stressful conditions.
- Unwilling to work additional hours during busy situations when asked.

### Unsatisfactory (5)
*Demonstrates a level of performance that is below Development Needed*

RATING = [ 3 2 ]

## 5. Deliver Quality Services

Delivers services that consistently meet or exceed standards with little or no rework required. This includes verifying the accuracy and completeness of all work; identifying missing or inconsistent information or data, asking for assistance when appropriate; documenting and sharing work-related problems and solutions with co-workers, and striving for Six Sigma quality.

### Outstanding (1)

- Serves as a role model who continuously strives to deliver quality services.
- Proactively takes steps or recommends steps to ensure quality problems are prevented.
- Serves as role model for detail orientation.

### Achieves Expectations (3)

- Delivers services that meet Quest Diagnostics' quality standards and require little rework.
- Continuously strives to deliver quality services and ensures work quality is at its highest level possible for self and others.
- Quickly and efficiently resolves quality problems when detected and asks for appropriate assistance when needed.
- Accurately documents quality problems.
- Identifies quality problems and shares problems with co-workers and/or supervisors.
- Ensures accuracy by verifying detailed information and checking work.

### Development Needed (4)

- Inconsistently delivers services that meet Quest Diagnostics' quality standards and require little rework.
- Has shown difficulty resolving quality problems when detected or inappropriately asks for assistance.
- Inconsistently documents quality problems.
- Has shown difficulty identifying quality problems or does not share problems with co-workers and/or supervisors.
- Shows inability or unwillingness to verify and check detailed information resulting in inaccurate results.

Comments

RATING = [ 3 ]

## 6. Problem Solving

Identifies problems related to work activities. This includes attempting to resolve the problem, referring the problems/issues to the proper individual(s) when appropriate, and following appropriate Standard Operating Procedures (SOP). This also includes identifying, defining, diagnosing, and resolving problems by: analyzing information; generating alternatives to the problem; making sound, timely, and objective decisions; and committing to action, even when uncertain.

### Outstanding (1)

- Proactively recognizes and defines potential problems and their causes before they occur and takes necessary steps to prevent their occurrence on a consistent basis.
- Demonstrates an in-depth understanding of the SOP's and consistently and accurately uses them when resolving problems.
- Consistently is the "go-to" person to help solve many problems.
- Makes sound, timely, and objective decisions, even in the face of uncertain situations when resolving problems.
- Quickly recognizes, defines, and corrects complex equipment problems/malfunctions when they occur on a consistent basis.
- Proactively identifies specimen/sample problems and prevents from occurring.

### Achieves Expectations (3)

- Quickly and correctly recognizes, identifies, defines, diagnoses documents common problems or issues when they occur.
- Consistently follows appropriate SOP's when solving problems.
- Effectively resolves common problems on a consistent basis.
- Makes good and timely decisions when resolving problems.
- Quickly recognizes, defines, and accurately corrects common equipment problems/malfunctions when they occur on a consistent basis.
- Searches for/locates missing specimens/samples and resolves specimen/sample problems within established timeframes.

### Development Needed (4)

- Inconsistently recognizes, identifies, and defines potential problems when they occur.
- Demonstrates an insufficient understanding of the SOP's or inconsistently uses them when resolving problems.
- Ineffectively resolves common problems.
- Has shown difficulty making good and timely decisions when resolving problems.
- Has shown difficulty correcting common equipment problems/malfunctions when they occur.
- Takes considerable time to locate missing specimens/samples or unable to resolve observed or reported specimen/sample problems.

Comments

RATING = [ 2 ]

# I. PERFORMANCE FACTOR RATING SCALES

## 7. Handle Specimens

Uses solutions, reagents, filtration, centrifugation, smearing, and/or sectioning techniques to prepare specimens/samples for laboratory delivery, examination, screens, and/or testing. This includes measuring liquid or solid substances to a specified amount using pre-calibrated scales/containers.

### Outstanding (1)

- Regarded by others as an expert in specimen/sample test preparation procedures using solutions, reagents, filtration, centrifugation, smearing, and/or sectioning techniques.
- Demonstrates in-depth knowledge of specimen storage and retrieval processes and is sought by others for expertise.
- Consistently double checks measurements of liquid and/or solid substances to ensure proper testing amounts, resulting in minimal or no errors.

### Excellent (2)

*Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see instructions)*

### Achieves Expectations (3)

- Correctly wears required PPE.
- Demonstrates full understanding of specimen/sample testing preparation procedures using solutions, reagents, filtration, centrifugation, smearing, and/or sectioning techniques.
- Demonstrates full understanding of specimen storage and retrieval processes.
- Accurately measures liquid and/or solid substances for testing using pre-calibrated scales/containers.

### Development Needed (4)

- Correct wearing of required PPE does not consistently meet department and/or Company standards.
- Shows insufficient understanding of specimen/sample testing preparation procedures using solutions, reagents, filtration, centrifugation, smearing, and/or sectioning techniques.
- Shows insufficient understanding of specimen storage and retrieval processes.
- Has shown difficulty accurately measuring liquid and/or solid substances for testing using pre-calibrated scales/containers.

### Unsatisfactory (5)

*Demonstrates a level of performance that is below Development Needed*

**Comments**

RATING = 3

## 8. Perform Tests/Analyses

Performs a variety of medical laboratory tests, procedures, experiments, analyses, and studies in the diagnosis, treatment, and prevention of disease. Interprets test results or output, and assures test results are accurate and/or acceptable for release. Operates, maintains, and troubleshoots equipment used in the preparation, storage, examination, analysis, and/or testing of specimens/samples.

### Outstanding (1)

- Frequently is asked to assist others in correctly conducting medical laboratory tests, procedures, analyses, and studies or interpreting test results.
- Efficiently and consistently double checks test results and confirmation procedures before transferring results to computer mainframe (e.g., LIS/QuestLab) and/or releasing results.
- Serves as a resource on the operation of laboratory equipment.
- Identifies and troubleshoots complex or hard to identify equipment problems.
- Demonstrates an in-depth understanding of the various computer systems and software used to execute testing.

### Excellent (2)

*Demonstrates a level of performance that fully meets Achieves Expectations standards and often meets Outstanding standards (see instructions)*

### Achieves Expectations (3)

- Accurately conducts medical laboratory tests, procedures, analyses, and studies with minimal supervision or assistance.
- Interprets test results within an acceptable range of accuracy with minimal supervision or assistance.
- Reviews test results, completes confirmation procedures, transfers results to computer mainframe (e.g., LIS/QuestLab) and/or releases results on time.
- Correctly operates and maintains all laboratory equipment used in the preparation, storage, examination, analysis, and/or testing of specimens.
- Uses various computer systems and software to execute testing programs and analyses with minimal supervision or assistance.
- Consistently completes required forms (e.g., quality control logs, preventative maintenance logs, customer records) in an accurate and timely manner.

### Development Needed (4)

- Requires significant assistance from others when conducting medical laboratory tests, procedures, analyses, and studies.
- Has shown difficulty correctly interpreting test results without assistance.
- Infrequently reviews test results, inappropriately completes confirmation procedures, has shown difficulty transferring results to computer mainframe (e.g., LIS/QuestLab) and/or releasing results on time.
- Needs frequent assistance in the operation and maintenance of laboratory equipment.
- Has shown difficulty using some or all of the computer systems and software used to execute testing programs and analyses.
- Inconsistently completes required forms (e.g., quality control logs, preventative maintenance logs, customer records) or takes too much time completing them.

### Unsatisfactory (5)

*Demonstrates a level of performance that is below Development Needed*

**Comments**

RATING = 2

*Laboratory Technical Services -- Medical Laboratory Technologist I & II PD&R Form*

## II. OVERALL PERFORMANCE RATING

| Performance Factor | Rating |
|---|---|
| 1. Following Policies and Procedures | 2 |
| Interpersonal (and Customer) Relations | 3 4 |
| 3. Communication | 3 |
| 4. Work Orientation | 2 3 ISM |
| 5. Deliver Quality Services | 3 |
| 6. Problem Solving | 2 |
| 7. Handle Specimens | 3 |
| 8. Perform Tests/Analyses | 2 |

| Overall Performance | Average Rating |
|---|---|
| O  Outstanding* | 1.00 to 1.33 |
| O  Excellent | 1.34 to 2.33 |
| ●  Achieves Expectations | 2.34 to 3.25 |
| O  Development Needed | 3.26 to 4.25 |
| O  Unsatisfactory | 4.26 to 5.00 |
| O  New to Company | |

*An overall rating of "Outstanding" may not be granted if any Performance Factor is rated below "Achieves Expectations".

**Average Rating**
(Sum of all ratings divided by the total number of ratings)   2.75    2.5 ISM

## III. DEVELOPMENT PLAN

This section enables the planning of performance improvements based upon the performance evaluation discussion and the employee's interests and aspirations. After considering the employee's ratings on the Performance Evaluation Factors and the employee's interests and aspirations, develop a plan of the work experiences, special assignments, educational activities or training you and the employee have agreed upon to increase the employee's effectiveness.

| Developmental Area | Activities Planned | Targeted Timeframe |
|---|---|---|
| Chem. | RXL (new instrument) check out  (PRN) | June 06 |
| | | |
| | | |
| | | |

## IV. COMMENTS AND SIGNATURES

*Supervisor Comments: (Use additional pages if necessary)*

*Employee Comments: (Use additional pages if necessary)*

*Signatures below indicate that the employee and supervisor have met on the date noted and mutually discussed and clarified the employee's performance and final evaluation rating in each of the performance factors, including the employee's overall performance. The employee's signature below does not necessarily indicate agreement with the contents of this appraisal.*

| | | |
|---|---|---|
| **Employee Signature:** *Bridget Pillard* | Date: | *1-13-06* |
| **Supervisor Signature:** *Doug Gray* | Date | *01-12-06* |
| **Manager Signature:** | Date: | |
| **HR Manager Signature:** | Date: | |

# PLAINTIFF'S EXHIBIT

# G

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 100-2006-00301 |

| D.C. Office Of Human Rights | | and EEOC |
|---|---|---|

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.)<br>**Ms. Bridget L. Pollard** | Home Phone No. (Incl Area Code)<br>**(301) 735-1425** | Date of Birth<br>**07-04-1963** |
|---|---|---|
| Street Address<br>**3205 Forest Run Drive** | City, State and ZIP Code<br>**District Heights, MD 20747** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name<br>**QUEST DIAGNOSTICS** | No. Employees, Members<br>**500+** | Phone No. (Include Area Code)<br>**(202) 269-7225** |
|---|---|---|
| Street Address<br>**1150 Varnum Street. N.E.** | City, State and ZIP Code<br>**Washington, DC 20017** | |
| Name | No. Employees, Members | Phone No. (Include Area Code) |
| Street Address | City, State and ZIP Code | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN<br>☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER (Specify below.) | Earliest **10-26-2005**   Latest **10-26-2005**<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.   In 10/02, I was hired by Respondent to work as a Medical Technologist at a contract site located at 1150 Varnum Street, N.E., Washington, D.C. In 4/05, I applied for a promotion to fill a vacancy for the position of Project Manager in the IT Department, and I was qualified to fill this position. In 4/05 and 8/05, Harvey Vandenburg, the Laboratory Director, interviewed me for this position. On 10/26/05, I discovered that a less qualified, Caucasian individual with no prior information technology experience was selected to fill this position.

II.   I believe that I was discriminated against based upon my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| _Nov. 29, 2005_   _Bridget L. Pollard_<br>Date      Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRIDGET POLLARD,

      Plaintiff,

      v.

QUEST DIAGNOSTICS,

      Defendant.

Civil Action No. 07-00692 (CKK)

## DEFENDANT QUEST DIAGNOSTICS' RESPONSE TO
## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant Quest Diagnostics ("Defendant"), by and through counsel and pursuant to Rule 34 (b) of the Federal Rules of Civil Procedure, hereby submit the following responses to Plaintiff Bridget Pollard's First Request for Production of Documents. Defendant's review and investigation are continuing in this case, and it reserves the right to correct and/or supplement these responses as permitted by Fed. R. Civ. P. 34.

## GENERAL OBJECTIONS

1.      Defendant objects to each document request to the extent that it seeks discovery of documents that were prepared in anticipation of litigation or for trial, or are protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or protection.

2.      Defendant objects to each document request to the extent that it purports to require Defendant to examine every document or file in its possession, custody or control to determine if it contains information responsive to the request. Defendant will, consistent with its

obligations, make a thorough search of the files and documents in its actual possession, custody or control which are reasonably likely to contain responsive information.

3.      Defendant objects to each document request to the extent that it seeks discovery of information or documents prohibited from disclosure by applicable federal, state or local privacy law or regulations.

4.      Defendant objects to each document request to the extent that it seeks disclosure of information that includes proprietary or confidential information on the grounds that the demand for such information would unfairly and materially damage or embarrass Defendant in its business.  Any otherwise non-privileged, responsive, relevant information that is proprietary or confidential information will be provided by Defendant only after it obtains, by stipulation or otherwise, a suitable protective order preserving the privacy of such information by limiting its disclosure solely to the parties and/or counsel for parties by limiting its use exclusively for the purpose of this litigation.

5.      Defendant objects to each document request to the extent that it purports to impose obligations beyond those required by the Federal Rules of Civil Procedure.

6.      Defendant objects to each document request to the extent that it seeks information and documents that are not relevant to the subject matter of this action and are not reasonably calculated to lead to the discovery of admissible evidence.

7.      No response by Defendant to any part of the document request is an admission or acknowledgement that the discovery request seeks information or documents that are relevant to the subject matter of this action.  Each response to the document requests is without prejudice to Defendant's right to contend that such response is inadmissible, irrelevant, and/or immaterial.

Further, each response by Defendant is without prejudice to, and does not constitute a waiver of, any objection Defendant may make to the use of any information or documents.

8.    Defendant objects to each request to the extent that it does not define the documents sought with sufficient particularity.

9.    Defendant objects to each request to the extent it requests documents in the exclusive possession, custody or control of Plaintiff.

## REQUESTS FOR PRODUCTION

Subject to and without waiving his objections, Defendant responds to Plaintiff's requests as follows:

**Request No. 1**:  All records relating in any way to the Plaintiff's Performance, including any and all records of performance evaluations, positions descriptions, commendations, awards, testing, interviews, counseling, accident or incident reports, disciplinary actions or any other record of any act or activity addressing issues of the Plaintiff's performance during her employment.

**Response No. 1**:  Defendant objects to this request to the extent it is vague, overbroad and unduly burdensome and/or it seeks documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence.  It also does not describe the documents sought with sufficient particularity.  Subject to and without waiving any of its objections, Defendant will produce responsive documents.

**Request No. 2**:  All records relating in any way to Plaintiff's job assignment, including such documents as job descriptions, job evaluations, qualifications for position, duties of the position, workload schedules, sick leave, family medical leave, workers compensation, staffing schedules, training schedules, references requests and references received.

**Response No. 2**: Defendant objects to this request to the extent it is vague,

overbroad and unduly burdensome and/or it seeks documents that are not relevant to the subject

matter of this action, and it is not reasonably calculated to lead to the discovery of admissible

evidence. It also does not describe the documents sought with sufficient particularity. Subject to

and without waiving any of its objections, Defendant will produce responsive documents.

**Request No. 3**: All communications from the Defendant relating to the Plaintiff

and the requirements such position [sic], including any and all applicable policies and

procedures, handbooks, newsletters, memos, correspondence, or posted material.

**Response No. 3**: Defendant objects to this request to the extent it is vague, overbroad and

unduly burdensome and/or it seeks documents that are not relevant to the subject matter of this

action, and it is not reasonably calculated to lead to the discovery of admissible evidence. It also

does not describe the documents sought with sufficient particularity. Subject to and without

waiving any of its objections, Defendant will produce responsive documents.

**Request No. 4**: All reports or communications relative to complaints or

grievances similar to that of the Plaintiff's, including the complaints filed, the reports of

investigation, reports to any governmental agency, and the resolution of the issues that resulted

in the complains [sic] or grievances.

**Response No. 4**: Defendant objects to this request to the extent it seeks documents which are protected by the attorney-client and/or work product privileges. Defendant further objects to this request to the extent it is overbroad and it seeks some documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to the request to the extent it seeks confidential documents. Subject to and without waiving any of its objections, Defendant states that to the best of its knowledge, information and belief, there are no such documents relating to any work location at which Plaintiff worked.

**Request No. 5**: All documents, tape recordings, or other writings memorializing or in any way recording or reflecting any words, statements, declarations, conversations or other communications by the Plaintiff or the Defendant regarding the Plaintiff's employment relationship with the Defendant.

**Response No. 5**: Defendant objects to this request to the extent it seeks documents which are protected by the attorney-client and/or work product privileges. Defendant further objects to the extent it is overbroad and unduly burdensome and/or it seeks documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence. It also does not describe the documents sought with sufficient particularity. Subject to and without waiving any of its objections, Defendant will produce responsive documents.

**Request No. 6**: All documents relating to all inquiries or investigations conducted as a result of claims or allegations made by Plaintiff.

**Response No. 6**: Defendant objects to this request to the extent it seeks

documents which are protected by the attorney-client and/or work product privileges. Defendant further objects to the extent it is overbroad and unduly burdensome and/or it seeks documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence. It also does not describe the documents sought with sufficient particularity. Subject to and without waiving any of its objections, Defendant will produce responsive documents.

**Request No. 7**: All documents pertaining to any meetings, discussions, encounters, and/or conversations, whether private or public that the Defendant or any agent or employee of the Defendant had regarding the Plaintiff.

**Response No. 7:** Defendant objects to this request to the extent it seeks documents which are protected by the attorney-client and/or work product privileges. Defendant further objects to the extent it is overbroad and unduly burdensome and/or it seeks documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence. It also does not describe the documents sought with sufficient particularity. Subject to and without waiving any of its objections, Defendant will produce responsive documents.

**Request No. 8:** All documents reflecting all communications made to any of the Defendant's agents and/or in response to inquiries pertaining to the Plaintiff, work performance or other employment-related circumstances.

**Response No. 8:** Defendant objects to this request to the extent it seeks documents which are protected by the attorney-client and/or work product privileges. Defendant further objects to the extent it is vague, overbroad and unduly burdensome and/or it seeks documents that are not relevant to the subject matter of this action, and it is not reasonably

calculated to lead to the discovery of admissible evidence.  It also does not describe the documents sought with sufficient particularity. Subject to and without waiving any of its objections, Defendant will produce responsive documents.

**Request No. 9:** All documents pertaining to the orientation or any training received by the Plaintiff from Defendant during the relevant time period.

**Response No. 9:** Defendant objects to this request to the extent it is vague, overbroad and unduly burdensome and/or it seeks documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence.  It also does not describe the documents sought with sufficient particularity. Subject to and without waiving any of its objections, Defendant will produce responsive documents.

**Request No. 10:** Produce Sean Townsend's complete personnel file, including his social security number.

**Response No. 10:** Defendant objects to this request to the extent that it is overbroad and/or it seeks documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to the extent the request seeks confidential information.  Plaintiff should have no need for Mr. Townsend's social security number, and Plaintiff should not publicize the number or use it for any improper or illegal purpose.  Thus, Defendant has redacted the documents that contain Mr. Townsend's social security number, and will not produce the number until and unless an appropriate Stipulated Protective Order is entered into by the parties and approved by the Court. Subject to and without waiving any of its objections, Defendant will produce responsive documents.

**Request No.11:** Identify and produce all documents relied upon in Defendant's Answer

to Plaintiff's Complaint.

**Response No. 11:** Defendant objects to this request to the extent it seeks

documents which are protected by the attorney-client and/or work product privileges. Defendant

further objects to the extent it is overbroad and unduly burdensome and/or it seeks documents

that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead

to the discovery of admissible evidence.  It also does not describe the documents sought with

sufficient particularity. Subject to and without waiving any of its objections, Defendant will

produce responsive documents.

**Request No. 12:** Produce Plaintiff's complete personnel file.

**Response No. 12:**  Defendant objects to this request to the extent it is

overbroad and/or it seeks documents that are not relevant to the subject matter of this action, and

it is not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and

without waiving any of its objections, Defendant will produce responsive documents.

**Request No. 13:** Produce all information and documents Defendant relied upon in its

decision to not promote Plaintiff to the Project Manager position.

**Response No. 13:** Defendant objects to this request to the extent it seeks

documents which are protected by the attorney-client and/or work product privileges.

Defendant further objects to the extent it is overbroad and/or it seeks documents that are not

relevant to the subject matter of this action, and it is not reasonably calculated to lead to the

discovery of admissible evidence.  It also does not describe the documents sought with sufficient

particularity. Subject to and without waiving any of its objections, Defendant will produce

responsive documents.

**Request No. 14:** Defendant's complete personnel policies, procedures and guidelines during the relevant time period.

**Response No. 14:** Defendant objects to this request to the extent it is vague, overbroad and unduly burdensome and/or it seeks documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence. It also does not describe the documents sought with sufficient particularity. Subject to and without waiving any of its objections, Defendant will produce responsive documents.

**Request No. 15**: Please produce Defendant's liability insurance policy.

**Response No. 15:** Defendant objects to this request to the extent that it seeks confidential documents and documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving any of its objections, Defendant states that to the best of its knowledge, information and belief, there are no such documents that relate to or provide coverage for the claims that are the subject matter of this action.

**Request No. 16**: All incident reports, investigation reports prepared by Defendant, its agents, regarding Plaintiff during Plaintiff's employment with Defendant.

**Response No. 16:** Defendant objects to this request to the extent it seeks documents which are protected by the attorney-client and/or work product privileges. Defendant further objects to the extent it is overbroad and unduly burdensome and/or it seeks documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence. It also does not describe the documents sought with sufficient particularity. Subject to and without waiving any of its objections, Defendant will produce responsive documents.

**Request No. 17**: All information related to Plaintiff's claims filed or made against Defendant with a state and/or federal agency to include the Report of Investigation, Defendant's Position Statement, Complainant's Charge of Discrimination, disposition of the complaint, resolution.

**Response No. 17**: Defendant objects to this request to the extent it seeks documents which are protected by the attorney-client and/or work product privileges. Defendant further objects to the extent it seeks documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence. Finally, Defendant objects to the extent the request seeks confidential documents. Subject to and without waiving any of its objections, Defendant will produce responsive documents.

**Request No. 18**: Produce all documents related to job vacancies, positions descriptions, announcements, advertisements, resumes received, interviewer(s) notes for all positions announced from 2003 to present.

**Response No. 18**: Defendant objects to this request to the extent it is vague, overbroad and unduly burdensome and/or it seeks documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence. It also seeks confidential business information.

**Request No. 19**: Produce a list of all individuals both currently and formerly employed by Defendant at the situs of this litigation by the following: name, race, gender, job description, dates of hire, date of termination of employment, rate of pay and educational level.

**Response No. 19**: Defendant objects to this request to the extent it is overbroad and unduly burdensome and/or it seeks documents that are not relevant to the subject matter of this action, and it is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving any of its objections, Defendant will produce responsive documents.

Respectfully submitted,

Michael L. Stevens, No. D.C. Bar No. 384887
ARENT FOX LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
Telephone: (202) 857-6000
Facsimile:(202) 857-6395
Counsel for Defendant

Date:  September 21, 2007

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendant Quest Diagnostics' Response to Plaintiff Pollard's First Request for Production of Documents and copies of the documents being produced were served this 21st day of September, 2007 by Federal Express on the following:

> Nathaniel D. Johnson, Esquire
> 3475 Leonardtown Road
> Waldorf, MD 20602

Akia F. Roane

# Plaintiff's Deposition

0001

```
 1              THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF COLUMBIA
 3
 4    _____
                              )
 5    BRIDGET POLLARD,        )      Case No. 1:07-0692 (CKK)
                              )
 6         Plaintiff,         )
                              )
 7    vs.                     )
                              )
 8    QUEST DIAGNOSTICS,      )
                              )
 9         Defendant.         )
      _____)
10
11
12              VIDEOTAPED DEPOSITION OF
13                 BRIDGET L. POLLARD
14                  Washington, D.C.
15              Friday, December 21, 2007
16                     8:59 a.m.
17
18
19
20
21    Job No.:  1-119106
      Pages 1 through 169
22    Reported by:  John L. Harmonson, RPR
```

0002

```
 1
 2
 3              Videotaped Deposition of
 4                 BRIDGET L. POLLARD
 5
 6
 7    Held at the offices of:
 8              ARENT FOX, PLLC
 9              1050 Connecticut Avenue, N.W.
10              Washington, D.C.  20036
11
12
13
14        Taken pursuant to the Federal Rules of Civil
15    Procedure, before John L. Harmonson, Registered
16    Professional Reporter, Notary Public in and for the
17    District of Columbia, who officiated in administering
18    the oath to the witness.
19
20
21
22
```

0003

```
09:53:14   3   Providence were black?
09:53:19   4        A.    When you say "black," as in --
09:53:24   5             MR. JOHNSON:   I'm going to object to
09:53:25   6   the form of the question.
09:53:26   7   BY MR. STEVENS:
09:53:26   8        Q.    You can answer.
09:53:28   9        A.    I don't know what you mean when you say
09:53:29  10   "black."  There are people there from different
09:53:33  11   countries.  Their skin is dark, and there are
09:53:37  12   probably some people there I don't even know their
09:53:42  13   nationalities.  Black Americans?
09:53:44  14        Q.    Well, in your complaint you've alleged
09:53:46  15   that you were discriminated against based on your
09:53:49  16   race, black.  So how many other people would you
09:53:52  17   say worked at Quest who were the same race as you?
09:53:56  18        A.    At the Providence Hospital site, I
09:53:59  19   would say probably 70 percent of the people were
09:54:03  20   black in color minority.
09:54:20  21        Q.    Were you aware of any supervisors or
09:54:23  22   managers who were, to use your term, black in
0060
09:54:33   1   color minority?
09:54:35   2        A.    Yes.
09:54:36   3        Q.    Who?
09:54:36   4        A.    Elmore Wright.
09:54:38   5        Q.    Anyone else?
09:54:40   6        A.    Hewitt is Ethiopian.   Solomon is
09:54:44   7   Ethiopian minority.
09:54:48   8        Q.    Anyone else?
09:54:49   9        A.    No.
09:54:58  10        Q.    Are you aware of whether or not
09:55:03  11   Mr. Vandenburg has ever promoted anyone who is
09:55:06  12   black?
09:55:08  13        A.    No.
09:55:09  14        Q.    Do you have any evidence to suggest
09:55:10  15   that he has never promoted anyone who is black?
09:55:15  16        A.    No.
09:55:19  17        Q.    Do you have any evidence to suggest
09:55:20  18   that Mr. Leap has never promoted anyone who is
09:55:27  19   black?
09:55:27  20        A.    I do not have any information about
09:55:28  21   that.
09:55:29  22        Q.    Do you know what the racial composition
0061
09:55:32   1   of the IT Department of Quest is?
09:55:35   2        A.    No, I do not.
09:55:49   3        Q.    When was the first time you met Harvey
09:55:52   4   Vandenburg?
09:55:55   5        A.    At work, night shift, one morning, I
09:56:00   6   believe he spoke.
09:56:01   7        Q.    Spoke to whom?
09:56:03   8        A.    Said hello, good morning.
09:56:05   9        Q.    Okay.  Did he introduce himself to you
09:56:09  10   or did you introduce yourself to him?
```

```
11:58:13  1   with them; they did not reflect my quality of
11:58:16  2   work.  Isabelita informed me that no one would be
11:58:19  3   allowed an excellent rating per Harvey Vandenburg,
11:58:23  4   the laboratory director.  I did not want to argue
11:58:26  5   the matter and accepted the rating with some minor
11:58:29  6   changes."
11:58:30  7        Q.    And is what you just read accurate?
11:58:33  8        A.    Yes, it is.
11:58:35  9        Q.    Okay.  Now, when Isabelita told you
11:58:39  10  that no one would be allowed an excellent rating
11:58:43  11  per Harvey Vandenburg, did you understand that
11:58:50  12  Mr. Vandenburg was making that rule for all
11:58:53  13  employees?
11:58:55  14       A.    That's what I understood.
11:59:01  15       Q.    And did Ms. Aglipay tell you why he
11:59:04  16  made that rule?
11:59:05  17       A.    No, she did not.
11:59:08  18       Q.    Let's look back at Exhibit 16, page 5.
11:59:23  19  Are you there?
11:59:25  20       A.    Yes.
11:59:31  21       Q.    Now, it looks like in the performance
11:59:39  22  factor ratings in the top left-hand corner on page
0154
11:59:44  1   Q00237 the rating for No. 2 was changed from a
11:59:51  2   4 to a 3, and the rating for No. 4 was changed
11:59:58  3   from a 3 to a 2.  Do you see that?
12:00:01  4        A.    Yes.
12:00:01  5        Q.    And that looks like that changed your
12:00:03  6   average rating from a 2.75 to a 2.5.  Do you see
12:00:06  7   that?
12:00:07  8        A.    Yes.
12:00:08  9        Q.    And it looks like that 2.5 rating put
12:00:11  10  you in the achieves expectations box in the
12:00:15  11  overall performance average rating on the
12:00:18  12  right-hand corner; is that correct?
12:00:21  13       A.    Yes.
12:00:21  14       Q.    Now, did you just have one conversation
12:00:25  15  with Ms. Aglipay about this review?
12:00:27  16       A.    Yes.
12:00:29  17       Q.    Please tell me as best as you can
12:00:32  18  recall what you said and what she said during that
12:00:35  19  conversation and in what order.
12:00:39  20       A.    So she informed me that we had to
12:00:43  21  review this, and we reviewed it.  And at the end
12:00:47  22  of the review I told her that I didn't feel like
0155
12:00:50  1   this reflected my job performance.  And I told
12:00:53  2   her -- she pretty much agreed that it didn't.
12:00:58  3             We discussed some other areas as well
12:01:01  4   as the ones that she changed, the 3s basically,
12:01:07  5   that I thought were previously 2s.  And that would
12:01:11  6   have given me the 2.0 or put me in the
12:01:17  7   excellent -- the excellent range.
12:01:19  8             And she seemed to feel that she
```

12:01:24  9    couldn't give me the proper evaluation because of
12:01:27  10   what she had been told by Mr. Vandenburg.  I felt
12:01:33  11   I did the same job the same way.  Nothing had
12:01:36  12   changed, and I didn't understand why I was getting
12:01:39  13   a lower score than I did before.
12:01:44  14           So she made a few changes with the
12:01:46  15   statement that she was advised by Mr. Vandenburg
12:01:49  16   that no one would get a 2.0.
12:01:54  17       Q.    Okay.  When you say she made a few
12:01:57  18   changes, I see two changes, one to factor two and
12:02:02  19   one to factor four.  Were there any other changes
12:02:05  20   she made?
12:02:06  21       A.    No.  Just the final calculation.
12:02:08  22       Q.    The average rate?  Okay.
0156
12:02:21  1            During the time that you discussed the
12:02:23  2    performance review, did the subject of your EEOC
12:02:26  3    charge come up?
12:02:33  4        A.    I don't -- I don't remember.
12:02:37  5        Q.    Did you have any discussion with her
12:02:39  6    when you were discussing this review about the
12:02:41  7    pending EEOC charge?
12:02:42  8            MR. JOHNSON:  Objection; asked and
12:02:42  9    answered.
12:02:49  10           THE WITNESS:  I'm not -- I'm not sure.
12:02:53  11   I may have said that I felt that this was in
12:02:57  12   reference to my complaint.  I don't know that I
12:03:01  13   said that.  Maybe I told her that; I don't know.
12:03:03  14   BY MR. STEVENS:
12:03:03  15       Q.    You may have said that?
12:03:05  16       A.    Yeah.
12:03:05  17       Q.    But you don't recall if you said that?
12:03:08  18       A.    I don't remember.  I was just upset.
12:03:10  19       Q.    Okay.  You were upset in this meeting?
12:03:13  20       A.    Yeah, I was upset.  I was very
12:03:15  21   disappointed that I had been doing the same job
12:03:19  22   and I got a lower evaluation.
0157
12:03:23  1        Q.    Now, this was a review that was
12:03:25  2    conducted by a different supervisor; isn't that
12:03:28  3    correct?
12:03:29  4        A.    No.  Isabelita was always the
12:03:31  5    supervisor.
12:03:32  6        Q.    I understand that.  But she didn't
12:03:34  7    prepare your previous review?
12:03:36  8        A.    I don't know if she prepared it or not.
12:03:38  9        Q.    But you didn't discuss your previous
12:03:40  10   review with her, you discussed it with Mr. Meeder;
12:03:44  11   isn't that right?
12:03:45  12       A.    Yes.
12:03:46  13       Q.    Now, do you have any evidence to
12:03:52  14   suggest that the reason that Ms. Aglipay rated you
12:03:56  15   the way she did was because you had filed an EEOC
12:04:01  16   charge?

# Vanderburg's Deposition

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

BRIDGET POLLARD,                    X

                                    :

         Plaintiff,                 :

    vs.                             :Case No. 1:07-0692

Quest DIAGNOSTICS                   :

                                    :

         Defendant.            X

WASHINGTON, DC
December 20, 2007

DEPOSITION OF:

**HARVEY VANDENBURG,**

a witness, called for examination by counsel on behalf of

the Plaintiff, pursuant to notice and agreement of the

parties as to time and date, taken at the Arent Fox, LLP,

1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,

beginning at approximately 12:39 p.m., before Raakeebah

L. Henderson, a Notary Public and court reporter in and

for the District of Columbia, when were present on behalf

of the respective parties:

Raakeebah L. Henderson, Professional Court Reporter
13017 Wisteria Drive, Suite 364
Cell: (301) 717-9468   Fax: (240) 912-7323   E-mail: keebahcr@comcast.net



1       Q.   Or you couldn't direct, should I say; is that

2    correct?

3       A.   Yes.

4       Q.   Let me back up for a moment.  You and Mr. Leap

5    composed the position description; is that correct?

6       A.   I -- honestly I don't remember my exact role in

7    producing the position description.  I remember we needed

8    one.

9            I remember that we didn't -- that I had never

10   made a position description for a laboratory information

11   systems person, that the people in Chantilly have a lot

12   of expertise in that and I asked them to prepare that.

13           I do remember reviewing it when it was done and

14   finding it satisfactory for the elements that I

15   considered to be important.

16      Q.   So you say you asked them within HR to prepare

17   the position description; is that your testimony?

18      A.   Yes.

19      Q.   Who are them?  Identify who them were?

20      A.   Most doctorately there was a lady who was

21   serving as the laboratory information systems coordinator

22   for the old system and her name was Gloria Lim.

1    resources?

2        A.   Yes, sir.

3        Q.   Who specifically?

4        A.   I don't recall.

5        Q.   But you made the recommendation; did you not?

6        A.   Yes, I did.

7        Q.   And so the recommendation would have predated

8    the offer or position; would it not?

9        A.   Yes.

10        Q.   So Mr. Townsend he was interviewed July 20th,

11    2005; is that correct?

12        A.   I'm not certain.

13        Q.   Is that what it represents?

14        A.   Yes.

15        Q.   Again, you don't have any reason to dispute

16    those dates?

17        A.   No, I don't.

18        Q.   Let me go back to the position description, the

19    previous exhibit for the lab project manager position,

20    okay, which was constructed according to this on August

21    22nd, 2005.  Again, that's what it says, correct?

22            MR. STEVENS:  Objection.  You can answer the

1          MR. STEVENS:  Objection you can answer.

2      A.   Jointly.

3      Q.   Let me ask the question this way.  After you

4   and Mr. Leap composed the position description what

5   happened to it?  Was it posted for the job announcement?

6      A.   Here's how I recall the process.  And believe

7   me my memory is foggy on this because it's been a long

8   time for me.

9      Q.   Okay.

10      A.   We needed a job description in order to post

11   the position.  This is one of the things that HR wants.

12   It makes sense to me.

13          So not knowing how compose it because I'm not

14   that familiar with the technical aspects of this job, I

15   asked that we have some help in doing so from Rich Leap

16   and his group specifically Gloria Lim who worked for Rich

17   Leap who was the incumbent in that job.

18          And I suggested it might be a good idea to pull

19   out her position description and see what it entailed and

20   if they should modify that and present that as the

21   position description.

22          Those are what I remember in fact.  After that

1    wanted to get the job posted.  Around that time after we

2    decided that we needed to get it posted we started

3    working on the position description because it didn't

4    exist.

5              So I would surmise that the posting predated the

6    finalization of the position description.

7         Q.   How many position descriptions were there?

8         A.   This is the only one I know of.

9         Q.   Wasn't there a position description with one

10   page submitted by you -- agreed upon and submitted by you

11   and Mr. Leap?

12        A.   I don't recall that.

13        Q.   How typical is it that a position description

14   would be composed and presented after a position is

15   announced?

16             MR. STEVENS:  Objection.  You can answer.

17        A.   It would be fairly unusual.  Since this was a

18   new position it was more on the fly than you would

19   usually anticipate.

20        Q.   But again you testified previously for lack of

21   a better word the template or skeleton of the position

22   description existed from Ms. Lim's position; is that

# Leap's Deposition

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

BRIDGET POLLARD,                    X

                                    :

        Plaintiff,                  :

    vs.                             :Case No. 1:07-0692

QUEST DIAGNOSTICS                   :

                                    :

        Defendant.            X

                        WASHINGTON, DC
                        December 20, 2007

DEPOSITION OF:

**RICHARD LEAP**,

a witness, called for examination by counsel on behalf of

the Plaintiff, pursuant to notice and agreement of the

parties as to time and date, taken at the Arent Fox, LLP,

1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,

beginning at approximately 10:35 a.m., before Raakeebah

L. Henderson, a Notary Public and court reporter in and

for the District of Columbia, when were present on behalf

of the respective parties:

Raakeebah L. Henderson, Professional Court Reporter
13017 Wisteria Drive, Suite 364
Cell: (301) 717-9468   Fax: (240) 912-7323  E-mail: keebahcr@comcast.net



1   to interview.

2       Q.   Was there a position description for the

3   position?

4       A.   Yes.

5       Q.   Do you know who drafted the position

6   description?

7       A.   A combination of Harvey, myself and human

8   resources.

9       Q.   Vandenburg?

10      A.   Mm-hmm.  Mr. Vandenburg, I'm sorry.  Yes.

11      Q.   Yourself?

12      A.   Mm-hmm.

13      Q.   Who specifically in HR?

14      A.   That I don't know.  I'm assuming that's who

15  typed it in the paper.  In the form that we have.

16      Q.   But you don't have any personal first-hand

17  knowledge of anyone associated with HR who assisted in

18  the composition of the position description?

19      A.   No, I do not.

20      Q.   Prior to the composition of the position

21  description, did you previously compose any other

22  position descriptions?

# Knapp's Deposition

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

BRIDGET POLLARD,         X

                           :

      Plaintiff,       :

   vs.             :Case No. 1:07-0692

QUEST DIAGNOSTICS     :

                           :

      Defendant.     X

WASHINGTON, DC
January 28, 20078

DEPOSITION OF:

**MICHAEL KNAPP,**

a witness, called for examination by counsel on behalf of

the Plaintiff, pursuant to notice and agreement of the

parties as to time and date, taken at the Arent Fox, LLP,

1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,

beginning at approximately 2:05 a.m., before Raakeebah L.

Henderson, a Notary Public and court reporter in and for

the District of Columbia, when were present on behalf of

the respective parties:

ORIGINAL

Raakeebah L. Henderson, Professional Court Reporter
13017 Wisteria Drive, Suite 364
Cell: (301) 717-9468    Fax: (240) 912-7323    E-mail: keebahcr@comcast.net

```
1        A.    Generally, yes.

2        Q.    You said generally?

3        A.    Yes.

4        Q.    Are there any exceptions to that?

5        A.    Sometimes the hiring manager wants us to do

6    more look, for example, administer a test of some sort.

7        Q.    Generally when are position descriptions

8    composed for the vacancy announcements that are included

9    in the bulletin?

10        A.    Prior to their approval to be filled.  So prior

11    to the posting.

12        Q.    So, for instance, let me direct your attention

13    to the bottom of the last exhibit where it reads:

14    "Providence Hospital" and I apologize but this is what I

15    received from Mike.

16            I think they attempted to highlight this and

17    it's a difficult read but nonetheless the position is

18    posted 5/13/2005; is it not?

19        A.    Yes.

20        Q.    So based on your previous testimony it's safe

21    to say the position description should have been posted

22    before the listing of this position here in the bulletin,
```

1       Q.   Do you know what exactly did she do as far as

2   following your instructions to that effect?

3       A.   She prepared this document and attached to it

4   the items that are listed there.

5       Q.   Okay.  Do you know over how long a period of

6   time did it take for her to compile this information?

7       A.   No.

8       Q.   It's dated January 10th, 2006?

9       A.   I see that.

10      Q.   Let me direct your attention now to what was

11  previously marked as Exhibit 5, which is an amendment; do

12  you see that?

13      A.   Mm-hmm.

14      Q.   Well, let me back up.  And I apologize.  Number

15  4, November 29th, 2005.  So again by the date of Exhibit

16  3, Pollard Bridgett discrimination charge January 10,

17  '06, is it safe to say that Quest Diagnostic was made

18  aware of Ms. Pollard's formal charge of discrimination

19  prior to that date, correct?

20      A.   Prior to 1/10/06?

21      Q.   Yes, sir.

22      A.   Yes.

# Aglipay's Deposition

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

_____

BRIDGET POLLARD,              X

                              :

        Plaintiff,            :

     vs.                      :Case No. 1:07-0692

QUEST DIAGNOSTICS             :

                              :

        Defendant.            X
_____

                    WASHINGTON, DC
                    January 28, 20078

DEPOSITION OF:

             **ISABELITA AGLIPAY,**

a witness, called for examination by counsel on behalf of

the Plaintiff, pursuant to notice and agreement of the

parties as to time and date, taken at the Arent Fox, LLP,

1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,

beginning at approximately 11:12 a.m., before Raakeebah

L. Henderson, a Notary Public and court reporter in and

for the District of Columbia, when were present on behalf

of the respective parties:                    ORIGINAL

1  Ms. Pollard's ability to do or perform her job; is that

2  correct?

3          MR. STEVENS:  Objection.  You can answer.

4      A.  Yes.

5      Q.  Now, a couple of wrap-up questions.  The

6  average rating for this performance cycle of 2.0 that

7  gave her, what, an excellent rating, correct?

8      A.  That's correct.

9      Q.  Do you know anything about the merit increase

10 pay for Quest Diagnostic Laboratories?

11     A.  Excuse me?

12     Q.  Merit increase pay.

13     A.  It depends on your evaluation.

14     Q.  And if an employee is given an excellent versus

15 achieved expectation does that have an impact on their

16 merit increase pay, if you know?

17         MR. STEVENS:  Objection.  You can answer.

18     A.  Yes.

19     Q.  Now, let me direct your attention to number 3

20 exhibit.  This is the e-mail.  You review that document

21 when I presented it to you, right?  Take a moment if you

22 need to review it again.

1    promotional opportunity; does it not?

2        A.    That's what it says in here.

3        Q.    It's dated October 24th, 2005.  Were you

4    informed around this time regarding Ms. Pollard's

5    complaint of discrimination because she did not receive

6    the promotion to project manager position?

7        A.    No.  I didn't hear any complaint about this.

8        Q.    When were you first informed that she was

9    discussing filing a complaint or that she was going to

10   follow through with filing a complaint of discrimination?

11           MR. STEVENS: Object to the form of the

12   question.  You can answer.

13       A.    When I notice the complaint it was Mr. Harvey

14   called me in his office at that time that Ms. Pollard

15   complain about not getting the position.

16       Q.    When was that, ma'am?

17       A.    I cannot give you the exact date.

18       Q.    What month was it?

19       A.    I don't know what month was that.  That was

20   before I went to part-time position.

21       Q.    When did you go to part-time?

22       A.    2006, I believe.

1          MR. JOHNSON:  At the time  or before that time?

2      A.   I don't remember.

3      Q.   Is it possible that he did mention that

4  Ms. Pollard was considering or she had filed a

5  discrimination complaint at the time that you provided

6  her performance appraisal?  Is it possible?

7          MR. STEVENS:  Objection.

8      A.   No.  I don't know.

9      Q.   Is it possible?

10         MR. STEVENS:  Same objection.

11     A.   No.  It's not possible.

12     Q.   But you don't know; is that correct?

13     A.   Yeah.

14     Q.   So it could be possible?

15     A.   Yes.

16     Q.   I'll move on.  You testified previously

17  Mr. Vandenburg directed you to appraise Ms. Pollard's

18  performance by Exhibit 2, correct?

19         MR. STEVENS:  Objection.  Asked and answered.

20  You can answer.

21     A.   Yes.

22     Q.   Did he tell you not to give her an excellent

1    explain it.  Give the result.  Not just say it's in the

2    computer.  Don't give an attitude to your client because

3    we are here to help our client.  This is how we treat

4    them.

5         Q.   Anything else in terms of complaints against

6    Ms. Pollard brought by the staff or the client?

7         A.   About the staff they complain about some

8    attitude.

9         Q.   Attitude?

10        A.   Yes, sir.

11        Q.   Specifically what allegations were made

12   regarding Ms. Pollard's attitude by the staff?

13        A.   The way she answered them back.

14        Q.   She answered who back, ma'am?

15        A.   Our coworkers.  Some of the staff.

16        Q.   Was it the coworkers or was it the staff?

17        A.   Some of staff, nurses.

18        Q.   We're talking Providence Hospital staff,

19   correct?

20        A.   Yes, sir.

21        Q.   Some of the way you said her attitude how she

22   answered them back?