**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**BRIDGET POLLARD,**                    )
                                                    )
                **Plaintiff,**                    )
                                                    )
        **v.**                                       )        **Case No. 1: 07-00692(CKK)**
                                                    )
                                                    )
**QUEST DIAGNOSTICS,**              )
                                                    )
                **Defendant.**                )
_____     )

<u>**DEFENDANT'S REPLY TO PLAINTIFF'S REVISED OPPOSITION TO**</u>
<u>**DEFENDANT'S  MOTION FOR SUMMARY JUDGMENT**</u>

Michael L. Stevens
D.C.  Bar No. 384887
Arent Fox LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5339
(202) 857-6000
Counsel for Defendant

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ...................................................................................................1

II. ARGUMENT………………………………………………………………..………..3

      A.    Most of the Documentary Exhibits Submitted By Plaintiff Are Not
            Authenticated………………………………………………………………...3

      B.    Plaintiff Has Admitted Most of Quest's Material Facts, and Her Denials are not
            Supported by the Record……………………………………………………..4

      C.    The Court Should Grant Summary Judgment for Defendant on the
            Discrimination Claim ……………………..………………………………….. 7

            1.    Plaintiff was not Qualified for the Project Manager Position and/or was
                  not as Qualified as Mr. Townsend……………………………………..7

            2.    The Position Description was not Tailored to Meet Mr. Townsend's
                  Qualifications. …………………………………………………………8

            3.    The Position Description Was not Used to Exclude all Other Minority
                  Applicants…………………………………………………………..10

            4.    There is no Evidence that Mr. Vandenburg Knew Plaintiff's Race, and
                  Even if he Did, Mr. Leap decided she was not Technically
                  Qualified………..………………………………………………………12

            5.    Case Law in this Court Supports Quest's Motion. ……………………...13

            6.    The Minor Irregularities and Inconsistencies cited by Plaintiff are
                  Illusory and Immaterial …......................................................................15

      D.    The Court Should Grant Summary Judgment for Defendant on the Retaliation
            Claim…………………………………………………………………… 18

III. CONCLUSION....................................................................................................22

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Anderso*n *v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) ...........................……………………………3

*\*Burlington N & Santa Fe Ry. Co. v. White*
  548 U.S. 53 (2006) ....................………………………………………………………………..21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........…………………………………………………2

*\*Fischbach v. District of Columbia Dept. of Corrections,* 86 F.3d 1180 (D.C. Cir
1996)……………………………………………………………………………….......15, 16

*Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999) ......…………………………………………………3

*Greer v. Paulson*, 505 F.3d 1306
  (D.C. Cir. 2007) ...................................………………………………………………………3

*\*Hamilton v. Paulson,* 542 F. Supp.2d 37 (D.D.C. 2008) …………………………………13, 14, 15, 16

*Harding v. Gray*,
  9 F.3d 150 (D.C. Cir. 1993).............................................................................................................3

*\*Murray v. Gilmore,* 406 F.3d 708 (D.C.Cir.2005)…………………………………………..............6

*\*Pyne v. District of Columbia,* 468 F.Supp.2d 14 (D.D.C.2006)…………………………… ............6

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000)…………………………...........17

*Shaw v. Boorstin*, 517 F. Supp. 336  (D.D.C.1981)………………………………………………13

*Stodola v. Finley & Co., Inc. et.al.,* 2008 WL 835709 (N.D. Ind. 2008)……………….. .....................18

*\*Waterhouse v. District of Columbia,* 124 F.Supp.2d 1 (D.D.C. 2000)…………………….................15

\*denotes cases chiefly relied upon

**Miscellaneous**

Fed. R. Civ. P. 56(c) ...................................................................................................................1, 3

Local Rule LCvR 7(h) ......…………………………………………………………………..1, 3

Local Rule LCvR 56.1 ...……………………………………………...…………………………1, 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
BRIDGET POLLARD,                        )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )          Case No. 1: 07-00692(CKK)
                                        )
                                        )
QUEST DIAGNOSTICS,                      )
                                        )
          Defendant.                    )
_____ )

**DEFENDANT'S  REPLY TO PLAINTIFF'S REVISED OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Quest Diagnostics ("Quest"), by and through its undersigned counsel and

pursuant to Fed. R. Civ. P. 56 and Local Rules LCvR 7(h) and LCvR 56.1, respectfully submits

this Reply to Plaintiff's Revised Opposition to its Motion for Summary Judgment.

**I.      INTRODUCTION**

Having been given every conceivable opportunity to assert a viable Opposition to

Defendant's Motion for Summary Judgment, Plaintiff once again has pulled up considerably

short.

To recap, Plaintiff was granted an extension of time to file an Opposition to Defendant's

Motion.  Plaintiff then filed her Opposition late, but the Court *nunc pro tunc* granted her leave to

file her Opposition out of time.

Then, when Plaintiff filed her Opposition, she failed to submit a Statement of Material

Facts in Dispute.  She apparently did not realize this until Quest made the observation in its

initial Reply.  Then Plaintiff filed a Motion for Leave to file a Statement out of time, and that

Statement did not comply with the Court's rules.  The Court mercifully struck Plaintiff's

Opposition, instead of deeming the failure to file the Statement as an admission of the facts in

Defendant's Statement of Material Facts, and notwithstanding that the Court's March 7, 2008

Order expressly provided otherwise.

Now, after being given an unprecedented opportunity to file another Opposition and

another Statement, and in effect being able to respond to Quest's initial Reply, Plaintiff has filed

a Revised Opposition, this time with a Statement of Material Facts in Dispute.  Plaintiff had to

admit virtually all of the facts in Defendant's Statement, but has denied some facts with no

genuine support in the record.  Instead, Plaintiff relies on speculation, fabrication and

unsupported allegations.  Indeed, Plaintiff's claim for discrimination rests entirely on her

allegation that the job description was prepared on August 22, 2005 and that Dr. Vandenburg (or

as Plaintiff repeatedly calls him, Dr. "Vanderburg") should have known her race, all the time

ignoring undisputed evidence in the record on both issues to the contrary.  Likewise, her claim

for retaliation is based on her belief that Dr. Vandenburg instructed Ms. Aglipay not to give her a

lower rating on her evaluation when she even admits that she believes he instructed Ms. Aglipay

to treat all employees she evaluated similarly.  Plaintiff also has failed to dispute, or for that

matter, to even address, the glaring admissions she made in the record that render her

discrimination and retaliation claims utterly meritless.

As the nonmoving party, Plaintiff cannot simply rely on the allegations of her pleadings

or on mere speculation.  Instead, she must produce "specific facts showing that there is a genuine

issue for trial . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). (citation omitted).

"[T]he mere existence of a scintilla of evidence" or of unsubstantiated conclusory allegations is

insufficient to withstand a motion for summary judgment. *Anderso*n v. *Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gra*y, 9 F.3d 150, 154 (D.C. Cir.1993).

Accordingly, for the reasons discussed below, no reasonable juror could sustain either of Plaintiff's claims, Quest's Motion should be granted and the Amended Complaint should be dismissed in its entirety.

## II.    **ARGUMENT**

### A.    **Most of the Documentary Exhibits Submitted By Plaintiff Are Not Authenticated.**

Plaintiff attached several documents as exhibits to her Opposition, but many of them are not identified or authenticated by any testimony from a witness with personal knowledge whose deposition testimony or affidavit was included in the Opposition. *See* Exhibit A (Opposition p. 5); Exhibit C (Opposition p.5); Exhibit D (Opposition at p. 8); Exhibit E (Opposition p.13); and Exhibit G (not cited in Opposition).

Rule 56, and Local Rules 7(h) and 56.1 require that evidence submitted in an opposition to a motion for summary judgment be appropriately referenced to the record in the case with sworn testimony from competent witnesses. Because these documents are not properly identified and authenticated by witnesses with personal knowledge, they should not be considered by the Court.

To survive summary judgment the non-moving party must "produce evidence ... capable of being converted into admissible evidence." *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (citing *Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 199 F.3d 1365, 1369 (D.C.Cir. 2000)). Because Plaintiff's evidence concerning these exhibits is "sheer hearsay," it "counts for nothing on summary judgment." *Greer,* 505 F.3d at 1315 (citation omitted).

**B.** **Plaintiff Has Admitted Most of Quest's Material Facts, and Her Denials are not Supported by the Record.**

In her Statement of Material Facts in Dispute, Plaintiff has denied only four (4) of the sixty-one (61) facts alleged to be undisputed by Quest in its Statement, and none of those denials is supported by evidence in the record.

First, Plaintiff denies Fact 20, claiming that the position description was composed in August 2005, <u>after</u> Mr. Townsend was interviewed.  The only evidence she cites to support this denial is a copy of the position description dated August 22, 2005 and Mr. Vandenburg's deposition testimony which stated:  "So I would surmise that the posting predated the finalization of the position description."  However, Plaintiff has not disputed the Declaration of Mr. Knapp indicating that the template for the position description was actually created on September 17, 2004, and that the "Date Written" stamp on the document changes each time the document is revised or updated, no matter how slight.    Reply Ex. 1 [Knapp Sec. Dec. at ¶ 5 and Ex. 1 attached thereto].  Plaintiff also has not disputed the Declarations of Messrs. Vandenburg and Leap that they did not revise the position description after interviewing Ms. Kopley or Mr. Townsend.  Reply Ex. 2 [Vandenburg Declaration  ("Vandenburg Dec." at ¶ 3)]; Reply Ex. 3 [Leap Declaration  ("Leap Dec." at ¶ 3)].

Second, although Plaintiff denies Quest's Fact 22 concerning the minimum qualifications stated in the position description, her denial is misplaced, because she makes reference to the "vacancy announcement," not the position description.  As discussed in more detail below, the vacancy announcement was merely a summary of major qualifications; it was not a complete listing of qualifications.

Third, Plaintiff denies Quest's Fact 55, that in preparing Plaintiff's performance evaluation, Ms. Aglipay considered several complaints about Plaintiff's performance and failing

4

to meet time pressures of her job.  The only "evidence" Plaintiff cites to support this denial is

Quest's response to two document requests.  However, there is no evidence that the complaints

or time pressures to which Ms. Aglipay referred were written.  In fact, as discussed below, Ms.

Aglipay testified that they were oral.

Finally, Plaintiff denied Quest's Fact 58, that Ms. Aglipay was unaware of

Plaintiff's EEOC Charge during the evaluation period.  The deposition testimony

of Ms. Aglipay cited by Plaintiff does not support her denial of this fact.  Ms.

Aglipay made it absolutely clear in her deposition testimony that she did not

know about the Charge when she completed the evaluation.  Reply Ex. 4 [Aglipay

Deposition ("Aglipay Dep.") at P. 55 L. 16 to P. 56 L.16; P. 59 L. 3 to L. 8].

And, Plaintiff admitted that she had no evidence that Ms. Aglipay knew about the

Charge at the time Ms. Aglipay prepared the evaluation.  Reply Ex. 5   [Pollard

Dep. P. 157 L. 13 to L. 17].

Plaintiff also admitted several facts but added commentary or qualifications to her

admissions.  For example, with respect to Fact 7, Plaintiff admitted Quest's allegations about her

duties, but added that she "also performed LIS duties and responsibilities during the course of

her employment."  Even if true, this allegation is immaterial, because it is undisputed that she

only had user experience with the LIS system, and had no experience with the upgrade that was

being installed.  Reply Ex. 5   [Pollard Dep. at P. 131 L. 3 to 132 L.15].

Concerning Fact 28, Plaintiff admits she never had a formal conversation with Dr.

Vandenburg, she states that because of Exhibit D, "Applicant Flow Data," which is not

authenticated, "Vanderburg [sic] was fully aware of Plaintiff and the other applicants' protected

classifications during the selection process."  Interestingly, Plaintiff failed to provide <u>any</u>

citations to the record to support this allegation, in direct violation of the Court's March 7, 2008 Order and Local Rules 7(h) and 56.1.  Moreover, Plaintiff admitted in deposition testimony that she has no evidence that Dr. Vandenburg knew her race.  Reply Ex. 5 [Pollard Dep. P. 85 L. 4 to P. 86 L. 7].

Perhaps more importantly, however, it is undisputed that Mr. Leap, who made the decision not to interview Plaintiff further because she was not technically qualified for the job, had never met Plaintiff and did not know her race.  *See* Fact 34.  There simply is no dispute about that fact.

Plaintiff also admits Fact 47, that the Project Manager position is currently held by an African-American female, but claims the fact is "not material to this litigation," without offering any explanation as to why.  Although this may be immaterial as to whether Plaintiff has established a *prima facie* case of discrimination, courts regularly have considered the race of replacement employees in determining whether discrimination has occurred.  For instance, in *Murray v. Gilmore,* 406 F.3d 708, 715 (D.C. Cir. 2005), the D.C. Circuit noted that "a replacement within the same protected class cuts strongly against any inference of discrimination." *See also Pyne v. District of Columbia,* 468 F. Supp. 2d 14, 21 (D.D.C. 2006) (stating that African American plaintiff's case was severely undermined by the fact that the defendant filled two of the three positions for which plaintiff applied with African Americans).

Plaintiff claims that Fact 48, that Dr. Vandenburg promoted an African-American female in the past, is also immaterial, again without explanation.  This fact clearly could lead a reasonable juror to conclude that Dr. Vandenburg was not motivated by race.

Fact 57 alleged that after Ms. Aglipay changed Plaintiff's ratings on her performance review, she did not voice any further objections and "accepted" the rating.  The fact that she was

satisfied with the rating at that stage clearly is material to this case. Plaintiff did not offer any reason why it is immaterial.

Based on the foregoing, and the arguments below, there are no genuine issues of material fact and Quest is entitled to judgment as a matter of law.

C.     **The Court Should Grant Summary Judgment for Defendant on the Discrimination Claim.**

Without a scintilla of record evidence to support her, Plaintiff alleges that Defendant's Motion should be denied for four major reasons: (1) she was qualified for the Project Manager position; (2) the job description for the position was created after Mr. Townsend was interviewed; (3) the job description was used to exclude Plaintiff and all other minority applicants; and (4) Mr. Vandenburg should have known Ms. Pollard's race.

1.     **Plaintiff Was not Qualified for the Project Manager Position and/or was not as Qualified as Mr. Townsend.**

The record evidence is undisputed that Plaintiff lacked the experience that Messrs. Vandenburg and Leap were seeking in the successful candidate. Although she claims to have met the minimum qualifications set forth in the very cursory job posting, it is undisputed that she clearly lacked the technical experience that was considered essential by Messrs. Vandenburg and Leap. The job posting she included in her Opposition clearly does not include the full job description for each of the numerous positions posted. Rather, it only allows for two or three lines to summarize job requirements for each position. According to Michael Knapp, Director of Employee Services for Quest, the job posting bulletin relied upon by Plaintiff "does not and could not contain all of the elements of the job description for each position posted." Reply Ex. 1 [Knapp Sec. Dec. at ¶ 4]. Indeed, if Plaintiff's argument is carried to its logical extreme, it would mean that every employer who advertises a position in a newspaper cannot impose other

qualifications for the position if the qualifications were not contained in the two or three line classified advertisement. That is simply absurd.

In this case, the posting stated: "BS or AA in Medical Technology or Computer Science. General laboratory knowledge. LIS functionalities. LIS/HIS interface knowledge." Significantly, Plaintiff concedes that Defendant's initial selection of Jane Kopley for the position was not discriminatory, because she acknowledges that Ms. Kopley had superior qualifications for the job. It is inconsistent for Plaintiff to then argue that Defendant's subsequent selection of Mr. Townsend was discriminatory, when he assisted Ms. Kopley with the implementation of the new LIS system at Holy Cross Hospital.

Even for the purposes of establishing a *prima facie* case, the Court concludes that there is a genuine issue of material fact over whether Plaintiff met the minimum qualifications for the job, the Court still has to determine whether there is a genuine issue of material fact concerning whether Quest's proffered legitimate nondiscriminatory reason for her non-selection, that Mr. Townsend was better qualified, is pretextual. It is undisputed that Mr. Townsend was better qualified for the position than Plaintiff. Indeed, Plaintiff even admitted that if the information on Mr. Townsend's resume is true, he was more qualified than she was. Reply Ex. 5 [Pollard Dep. P. 117 L. 19 to P. 119 L. 1].

## 2. The Position Description Was not Tailored to Mr. Townsend's Qualifications.

Concerning the date of the position description, as discussed above, Plaintiff offers absolutely no evidence that it was created in August 2005, after Mr. Townsend was interviewed, and to conform to his qualifications, other than the fact that in a section entitled "Date Written" the description states "August 22, 2005." Every witness with personal knowledge who testified, except Mr. Vandenburg, confirmed that the job description was completed prior to the job being

posted in May 2005.  Considered in its entirety, Mr. Vandenburg's testimony confirms his belief that the position description was at least started and substantially completed before the job was posted, and there is no evidence that he or Mr. Leap made any changes to the description after Mr. Townsend was interviewed.  Indeed, both Mr. Vandenburg and Mr. Leap have confirmed that they made no changes to the job description after Ms. Kopley or Mr. Townsend or Plaintiff were interviewed.  Reply Ex. 2 [Vandenburg Dec. at ¶ 3)]; Reply Ex. 3 [Leap Dec. at ¶ 3)].

Mr. Knapp confirmed that a job cannot be posted until and unless a job description is prepared.  The Human Resources Department is instructed not to post jobs unless a job description is prepared, and he is not aware of any instances where a job was posted before the job description was completed.  Reply Ex. 1 [Knapp Sec. Dec. at ¶ 3].

In addition to this evidence, other indisputable evidence suggests that the job description was prepared prior to its posting.  Indeed, the electronic properties for the document indicate that it was derived from a September 17, 2004 job description for a Project Manager position at Washington Adventist Hospital and Shady Grove Adventist Hospital that is substantially similar in many respects.  Reply Ex. 1 [Knapp Sec. Dec. at ¶ 5 and Ex. 1 attached thereto].  In fact, in many respects, the prior job description was much more demanding than the description for the job for which Plaintiff applied.[1]  This conclusively shows that Messrs. Vandenburg and Leap did not conspire to revise the position description to put the job out of Plaintiff's reach, as she alleges.  No reasonable juror could conclude otherwise.

Moreover, the electronic properties show that the job description was printed on June 24, 2005, around the time the job was posted.   Reply Ex. 1 [Knapp Sec. Dec. at ¶ 7 and Ex. 2 attached thereto].  Finally, each time a job description is revised or updated in any manner, no

---

[1] For example, the Shady Grove/Washington Adventist Hospital Position Description had 24 "Essential Job Duties and Responsibilities" and the Providence Hospital Position Description had only 16.  Moreover, the "Experience, Education and Licensure" and "Knowledge, Skills and Abilities Requirements" were slightly more demanding.

matter how slight, the date in the "Date Written" section is overwritten to reflect the then current date. Reply Ex. 1 [Knapp Sec. Dec. at ¶ 6].

Furthermore, even if the job description was prepared on August 22, 2005, which it was not, it also would have been prepared after Ms. Kopley was interviewed, and Plaintiff concedes that the selection of Ms. Kopley was not discriminatory. In addition, Plaintiff has offered absolutely no evidence to suggest that the technical qualifications allegedly added after Mr. Townsend was interviewed were somehow not job-related and thus a pretext for discrimination. There is no evidence in the record that controverts the testimony of Dr. Vandenburg and Mr. Leap on this point. The fact that Plaintiff simply may have used the system after it was upgraded is immaterial. She admits that she had no experience installing upgrades to the new system, building and testing the new system, training staff on the new system or collaborating the new system with the hospital information system. Reply Ex. 5 [Pollard Dep. P. 131 L. 3 to P. 132 L. 15].

> **3.  The Position Description Was not Used to Exclude all Other Minority Applicants.**

Plaintiff's argument that the job description was used to exclude all of the other minority applicants is the most specious of all. She does not offer any record evidence, because none exists, that any other minority applicant was qualified for the position and was discriminatorily denied the position.

In fact, she admits that Tuy Le, another internal applicant who was not selected, was not as qualified for the job as Mr. Townsend or Ms. Kopley. Reply Ex. 5 [Pollard Dep. at P. 122 L. 1 to L. 6]. Under these circumstances, Plaintiff's reckless speculation cannot be credited.

The reality is that Plaintiff admitted that after Ms. Kopley declined the position, she, Mr. Townsend and Mr. Le were the three remaining best qualified candidates. And, when asked why

she thought the selection of Mr. Townsend was discriminatory, the best she could come up with

was that she was aware of the needs of the doctors and her co-workers, and that Quest did not

repost the position so she could apply again:

> Q.  Okay.  Why do you think it was discriminatory for Quest to offer the position to Mr. Townsend?
> A.  Well, I think that it was discriminatory because – initially because I was an in-house employee who was familiar with the system, and I was aware of some of the needs of the doctors and my co-workers for the system as an upgrade. And I felt that it was discriminatory because they never reposted the position in order for me to have an opportunity to reapply.
> From my understanding, out of the applicants, it would have been myself, Mr. Townsend and Mr. Le.  And I don't think that I had a fair opportunity.  There may have been a possibility that Mr. Townsend would not have reapplied and I would have had the opportunity to have the position.
> Q.  Why did you think the company had to repost the position if they already posted it and had already gotten applicants for it?
> A.  I thought that was how they handled their jobs in general, that if somebody doesn't accept it, that it be reposted.
> Q.  Are you aware of any policy that says if the highest rated applicant doesn't accept an offer, that it's the policy or practice of Quest to repost the position?
> A.  No.  I'm not aware of a policy.
> Q.  Are you aware of any other situation while you worked at Quest where a candidate declined a position and Quest reposted it?
> A.  Not exactly.
> Q.  Okay.  Why not exactly?
> A.  Because there have been instances where jobs have been – for technologists or phlebotomists and the position they offer and the person hasn't taken it, so it has been reposted.  I don't know if there was a second person or if that was the only person.
> Q.  So you don't know if there have been any other positions where candidates were ranked and the top ranked position – the top ranked candidate declined the position and Quest reposted it instead of offering it to the second ranked candidate, do you?
> A.  That's true.

Reply Ex. 5 [Pollard Dep. P. 108 L. 9 to P. 110 L. 11].

Although Plaintiff felt Quest should have reposted the position, she was aware of no

policy or practice of the Company doing so.  Likewise, the fact that she thought that Mr.

Townsend may not have reapplied if the position had been reposted is an implicit admission that

he was more qualified than she was.  It also is important to note that in other testimony, Plaintiff

admitted that she has no evidence to suggest that if Mr. Townsend were Black, Quest would not

have selected him for the position.  Reply Ex. 5 [Pollard Dep. P. 158 L. 17 to P. 160 L. 22].

**4.**    **There is no Evidence that Mr. Vandenburg Knew Plaintiff's Race, and Even if he Did, Mr. Leap Decided she was not Technically Qualified.**

Plaintiff bases her Opposition on the allegation that Mr. "Vanderburg" [sic] was the sole

deciding official.  The reality is, and the record is undisputed that, Mr. Vandenburg focused only

on the candidates' interpersonal skills and deferred to Mr. Leap on the more important technical

skills because as the Director of IT, Mr. Leap had more knowledge about the technical aspects of

the job.  Reply Ex. 6 [Vandenburg Deposition ("Vandenburg Dep.") at P. 35 L. 19 to P. 37 L.1].

It is undisputed that Mr. Leap did not know Ms. Pollard's race when he made the decision.

Indeed, Plaintiff has no evidence that he knew her race or the race of Ms. Kopley or Mr.

Townsend or anyone else who applied for the job.  Reply Ex. 5 [Pollard Dep. at P. 160 L. 9 to

22].

Plaintiff has offered no evidence that Mr. Vandenburg knew her race.  Her suggestion

that he should have known she was African-American because most of Quest's employees are

African-American and she spoke on the telephone with Mr. Vandenburg is so meritless that it

does not warrant a response.  *See* Opposition at pp. 7-8.  Plaintiff states that "Defendant does not

discount the likelihood that Vanderburg [sic] suspected or identified Plaintiff's racial

classification from the telephone interview."  Opposition p. 8.  This is disingenuous, because

there is no evidence in the record that he knew her race. Reply Ex. 5 [Pollard Dep. P. 85 L. 4 to

P.  87 L. 1].   Most important, however, is that even after his telephone interview with Ms.

Pollard, he suggested to Mr. Leap that she be one of the four finalists for the position that Mr.

12

Leap consider, and it was Mr. Leap, who did not know her race, who made the decision not to pursue her candidacy further.  Reply Ex. 6 [Vandenburg Dep. P. 35 L. 19 to P. 38 L. 19]; Reply Ex. 7 [Leap Deposition ("Leap Dep.")  P. 18 L. 4 to P. 20 L. 5.]

### 5.     Case Law in this Court Supports Quest's Motion.

Plaintiff's reliance on *Shaw v. Boorstin*, 517 F. Supp. 336 (D.D.C. 1981) is misplaced.  In *Shaw,* a case decided more than 27 years ago, the Court ruled that the plaintiff was discriminatorily denied a promotion because, among other things, it found that she had equivalent background and experience to satisfy the requirement of  "one year at the GS-14 level or the equivalent"; that "the successful applicant's credentials were strikingly less impressive"; that the successful candidate was pre-selected because he was a friend of a decision-maker; and because there was no evidence to support the Library's subjective assertions that the plaintiff was "domineering, abrupt and abrasive."  *Id.* at 338-341(internal quotations omitted).

In contrast, in this case there is no dispute that Plaintiff lacked technical experience training users in the new LIS system and in interfacing with the Hospital ("HIS") system.  She even admitted that she had no experience with the upgrade to the LIS system that was being installed at the Providence Hospital laboratory.  Reply Ex. 5   [Pollard Dep. at P. 131 L. 3 to 132 L.15].  There is no assertion by Plaintiff or evidence in the record that Mr. Townsend's credentials were less impressive than hers.  In fact, she admits that if his resume was true, they were more impressive.  Mr. Townsend was not pre-selected; neither Mr. Vandenburg nor Mr. Leap knew him before he applied for the job.  Reply Ex. 6 [Vandenburg Dep. P. 39 L. 10 to 15]; Reply Ex. 7 [Leap Dep. at P. 16 L. 6 to 8].  Finally, there is no evidence that Messrs. Vandenburg or Leap considered any subjective factors in making their decisions.

A much more relevant case is *Hamilton v. Paulson,* 542 F. Supp. 2d 37 (D.D.C. 2008),

decided very recently, where the Court granted the defendant summary judgment on the

plaintiff's claim that he was not selected for a safety manager position because of his race and

sex.  In that case, as here, the plaintiff could not show that his qualifications were vastly superior

to the employee selected.  In such a situation, the court reasoned as follows:

> . . . "[i]n a close case, a reasonable juror would usually assume that the employer
> is more capable of assessing the significance of small differences in the
> qualifications of the candidates, or that the employer simply made a judgment
> call."  . . .  Thus, 'in order to justify an inference of discrimination, the
> qualifications gap must be great enough to be inherently indicative of
> discrimination.'  . . . Otherwise, the Court 'must assume that a reasonable juror
> who might disagree with the employer's decision, but would find the question
> close, would not usually infer discrimination on the basis of a comparison of the
> qualifications alone.'

*Id.* at 44-45 (citations omitted).

After comparing the qualifications of the candidates, the court concluded as

follows:

> . . . there is no factual basis whatsoever for a jury to conclude that there
> are disparities in the relative qualifications of the plaintiff and Burrell 'so
> apparent as to virtually jump off the page and slap [them] in the face.' …
> If anything, the record suggests that Burrell, who had previously worked
> as a Safety Manager and performed some of the same duties while on her
> detail in 2002, …was more qualified for the position than the plaintiff.  At
> a minimum, the question is an extremely close one.  '[T]herefore[,] the
> Court must respect the employer's unfettered discretion to choose among
> qualified candidates.'

*Id.* at 47-48 (citations omitted).

Plaintiff freely admitted that if the information on Mr. Townsend's resume was true, he

was more qualified for the position than she was.  She also admitted that she had no evidence

that Quest knew that any of the information he provided on his resume was false.  Finally, she

admitted she has no evidence that Mr. Leap knew M. Kopley's race, Mr. Townsend's race or any

other candidate's race.  Reply Ex. 5 [Pollard Dep. at P. 117 L. 19 to P. 119 L. 15; P. 159 L. 14 to

14

P. 160 L.22].

Absent any evidence that there was discriminatory motive in the selection procedure,

Plaintiff's claim must fail.  According to the D.C. Circuit:

> Even if a court suspects that a job applicant 'was victimized by [ ] poor selection
> procedures' it may not 'second-guess an employer's personnel decision absent
> demonstrably discriminatory motive.'  Once the employer has articulated a non-
> discriminatory explanation for its action, as did the [employer] here, the issue is not 'the
> correctness or desirability of [the] reasons offered . . . [but] whether the employer
> honestly believes the reasons it offers.'

*Fischbach v. District of Columbia Dep't of Corrections,* 86 F.3d 1180, 1183 (D.C. Cir. 1996)

(citations omitted).

Put another way, Plaintiff cannot establish pretext "simply based on her own subjective

assessment of her own performance, for 'plaintiff's perception of h[er]self, and of h[er] work

performance, is not relevant.  It is the perception of the decisionmaker which is relevant.'"

*Waterhouse v. District of Columbia,* 124 F. Supp. 2d 1, 7 (D.D.C. 2000) (citations omitted).

In this case, Quest made a good faith decision that Mr. Townsend was more qualified

than Plaintiff.  No reasonable juror could conclude that it was based on discrimination.

**6.    The Minor Irregularities and Inconsistencies cited by Plaintiff are
Illusory and Immaterial.**

In a last ditch effort to avoid dismissal, Plaintiff alleges that there were irregularities and

inconsistencies in Quest's selection process and in the deposition testimony of Messrs.

Vandenburg and Leap.  The plaintiff in *Hamilton* also pointed to an alleged "litany" of

irregularities in the defendant's selection process, similar to Plaintiff's assertion in this case that

the job description was written after the job was posted.  The Court made the following relevant

observations: " . . . [a]n employer's failure to follow its own regulations and procedures, alone,

may not be sufficient to support the conclusion that its explanation for the challenged

employment action is pretextual . . . Rather, 'the irregularities, even if proven,' must 'indicate

discriminatory hiring practices.'"   *Hamilton*, 542 F. Supp. 2d  at  48 (citations omitted).  *See

also Fischbach,* 86 F.3d at 1183.  In this case, even if the Court believes that Quest strayed from

its normal practice and did not prepare the job description until after the job was posted, there is

not a scintilla of evidence that there was any discriminatory motive behind this delay.

Plaintiff's reliance on some minor inconsistencies between the deposition testimony of

Messrs. Vandenburg and Leap should also be viewed in the same manner as the *Hamilton* Court

analyzed similar inconsistencies:

> To recapitulate, the assorted alleged inconsistencies between the deposition
> testimony of Burns, Mitchell, and Huston, and other evidence in the record
> advanced by the plaintiff fall into one of two camps. On the one hand, several of
> these supposed "inconsistencies" are in reality the product of the plaintiff's
> selective use of the record. The remaining discrepancies, while authentic, could
> not serve as a basis for a reasonable jury to infer pretext on the part of the
> interviewing panel. None of the contradictions asserted by the plaintiff create a
> genuine dispute of material fact with respect to the authenticity of the defendant's
> explanation for the selection of Burrell over the plaintiff for the Safety Manager
> position; consequently, none of these contradictions suffices to defeat the
> defendant's motion for summary judgment.

*Hamilton*, 542 F. Supp. 2d at 56.

Thus, the fact that Mr. Leap and Mr. Vandenburg had slightly different

recollections of how the job description was prepared and what role Quest's Human

Resources Department played is immaterial and of no consequence.  First, their

respective testimony is fundamentally consistent.  Given all of the other undisputed

evidence in the record, including the fact that Mr. Townsend was replaced by an African-

American female, no reasonable juror could conclude that discrimination occurred.

Moreover, Plaintiff distorted and mischaracterized the testimony of Mr. Leap.

Plaintiff claims Mr. Leap testified that only he and Mr. Vandenburg prepared the job

description, "without the assistance of others." Opposition p. 11. Yet Mr. Leap clearly testified in his deposition that the position description was drafted by "[a combination of Harvey [Vandenburg], myself and human resources." Reply Ex. 7 [Leap Dep. P. 21 L. 5 to L. 8]. This was consistent with Mr. Vandenburg's testimony. Next, Plaintiff claims that Mr. Leap testified that the position description was composed "without use of another position description as a template." Opposition p. 11. Again, however, Mr. Leap clearly testified that he reviewed a few existing job descriptions in composing the one involved in this case. Reply Ex. 7 [Leap Dep. P. 30 L. 12 to L. 17]. This also is consistent with Mr. Vandenburg's testimony that he asked Mr. Leap to modify an existing job description to create the new one. Reply Ex. 6 [Vandenburg Dep. P. 24 L. 16 to P. 25 L. 9]. It also is consistent with Mr. Knapp's testimony that the position description was prepared from a previous description on file for a similar position. Reply Ex. 1 [Knapp Sec. Dec. at ¶ 5].

Plaintiff's reliance on *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000) is entirely misplaced. Indeed, his assertion that "Defendant's non-discriminatory explanations are replete with the appearance of . . .'mendacity'" is a reckless and cavalier overstatement. Opposition p. 9. In *Reeves,* not only was there record evidence establishing that the employer's proffered reasons were demonstrably false, but there were also a slew of age-based comments by the decision-maker that showed discriminatory animus. In contrast, in this case there is no evidence that Quest has falsified anything or that any decision-maker harbored any discriminatory motive. The fact that other minorities were not selected for the position is meaningless, because there is no evidence of their qualifications on the record. The dogged reliance on the August

17

2005 date on the position description fares no better, when all of the undisputed evidence indicates that it was prepared before the job was posted.

Plaintiff's citation to *Stodola v. Finley & Co., Inc. et al.,* No. 2:05-CV-464, 2008 WL 835709 (N.D. Ind. Mar. 24, 2008) is completely off point. *Stodola* is a discriminatory termination case decided by the Northern District of Indiana that has nothing to do with the instant case. In this case, there simply is no suspicious timing and there are no inadequate explanations upon which any reasonable juror could conclude that discrimination occurred.

### D.    The Court Should Grant Summary Judgment for Defendant on the Retaliation Claim.

Citing selectively from the record, Plaintiff argues that Defendant should not prevail on her retaliation claim. Like the discrimination claim, however, no reasonable juror could conclude that Plaintiff was a victim of retaliation.

It is undisputed that Ms. Aglipay, not Mr. Vandenburg, prepared Plaintiff's evaluation at issue. Although Plaintiff's counsel asked Ms. Aglipay numerous times, there is absolutely no evidence that Ms. Aglipay knew about Ms. Pollard's complaint of discrimination when she prepared the evaluation:

> Q. Did you know of Ms. Pollard complaining of discrimination at the time you assessed her performance from that evaluation?
> A. No. She didn't mention anything.
> Q. What about Mr. Vandenburg? Did he mention it to you?
> MR. STEVENS: At the time?
> MR. JOHNSON: At the time or before that time?
> A. I don't remember.
> Q. Is it possible that he did mention that Ms. Pollard was considering or she had filed a discrimination complaint at the time that you provided her performance appraisal? Is it possible?
> MR. STEVENS: Objection.
> A. No. I don't know.

> Q. Is it possible?
> MR. STEVENS: Same objection.
> A. No. It's not possible.
> Q. But you don't know; is that correct?
> A. Yeah.
> Q. So it could be possible?
> A. Yes
> . . .
> Q. . . . The performance appraisal that was conducted by you on Ms.
> Pollard dated January 2006, right? At the time you had assessed her performance
> did anybody mention that Ms. Pollard was complaining of or she raised the issue
> of discrimination?
> A. No. I didn't hear anything.

Reply Ex. 4 [Aglipay Dep. at P. 55 L. 16 to P. 56 L.16; P. 59 L. 3 to L. 8].

For his part, Mr.Vandenburg's recollection was absolutely clear that he did not

have any input into Plaintiff's evaluation. Reply Ex. 6 [Vandenburg Dep. P. 71 L. 20 to

L. 22].

There is no significance to the fact, even if true, that Mr. Vandenburg instructed

Ms. Aglipay to appraise Plaintiff's performance. This would have been perfectly

appropriate for Mr. Vandenburg to do, because she was Plaintiff's supervisor. In fact,

Plaintiff's argument would perhaps be more compelling if Mr. Vandenburg himself

strayed from Quest policy and evaluated Plaintiff's performance himself.

Plaintiff's testimony that Ms. Aglipay told her that "Michael [*sic*] Vandenburg"

instructed Ms. Aglipay to only give "2.0" to her subordinates is indeed curious.

Although Mr. Vandenburg denied this, even if it is true, it is harmful, and not helpful, to

Plaintiff's case. Indeed, if Mr. Vandenburg told Ms. Aglipay to evaluate all of her

subordinates in the same exact manner, then Plaintiff could not possibly have been

singled out as a victim of retaliation.

It is also important to note that Plaintiff's testimony is inconsistent on this point.

Although in her Opposition she stated that Mr. Vandenburg instructed Ms. Aglipay to give all of her subordinates a "2" on their evaluations, her earlier testimony and a letter to her former lawyer told quite a different story:

> Q.  The court reporter has placed before you a document which is marked as Exhibit 17, which is o one-page document.  Please take the time you need to review that document and let me know when you're prepared to answer questions about it.
> A.  I'm prepared.
> Q.  Can you identify the document for me, please?
> A.  Yes.  This is a letter that I had written and submitted to my lawyer at the time, Ms. Thatcher, in reference to my job performance evaluation for 2005.
> Q.  Okay.  And can you read for the record what the letter says?
> A.  It says:  "The job performance evaluation for 2005 was conducted by my working supervisor, Isabelita Aglipay.  I asked that some of the scores be changed because I did not agree with them; they did not reflect my quality of work.  Isabelita informed me that no one would be allowed an excellent rating per Harvey Vandenburg, the laboratory director.  I did not want to argue the matter and accepted the rating with some minor changes."
> Q.  And is what you just read accurate?
> A.  Yes, it is.
> Q.  Okay.  Now, when Isableita told you that no one would be allowed an excellent rating per Harvey Vandenburg, did you understand Mr. Vandenburg was making that rule for all employees?
> A.  That's what I understood.

Reply Ex. 5 [Pollard Dep. P. 152 L. 4 to P. 153 L. 14 and Exhibit 17 referenced therein].

At the end of the day, Plaintiff had to admit she had no evidence to support her retaliation claim:

> Q.  Now, do you have any evidence to suggest the reason that Ms. Aglipay rated you the way she did was because you had filed an EEOC Charge?
> A.  No.

Reply Ex. 5  [Pollard Dep. P. 157 L. 13 to L. 17].

Furthermore, Plaintiff failed to refute the record evidence that any harm she suffered as a result of the evaluation was *de minimis*.  Given the slight difference in the raise she may have received, the minimal number of hours she worked, and the short period of time she worked after the evaluation, this issue simply does not rise to the level of conduct that is covered by the anti-retaliation provisions of Title VII.  *Burlington N. & Santa Fe Ry. Co. v. White* 548 U.S. 53, 67-68 (2006) ("actionable retaliation" claims are limited to those where an employer causes "material adversity," not "trivial harm.")

Finally, although Plaintiff claims in the Declaration submitted with her Opposition that Ms. Aglipay never told her about complaints or criticisms about her work, she does not and cannot dispute that Ms. Aglipay actually received such complaints and criticisms.  *See* Ex. B to Plaintiff's Opposition at ¶ 4.  Similarly, the fact that Defendant did not produce any documents about these complaints does not prove that the complaints were not received:  it simply establishes that they were not written complaints.

In this regard, Plaintiff's characterization of Ms. Aglipay's testimony on this point is disingenuous.  First, Plaintiff claims Ms. Aglipay was "mysteriously unable to respond" when pressed for the identities of the "phantom staffers" who complained about Plaintiff.  Opposition p. 15.  Plaintiff fails to mention, however, that her counsel <u>never once</u> asked her for the identity of the doctors, nurses and co-workers who complained to Ms. Aglipay numerous times. Reply Ex. 4 [Aglipay Dep. P. 31 L. 21 to P. 40 L. 19].  As to the quantity of the alleged criticisms, Ms. Aglipay could not say for sure, but she was able to provide a range, which is not surprising, given the amount of time that has elapsed.  *Id.*  Finally, Ms. Aglipay testified that she had nothing in writing about these complaints, and that all of her discussions with Ms. Aglipay were "verbal counseling."  *Id.* P. 39 L. 8 to L. 18.  Even if Plaintiff disputes that these criticisms were

communicated to her, she does not and cannot dispute that Ms. Aglipay received the complaints from doctors, nurses and co-workers.

But even if Plaintiff was able to dispute this, it would be immaterial, because it is undisputed that Ms. Aglipay was unaware of the EEOC Charge when the evaluation was prepared, and that there is no relationship between the EEOC Charge and the rating Plaintiff received from Ms. Aglipay.  Plaintiff's suggestion that Ms. Aglipay gave her a "lesser score" is illusory, because there is no basis for comparison.  Indeed, Ms. Aglipay did not prepare her previous evaluation, so she could not be giving her a "lesser score" than she previously received.  Moreover, the fact that Ms. Aglipay changed the scores at Plaintiff's request, and Plaintiff accepted them, belies any assertion of retaliatory motive.

In the final analysis, there is no genuine issue of material fact with respect to Plaintiff's retaliation claim. And, no reasonable juror could find that Plaintiff was the victim of retaliation.

## III.    <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant respectfully requests that this Court grant Defendant's Motion for Summary Judgment in its entirety, and enter judgment in Defendant's favor, award Defendant its reasonable attorneys' fees and costs, and grant Defendant such further relief as the Court may deem proper.

Respectfully submitted,

_/s/  Michael L. Stevens_____
Michael L. Stevens D.C.  Bar No. 384887
ARENT FOX LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
Telephone: (202) 857-6000
Facsimile:(202) 857-6395
August 7, 2008                              Counsel for Defendants

22

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of August, 2008, a true and correct copy of the

foregoing Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary

Judgment was filed electronically.  Notice of this filing will be sent to all parties by operation of

the Court's electronic filing system and copies will be mailed via U.S. mail, postage prepaid to:


        Nathaniel D. Johnson, Esq.
        Richard L. Thompson, Esq.
        The Law Firm of Nathaniel D. Johnson, L.L.C.
        201 Centennial Street, Suite #A-2
        P.O. Box 1857
        LaPlata, MD 20646


                /s/ Michael L. Stevens
                Michael L. Stevens

23

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BRIDGET POLLARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1: 07-00692(CKK) |
| | ) | |
| | ) | |
| QUEST DIAGNOSTICS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SECOND DECLARATION OF MICHAEL KNAPP
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Michael Knapp, do hereby depose and state as follows:

1.      I am over 18 years of age, I have personal knowledge of all the facts set forth in this
Declaration, and I am competent to testify about them.

2.      I am employed as the Director of Employee Services for Defendant Quest Diagnostics
("Quest"). I have been employed with Quest since 1999. In that capacity, I administer Quest's human
resources policies, oversee the hiring selection process, and am a custodian for Quest's personnel
records for the Chantilly business unit, which includes the laboratory at Providence Hospital where
Bridget Pollard worked.

3.      It has been the consistent policy and practice of Quest's Human Resources Department to
require the preparation of a job description before posting a job vacancy. I have consistently instructed
all members of the Human Resources Department not to post vacant jobs unless a job description has

been prepared. I personally am not aware of any position that was posted before a job description was prepared for it.

4.    The Job Posting Bulletin attached as Exhibit A to Plaintiff's Opposition to Defendant's Motion for Summary Judgment does not and could not contain all of the elements of the job description for each position posted. Indeed, every job description for every job contains more requirements than the job posting does. The job posting simply contains a summary of some of the major requirements for the positions listed.

5.    I reviewed the electronic properties of the job description for the Project Manager position for which Ms. Pollard applied. I determined that the original document was created on September 17, 2004, and was for a Project Manager position at Shady Grove Adventist and Washington Adventist Hospitals. A copy of this job description is attached as Exhibit 1 to this Declaration. This job description is substantially similar in many respects to the job description for the position for which Ms. Pollard applied, and it is clear to me that the job description used for the position she sought was derived from the 2004 description.

6.    I also learned that each time a job description is revised or updated on the computer system in any way, the date in the "Date Written" section is updated to reflect the then current date.

7.    Attached as Exhibit 2 to this Declaration is a screen print of the electronic properties of the Job Description for the Project Manager position for which Ms. Pollard applied, and it shows that the document was printed on June 24, 2005, shortly after the job was posted in May 2005.

I declare under penalty of perjury that this Declaration is true and correct to the best of my knowledge, information and belief.

Michael Knapp                           Date: June 20, 2008

2



## Position Description

Quest Diagnostics Nichols Institute, Chantilly

| | | | |
|---|---|---|---|
| **Position Title:** | Project Manager, Laboratory | **Job Number:** | 101157 |
| **Department:** | Shady Grove Adventist Hospital. Washington Adventist Hospital | **Grade Level:** | 49 |
| **Reports to:** | Director of Field Operations | **FLSA Status:** | Exempt |
| **Direct Reports:** | LIS Coordinator | **Location:** | Chantilly |
| **Work Schedule:** | As scheduled | **Date Written:** | 09/17/04 |

### Position Summary

Oversees and facilitates all function of the onsite LIS for the Washington Adventist and Shady Grove Adventist Hospital including, but not limited to, building, testing and maintaining new tests, improving efficiency of laboratory processes, upgrades and interface (HIS, Ref lab, POC and instruments). Position provides LIS training for staff. Also oversees the activities of all onsite LIS personnel. Integrates project and resource plans with departmental strategies. Understands the strategic business plan and how to navigate within various IT and customer groups to evaluate/plan/design and follow-through projects from start to finish. Can apply technology to influence the achievements of hospital operating objectives.

### Essential Job Duties and Responsibilities

1.  Possesses overall responsibility for the WAH and SGAH LIS database.

2.  Facilitates LIS training and competency for all new and existing staff as new processes or procedures are added.

3.  Supervises all computer related activities at the WAH and SGAH sites.

4.  Directly supervisors all on-site LIS personnel at the Adventist Contracted laboratory sites.

5.  Plans and provides timeline for projects sanctioned by the Laboratory's Management Team.

6.  Requests and obtains the necessary personnel to complete the projects according to the each timeline created.

7.  Working with Adventist Healthcare's (AHC) third party vendor, provides in house computer support (currently PHNS) to develop, maintain or enhance services

provided by PHNS. Delineates the proper responsibilities between entities. Coordinates implementation of new equipment interfaces, software and hardware.

8. Coordinates new software testing and works with appropriate parties to rectify any problems identified.

9. Provides necessary audit trail documentation of all changes and validations to LIS system to meet or exceed regulatory requirements, including but not limited to, annual calculations review, biannual patient report for Medical Director review, LIS upgrade documentation, LIS backup and transaction documentation.

10. Arranges and coordinates system access for new LIS/HIS users.

11. Provides on site coordination and support to Quest Diagnostics network and hardware. Contacts appropriate personnel at Chantilly as issues are identified.

12. Working with laboratories supervisors, creates tools to capture key operation metrics or to examine data to identify areas of improvement.

13. Working with AHC billing department, maintains current CDM (Charge Description Master) to allow proper billing, with CPT codes, to allow AHC to correctly bill for laboratory tests. Obtains and maintains the appropriate signed review from AHC.

14. Monitors LIS computer functions, including but limited to, review of background jobs, system errors, site instrument interface status, print scheduler, processor, hardware and printers within the laboratory and its related sites, and investigates HIS lab order resulting issues. In addition, monitors creation of monthly Transave tapes by IT operator by the 15th of each month.

15. Oversees computer maintenance functions, including but not limited to, reconciliation of rejected charges.

16. Primary contact for Chantilly interface including, but not limited to, making appropriate changes to database in response to a Quest Diagnostics Lab Update by the stated effective date (including the initiation of a Lab Update to our own customers.

17. Provides weekly on call schedule for coverage for LIS related problems to include nights, weekends and holidays.

18. Creates, runs and provides training on Crystal Reports and other reports, including, but not limited to, TAT, outlier reports to identify those specimens that did not meet TAT. Provides daily accession reports to Chantilly's Finance group by 9 am.  Provides Ad-Hoc Crystal reports upon demand. Reconciles monthly Discharged pre-admit patients report from HIS. Collates data for contract performance metrics by the 9th of each month for each hospital.

19. Writes and maintains LIS SOPs including annual review with appropriate sign off.

JOB DESCRIPTION: Project Manager –Laboratory Adventist                    (3)

20.    Defines Service Master and CRMFs in HIS.

21.    Actively supports and complies with laboratory policies and procedures.

22.    Adheres to all established laboratory safety requirements.

23.    Required to use (a) personal protective equipment, (b) engineering controls and/or (c) work practice controls as directed by management, when necessary.

24.    Other job-related, miscellaneous duties as assigned.


**Physical Demands**

Ability to sit for extended periods

Ability to lift up to 40 lbs.

**QUALIFICATIONS:**

Experience, Education, and Licensure:
1. Graduate of approved school of medical technology –or-

2. Bachelor's degree in laboratory science, plus one (1) year of pertinent full-time laboratory experience and/or training "in the specialty" in which the individual performs tests. –or-

3. Three (3) years academic study (minimum 90 semester hours) plus successful completion of a 12-month course of training at an accredited school of medical technology –or-

4. Has passed a properly benchmarked and validated competency examination (HHS/ ASCP) in the designated specialty.

Knowledge, Skills, Abilities:
Five years or greater in-house experience and fully trained in the current computer system.

Have a Medical Technologist/Hospital Laboratory background.

Have direct experience testing and/or troubleshooting new or existing LIS products.

Basic theoretical and operational job knowledge necessary to perform assigned tasks.

Interpersonal skills necessary to deal courteously and effectively with supervisors, co-worker and clients.

Attention to detail.

JOB DESCRIPTION: Project Manager –Laboratory Adventist                    (4)

Ability to follow procedures.

Good verbal communication skills.

Knowledge of basic laboratory operations.

Ability to deal with client information in a confidential manner.


_____
Employee Signature                    Date

JD Mgr, Project – Lab Adventist
/js
9/17/04





EXHIBIT

2

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRIDGET POLLARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case No. 1: 07-00692(CKK) |
| | ) |
| | ) |
| QUEST DIAGNOSTICS, | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF HARVEY VANDENBURG
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Harvey Vandenburg, do hereby depose and state as follows:

1.    I am over 18 years of age, I have personal knowledge of all the facts set forth in this Declaration, and I am competent to testify about them.

2.    I was employed by Quest Diagnostics as the Administrative Director of the laboratory at Providence Hospital at all relevant times prior to, during and after the selection process for the Project Manager position for which Bridget Pollard applied. Richard Leap, Quest's Director of Information Technology, and I prepared the position description for this job with assistance from Quest's Human Resources Department.

3.    I did not make any changes to the position description after Jane Kopley or Sean Townsend or Ms. Pollard interviewed for the Project Manager position. In addition, to my knowledge, no one else, including without limitation Mr. Leap, made any changes to the position description after Ms. Kopley or Mr. Townsend or Ms. Pollard interviewed for the Project Manager position.

I declare under penalty of perjury that this Declaration is true and correct to the best of my knowledge, information and belief.

Harvey Vandenburg                    Date: 6/23/08

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRIDGET POLLARD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case No. 1: 07-00692(CKK)** |
| ) | |
| ) | |
| **QUEST DIAGNOSTICS,** ) | |
| ) | |
| **Defendant.** ) | |

### DECLARATION OF RICHARD LEAP
### IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Richard Leap, do hereby depose and state as follows:

1.      I am over 18 years of age, I have personal knowledge of all the facts set forth in this Declaration, and I am competent to testify about them.

2.      I was employed by Quest Diagnostics as the Director of Information Technology at all relevant times prior to, during and after the selection process for the Project Manager position for which Bridget Pollard applied.  Harvey Vandenburg, Quest's Administrative Director at the Providence Hospital laboratory, and I prepared the position description for this job with assistance from Quest's Human Resources Department.

3.      I did not make any changes to the position description after Jane Kopley or Sean Townsend or Ms. Pollard interviewed for the Project Manager position.  In addition, to my knowledge, no one else, including without limitation Mr. Vandenburg, made any changes to the position description after Ms. Kopley or Mr. Townsend or Ms. Pollard interviewed for the Project Manager position.

I declare under penalty of perjury that this Declaration is true and correct to the best of my knowledge, information and belief.

_____     Date: _____4/23/08_____

Richard Leap

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

BRIDGET POLLARD,           X

                           :

         Plaintiff,        :

     vs.                  :Case No. 1:07-0692

QUEST DIAGNOSTICS        :

                           :

        Defendant.       X

---

WASHINGTON, DC
January 28, 20078

DEPOSITION OF:

**ISABELITA AGLIPAY,**

a witness, called for examination by counsel on behalf of
the Plaintiff, pursuant to notice and agreement of the
parties as to time and date, taken at the Arent Fox, LLP,
1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,
beginning at approximately 11:12 a.m., before Raakeebah
L. Henderson, a Notary Public and court reporter in and
for the District of Columbia, when were present on behalf
of the respective parties:

COPY

---

Raakeebah L. Henderson, Professional Court Reporter
13017 Wisteria Drive, Suite 364
Cell: (301) 717-9468    Fax: (240) 912-7323  E-mail: keebahcr@comcast.net

2

```
 1   APPEARANCES BY COUNSEL:

 2      FOR THE PLAINTIFF:

 3           NATHANIEL D. JOHNSON & ASSOCIATES, LLC

 4           BY: NATHANIEL D. JOHNSON, ESQUIRE
             3475 Leonardtown Road, Suite 105
 5           Waldorf, Maryland 20602
             301.893.0807
 6

 7      FOR THE DEFENDANT:

 8           ARENT FOX, LLP

 9           BY: MICHAEL L. STEVENS, ESQUIRE
             1050 Connecticut Avenue, NW, Suite 600
10           Washington, D.C. 20036-5339
             (202) 857-6000
11           stevens.michael@arentfox.com

12

13   ALSO PRESENT:  Bridget Pollard, Plaintiff

14                  Michael Knapp

15

16              -   -   -   -   -   -   -

17

18         (Index appears following the transcript.)

19

20

21

22
```

```
 1   Performance Rating."  Do you see that?

 2        A.   Which one?  This one?

 3        Q.   Yes, ma'am.  That's the one.  Page 5, right?

 4   Do you see that?  I'll give you a moment to review it.

 5        A.   2.5.

 6        Q.   Have you reviewed it?  Let me know when you're

 7   ready.

 8        A.   I read 2.5.

 9        Q.   Okay.  Now you initially in rating

10   Ms. Pollard's performance for that rating cycle,

11   initially you had given her interpersonal and customer

12   relations.  I believe you gave her a 4, is that correct,

13   before you changed it to a 3?  That's the second number.

14   Second column.  I'm still on page 5.

15             MR. STEVENS:  This page right here

16   (indicating).

17        Q.   Ma'am, let me direct your attention to this

18   page.  I need you to focus on this page and only this

19   page, okay?

20        A.   Okay.

21        Q.   Let me direct your attention now to the column

22   on the left that says -- the second column reads;
```

1    "Interpersonal and Customer Relations" and then there's a

2    3 and to the right of the 3 there's a 4 crossed out; is

3    that correct?

4        A.    Yes.

5        Q.    Are those your initials?

6        A.    Yes, that's my initial.

7        Q.    Let me direct your attention to number 4 where

8    it reads, "Work Orientation"; do you see that?

9        A.    Yes.

10       Q.    There's a 2 and there's a 3 to the right of

11   that slash.  Are those your initials?

12       A.    Yes, those are my initials.

13       Q.    And at the bottom of the column average rating

14   reads 2.5 -- within the box it reads 2.75 crossed out;

15   does it not?

16       A.    Yes.

17       Q.    And are your initials?

18       A.    Yes.

19       Q.    So you made these adjustments in the

20   computation of the score; did you not?

21       A.    Yes.

22       Q.    Why did you make a change in the computation of

1   the score?

2       A.   This is how I feel how the work orientation and

3   the customer relations that fit her.

4       Q.   I didn't hear that last part and I apologize.

5       A.   The number 2 is crossed out the 3.  This is how

6   I feel to Ms. Pollard in that rating.

7       Q.   Did you point to any specific incident or

8   occurrence which led you to give her the 4 rating before

9   the 3?

10          MR. STEVENS:  Objection.

11      Q.   Under interpersonal and customer relations?

12          MR. STEVENS:  Objection.

13      Q.   In other words, did anything happen that

14   particular rating cycle for the year 2005?

15          MR. STEVENS:  Objection to the form.  You can

16   answer the question.

17      A.   Okay.  Relation with our customers.  What I'm

18   saying that some of our customers some complain about

19   her.

20      Q.   Who were these customers?

21      A.   Nurses, doctors.

22      Q.   Nurses and doctors?

1    A.   Yes.  They complain to me about her being, you

2  know, not giving some information about results or

3  what -- for example, I give you an example for this.

4    Q.   Please do.

5    A.   If the doctor ask for a result or nurse, don't

6  just say, oh, it's in the computer.  Look in the

7  computer.  No, you give the result to your client when

8  they ask it.  That's the complaint of the nurses and

9  doctors about her.

10    Q.   Is that it?  That's the extent of your

11  rationale for giving her that initial score?

12         MR. STEVENS:  Objection.  You can answer.

13    A.   Yes, sir.

14    Q.   What about number 4 under "Work Orientation."

15  Why is it a 3 crossed out and then subsequently it's a 2?

16    A.   Okay.  I explain that to her about work

17  orientation before I crossed it out.  Before I crossed

18  this thing out I explain it to her why I cross it out.

19    Q.   Well, explain to me.

20    A.   Okay.  Work orientation is under pressure or

21  something that -- some work that is too busy sometimes

22  and it's some things that the work should be done in a

1    turn-around time.  We are focusing for turn-around time

2    30 minutes turn-around time and the way she acts she

3    said, oh, that will be done if it will be done.  Our

4    focus is turn-around time.

5         We make the turn-around time that's what I was

6    trying to explain to her and then she say, oh, it will be

7    done.  It will be done.  Something like that.  So this is

8    how I explained it to her about the work orientation.

9         Q.   Anything else -- I'm sorry.

10        A.   Because we deal with the patient.  We had to

11   meet the turn-around time, not to delay the lab work for

12   the patient because they have been treated from emergency

13   room and they needed badly the results.

14        Q.   Tell me this, ma'am.  How many times during the

15   course of this rating cycle did you speak to my client

16   regarding a delay in the turn-around time?

17        MR. STEVENS:  Objection.  You can answer.

18        A.   I cannot remember how many times.

19        Q.   Do you think it was more than five times or

20   less than five times?

21        A.   More than that.

22        Q.   More than that?

```
 1        A.   Yes, sir.

 2        Q.   More than ten times you spoke to her about

 3   delay in turn around time?

 4        A.   I don't remember.  It's more than -- I can't

 5   remember for the duration of that year.   I cannot give

 6   you the exact numbers.

 7        Q.   I understand, but you do recall it was more

 8   than five times?

 9        A.   More than five times.

10        Q.   Is that your testimony?

11        A.   Yes, sir.

12        Q.   Was it less than ten times?

13        A.   Maybe.

14        Q.   What about complaints as you said a moment ago

15   from doctors or just from the staff.  Give me some again

16   some of those specific complaints or concerns raised by

17   the hospital staff as it relates to Ms. Pollard?

18             MR. STEVENS:  Objection.  Asked and answered.

19        Q.   What were you told specifically?

20             MR. STEVENS:  Same objection.  You can answer.

21        A.   Okay.  If the nurse or doctors come into the

22   lab and asking for the result this is what I'm trying to
```

37

```
1    explain it.  Give the result.  Not just say it's in the

2    computer.  Don't give an attitude to your client because

3    we are here to help our client.  This is how we treat

4    them.

5        Q.    Anything else in terms of complaints against

6    Ms. Pollard brought by the staff or the client?

7        A.    About the staff they complain about some

8    attitude.

9        Q.    Attitude?

10       A.    Yes, sir.

11       Q.    Specifically what allegations were made

12   regarding Ms. Pollard's attitude by the staff?

13       A.    The way she answered them back.

14       Q.    She answered who back, ma'am?

15       A.    Our coworkers.  Some of the staff.

16       Q.    Was it the coworkers or was it the staff?

17       A.    Some of staff, nurses.

18       Q.    We're talking Providence Hospital staff,

19   correct?

20       A.    Yes, sir.

21       Q.    Some of the way you said her attitude how she

22   answered them back?
```

Raakeebah L. Henderson, Professional Court Reporter
13017 Wisteria Drive, Suite 364
Cell: (301) 717-9468    Fax: (240) 912-7323  E-mail: keebahcr@comcast.net

1    A.    Yes.  It's not professional manner.

2    Q.    It was not professional manner?

3    A.    Yes.

4    Q.    How many times did you receive any complaints

5    from hospital staff regarding her attitude or any

6    instances in which as you said she was not professional?

7              MR. STEVENS:  What year are you talking about?

8              MR. JOHNSON: Specifically 2005, for the 2006

9    rating.

10             THE WITNESS:  That duration?

11             MR. JOHNSON:  Yes, ma'am.  We're still in this

12   exhibit, Exhibit 2.  Performance Evaluation.

13   A.    Okay.  I don't know how many times but there's

14   time she was like that.

15   Q.    Was it more than five times or less than five

16   times?

17   A.    I cannot give you five or six.  I cannot give

18   you numbers.

19   Q.    Was it one time?

20   A.    Times; yes.

21   Q.    It was just one time?

22   A.    No, no.  It wasn't.

1    Q.   It was more than one time?

2    A.   More than one time.  More than that.

3    Q.   Was it two times; three times?

4         MR. STEVENS:  Objection.  Asked and answered.

5    You can answer.

6    A.   Just what I said.  So I cannot give you a

7    number how many times.

8    Q.   Tell me this, ma'am.  Did anyone make any

9    complaints regarding Ms. Pollard's lack of

10   professionalism to you in writing?

11   A.   I don't remember if I have anything in writing.

12   Q.   I'm sorry?

13   A.   I don't remember --

14   Q.   You don't remember?

15   A.   -- if I have anything in writing.  It was

16   verbal counseling.

17   Q.   It was all verbal counseling?

18   A.   Yes.

19   Q.   Well, tell me this.  You're familiar with Quest

20   Diagnostic personnel policies; are you not?

21   A.   Yes, sir.

22   Q.   And Quest Diagnostic Personnel policy does

1   contain a provision for counseling; does it not?

2       A.   Yes.

3       Q.   For written counseling?

4       A.   Yes.

5       Q.   Did you issue Ms. Pollard a written counseling

6   regarding these alleged complaints from staff or on the

7   issue of her failure to timely return lab results?

8       A.   I remember I have some writing written for

9   those things.  I just talk to her not to, you know, to be

10  nice to the client.

11      Q.   So that's no to my question.  You didn't give

12  her or issue you her anything in writing?

13      A.   I don't remember if I gave her one.

14      Q.   Well, I have a copy of her complete personnel

15  file.  Would it come as a surprise to you that there's

16  nothing in her file from 2005 or in the year 2005 which

17  memorialize any of these alleged complaints?

18      A.   Maybe I do, but if I see I would say yes, if I

19  see it.

20      Q.   My next question to you, ma'am -- let me direct

21  your attention now to the same exhibit.  The bottom of

22  page 5, the bottom of page 6.

1          Q.    When in 2006?

2          A.    Before Mr. Vandenburg -- I think.  I don't know

3      if that's -- I cannot answer you what month was that

4      because I might give you wrong month.

5          Q.    All right.  I appreciate that.  At the time

6      that you had evaluated my client's performance, and we're

7      going back to January 2006, that would be Exhibit 2,

8      right?  Exhibit 2.  The performance evaluation in which

9      you conducted?

10         A.    Yes.

11         Q.    Do you have it?

12         A.    Yes.

13         Q.    The appraisal period -- let's go to the last

14     page.  It says January 2006, correct?

15         A.    Yes, 2006.

16         Q.    Did you know of Ms. Pollard complaining of

17     discrimination at the time that you assessed her

18     performance from that evaluation?

19         A.    No.  She didn't mention anything.

20         Q.    What about Mr. Vandenburg?  Did he mention it

21     to you?

22              MR. STEVENS:  At the time?

56

```
 1                MR. JOHNSON:  At the time  or before that time?
 2        A.   I don't remember.
 3        Q.   Is it possible that he did mention that
 4   Ms. Pollard was considering or she had filed a
 5   discrimination complaint at the time that you provided
 6   her performance appraisal?  Is it possible?
 7                MR. STEVENS:  Objection.
 8        A.   No.  I don't know.
 9        Q.   Is it possible?
10                MR. STEVENS:  Same objection.
11        A.   No.  It's not possible.
12        Q.   But you don't know; is that correct?
13        A.   Yeah.
14        Q.   So it could be possible?
15        A.   Yes.
16        Q.   I'll move on.  You testified previously
17   Mr. Vandenburg directed you to appraise Ms. Pollard's
18   performance by Exhibit 2, correct?
19                MR. STEVENS:  Objection.  Asked and answered.
20   You can answer.
21        A.   Yes.
22        Q.   Did he tell you not to give her an excellent
```

59

1    that time -- you're looking for it.  That's Number 2.

2         A.   That's Number 6.

3         Q.   No, ma'am, not 6.  2002.  The performance

4    appraisal that was conducted by you on Ms. Pollard dated

5    January 2006, right?  At the time you had assessed her

6    performance did anybody mention that Ms. Pollard was

7    complaining of or she raised the issue of discrimination?

8         A.   No.  I didn't hear anything.

9         Q.   Did you have any communication with Ms. Pollard

10   after she relocated to North Carolina?

11        A.   After?

12        Q.   Yes.

13        A.   No.  No.  I don't think so.  I haven't talked

14   to her after North Carolina.

15        Q.   In 2006 -- January 2006, did you evaluate any

16   other subordinates' performance for 2005 cycle or for the

17   year 2005?

18        A.   Yes.  All the employees.

19        Q.   And that was, what, six?

20        A.   It was about three or -- three or four people.

21        Q.   Did any of them receive an excellent rating?

22        A.   Not all of them.

# **EXHIBIT 5**

1

1       THE UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF COLUMBIA

3

4       _____

                                    )

5    BRIDGET POLLARD,               )      Case No. 1:07-0692 (CKK)

                                    )

6           Plaintiff,              )    ORIGINAL

                                    )

7    vs.                            )

                                    )

8    QUEST DIAGNOSTICS,             )

                                    )

9           Defendant.              )

     _____ )

10

11

12           VIDEOTAPED DEPOSITION OF

13              BRIDGET L. POLLARD

14              Washington, D.C.

15         Friday, December 21, 2007

16                8:59 a.m.

17

18

19

20

21    Job No.:   1-119106

      Pages 1 through 169

22    Reported by:   John L. Harmonson, RPR


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

2

1

2

3             Videotaped Deposition of

4               BRIDGET L. POLLARD

5

6

7   Held at the offices of:

8             ARENT FOX, PLLC

9             1050 Connecticut Avenue, N.W.

10            Washington, D.C.  20036

11

12

13

14      Taken pursuant to the Federal Rules of Civil

15   Procedure, before John L. Harmonson, Registered

16   Professional Reporter, Notary Public in and for the

17   District of Columbia, who officiated in administering

18   the oath to the witness.

19

20

21

22

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

3

1                        APPEARANCES

2

3    ON BEHALF OF PLAINTIFF:

4            NATHANIEL D. JOHNSON, ESQ.

             Law Firm of Nathaniel D. Johnson, LLC

5            3475 Leonardtown Road, Suite 200

             Waldorf, Maryland  20602

6            (301) 645-9103

7

8

     ON BEHALF OF DEFENDANT:

9

             MICHAEL L. STEVENS, ESQ.

10           AKIA ROANE, ESQ.

             Arent Fox, PLLC

11           1050 Connecticut Avenue, N.W.

             Washington, D.C.  20036

12           (202) 857-6000

13

14

15   ALSO PRESENT:

16           CALI DAY, Videographer

17

18

19

20

21

22

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

4

1                        EXAMINATION INDEX

2                                                    PAGE

3    EXAMINATION BY MR. STEVENS                        7

4                        *   *   *   *   *

5

6                        EXHIBIT INDEX

7            (Exhibits attached to transcript.)

8    EXHIBIT              DESCRIPTION              PAGE

9    1       Letter from INC Research to B.          10

10           Pollard; August 9, 2007

11   2       INC job description for research        11

12           associate

13   3       Tender of Employment and Contract,      14

14           Wake Tech Community College

15   4       Job description, Wake Tech Community     16

16           College, for lab technician

17   5       Plaintiff's Responses to                21

18           Interrogatories

19   6       Résumé of Bridget Pollard               25

20   7       Letter from Quest Employee Services to   35

21           B. Pollard; October 4, 2006

22

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

5

1              EXHIBIT INDEX (Cont.'d)

2    EXHIBIT              DESCRIPTION                    PAGE

3    8      American Medical Laboratories job            51

4           description for medical technologist

5    9      Quest job description for project lab        70

6           manager

7    10     Letter from B. Pollard to H.                 80

8           Vandenburg; July 26, 2005

9    11     Résumé of Jane Kopley                       103

10   12     Résumé of Sean Townsend                     112

11   13     Résumé of Tuy Le                            119

12   14     2003 Annual Performance Development         132

13          and Review

14   15     2004 Annual Performance Development         136

15          and Review

16   16     2005 Annual Performance Development         146

17          and Review

18   17     Letter from B. Pollard to L. Thatcher;      152

19          February 2, 2006

20   18     EEOC Dismissal and Notice of Rights         162

21

22

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

85

| | | | |
|---|---|---|---|
| 1 | Q. | Did he tell you that he had been trying | 10:33:50 |
| 2 | to contact you to have a face-to-face interview? | | 10:33:53 |
| 3 | A. | No. | 10:33:56 |
| 4 | Q. | Do you know if Mr. Vandenburg knew what | 10:34:02 |
| 5 | your race was when he was talking to you? | | 10:34:07 |
| 6 | A. | Yes. | 10:34:10 |
| 7 | Q. | How do you know? | 10:34:11 |
| 8 | A. | Mr. Vandenburg, my supervisor -- the | 10:34:13 |
| 9 | manager? | | 10:34:15 |
| 10 | Q. | Uh-huh. | 10:34:16 |
| 11 | A. | Because I worked there. | 10:34:17 |
| 12 | Q. | But you've testified that you didn't | 10:34:19 |
| 13 | work there when he was there. | | 10:34:23 |
| 14 | A. | Mr. Vandenburg? | 10:34:27 |
| 15 | Q. | He worked during the day, correct? | 10:34:28 |
| 16 | A. | Right. | 10:34:31 |
| 17 | Q. | During the weekdays? | 10:34:31 |
| 18 | A. | Yes. | 10:34:33 |
| 19 | Q. | And you worked either the night shift | 10:34:33 |
| 20 | or on weekends; isn't that correct? | | 10:34:35 |
| 21 | A. | Yes.  And I would see him occasionally | 10:34:37 |
| 22 | when he came in and he would walk through the lab | | 10:34:39 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

86

| | | |
|---|---|---|
| 1 | and say good morning. | 10:34:4: |
| 2 | Q.   Do you know for a fact that he knew | 10:34:4: |
| 3 | your name was Bridget Pollard? | 10:34:46 |
| 4 | A.   I don't know what he knew. | 10:34:48 |
| 5 | Q.   Okay.  So you don't know if when he | 10:34:49 |
| 6 | spoke to you about this position, whether he knew | 10:34:5: |
| 7 | what your race was, do you? | 10:34:54 |
| 8 | A.   I believe he did. | 10:34:56 |
| 9 | Q.   What evidence do you have that he did? | 10:34:58 |
| 10 | A.   I don't have any evidence.  Except for | 10:35:0: |
| 11 | that he had my records and that sort of | 10:35:0: |
| 12 | information available. | 10:35:09 |
| 13 | Q.   What information in your -- | 10:35:1( |
| 14 | A.   My application, something or another. | 10:35:1: |
| 15 | Q.   Do you have any evidence that anything | 10:35:1: |
| 16 | in your application indicated that you were black? | 10:35:18 |
| 17 | A.   No, I don't. | 10:35:2( |
| 18 | Q.   And I believe you told me that prior to | 10:35:26 |
| 19 | yesterday you never met Mr. Leap; is that correct? | 10:35:28 |
| 20 | A.   That's correct. | 10:35:31 |
| 21 | Q.   Do you have any evidence to suggest | 10:35:31 |
| 22 | that Mr. Leap knew what your race was when you | 10:35:33 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

87

| | | |
|---|---|---|
| 1 | submitted your application? | 10:35:37 |
| 2 | A.    No, I don't. | 10:35:38 |
| 3 | Q.    After you spoke to Mr. Vandenburg about | 10:35:45 |
| 4 | the position, what, if anything, happened next in | 10:35:51 |
| 5 | connection with your application for this | 10:35:56 |
| 6 | position? | 10:35:57 |
| 7 | A.    I was called by HR, and they informed | 10:35:58 |
| 8 | me that the position had been filled. | 10:36:03 |
| 9 | Q.    Do you recall when that was? | 10:36:07 |
| 10 | A.    I want to say maybe in September, | 10:36:13 |
| 11 | October of that year. | 10:36:18 |
| 12 | Q.    Of 2005? | 10:36:22 |
| 13 | A.    Yes, I believe so. | 10:36:24 |
| 14 | Q.    Okay.  I just want to get some of the | 10:36:26 |
| 15 | timing straight.  If you look at Deposition | 10:36:29 |
| 16 | Exhibit 10, your letter to Mr. Vandenburg is dated | 10:36:31 |
| 17 | July 26, 2005, correct? | 10:36:34 |
| 18 | A.    Yes. | 10:36:36 |
| 19 | Q.    Do you recall approximately when he | 10:36:38 |
| 20 | called you in response to this letter?  Would it | 10:36:41 |
| 21 | have been a couple of days after this? | 10:36:46 |
| 22 | A.    It may have been a week later. | 10:36:48 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

108

| | | |
|---|---|---|
| 1 | Go ahead. | 11:00:16 |
| 2 | THE WITNESS:  Not knowing what I know | 11:00:17 |
| 3 | now, no, I don't. | 11:00:18 |
| 4 | BY MR. STEVENS: | 11:00:21 |
| 5 | Q.    But you do think it was discriminatory | 11:00:21 |
| 6 | for Quest to offer the position to Mr. Townsend? | 11:00:24 |
| 7 | A.    After finding out what I found out, | 11:00:29 |
| 8 | yes. | 11:00:33 |
| 9 | Q.    Okay.  Why do you think it was | 11:00:33 |
| 10 | discriminatory for Quest to offer the position to | 11:00:35 |
| 11 | Mr. Townsend? | 11:00:37 |
| 12 | A.    Well, I think that it was | 11:00:39 |
| 13 | discriminatory because -- initially because I was | 11:00:41 |
| 14 | an in-house employee who was familiar with the | 11:00:51 |
| 15 | system, and I was aware of some of the needs of | 11:00:55 |
| 16 | the doctors and my co-workers for the system as an | 11:01:00 |
| 17 | upgrade.  And I felt that it was discriminatory | 11:01:08 |
| 18 | because they never reposted the position in order | 11:01:11 |
| 19 | for me to have an opportunity to reapply. | 11:01:16 |
| 20 | From my understanding, out of the | 11:01:21 |
| 21 | applicants, it would have been myself, | 11:01:24 |
| 22 | Mr. Townsend and Mr. Le.  And I don't think that I | 11:01:31 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

109

| | | |
|---|---|---|
| 1 | had a fair opportunity.  There may have been a | 11:01:35 |
| 2 | possibility that Mr. Townsend would not have | 11:01:38 |
| 3 | reapplied and I would have had the opportunity to | 11:01:40 |
| 4 | have the position. | 11:01:44 |
| 5 | Q.    Why did you think the company had to | 11:01:46 |
| 6 | repost the position if they had already posted it | 11:01:49 |
| 7 | and had already gotten applicants for it? | 11:01:54 |
| 8 | A.    I thought that was how they handled | 11:01:57 |
| 9 | their jobs in general, that if somebody doesn't | 11:02:00 |
| 10 | accept it, that it be reposted. | 11:02:05 |
| 11 | Q.    Are you aware of any policy that says | 11:02:08 |
| 12 | if the highest rated applicant doesn't accept an | 11:02:11 |
| 13 | offer, that it's the policy or practice of Quest | 11:02:16 |
| 14 | to repost the position? | 11:02:21 |
| 15 | A.    No, I'm not aware of a policy. | 11:02:22 |
| 16 | Q.    Are you aware of any other situation | 11:02:24 |
| 17 | while you worked at Quest where a candidate | 11:02:27 |
| 18 | declined a position and Quest reposted it? | 11:02:30 |
| 19 | A.    Not exactly. | 11:02:36 |
| 20 | Q.    Okay.  Why not exactly? | 11:02:38 |
| 21 | A.    Because there have been instances where | 11:02:40 |
| 22 | jobs have been -- for technologists or | 11:02:43 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

110

| | | |
|---|---|---|
| 1 | phlebotomists and the position they offer and the | 11:02:50 |
| 2 | person hasn't taken it, so it has been reposted. | 11:02:54 |
| 3 | I don't know if there was a second person or if | 11:02:57 |
| 4 | that was the only person. | 11:02:59 |
| 5 | Q.    So you don't know if there have been | 11:03:01 |
| 6 | any other positions where candidates were ranked | 11:03:03 |
| 7 | and the top ranked position -- the top ranked | 11:03:06 |
| 8 | candidate declined the position and Quest reposted | 11:03:10 |
| 9 | it instead of offering it to the second ranked | 11:03:13 |
| 10 | candidate, do you? | 11:03:16 |
| 11 | A.    That's true. | 11:03:17 |
| 12 | MR. STEVENS:  We're running out of | 11:03:19 |
| 13 | videotape, so let's take a break. | 11:03:20 |
| 14 | THE VIDEOGRAPHER:  This marks the end | 11:03:23 |
| 15 | of Tape 1 in the deposition.  We are going off the | 11:03:23 |
| 16 | record.  The time is 11:03 a.m. | 11:03:26 |
| 17 | (A recess was then taken.) | |
| 18 | THE VIDEOGRAPHER:  This marks the | 11:09:17 |
| 19 | beginning of Tape 2 in the deposition.  We are | 11:09:18 |
| 20 | back on the record.  The time is 11:09 a.m. | 11:09:20 |
| 21 | BY MR. STEVENS: | 11:09:30 |
| 22 | Q.    Ms. Pollard, do you have any reason to | 11:09:30 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

117

| | | |
|---|---|---|
| 1 | Q. What -- What position did Mr. Tsehay | 11:18:00 |
| 2 | hold at Holy Cross Hospital? | 11:18:04 |
| 3 | A. He was the assistant lab supervisor. | 11:18:07 |
| 4 | Q. So he was -- he worked at both Holy | 11:18:11 |
| 5 | Cross and Providence? | 11:18:15 |
| 6 | A. Yes. | 11:18:17 |
| 7 | Q. And do you know what level of | 11:18:19 |
| 8 | interaction he had with Mr. Townsend? | 11:18:21 |
| 9 | A. No, I don't. | 11:18:24 |
| 10 | Q. Do you know for a fact whether | 11:18:29 |
| 11 | Mr. Tsehay had personal knowledge as to whether | 11:18:30 |
| 12 | Mr. Townsend did what he said with respect to | 11:18:33 |
| 13 | interfacing all laboratory instruments with the | 11:18:36 |
| 14 | new LIS? | 11:18:40 |
| 15 | A. I believe he would. | 11:18:41 |
| 16 | Q. But do you have any personal knowledge | 11:18:42 |
| 17 | to that effect? | 11:18:44 |
| 18 | A. No, I don't. | 11:18:45 |
| 19 | Q. Do you know if Mr. Vandenburg or | 11:18:48 |
| 20 | Mr. Leap or anyone in the Human Resources | 11:18:56 |
| 21 | Department at Quest knew that any information on | 11:19:01 |
| 22 | Mr. Townsend's résumé was false at the time they | 11:19:07 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

118

| | | |
|---|---|---|
| 1 | made the offer? | 11:19:11 |
| 2 | A.    No, I don't know. | 11:19:12 |
| 3 | Q.    You don't have any evidence that they | 11:19:13 |
| 4 | knew that there was any false information on this | 11:19:15 |
| 5 | application, do you? | 11:19:18 |
| 6 | A.    No, I don't have any evidence. | 11:19:19 |
| 7 | Q.    If it was true that from 2004 to | 11:19:30 |
| 8 | present Mr. Townsend was responsible for | 11:19:36 |
| 9 | interfacing all laboratory instruments with the | 11:19:40 |
| 10 | new LIS and for building the respiratory and | 11:19:43 |
| 11 | point-of-care components for SoftLab, that would | 11:19:47 |
| 12 | have made him more qualified for the position than | 11:19:51 |
| 13 | you were -- | 11:19:54 |
| 14 | MR. JOHNSON:  Objection. | 11:19:54 |
| 15 | Q.    -- wouldn't it have? | 11:19:54 |
| 16 | MR. JOHNSON:  Objection.  Sorry. | 11:19:56 |
| 17 | THE WITNESS:  Yeah, that would have | 11:19:58 |
| 18 | gave him some more experience. | 11:19:59 |
| 19 | BY MR. STEVENS: | 11:20:00 |
| 20 | Q.    That would have made him more qualified | 11:20:00 |
| 21 | than you; isn't that correct? | 11:20:03 |
| 22 | MR. JOHNSON:  Same objection. | 11:20:04 |

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

119

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yes. | 11:20:05 |
| 2 | BY MR. STEVENS: | 11:20:06 |
| 3 | Q.    And do you have any reason to believe | 11:20:08 |
| 4 | that under 1999 to present, the description of | 11:20:11 |
| 5 | what he did at Holy Cross Hospital is incorrect? | 11:20:20 |
| 6 | A.    No. | 11:20:36 |
| 7 | Q.    Do you have any reason to believe that | 11:20:37 |
| 8 | other than what you've already testified about, | 11:20:40 |
| 9 | that there is any other false information on his | 11:20:43 |
| 10 | résumé? | 11:20:46 |
| 11 | A.    Say that again. | 11:20:47 |
| 12 | Q.    Do you have any information to suggest | 11:20:48 |
| 13 | that anything else on his résumé, other than what | 11:20:51 |
| 14 | you've already testified about, is false? | 11:20:54 |
| 15 | A.    No. | 11:20:57 |
| 16 | (Exhibit 13 marked for identification and | |
| 17 | attached hereto.) | |
| 18 | BY MR. STEVENS: | 11:21:15 |
| 19 | Q.    The court reporter has placed before | 11:21:35 |
| 20 | you what has been marked as Deposition Exhibit 13, | 11:21:36 |
| 21 | which is a two-page document with the Bates labels | 11:21:39 |
| 22 | Q00127 and Q00128. | 11:21:44 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

122

1      Q.    Okay.  And do you think Mr. Le was more          11:24:23

2   qualified than Mr. Townsend for the position?            11:24:25

3      A.    No, I don't.                                     11:24:27

4      Q.    Do you think Mr. Le was more qualified           11:24:28

5   than Ms. Kopley for the position?                         11:24:31

6      A.    No, I don't.                                     11:24:34

7      Q.    Do you think Mr. Le was discriminated            11:24:36

8   against based on his race because he didn't get           11:24:38

9   this position?                                            11:24:41

10     A.    I think he was discriminated against             11:24:42

11  because of his accent.                                    11:24:44

12     Q.    Because of his accent?                           11:24:46

13     A.    Yes.                                             11:24:48

14     Q.    Okay.  Why do you think he was                   11:24:48

15  discriminated against because of his accent?              11:24:50

16     A.    Because I believe that it was said that          11:24:53

17  that was the reason he didn't get the position,           11:24:55

18  because -- he was hard to understand verbally.            11:24:58

19     Q.    Is that true?  Was he hard to                    11:25:03

20  understand verbally?                                      11:25:06

21     A.    I don't have a problem with accents.             11:25:07

22     Q.    Do you know of anyone who had a problem          11:25:10

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

131

| | | |
|---|---|---|
| 1 | the LIS system? | 11:32:43 |
| 2 | A.    Probably maybe eight years. | 11:32:52 |
| 3 | Q.    And had you ever worked with the LIS | 11:33:02 |
| 4 | system, the upgraded LIS system that Quest was | 11:33:06 |
| 5 | going to install? | 11:33:12 |
| 6 | A.    No. | 11:33:13 |
| 7 | Q.    And did you have any experience | 11:33:16 |
| 8 | installing the upgrades to the system that Quest | 11:33:18 |
| 9 | was going to install? | 11:33:22 |
| 10 | A.    No. | 11:33:23 |
| 11 | Q.    And did you have any experience | 11:33:25 |
| 12 | building and testing a new system that included | 11:33:28 |
| 13 | the upgrades that Quest was going to install? | 11:33:33 |
| 14 | A.    No. | 11:33:35 |
| 15 | Q.    And had you ever trained any staff on | 11:33:37 |
| 16 | the use of LIS using the upgrades that Quest was | 11:33:40 |
| 17 | about to install? | 11:33:46 |
| 18 | A.    No. | 11:33:47 |
| 19 | Q.    And had you had any experience | 11:33:50 |
| 20 | collaborating with hospital information system | 11:33:53 |
| 21 | personnel in maintaining the LIS database for the | 11:33:57 |
| 22 | upgraded system that Quest was going to install? | 11:34:01 |

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

132

| | | |
|---|---|---|
| 1 | A.    No. | 11:34:04 |
| 2 | Q.    And had you had any experience in | 11:34:05 |
| 3 | writing LIS standard operating procedures for the | 11:34:08 |
| 4 | LIS system that Quest was going to install? | 11:34:13 |
| 5 | A.    No. | 11:34:16 |
| 6 | Q.    And did you have any experience | 11:34:17 |
| 7 | providing any audit trail documentation for the | 11:34:19 |
| 8 | upgraded LIS system that Quest was going to | 11:34:22 |
| 9 | install? | 11:34:26 |
| 10 | A.    No. | 11:34:27 |
| 11 | Q.  .  And did you have any experience in | 11:34:28 |
| 12 | monitoring the performance of the LIS system for | 11:34:30 |
| 13 | the upgraded system that Quest was going to | 11:34:34 |
| 14 | install? | 11:34:38 |
| 15 | A.    No. | 11:34:38 |
| 16 | (Exhibit 14 marked for identification and | |
| 17 | attached hereto.) | |
| 18 | BY MR. STEVENS: | 11:35:15 |
| 19 | Q.    The court reporter has placed before | 11:35:23 |
| 20 | you what's been marked as Deposition Exhibit 14, | 11:35:25 |
| 21 | which is a multi-page document with the Bates | 11:35:28 |
| 22 | label Q00257 through Q00264. | 11:35:32 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

152

1    (Exhibit 17 marked for identification and

2    attached hereto.)

3    BY MR. STEVENS:                                      11:57:05

4        Q.    The court reporter has placed before      11:57:20

5    you a document which is marked as Exhibit 17,        11:57:22

6    which is a one-page document.                        11:57:26

7              Please take the time you need to review    11:57:30

8    that document and let me know when you're prepared   11:57:31

9    to answer questions about it.                        11:57:33

10       A.    I'm prepared.                              11:57:35

11       Q.    Can you identify that document for me,     11:57:36

12   please?                                              11:57:38

13       A.    Yes.   This is a letter that I had         11:57:38

14   written and submitted to my lawyer at the time,      11:57:46

15   Ms. Thatcher, in reference to my job performance     11:57:51

16   evaluation for 2005.                                 11:57:55

17       Q.    Okay.  And can you read for the record     11:57:57

18   what the letter says?                                11:58:01

19       A.    It says: "The job performance             11:58:03

20   evaluation for 2005 was conducted by my working      11:58:05

21   supervisor, Isabelita Aglipay.  I asked that some    11:58:08

22   of the scores be changed because I did not agree     11:58:11

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

153

| | | |
|---|---|---|
| 1 | with them; they did not reflect my quality of | 11:58:13 |
| 2 | work.  Isabelita informed me that no one would be | 11:58:16 |
| 3 | allowed an excellent rating per Harvey Vandenburg, | 11:58:19 |
| 4 | the laboratory director.  I did not want to argue | 11:58:23 |
| 5 | the matter and accepted the rating with some minor | 11:58:26 |
| 6 | changes." | 11:58:29 |
| 7 | Q.    And is what you just read accurate? | 11:58:30 |
| 8 | A.    Yes, it is. | 11:58:33 |
| 9 | Q.    Okay.  Now, when Isabelita told you | 11:58:35 |
| 10 | that no one would be allowed an excellent rating | 11:58:39 |
| 11 | per Harvey Vandenburg, did you understand that | 11:58:43 |
| 12 | Mr. Vandenburg was making that rule for all | 11:58:50 |
| 13 | employees? | 11:58:53 |
| 14 | A.    That's what I understood. | 11:58:55 |
| 15 | Q.    And did Ms. Aglipay tell you why he | 11:59:01 |
| 16 | made that rule? | 11:59:04 |
| 17 | A.    No, she did not. | 11:59:05 |
| 18 | Q.    Let's look back at Exhibit 16, page 5. | 11:59:08 |
| 19 | Are you there? | 11:59:23 |
| 20 | A.    Yes. | 11:59:25 |
| 21 | Q.    Now, it looks like in the performance | 11:59:31 |
| 22 | factor ratings in the top left-hand corner on page | 11:59:39 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

157

| | | |
|---|---|---|
| 1 | Q. Now, this was a review that was | 12:03:23 |
| 2 | conducted by a different supervisor; isn't that | 12:03:25 |
| 3 | correct? | 12:03:28 |
| 4 | A. No. Isabelita was always the | 12:03:29 |
| 5 | supervisor. | 12:03:31 |
| 6 | Q. I understand that. But she didn't | 12:03:32 |
| 7 | prepare your previous review? | 12:03:34 |
| 8 | A. I don't know if she prepared it or not. | 12:03:36 |
| 9 | Q. But you didn't discuss your previous | 12:03:38 |
| 10 | review with her, you discussed it with Mr. Meeder; | 12:03:40 |
| 11 | isn't that right? | 12:03:44 |
| 12 | A. Yes. | 12:03:45 |
| 13 | Q. Now, do you have any evidence to | 12:03:46 |
| 14 | suggest that the reason that Ms. Aglipay rated you | 12:03:52 |
| 15 | the way she did was because you had filed an EEOC | 12:03:56 |
| 16 | charge? | 12:04:01 |
| 17 | A. No. | 12:04:01 |
| 18 | Q. And during the time that you were | 12:04:04 |
| 19 | employed by Quest, did you ever hear any manager | 12:04:06 |
| 20 | or supervisor discuss the fact that there was a | 12:04:11 |
| 21 | distribution for ratings on the evaluation system? | 12:04:18 |
| 22 | A. No. | 12:04:21 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

158

| | | |
|---|---|---|
| 1 | Q.    So do you have any evidence to suggest | 12:04:23 |
| 2 | that Quest does not require managers and | 12:04:28 |
| 3 | supervisors to give outstanding ratings and | 12:04:34 |
| 4 | excellent ratings to only a limited percentage of | 12:04:38 |
| 5 | employees? | 12:04:42 |
| 6 | A.    I know nothing of that. | 12:04:42 |
| 7 | Q.    Okay.  Do you have any evidence that | 12:04:44 |
| 8 | would dispute that? | 12:04:51 |
| 9 | A.    No, I don't. | 12:04:53 |
| 10 | Q.    And I think you testified that you | 12:04:59 |
| 11 | never had any conversations with Mr. Vandenburg | 12:05:01 |
| 12 | about this review? | 12:05:04 |
| 13 | A.    That's right. | 12:05:05 |
| 14 | Q.    Did you have any communications with | 12:05:06 |
| 15 | anyone else besides Ms. Aglipay about this review? | 12:05:08 |
| 16 | A.    Not that I know of. | 12:05:11 |
| 17 | Q.    Sitting here today, Ms. Pollard, do you | 12:05:27 |
| 18 | have any evidence that Quest would not have | 12:05:30 |
| 19 | selected Mr. Townsend for the project manager | 12:05:35 |
| 20 | position if he were black? | 12:05:38 |
| 21 | A.    I have no evidence. | 12:05:40 |
| 22 | Q.    Okay.  Do you think that if he were | 12:05:41 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

159

| 1 | black, Quest would not have selected him? | 12:05:44 |
| 2 | MR. JOHNSON:  Objection. | 12:05:47 |
| 3 | THE WITNESS:  Probably. | 12:05:49 |
| 4 | BY MR. STEVENS: | 12:05:49 |
| 5 | Q.    Why? | 12:05:50 |
| 6 | MR. JOHNSON:  Same objection. | 12:05:52 |
| 7 | THE WITNESS:  Because I feel they're | 12:05:54 |
| 8 | discriminatory. | 12:05:55 |
| 9 | BY MR. STEVENS: | 12:05:56 |
| 10 | Q.    Okay.  Do you have any evidence to | 12:05:57 |
| 11 | suggest that they would not have selected | 12:05:59 |
| 12 | Mr. Townsend -- | 12:06:02 |
| 13 | A.    I have no evidence. | 12:06:04 |
| 14 | Q.    Okay.  And you don't have any evidence | 12:06:05 |
| 15 | that Mr. Leap knew Mr. Townsend's race when he | 12:06:09 |
| 16 | recommended that the offer be given to | 12:06:14 |
| 17 | Mr. Townsend, do you? | 12:06:16 |
| 18 | A.    I believe he had access to that data | 12:06:18 |
| 19 | sheet that says that, his race on there. | 12:06:21 |
| 20 | Q.    What information do you have that | 12:06:24 |
| 21 | Mr. Leap had access to that data sheet? | 12:06:26 |
| 22 | A.    None at all. | 12:06:29 |

VIDEOTAPED DEPOSITION OF BRIDGET L. POLLARD
CONDUCTED ON FRIDAY, DECEMBER 21, 2007

160

| | | |
|---|---|---|
| 1 | Q.    None at all. | 12:06:30 |
| 2 | But you believe it anyway, don't you? | 12:06:31 |
| 3 | MR. JOHNSON:  Objection.  Is that a | 12:06:35 |
| 4 | question? | 12:06:37 |
| 5 | BY MR. STEVENS: | 12:06:38 |
| 6 | Q.    You don't have any evidence that he had | 12:06:38 |
| 7 | access to that data sheet, do you? | 12:06:40 |
| 8 | A.    No, I don't. | 12:06:42 |
| 9 | Q.    And you don't have any evidence that | 12:06:43 |
| 10 | Mr. Leap knew what Mr. Townsend's race was, do | 12:06:45 |
| 11 | you? | 12:06:48 |
| 12 | A.    No, I don't. | 12:06:48 |
| 13 | Q.    And you don't have any evidence that | 12:06:49 |
| 14 | Mr. Leap knew what Ms. Kopley's race was, do you? | 12:06:50 |
| 15 | A.    No, I don't. | 12:06:55 |
| 16 | Q.    In fact, you don't have any evidence | 12:06:56 |
| 17 | that Mr. Leap knew what your race was, do you? | 12:06:57 |
| 18 | A.    No, I don't. | 12:07:00 |
| 19 | Q.    And you don't have any evidence that | 12:07:01 |
| 20 | Mr. Leap knew the race of any of the other | 12:07:03 |
| 21 | applicants for the position, do you? | 12:07:05 |
| 22 | A.    No, I don't. | 12:07:07 |

Thatcher Law Firm
Belle Point Office Park
7849 Belle Point Drive
Greenbelt, MD 20770

3205 Forest Run Drive
Forestville, MD 20747
February 2, 2006

To: Linda Thatcher
RE: 2005 Evaluation

The Job Performance evaluation for 2005 was conducted by my working supervisor, Isabelita Aglipay. I asked that some of the scores be changed because I did not agree with them, they did not reflect my quality of work. Isabelita informed me that I no one would be allowed an Excellent Rating per Harvey Vandenburg, the Laboratory Director. I did not want to argue the matter, and accepted the rating with some minor changes.

Sincerely,

Bridget Pollard



# **EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

BRIDGET POLLARD,          X

                            :

         Plaintiff,        :

    vs.                  :Case No. 1:07-0692

QUEST DIAGNOSTICS        :

                            :

      Defendant.       X

WASHINGTON, DC
December 20, 2007

DEPOSITION OF:

**HARVEY VANDENBURG,**

a witness, called for examination by counsel on behalf of
the Plaintiff, pursuant to notice and agreement of the
parties as to time and date, taken at the Arent Fox, LLP,
1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,
beginning at approximately 12:39 p.m., before Raakeebah
L. Henderson, a Notary Public and court reporter in and
for the District of Columbia, when were present on behalf
of the respective parties:

2

1  APPEARANCES BY COUNSEL:

2      FOR THE PLAINTIFF:

3          NATHANIEL D. JOHNSON & ASSOCIATES, LLC

4          BY: NATHANIEL D. JOHNSON, ESQUIRE
            3475 Leonardtown Road, Suite 105
5          Waldorf, Maryland 20602
            301.893.0807
6

7      FOR THE DEFENDANT:

8          ARENT FOX, LLP

9          BY: MICHAEL L. STEVENS, ESQUIRE
            1050 Connecticut Avenue, NW, Suite 600
10         Washington, D.C. 20036-5339
            (202) 857-6000
11         stevens.michael@arentfox.com

12

13 ALSO PRESENT:  Bridget Pollard, Plaintiff

14

15

16              —  —  —  —  —  —

17

18         (Index appears following the transcript.)

19

20

21

22

Raakeebah L. Henderson, Professional Court Reporter
              13017 Wisteria Drive, Suite 364
Cell: (301) 717-9468    Fax: (240) 912-7323  E-mail: keebahcr@comcast.net

1      Q.   Or you couldn't direct, should I say; is that

2  correct?

3      A.   Yes.

4      Q.   Let me back up for a moment.  You and Mr. Leap

5  composed the position description; is that correct?

6      A.   I -- honestly I don't remember my exact role in

7  producing the position description.  I remember we needed

8  one.

9          I remember that we didn't -- that I had never

10  made a position description for a laboratory information

11  systems person, that the people in Chantilly have a lot

12  of expertise in that and I asked them to prepare that.

13          I do remember reviewing it when it was done and

14  finding it satisfactory for the elements that I

15  considered to be important.

16      Q.   So you say you asked them within HR to prepare

17  the position description; is that your testimony?

18      A.   Yes.

19      Q.   Who are them?  Identify who them were?

20      A.   Most doctorately there was a lady who was

21  serving as the laboratory information systems coordinator

22  for the old system and her name was Gloria Lim.

1      And I asked Rich to use Gloria's position

2    description, modify it however they would like it to be

3    modified in order for the requirements for the new

4    position to be met and they were to involve HR in that.

5       I don't remember the exact words or the

6    conversations but that was kind of a gist of the thing

7    that they were supposed to, you know, draft it up, send

8    it to HR make sure it was good to go and send it to me

9    for review.

10    Q.   Who in HR signed off on this?

11    A.   I don't know.

12    Q.   Did you have any discussion with anyone in HR

13    relative to composing the position description?

14    A.   Not that I recall.

15    Q.   You said the old LIS system, correct?

16    A.   Mm-hmm.

17    Q.   You have to verbalize your response.

18    A.   Okay.  The old laboratory information system?

19    Q.   Yes.

20    A.   There was a current system that was in use it

21    was actually the system that Bridgett was using to do the

22    laboratory work, session specimens, and put in laboratory

35

1    see any language within this position description which

2    requires a person or a candidate's certification?

3        MR. STEVENS:  Objection.  You can answer.

4        A.   Laboratory certification; is that what you're

5    referring to?

6        Q.   Anything that could possibly be construed as

7    requiring certification.

8        A.   No.

9        Q.   Eventually did you interview Mr. Townsend?

10       A.   Yes.

11       Q.   How many times did you interview Mr. Townsend?

12       A.   Once.

13       Q.   Was it face-to-face?

14       A.   Yes.

15       Q.   What about Ms. Copley?

16       A.   Yes.

17       Q.   How many times did you interview her?

18       A.   Once.

19       Q.   Mr. Vandenburg, who did you select or recommend

20   for selection for the project manager position?

21       A.   It really didn't work that way.  What I did was

22   I interviewed the applicants and I made my own

36

1    determination about how I felt their interpersonal

2    communication skills were and whether what they put on

3    their resume was consistent with what they were able to

4    verbalize to me and answer any questions they had about

5    the job.

6            So essentially I was, you know, looking at more

7    of the interpersonal aspect and I was relying on Rich to

8    look at the LIS, the technical aspects, and we agreed

9    that we would decide together.

10           So my conversation to Rich although I don't

11   remember the exact words was like this.  Well, you know,

12   I've talked to all these people, it seems like they could

13   all get along.  They can speak and they have good verbal

14   communications skills, you know, the technical aspects

15   are going to be the deciding factors here.  Who do you

16   think is the best candidate.

17           And the person that he was said was Jane Copley

18   because she had he told me a breadth of laboratory

19   information and experience in her previous job that would

20   essentially prime her for this job.

21           And he recommended that that would be the person

22   that we make the offer to.  And I accepted that

1    recommendation.  It seemed reasonable to me.

2        Q.    And eventually she declined the position,

3    correct?

4        A.    That's correct.

5        Q.    Why did she decline the position?

6        A.    My understanding from the HR people

7    post-interview was that she wanted more money than we

8    were offering.

9        Q.    So after she declined the position or the offer

10   for the position then was the position reposted?

11       A.    No.  Then we went to our second choice because

12   we felt our second choice would be able to perform the

13   job adequately.

14       Q.    Okay.  I'm a little confused.  A moment ago you

15   testified that it was Lee who would make the

16   recommendation based upon the person's technical

17   background and expertise, correct?

18       A.    Mm-hmm.

19       Q.    You have to verbalize your responses, all

20   right?

21       A.    Oh, yes, sir.  Sorry.

22       Q.    You're saying that it was -- now you're saying

1    that it was a collaborative effort or a recommendation?

2         MR. STEVENS:  Objection.  Mischaracterizes the

3    testimony.  You can respond.

4         A.   Rich and I collaborated from the start.

5         Q.   Okay.  I'm talking about in terms of

6    Mr. Townsend.

7         A.    In terms of Mr. Townsend in our conversation

8    about who was most qualified for the position he

9    articulated to me that Jane had the best qualifications.

10   However, Sean's qualifications were adequate and he would

11   be a good second choice.  I agreed with that.  It seemed

12   to make sense to me.

13        Q.   Who would have been the next most qualified

14   individual other than -- well, moving on from

15   Mr. Townsend who would have -- the other candidates?

16        A.   Of those four?

17        Q.   Yes.

18        A.   If Sean would have declined the offer for the

19   position we would have kept looking.

20        Q.   What do you mean kept looking?

21        A.   We would have reposted the position and gotten

22   in more resumes.

39

1      Q.    Now, is it not Quest Diagnostics' policy to

2   have a preference if you will for internal applicants as

3   opposed to external applicants?

4         MR. STEVENS:  Objection.  You can answer the

5   question.

6      A.    I'm not aware of any such policy.  However in

7   practice I think it's a good idea to try to put your own

8   people's ambitions with the best possible phase and move

9   them forward in the process for promotions.

10      Q.    Did you know Mr. Townsend prior to the time he

11   applied for the position?

12      A.    No.

13      Q.    Did you know Ms. Copley prior to her

14   application for the position?

15      A.    No.  I did not.

16      Q.    Is it your testimony that Ms. Pollard didn't

17   have sufficient technical background and expertise to be

18   seriously considered for the position had Mr. Townsend

19   declined?

20      A.    It's my testimony that Ms. Pollard had

21   sufficient laboratory knowledge as a medical technologist

22   where she lacked knowledge or experience was in the

Raakeebah L. Henderson, Professional Court Reporter
13017 Wisteria Drive, Suite 364
Cell: (301) 717-9468    Fax: (240) 912-7323  E-mail: keebahcr@comcast.net

1       Q.   Now let me direct your attention to Exhibit 13

2  and it's dated 2005, correct?

3           MR. STEVENS:  Objection.  You can answer.

4       A.   Yes, it is.

5       Q.   And it's Ms. Pollard's performance evaluation,

6  correct?

7       A.   It appears to be so.

8       Q.   Let me direct your attention to the fifth page.

9       A.   Okay.

10      Q.   Where previous year Ms. Pollard received a 2.0

11  and here she received initially a 2.75; is that correct?

12      A.   It looks like it, it's crossed through.

13      Q.   But ultimately she received a 2.5; is that

14  correct?

15      A.   It looks like it.

16      Q.   And this was -- the appraiser here is who?

17      A.   Isabalida Aglipay (phonetic).

18      Q.   And that was her immediate supervisor?

19      A.   Correct.

20      Q.   Did you have any input in Ms. Pollard's

21  supervisor giving her a score of 2.75 or the 2.5?

22      A.   No, I did not.

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

BRIDGET POLLARD,                    X

                                 :

        Plaintiff,             :

    vs.                          :Case No. 1:07-0692

QUEST DIAGNOSTICS                   :

                                 :

        Defendant.             X

---

WASHINGTON, DC
December 20, 2007

DEPOSITION OF:

**RICHARD LEAP,**

a witness, called for examination by counsel on behalf of

the Plaintiff, pursuant to notice and agreement of the

parties as to time and date, taken at the Arent Fox, LLP,

1050 Connecticut Avenue, NW, Suite 600, Washington, D.C.,

beginning at approximately 10:35 a.m., before Raakeebah

L. Henderson, a Notary Public and court reporter in and

for the District of Columbia, when were present on behalf

of the respective parties:

Raakeebah L. Henderson, Professional Court Reporter
13017 Wisteria Drive, Suite 364
Cell: (301) 717-9468    Fax: (240) 912-7323    E-mail: keebahcr@comcast.net



2

```
 1     APPEARANCES BY COUNSEL:

 2        FOR THE PLAINTIFF:

 3             NATHANIEL D. JOHNSON & ASSOCIATES, LLC

 4             BY: NATHANIEL D. JOHNSON, ESQUIRE
               3475 Leonardtown Road, Suite 105
 5             Waldorf, Maryland 20602
               301.893.0807
 6

 7        FOR THE DEFENDANT:

 8             ARENT FOX, LLP

 9             BY: MICHAEL L. STEVENS, ESQUIRE
               1050 Connecticut Avenue, NW, Suite 600
10             Washington, D.C. 20036-5339
               (202) 857-6000
11             stevens.michael@arentfox.com

12

13     ALSO PRESENT:  Bridget Pollard, Plaintiff

14

15

16              -   -   -   -   -   -   -

17

18          (Index appears following the transcript.)

19

20

21

22
```

16

```
1          A.    Shawn Townsend.

2          Q.    Have you met Mr. Townsend?

3          A.    Yes.

4          Q.    What race is Mr. Townsend?

5          A.    He is white.

6          Q.    Did you know Mr. Townsend prior to his

7     selection for the project manager position?

8          A.    No.

9          Q.    Did you have any role or any input in the

10    selection of Mr. Townsend for the project manager

11    position.

12         A.    Yes.

13         Q.    And what was that, sir?

14         A.    I interviewed him on the phone.  I read his

15    resume.

16         Q.    How many times did you interview Mr. Townsend?

17         A.    Once.

18         Q.    How long did the phone interview last?

19         A.    Probably 45 minutes.

20         Q.    When you said on the phone was it a one-on-one

21    telephone conversation or was it a conference call?

22         A.    One-on-one.
```

1    interviews of candidates or applicants for employment; is
2    that --
3        A.    No.
4        Q.    Is there a policy in place for the practice of
5    conducting interviews of job applicants with Quest
6    Diagnostics?
7            MR. STEVENS:  Objection.  You can answer.
8        A.    Not a policy for the interview that I know of.
9        Q.    Is there a practice?
10            MR. STEVENS:  Same objection.  You can answer.
11        A.    Not a practice either.  Just the process to do
12    and interview.
13        Q.    What do you mean a process?
14        A.    As far as bringing someone in it's a matter of
15    convenience to phone interview them first to see if they
16    have the basic skills to move forward.
17        Q.    The telephone interviews as you said the
18    preference for telephonic interviews is it preferred more
19    with external applicants or internal applicants or is
20    there any difference or distinction?
21            MR. STEVENS: Objection.  You can answer.
22        A.    I would say preferred more for external

1    candidates as a matter of convenience.

2        Q.    Did you interview anyone for the project

3    manager position?

4        A.    Yes.

5        Q.    Who else?

6        A.    Jane Copley.

7        Q.    How was her interview conducted?

8        A.    Phone.

9        Q.    Anyone else?

10       A.    No.

11       Q.    These were the only two individuals who applied

12   for the position that were interviewed by you?

13       A.    Yes.

14       Q.    Were there any other applicants for the

15   position?

16       A.    Yes.

17       Q.    But you distinctively recall interviewing only

18   these two applicants, correct?

19       A.    Yes.

20       Q.    Who instructed or directed you to interview

21   these applicants?

22            MR. STEVENS: Objection.  You can answer.

1    A.   I was given the applications that came through

2    and determined that these were the two that I would phone

3    interview first.

4        Q.   So that was an independent decision?

5        A.   Yes.

6        Q.   Did human resource HR play a role in the

7    selection or the interviewing of candidates for the

8    position?

9            MR. STEVENS:  Objection.  You can answer.

10       A.   Not leading up to me that I knew of.

11       Q.   Perhaps a better question would be prior to you

12   interviewing candidates did the candidates meet or have a

13   discussion with anyone else associated with Quest

14   Diagnostics?

15       A.   No.

16       Q.   Did you have the authority to hire these

17   individuals or just interview?

18       A.   Just interview.

19       Q.   Did you interview Ms. Pollard for the position?

20       A.   I did not.

21       Q.   Any particular reason why you did not?

22       A.   Based on her resume I chose the first the two

1    to interview.

2        Q.    Was there a position description for the

3    position?

4        A.    Yes.

5        Q.    Do you know who drafted the position

6    description?

7        A.    A combination of Harvey, myself and human

8    resources.

9        Q.    Vandenburg?

10        A.    Mm-hmm.  Mr. Vandenburg, I'm sorry.  Yes.

11        Q.    Yourself?

12        A.    Mm-hmm.

13        Q.    Who specifically in HR?

14        A.    That I don't know.  I'm assuming that's who

15    typed it in the paper.  In the form that we have.

16        Q.    But you don't have any personal first-hand

17    knowledge of anyone associated with HR who assisted in

18    the composition of the position description?

19        A.    No, I do not.

20        Q.    Prior to the composition of the position

21    description, did you previously compose any other

22    position descriptions?

1    any kind of documentation to assist you in composing the

2    position description?

3            MR. STEVENS:  Objection.  You can answer.

4        A.    Review of other job descriptions.

5        Q.    What other job descriptions did you review?

6        A.    The company has many, many job descriptions.

7        Q.    But sitting here today you can't recall

8    specifically the identity of any of those position

9    descriptions that you had reviewed to help you compose

10   this one?

11       A.    No.

12       Q.    Do you know how many position descriptions you

13   reviewed or took into consideration in composing this

14   one?

15       A.    Probably a few.

16       Q.    A few is what, less than five, more than five?

17       A.    Probably less than five.

18       Q.    Do you know if Mr. Vandenburg reviewed any kind

19   of document; any other position descriptions?

20           MR. STEVENS:  Objection.  You can answer.

21       A.    I do not know.

22       Q.    Do you know if Mr. Vandenburg conferred or had