# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRIDGET POLLARD,

    Plaintiff,

    v.

QUEST DIAGNOSTICS,

    Defendant.

Civil Action No. 07-692 (CKK)

## MEMORANDUM OPINION
(February 17, 2009)

Plaintiff, Bridget Pollard ("Pollard" or "Plaintiff"), an African-American female, brings the instant lawsuit against her previous employer, Defendant Quest Diagnostics ("Quest" or "Defendant"), alleging claims of discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). Specifically, Pollard asserts a claim of disparate treatment based upon race and color in regard to allegations that Quest failed to promote Pollard while instead promoting a Caucasian male into a newly-created Project Manager position. Pollard also asserts a claim of retaliation based on allegations that Quest gave her an inferior performance evaluation because of her complaints of discriminatory treatment.

Currently pending before the Court is Defendant's Motion for Summary Judgment. As briefing on Defendant's motion is complete, the case is now ripe. After a searching review of the parties' briefing, the exhibits attached thereto, the relevant case law, and the entire record herein, the Court shall GRANT Defendant's Motion for Summary Judgment, for the reasons that follow.

# I. BACKGROUND

*A.      Factual Background*

In October of 2002, Pollard, an African-American female, was hired by American

Medical Laboratories to work as a Medical Technologist at its medical laboratory facility located

in Providence Hospital ("Providence") in Washington, D.C.  Defendant's Statement of Material

Facts ("Def.'s Stmt.") ¶¶ 2, 6.[1]  Shortly thereafter, Quest[2] acquired the Providence medical

laboratory facility from American Medical Laboratories.  *Id.* ¶¶ 1, 2.  Pollard continued working

as a Medical Technologist at the Providence laboratory after it was acquired by Quest.  *Id.* ¶ 2, 7.

As a Medical Technologist, both for American Medical Laboratories and for Quest,

Pollard's responsibilities included performing assigned medical tests, maintaining laboratory

---

[1] As a preliminary matter, the Court notes that it strictly adheres to the text of Local Civil
Rule 7(h)(1) (formerly 56.1 when resolving motions for summary judgment).  *See Burke v.
Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (district courts need to invoke Local Civil Rule 56.1
before applying it to the case).  The Court has repeatedly advised the parties that it strictly
adheres to Rule 7(h) and has stated that it "assumes that facts identified by the moving party in its
statement of material facts are admitted, unless such a fact is controverted in the statement of
genuine issues filed in opposition to the motion."  *See* May 25, 2007 Memorandum Opinion,
Docket No. [14] at 15 n.2.  Thus, in most instances the Court shall cite only to Defendant's
Statement of Material Facts ("Def.'s Stmt.") unless a statement is contradicted by the opposing
party.  Where Plaintiff has objected to relevant aspects of Defendant's proffered material fact, the
Court shall cite to Plaintiff's Response to Def.'s Stmt. ("Pl.'s Resp.").  The Court shall also cite
directly to evidence in the record, where appropriate.

[2]Quest is a national provider of medical laboratory services that operates medical
laboratories throughout the United States in both hospitals and medical centers as well as in its
own facilities.  Def.'s Stmt. ¶ 1.  It has a comprehensive anti-discrimination policy and conducts
annual equal employment opportunity training sessions.  *Id.* ¶ 3.  At the Providence location,
Quest currently has 83 employees, 70% (or 83) of whom are African-American; 100% of Quest's
current managerial staff, consisting of five employees, is African-American as well.  *Id.* ¶ 5. At
the time of Pollard's termination from Quest in Ocotber of 2006, as discussed below (*see supra*
at 3), 65% of Quest's staff at Providence, as well as 50% of the managerial staff, were African-
American.  *Id.* ¶¶ 4, 5.

areas and equipment, and ensuring that test systems were in control for each test performed. *Id.* ¶ 7. Her duties remained the same throughout her employment with Quest. *Id.* Pollard's duties also included performing functions related to Quest's Laboratory Information System ("LIS"), which is the computer system used in the laboratory in conjunction with the laboratory equipment to generate reports of test results. Plaintiff's Response Statement ("Pl.'s Resp.") ¶ 7; *see also* Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"), Ex. B (Pollard Decl.) ¶ 2; Def.'s Stmt. ¶ 17. Pollard confirmed at her deposition, however, that her only experience with LIS was as a user of the system and that she had no experience with the creation, installation and/or maintenance of the system. *See* Defendant's Reply in Support of its Motion for Summary Judgment ("Def.'s Reply"), Ex. 5 (12/21/07 Pollard Dep.) at 131:3-132:15.

From 2002 to 2005, Pollard worked the third (overnight) shift at the Providence location and reported directed to Isabelita Aglipay. Def.'s Stmt. ¶ 9. In 2005, Pollard requested to work on a "PRN," or on-call as needed, basis so that she could attend school full-time, which request Quest granted. *Id.* ¶ 10. While working on a PRN basis, Pollard's work hours varied, and she worked for several different supervisors. *Id.* Subsequently, in or around March 2006, Pollard relocated to Raleigh, North Carolina and thereafter worked only occasionally for Quest. *Id.* ¶ 11. As of early October 2006, however, Pollard had not worked for Quest for several pay periods and her employment with Quest was therefore terminated on October 4, 2006, as a result of a routine audit Quest periodically conducts of all PRN employees, consistent with Quest policy.[3] *Id.* ¶ 12.

---

[3]The Court notes that Pollard does not challenge or raise any issues concerning her termination from Quest. *See generally* Amended Complaint, Docket No. [12]; Pl.'s Opp'n.

1.      The Project Manager Position

In the spring of 2005, Quest decided to create an Information Technology Project Manager ("Project Manager") position at Providence.  *Id.* ¶ 14.  The Project Manager position was posted in mid-May of 2005, *see* Pl.'s Resp. ¶ 20; Pl.'s Opp'n, Ex. A ("Vacancy Announcement),[4] Quest made the position available to both internal and external applicants by announcing it on the internet, on Quest's internal intranet, and by posting it on the bulletin board in the Providence lab, Def.'s Stmt. ¶ 15.  Harvey Vandenburg, the Administrative Director of the Providence Laboratory, and Richard Leap, Director of Information Technology, collaborated in selecting a candidate for the Project Manager position.  *Id.* ¶ 19.

Vandenburg and Leap, together with Human Resources, composed a position description for the Project Manager position.  *Id.*; Def.'s Reply, Ex. 7 (Leap Dep.) 21:5-8 (testifying that he, Vandenburg and Human Resources drafted position description); *id.*, Ex. 6 (Vandenburg Dep.) 24:16- 25:14 (testifying that he and Leap drafted the position description with assistance from

---

[4]Quest objects to this exhibit as well as other exhibits provided by Pollard and attached to her Opposition on the grounds that the exhibits are inadmissible because they have not been properly authenticated.  *See* Def.'s Reply at 3.  All of Pollard's evidence, however, can be properly relied upon in its current form to create a genuine factual issue for trial. While it is true that a party opposing summary judgment may not merely rest upon her pleadings, and rather must "designate 'specific facts showing that there is a genuine issue for trial,'" the party opposing summary judgment need not "produce evidence in a form that would be admissible at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.").  An examination of Pollard's proffered evidence suggests that it certainly could be rendered admissible for trial.  Although the Court would ordinarily instruct that Quest could raise its objections at a subsequent point, the disposition of Quest's motion obviates the need for Quest to do so.

Human Resources).  They used a prior position description for a similar Project Manager position as a starting template.  *See id.* ¶ 20; Def.'s Reply, Ex. 6 (Vandenburg Dep. 24:19-25:4 (testifying that they used a template); Pl.'s Resp. ¶ 20 (denying only that the position description was composed at the time the vacancy was posted and not that Vandenburg and Leap used an incumbent Project Manager position description as the template).

According to Quest's policy, a written position description is required before an available position may be posted.  Def.'s Stmt. ¶ 20.  Quest asserts that Vandenburg and Leap composed a position description consistent with that policy.  *Id.*  Pollard, however, claims that the position description was not, in fact, composed until August 2005, well after the position was posted in May of 2005.  Pl.'s Resp. ¶ 20.  As support for this assertion, Pollard points to: (1) a copy of the position description at issue, which indicates the "Date Written" was August 22, 2005; and (2) testimony by Vandenburg, in which he stated: "So I would surmise the posting predated the finalization of the position description."  *Id.*; *see also* Def.'s Mot., Ex. 8 (Project Manager Position Description); Pl.'s Opp'n, Ex. H (Vandenburg Dep.) at 49:5-6.  As to the fact that the copy of the position description attached as Exhibit 8 to Defendant's Motion has a "Date Written" of August, 2005, Michael Knapp, Quest's Director of Employee Services, explained that "each time a job description is revised or updated on the computer system in any way, the date in the 'Date Written' section is updated to reflect the then current date.'" Def.'s Reply, Ex. 1 (Knapp Decl.) ¶ 6.  Furthermore, Quest presents evidence that the position description, or at least a version of it, was composed as early as June 24, 2005.  *See id.* ¶ 7 (showing that the position description at issue had been printed on June 24, 2005).  Finally, both Vandenburg and Leap have confirmed that neither made any changes to the position description, nor are they aware of

5

anyone else who made changes to the position description, after the interviews for the Project

Manager position had begun.  *See* Def.'s Reply, Ex. 2 (Vandenburg Decl.) ¶ 3; *id.*, Ex. 3 (Leap

Decl.) ¶ 3.  Accordingly, there is, to some extent, a dispute as to the exact date on which the

position description was created, but the Court concludes, for the reasons discussed below, *infra*

32-37, that such a dispute is not material.

Nonetheless, both parties agree that the Project Manager's primary responsibility was to

coordinate and maintain a new upgrade to the LIS system that was to be installed in the near

future.  *Id.* ¶ 16.  In particular, the "Essential Job Duties and Responsibilities" for the Project

Manager position included, *inter alia*, the following technical aspects:

> 3.  Collaborate with HIS personnel in maintaining database.

> 4.  Facilitates LIS training and competency for all new and existing staff as new processes
> or procedures are added.

> * * *

> 6.  Provides necessary audit trail documentation of all changes and validations to LIS system
> to meet or exceed regulatory requirements, including but not limited to, annual calculations
> review, biannual patient report for Medical Director review, LIS upgrade documentation, LIS
> backup and transaction documentation.

> * * *

> 9.  Monitor LIS performance and report outages or system degradation issues to
> appropriate channels.

*Id.* ¶ 21.  The position description also provided that the minimum qualifications for the Project

Manager position included: an educational background in Computer Science or Medical

Technology, strong interpersonal skills, basic knowledge of laboratory skills, and experience

testing or troubleshooting new or existing LIS systems.[5]  *Id.* ¶ 22.  In addition, Vandenburg and Leap both agreed that their preferred candidate would also have technical experience in LIS/laboratory instrument interfaces, LIS test file development, and LIS report maintenance and generation as well as experience training LIS users.  *Id.* ¶ 23.

Pollard makes much of the fact that the vacancy announcement, as posted in May of 2005, provided only that the position's requirements included having a degree in medical technology or computer science, general laboratory knowledge, LIS functionalities, and LIS/HIS interface knowledge—and did not include the specific technical requirements set forth in the position description.  *See* Pl.'s Resp. ¶ 22.; *see also* Pl.'s Opp'n, Ex. A (Vacancy Announcement).  Michael Knapp, Quest's Director of Employee Services, explained, however, that: "The Job Posting Bulletin (*i.e.*, the vacancy announcement to which Pollard refers) . . . does not and could not contain all of the elements of the job description for each position posted. Indeed, every job description for every job contains more requirements than the job posting does. The job posting simply contains a summary of some of the major requirements for the positions listed."  Def.'s Reply, Ex. 1 (Knapp Decl.) ¶ 4.

Pollard applied for the Project Manager position and she, along with three other individuals, was subsequently selected by Vandenburg for a first-round interview.  Def.'s Stmt.

---

[5]Pollard complains that the vacancy announcement for this position did not reference "minimum qualifications."  *See* Pl.'s Resp. ¶ 22.  The Court notes, however, that both the vacancy announcement and the position description include a list of these qualifications, although Pollard is correct that the vacancy announcement did not specifically label them as "minimum qualifications" for the Project Manager position.  *See* Pl.'s Opp'n, Ex. A (Vacancy Announcement); Def.'s Mot., Ex. 8 (Position Description).  Quest, however, has conceded that Pollard met these minimum qualifications, Def.'s Mot. at 16, and Pollard makes no allegations that the minimum qualifications were discriminatory, *see generally* Pl.'s Opp'n.  Accordingly, any dispute as to this point is immaterial.

¶¶ 24, 25. Specifically, Vandenburg selected: (1) Pollard, an African-American female; (2) Tuy Le, an Asian-American male; (3) Jane Kopley, a Caucasian female; and (4) Sean Townsend, a Caucasian male. *Id.* ¶ 26. Le, like Pollard, was an internal candidate. *Id.* Kopley and Townsend, however, were the only external candidates as well as the only white individuals who applied for the Project Manager position. *Id.*

As stated above, Vandenburg and Leap collaborated in selecting a candidate for the Project Manager position. *Id.* ¶ 19. Vandenburg was tasked with conducting the first round interviews and with making an initial determination as to the candidates' interpersonal skills, while Leap, who (as Director of IT) had more technical knowledge, was tasked with evaluating the candidates' technical experience. *See id.* ¶¶ 27-31; *see also* Def.'s Mot., Ex. 7, Pt. 2 (Vandenburg Dep.) 35:21-37:1.

Pollard was actually out of town on vacation at the time that Vandenburg attempted to contact her to schedule the initial interview. *Id.* ¶ 27. Vandenburg therefore left a note on the laboratory's bulletin board for Pollard to contact him. *Id.* However, because they worked different shifts, Pollard and Vandenburg had difficulty coordinating a time to meet for the interview. *Id.* Vandenburg ultimately was able to contact Pollard at home and thereafter conducted a telephone interview.[6] *Id.* Because the other three individuals did not have similar difficulties coordinating a time for an interview, Vandenburg conducted face-to-face interviews with Le, Kopley and Townsend. *Id.* ¶ 29. After interviewing each of the four candidates, Vandenburg concluded that each candidate displayed good verbal communication skills and

---

[6]Pollard does not allege that Vandenburg's decision to conduct her initial interview over the phone was discriminatory. *See generally* Pl.'s Opp'n.

therefore forwarded all four candidates' resumes to Leap.  *Id.* ¶ 30.

Quest emphasizes that, prior to this interview, Pollard and Vandenburg had never had a formal conversation nor had they been formally introduced, and their interaction at Quest had been limited to occasional greetings in the hall.  *Id.* ¶ 28.  In addition, Pollard admitted at her deposition that she had no evidence, other than her own unsupported belief, that Vandenburg knew Pollard's race or color prior to their phone interview.  Def.'s Mot., Ex. 2, Pt. 3 (Pollard Dep.) at 86:5-17.  Pollard, however, now asserts in her Opposition that Vandenburg "was fully aware" of Pollard's race and, as support, directs the Court's attention to an "Applicant Flow Data" chart, which provides the racial and gender composition of all of the applicants for the Project Manager position.  *See* Pl.'s Resp. ¶ 28 (citing Pl.'s Opp'n, Ex. D (Applicant Flow Data). Although the Applicant Flow Data chart does show that Pollard is "black," Pollard has failed to present any evidence that Vandenburg ever saw this chart.[7]  *See id.*

Leap reviewed the resumes of all four candidates to determine whether each candidate possessed the technical knowledge necessary for the Project Manner position.  *Id.* ¶¶ 30-31. Based upon his review of the candidates' resumes, Leap concluded that only Kopley and Townsend possessed the requisite technical experience and thus decided to interview only those

---

[7]Indeed, as Quest correctly notes, although Pollard avers in her Response Statement that "Vandenburg was fully aware of Plaintiff and the other applicants' protected classifications during the selection process," she provides no citation to the record for that supposition, in direct violation of this Court's [24] March 7, 2008 Order and Local Rules 7(h) and 56.1.  Because on a motion for summary judgment the party opposing the Motion must bring to bear contrary evidence in the record that creates a genuine issue of material fact for trial, Pollard's objection must be disregarded.

two candidates.[8]  *Id.* ¶ 31.  Kopley had significant LIS experience in her previous position as an Automated Laboratory Services Manager at Holy Cross Hospital, where she had helped implement the new LIS upgrade, built new test files into the system and trained users.  *Id.* ¶ 32. Townsend had been involved with the same project at Holy Cross, for which he developed interfaces between the laboratory instruments and the LIS, built the respiratory and clinic car components for Soft Lab, and trained users.  *Id.* ¶ 34.  Leap conducted both interviews with Kopley and Townsend over the telephone, and consequently—as Pollard admits—did not know the race of either candidate.  *Id.*; Pl.'s Resp. ¶ 31.

As stated above, however, Leap declined to interview either Pollard or Le and, as is specific to Pollard, explained that he decided not to interview her because he believed she lacked significant LIS experience.  *Id.* ¶ 34.  As Leap had never met Pollard and therefore did not know her race, he based this decision solely on his review of her resume.  *Id.*   In particular, Leap concluded from his review of her resume that she did not have experience in "setting up the filing structure of a LIS, managing interfaces for producing or setting up the laboratory reports," which were the most important aspects of the job.  *Id.* ¶ 35.  Plaintiff also lacked any experience with the new LIS that Quest had chosen to install.  *Id.* ¶ 36.  Leap concluded that Pollard's LIS experience was simply comparable to that of a user of the system, and she therefore did not have the requisite experience to manage the new LIS upgrade and to train LIS users.  *Id.* ¶ 37. Importantly, Pollard fully admits that LIS experience was critical to the Project Manager position and that she did not have such experience.  Pl.'s Resp. ¶¶ 35-37.  And, even more significantly,

---

[8]Although the date of Kopley's interview is not in the record, Townsend was interviewed on July 20, 2005.  *See* Pl.'s Opp'n, Ex. C (EEOC Investigative Report).

Pollard concedes that Leap declined to interview her because he believed that she lacked significant LIS experience and that Leap did not know her race, such that his decision not to interview her for the Project Manager position was based *solely* on her resume.  *Id.* ¶ 34.

Although both Kopley and Townsend were qualified for the Project Manager position, Leap believed that Kopley was the better candidate based on her experience and knowledge. Def.'s Stmt. ¶ 38.  Quest therefore offered Kopley the position.  *Id.*  Kopley, however, ultimately declined to accept the Project Manager position.  *Id.*  Quest does not have a policy of re-posting positions after a top-ranked candidate declines when there is a second ranked candidate.  *Id.* ¶ 39. Accordingly, as Townsend was the second most qualified candidate, Quest subsequently offered him the position.  *Id.*  Townsend accepted the offer and thereafter held the position of Project Manager.[9]  *Id.* ¶ 40.

Significantly, Pollard acknowledged in deposition that Kopley's prior experience with the new LIS upgrade rendered her far more qualified for the Project Manager position than Pollard herself, and indicated that Quest's initial offer to Kopley was *not* discriminatory:

Q.  Do you think [Kopley] was more qualified than you for the job?

\* \* \*

A.  I believe from  – Yes, that she had more qualifications than I had.  Yes.

Q.  So is it your belief, then, that the decision to initially offer the position to Ms. Kopley was *not* a discriminatory decision?

---

[9]On or about March 30, 2007, Townsend voluntarily resigned from the Project Manager position and is no longer employed by Quest.  Def.'s Stmt. ¶ 40.  The position is now filled by an African-American female, who was hired on or about December 3, 2008 by Leap and Vandenburg's successor, Robert Levy.  *Id.* ¶ 47.

* * *

    A.  I believe that.

Def.'s Mot., Ex. 2, Pt. 3 (Pollard Dep.) 103:3-15 (emphasis added); Def.'s Stmt. ¶ 41.  Similarly,

Pollard admits that Townsend's qualifications, as provided in his resume, also rendered him

more qualified for the Project Manager position.[10]  Def.'s Stmt. ¶ 42; *see also* Def.'s Mot., Ex. 2,

Pt. 3 (Pollard Dep.) 118:7-119:1 (acknowledging that Townsend's qualifications as set forth in

his resume were superior).  Indeed, Pollard admits that Townsend was the second most qualified

candidate for the position, and that Quest offered him the position on that basis.  Def.'s Stmt. ¶

39; Pl.'s Resp. ¶ 39 (admitting Def.'s Stmt. ¶ 39).

    Pollard initially complained to Michael Knapp, Quest's Director of Employee Services,

about Quest's failure to promote her into the Project Manager position at some point in October

of 2005.  *See* Pl.'s Reply, Ex. E (10/24/05 Email from Knapp to Vandenburg).  Thereafter, on

November 29, 2005, Pollard filed a Charge of Discrimination with the U.S. Equal Employment

Opportunity Commission ("EEOC") alleging race discrimination with respect to Quest's decision

not to promote her into the IT Project Manager position.  Def.'s Stmt. ¶ 49.

---

[10]Quest, in its Motion for Summary Judgment, notes that Pollard suggested at her deposition that Townsend misrepresented his qualifications in his resume.  *See* Def.'s Mot. at 18-19.  Pollard, however, has not raised this issue in her Opposition.  *See generally* Pl.'s Opp'n. Moreover, she admits that: (a) Townsend had developed interfaces between the laboratory instruments and the LIS, built the respiratory and clinic car components for Soft Lab, and trained users; (b) Townsend was qualified for the position of Project Manger; (c) Pollard herself lacks any personal knowledge or credible evidence to dispute the accuracy of Townsend's qualifications; and (d) Quest is unaware of any inaccuracies in Townsend's resume.  *See* Def.'s Stmt. ¶¶ 33, 38, 43-44; Pl.'s Resp. ¶¶ 33, 38, 43-44 (admitting each asserted fact).  Accordingly, the Court proceeds on the undisputed fact, agreed to by Pollard, that Townsend was qualified for the position of Project Manager, as provided in his resume.

2.    2005 Performance Evaluation

Quest evaluates its employees annually.  *Id.* ¶ 50.  Generally, employees are provided

written performance reviews, which include ratings of their performance in various categories.

*Id.*  Employees are also provided a final numerical score that corresponds to a specific overall

performance rating category, with a lower score correlating to a higher overall rating:

Outstanding (1.00 to 1.33); Excellent (1.34 to 2.33); Achieves Expectations (2.34 to 3.25); and

Development Needed (3.26 to 4.00).  *Id.*  Ordinarily, an employee's immediate supervisor

performs his or her evaluation.  *Id.*

As is relevant here, Pollard received a performance evaluation in 2004.  *See id.* ¶ 51.

Because her then-immediate supervisor, Aglipay, was on medical leave, Pollard's annual

performance review for the 2004 evaluation period was conducted by David Meeder, then-

Administrative Director of the Providence Laboratory (*i.e.,* Vandenburg's predecessor), rather

than her immediate supervisor.  *Id.*  Meeder gave Pollard an overall "Excellent" rating.  *Id.*  As a

result of the "Excellent" rating, Pollard received a 4% merit increase.  *Id.* ¶ 52.

Pollard also received a performance evaluation in 2005.  *See id.* ¶ 53.  The performance

evaluation is dated January 12, 2006.  *See* Def.'s Mot., Ex. 12 (2005 Performance Evaluation).

Aglipay, Pollard's immediate supervisor, had returned from medical leave by this time, and

therefore she prepared Pollard's 2005 performance evaluation, per Quest's general policy.  *Id.* ¶¶

50, 53.  Vandenburg confirmed at deposition that he did not have input into Pollard's evaluation.

Def.'s Reply, Ex. 6 (Vandenburg Dep.) at 71:20-22.  Based upon her overall performance,

Aglipay gave Pollard an initial numerical rating of 2.75, which corresponded to an overall rating

of "Achieves Expectations."  *See* Def.'s Stmt.  ¶¶ 53, 56; *see also* Def.'s Mot., Ex. 15 (Pollard

2005 Annual Performance and Development Review).  Significantly, Pollard does not deny that

Aglipay gave her the overall "Achieves Expectation" rating "[b]ased on her overall

performance."  Pl.'s Resp. ¶ 53 (admitting Def.'s Stmt. ¶ 53).

Pollard, however, subsequently voiced concerns to Aglipay regarding her 2005

performance evaluation rating, and, as a result, Aglipay agreed to improve Pollard's rating by

0.25 points to a 2.5 overall numerical score.  Def.'s Stmt. ¶ 56.  Although this was an

improvement in the overall numerical score, Pollard's overall performance rating remained

"Achieves Expectations," as that rating encompasses overall numerical scores from 2.34 to 3.25.

See Def.'s Mot., Ex. 15 (Pollard 2005 Annual Performance and Development Review).  Pollard

did not voice any further objections to either Aglipay or to anyone else at Quest regarding her

evaluation.  Def.'s Stmt. ¶ 57.  As Pollard admits, an "Achieves Expectations" rating reflects a

satisfactory performance evaluation.  Id. ¶ 54; Pl.'s Resp. ¶ 54.  As a result of the 2005

performance evaluation, Pollard received a 3% merit increase.[11]  Def.'s Stmt. ¶ 59.

Aglipay explained at deposition that, in assessing Pollard's performance, she took into

consideration: (a) several complaints she had received regarding Pollard's attitudes toward nurses

and doctors (i.e., Quest's customers); and (b) Pollard's failure to meet the time pressures

associated with her job.  Id. ¶ 55.  Specifically, Aglipay testified that "some of our customers

[sic] some complain about [Pollard]," clarifying that, by the term "customers," Aglipay meant

"[n]urses, doctors."  Def.'s Mot., Ex. 13 (Aglipay Dep.) at 33:17-22.  She continued: "Yes.  They

_____

[11]Quest, in its Motion, notes that Pollard alleged at her deposition that she was told Quest
had implemented a new policy in which no one would be allowed an excellent rating on their
annual performance rating.  See Def.'s Mot. at 32 (citing Ex. 2 (Pollard Dep.) at 153:2-4)).  The
Court notes that Pollard has not raised this argument in her briefing, and the Court therefore need
not address this point.

complain to me about her being, you know, not giving some information about results or what –

for example . . . If the doctor ask for a result or nurse, don't just say, oh it's in the computer.

Look in the computer.  No you give the result to your client when they ask it.  That's the

complaint of the nurses and doctors about her." *Id.* at 34:1-9.  In addition, Aglipay testified that,

on more than one occasion, some of the Providence hospital staff also had complained to her

about Pollard's attitude and "[t]he way she answered them back," complaining that Pollard's

behavior was "not [*sic*] professional manner." *Id.* 37:5-38:7.  Aglipay also explained that she

had to speak to Pollard on at least five occasions during the 2005 evaluation period about

Pollard's delay in completing laboratory work for emergency room patients.  *See id.* at 34:20-

36:13.

Although Pollard denies that Aglipay relied on such complaints in compiling Pollard's

2005 performance evaluation, Pollard has not directed the Court's attention to any affirmative

evidence disputing Aglipay's testimony.  *See* Pl.'s Resp. ¶ 55.  Rather, Pollard relies solely on

the fact that Quest did not produce any documentation of such complaints in response to

Pollard's requests for documents.  *Id.*  As Quest explains, however, Aglipay testified in

deposition that she would "just talk to [Pollard] not to [*sic*], you know, to be nice to the client,"

and could not recall whether any of the complaints issued were ever put in writing or if she

herself ever issued Pollard a written letter of counseling.  Def.'s Mot., Ex. 13 (Aglipay Dep.) at

39:8-40:13.  Knapp, Quest's Director of Employee Services, testified at his deposition that it was

not necessarily common practice or always appropriate for a supervisor to make written notations

of performance concerns and/or complaints in preparing an employee's performance evaluation.

Def.'s Mot., Ex. 5 (Knapp Dep.) at 35:15-36:22.[12]   Moreover, the Court emphasizes that, as

noted above, Pollard does not deny that Aglipay gave her the overall "Achieves Expectation"

rating "[b]ased on her overall performance."  Pl.'s Resp. ¶ 53 (admitting Def.'s Stmt. ¶ 53).

Finally, Aglipay repeatedly testified at her deposition that she was not aware of Pollard's

complaints of discrimination at the time she prepared Pollard's 2005 performance evaluation.

*See* Def.'s Reply, Ex. 4 (Aglipay Dep.) 55:16-56:16; 59:3-8.  Specifically, at her deposition,

Aglipay testified as follows:

> Q. . . . The performance appraisal that was conducted by you on Ms. Pollard [*sic*]
> dated January 2006, right? At the time you had assessed her performance did
> anybody mention that Ms. Pollard was complaining of or she raised the issue of
> discrimination?
>
> A. No. I didn't hear anything.

*Id.* at 59:3-8.

Pollard, however, ignores this testimony from Aglipay, and argues that, to the contrary,

Aglipay knew of Pollard's discrimination claims prior to her preparation of the 2005

performance evaluation.  *See* Pl.'s Resp. ¶ 58.  In support of this assertion, Pollard relies solely

on the following testimony from Aglipay:

> Q. . . . Were you informed around this time [October 24, 2005] regarding Ms.
> Pollard's complaint of discrimination because she did not receive the promotion to
> [*sic*] project manager position?
>
> A.  No.  I didn't hear any complaint about this.

---

[12]In addition, although Pollard's Opposition does not raise this issue, Quest acknowledges in its Reply that Pollard has denied that Aglipay ever "inform[ed] me that I was the subject of complaints or criticisms from Providence Hospital staff."  Pl.'s Opp'n, Ex. B (Pollard Decl.) ¶ 4. The Court notes, however, that Pollard does not similarly deny having received complaints from Aglipay herself regarding her timeliness in completing emergency work requests.  *See id.*

Q.  When were you first informed that she was discussing filing a complaint or that she was going to follow through with filing a complaint of discrimination?

*   *   *

A.  When I notice [*sic*] the complaint it was [*sic*] Mr. Harvey [Vandenburg] called me in his office at that time that Ms. Pollard complain about not getting the position.

Q.  When was that, ma'am?

A.  I cannot give you the exact date.

Q.  What month was it?

A.  I don't know what month was that.  That was before I went to part-time position.

Q.  When did you go part-time?

A.  2006, I believe.

Pl.'s Opp'n, Ex. H (Aglipay Dep.) at 54:3-22.  Pollard asserts that, because she first complained of discrimination to Knapp in October of 2005, this testimony demonstrates that Aglipay "could have" heard of Pollard's discrimination complaints as early as October of 2005.  Pl.'s Resp. ¶ 58. As noted above, the performance evaluation is dated January 12, 2006.  *See* Def.'s Mot., Ex. 12 (2005 Performance Evaluation).  Consideration of Aglipay's testimony in full, however, demonstrates that, at most, Aglipay was informed of Pollard's complaint at some unspecified time during 2006.  *See id.*  Indeed, Aglipay affirmatively testified that she did not hear about the October 24, 2005 complaint.  *Id.* at 54:7 ("No.  I didn't hear any complaint about this.").  More significantly, Pollard ignores that this exchange in Aglipay's deposition immediately precedes the excerpts above in which Aglipay went on to clarify that at the time she assessed Pollard's performance, she had not heard anything regarding Pollard's discrimination complaints.  Def.'s Reply, Ex. 4 (Aglipay Dep.) 55:16-56:16; 59:3-8.

B.      *Procedural History*

As stated above, Pollard filed a Charge of Discrimination with the EEOC on November 29, 2005, alleging race discrimination with respect to Quest's decision not to promote her into the IT Project Manager position.  Def.'s Stmt. ¶ 49.  Pollard amended her EEOC charge on February 28, 2006, to include an allegation of retaliation based upon the differences between her 2004 and 2005 performance evaluations.  *Id.* ¶ 60.  On February 28, 2007, the EEOC issued Plaintiff a Dismissal and Notice of Rights in which it determined that it was "unable to conclude that the information obtained establishes violations of the statute."  *Id.* ¶ 61.

Pollard subsequently filed the instant lawsuit on April 16, 2007.  *See* Compl., Docket No. [1].  Quest thereafter filed a Motion for Summary Judgment.  *See* Def.'s Mot., Docket No. [25]. Pollard filed her Opposition, *see* Pl.'s Opp'n, Docket No. [35], and Quest its Reply, *see* Def.'s Reply, Docket No. [36].  Defendant's Motion is therefore now ripe.

## II.  LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, Quest, as the moving party, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Pollard, in response to Quest's Motion, must "go beyond the pleadings and by [its] own affidavits, or by the

18

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).  "Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment."  *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Id.* at 587 (citing FED. R. CIV. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in

discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex Corp.*, 477 U.S. at 327). Accordingly, the Court reviews Quest's Motion under a "heightened standard" that reflects "special caution." *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997) (internal quotations omitted), *overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc). Nonetheless, while this special standard is more exacting, it is not inherently preclusive. Although more circumspect, the Court shall continue to grant a motion for summary judgment in which the nonmoving party has failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

### III.  DISCUSSION

Pollard's Amended Complaint sets forth claims of discrimination and retaliation under both Title VII and Section 1981. Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), and from retaliating against employees for engaging in

activity protected by Title VII, *id.* § 2000e-3(a).  Section 1981, as amended by the Civil Rights

Act of 1991, prohibits racial discrimination in the "making, performance, modification, and

termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the

contractual relationship."  *Id.* § 1981; *see also Rivers v. Roadway Express*, 511 U.S. 298, 302

(1994) ("§ 1981's prohibition against racial discrimination in the making and enforcement of

contracts applies to all phases and incidents of the contractual relationship . . . .").  The Supreme

Court has also recently held that Section 1981 encompasses claims of retaliation as well.

*CBOCS West, Inc. v. Humprhies*, __ U.S. __, 128 S. Ct. 1951, 1961 (2008).

 Under either Title VII or Section1981, Pollard must demonstrate by a preponderance of

the evidence that the actions taken by her employer were "more likely than not based on the

consideration of impermissible factors" such as race, ethnicity, or national origin.  *Tex. Dep't of

Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal quotation marks and citation

omitted).  In so doing, "the plaintiff may prove his claim with direct evidence,[13] and absent direct

evidence, he may indirectly prove discrimination" under the burden-shifting analysis created by

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Brady v. Livingood*, 456 F. Supp. 2d

1, 6 (D.D.C. 2006).

 Where, as here, the record contains no direct evidence of discrimination, it is necessary to

apply the *McDonnell Douglas* tripartite burden-shifting framework.  *Cones v. Shalala*, 199 F.3d

512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802).  "Like claims of

---

[13] Direct evidence "is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference*."  *Brown v. Small*, 437 F. Supp. 2d 125, 130 n. 7 (D.D.C. 2006) (emphasis in original) (citing *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989)).

discrimination, claims of retaliation are also governed by the *McDonnell Douglas* burden-shifting scheme." *Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)). The *McDonnell Douglas* framework applies equally to claims brought under both Section 1981 as well. *Id.* at 1093; *see also Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (*McDonnell Douglas* framework applies to claims brought pursuant to Section 1981). It is the district court's responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under this paradigm, a plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case. *McDonnell Douglas*, 411 U.S. at 802. If she succeeds, the burden shifts to the defendant to articulate some legitimate, non-discriminatory or non-retaliatory reason justifying its conduct. *Id.* If the defendant is successful, then "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted).

For a claim alleging disparate-treatment discrimination, a plaintiff makes out a prima facie case by showing (1) that she is a member of a protected group; (2) that she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Wiley v. Glassman*, 531 F.3d 151, 155 (D.C. Cir. 2007); *Mastro v. Potomac Elec. Power.* Co., 447 F.3d 843, 850 (D.C. Cir. 2006). For a claim of retaliation, the prima facie elements are (1) that she engaged in a statutorily protected activity; (2) that she suffered a

materially adverse action; and (3) a causal connection exists between the two.  *Wiley,* 511 F.3d at

155.

The D.C. Circuit has clarified that the *McDonnell Douglas* prima facie factors are

"almost always irrelevant" and are "largely [an] unnecessary sideshow" *Brady v. Office of the*

*Sergeant at Arms*, 520 F.3d 490, 492-93 (D.C. Cir. 2008).  Where an employer asserts a

legitimate, non-discriminatory (or non-retaliatory) reason for its challenged conduct, thereby

doing "everything that would be required of [it] if the plaintiff had properly made out a prima

facie case, whether the plaintiff really did so is no longer relevant." *Id.*, 520 F.3d at 494 (quoting

*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)); *see also Adeyemi v.*

*D.C.*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (holding that the prima facie inquiry "is irrelevant

when an employer has asserted a legitimate, non-discriminatory reason for an adverse

employment action").  "And by the time the district court considers an employer's motion for

summary judgment or judgment as a matter of law, the employer ordinarily will have asserted a

legitimate, non-discriminatory (or non-retaliatory) reason for the challenged decision—for

example, through a declaration, deposition, or other testimony from the employer's

decisionmaker." *Brady*, 520 F.3d at 493.  In such circumstances, a district court's inquiry

collapses into a single question: "[h]as the employee produced sufficient evidence for a

reasonable jury to find that the employer's asserted non-discriminatory [or non-retaliatory]

reason was not the actual reason and that the employer intentionally discriminated against the

employee on the basis of race, color, religion, sex, or national origin?" *Id.* at 494.

Based on this guidance, the D.C. Circuit has stated in no uncertain terms that a lower

court should not evaluate whether a plaintiff has established a prima facie case where a defendant

23

sets forth a legitimate, non-discriminatory and non-retaliatory reason for its conduct: "the district court need not —*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Id.* at 495 (emphasis in original); *see also Adeyemi*, 525 F.3d at 1226 n.1 ("the prima facie case is ultimately *irrelevant* here") (emphasis added); *Wiley,* 511 F.3d at 156 (D.C. Cir. 2007) ("[g]iven this record [which includes articulated, non-discriminatory reasons] we 'need not address the Government's contentions that [appellant] failed to make out a prima facie case'") (quoting *George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005)).

Nevertheless, the Supreme Court also advised lower courts in *Reeves v. Sanderson Plumbing Products, Inc.* that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated [or retaliated]." 530 U.S. 133, 148 (2000). "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143 (quoting *Burdine*, 450 U.S. at 255 n.10). The Court of Appeals for the District of Columbia Circuit has distilled this analysis, noting that the fact-finder can infer discrimination from the combination of:

> (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements of attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong record in equal opportunity employment).

*Aka*, 156 F.3d at 1289. However, evidence in each of the three categories is not required. *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable

trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination,

summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*,

119 F.3d 23, 27-28 (D.C. Cir. 1997).  "[T]he court must consider all the evidence in its full

context in deciding whether the plaintiff has met his burden of showing that a reasonable [fact-

finder] could conclude that he has suffered discrimination." *Aka*, 156 F.3d at 1290.

Accordingly, because Quest in this case has asserted legitimate, non-discriminatory and non-

retaliatory reasons for its challenged conduct, all of the evidence in the record shall be

considered, including that which would be used to establish Pollard's prima facie case (but not

for the purpose of evaluating whether a prima facie case has been established), to address the

ultimate question of discrimination or retaliation *vel non*.

> A.    *Pollard's Claim of Disparate Treatment*

First, Pollard alleges a claim of disparate treatment based upon race and color in violation

of both Title VII and Section 1981.  Specifically, Pollard alleges that Quest failed to promote

Pollard, while instead promoting a Caucasian male into the Project Manager position, based upon

discriminatory animus.[14]  As explained above, Pollard applied for the Project Manager position

and was selected for the initial round of interviews along with three other individuals.  Pollard,

however, was not among the two individuals selected for the second round of interviews.

Instead, Quest selected only Kopley and Townsend for the second round of interviews and

---

[14] Pollard alleges only that Quest's selection of Townsend was discriminatory.  She does not similarly challenge Quest's initial selection of Kopley.  Pl.'s Opp'n at 5 n1. ("Plaintiff's failure to promote claim only challenges [Quest's] selection of Sean Townsend, not Jane Kopley, the other white comparator.").  Indeed, Pollard admitted at deposition that she did *not* believe that Quest's decision to initially offer the Project Manager position to Kopley was discriminatory.  Def.'s Mot., Ex. 2, Pt. 3 (Pollard Dep.) 103:3-15 (emphasis added); Def.'s Stmt. ¶ 41.

ultimately offered the position to Townsend after Quest's first choice candidate, Kopley, turned

down the job offer.  Pollard was not selected.

Quest has repeatedly proffered legitimate, non-discriminatory reasons justifying

Townsend's selection.  Specifically, Quest asserts that it selected Townsend for the Project

Manager position because he was better qualified for the position than Pollard, who lacked the

requisite technical experience.  *See* Def.'s Stmt. ¶¶ 31, 34, 39.

Because Quest has stated a legitimate, non-discriminatory reason for Pollard's non-

selection, Pollard's ability to make out a prima facie case of discrimination is irrelevant, and

Pollard may establish liability in one of two ways.  *Fogg v. Gonzales*, 492 F.3d 447, 453 (D.C.

Cir. 2007).  First, Pollard may pursue a "single-motive case," in which she argues that race was

the sole reason for her non-selection and that Quest's stated reasons for her non-selection are

pretextual.  42 U.S.C. § 2000e-2(a)(1); *Ginger v. D.C.*, 527 F.3d 1340, 1345 (D.C. Cir. 2008).

Pollard may meet this burden by showing that "the employer treated other employees of a

different race . . . more favorably in the same factual circumstances," or by "demonstrat[ing] that

the employer is making up or lying about the underlying facts that formed the predicate for the

employment decision."  *Brady*, 520 F.3d at 495.  Second, Pollard may bring a "mixed-motive

case," in which Pollard does not contest the *bona fides* of Quest's proffered reasons, but argues

that race was *also* a factor giving rise to Pollard's non-selection.  42 U.S.C. § 2000e-2(m);

*Ginger*, 527 F.3d at 1345.

In the present case, Pollard has advanced a "single-motive" case of discrimination,

arguing that Quest's non-discriminatory explanations are a pretext for discrimination.  *See* Pl.'s

Opp'n at 8-12.  The Court finds, however, that Pollard cannot survive summary judgment

because Pollard cannot establish that race was a factor, much less the sole factor, in Quest's

decision to select Townsend, rather than Pollard, to fill the Project Manager position.  It is

axiomatic that a defendant cannot be found to have discriminated against a plaintiff on the basis

of race where the defendant had no knowledge of the plaintiff's race.  *See Jackson v. Dep't of

Justice*, 2003 U.S. App. LEXIS 20014 at * 2 (D.C. Cir. Sept. 29, 2003) (holding that plaintiff

could not "show unlawful discrimination" because "[t]he record . . . contains no evidence that the

individuals who made the hiring determinations knew of [the plaintiff's] race) (citing *Robinson v.*

*Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) ("[a]n employer cannot intentionally discriminate

against a job applicant based on race unless the employer knows the applicant's race")); *accord*

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005) ("a defendant's discriminatory

intent cannot be inferred . . . from circumstances unknown to the defendant"); *Sarullo v. United*

*States Postal Svc.*, 352 F.3d 789, 799 (3d Cir. 2003) (referring to the plaintiff's discrimination

claim as "meritless" where the plaintiff "provided no evidence to rebut [the defendant's] affidavit

stating that when he denied [the plaintiff's] reinstatement he was unaware of [the plaintiff's]

'race, color, national origin, age, or prior EEO activity' or that [the plaintiff] had made

allegations of name calling and improper language in the workplace").

      First, as explained above, prior to her phone interview with Vandenburg, Vandenburg and

Pollard had never had a formal conversation or had been formally introduced, and their

interaction at Quest had been limited to occasional greetings in the hall.  Def.'s Stmt. ¶ 28.

Moreover, even as to those interactions, Pollard has no evidence that Vandenburg knew her

name.  Def.'s Mot., Ex. 2, Pt. 2 (Pollard Dep.) at 61:17-21.  In addition, Pollard admitted at

deposition that she has no evidence that Vandenburg knew her race:

27

Q. . . . So you don't know if when [Vandenburg] spoke to you about this position, whether he knew what your race was, do you?

A. I believe he did.

Q. What evidence do you have that he did?

A. I don't have any evidence. Except for that he had my records and that sort of information available.

Q. What information in your —

A. My application, something or another.

Q. Do you have any evidence that anything in your application indicated that you were black?

A. No, I don't.

Def.'s Mot., Ex. 2, Pt. 3 (Pollard Dep.) at 86:5-17.

Nonetheless, Pollard now argues that Vandenburg "was fully aware" of Pollard's race. *See* Pl.'s Resp. ¶ 28. Her sole evidence on this point, however, is an "Applicant Flow Data" chart. *See id.* (citing Pl.'s Opp'n, Ex. D (Applicant Flow Data)). Although the chart provides the racial and gender composition of all of the applicants for the Project Manager position, including Plaintiff, Pollard has failed to proffer any evidence whatsoever as to who created this chart and when and, more importantly, as to whether Vandenburg ever saw this chart. *See id.* Plaintiff also speculates that Vandenburg may have "suspected or identified Plaintiff's racial classification from the telephone interview," or have otherwise inferred her race from the fact that a majority of Quest's employees are African-American. Pl.'s Opp'n at 8. "'However, a plaintiff may not rest on mere speculation alone[,] but must produce some *objective* evidence' in support of his theories." *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 60 (D.D.C. 2008) (emphasis in original)

(citing *Guerrero v. Univ. of District of Columbia*, 251 F. Supp. 2d 13, 25 (D.D.C. 2003). Pollard has not directed the Court to any objective evidence in the record from which a reasonable jury could infer that Vandenburg was aware of Pollard's race and/or color.

Similarly, as to Leap, there is also no evidence in the record that he knew Pollard's race and/or color at the time he declined to select her for the second round of interviews. Indeed, Pollard admits that Leap "did not know her race." Def.'s Stmt. ¶ 34; Pl.'s Resp. ¶ 34 (admitting Def.'s Stmt. ¶ 34); *see also* Def.'s Mot., Ex. 2, Pt. 3 (Pollard Dep.) at 86:18-87:2 (admitting at deposition that she met Leap for the first time the day before her deposition in this case and that she had no evidence to suggest that Leap knew what her race was when she submitted her application).

Under D.C. Circuit law, there can be no reasonable inference of racial discrimination where an individual just happens to be a member of a protected class—actionable discrimination only occurs when any employer acts "because of" the plaintiff's status as a member of a protected class. *Brady*, 520 F.3d at 493, 496 n.4 ("[e]ven if [the plaintiff] showed that the sexual harassment incident was not the actual reason for his demotion, he still would have to demonstrate that the actual reason was a racially discriminatory reason") (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 402, 514 (1993)); *Ginger*, 527 F.3d at 1345-46 (rejecting a claim of racial discrimination because "[t]he [plaintiffs] . . . adduced no evidence whatsoever of a causal link between *race* and those aspects of the reorganization [they challenged as discriminatory]") (emphasis added).

Pollard is therefore wrong as a legal matter when she argues that, even assuming Vandenburg did not know Pollard's race, the mere fact that only two Caucasian candidates were

permitted second level interviews, without more, is sufficient to raise an inference of

discrimination.  *See* Pl.'s Opp'n at 7-8.  Moreover, Pollard's focus on Vandenburg as the

"deciding official" who declined to select Pollard for a second-round interview is factually

inaccurate.  *See id.* (discussing only Vandenburg's knowledge of Pollard's race).  Plaintiff's

Opposition entirely ignores the undisputed fact that Leap—not Vandenburg—made the ultimate

decision not to select Pollard for the second round of interviews.  Def.'s Stmt. ¶ 34; Pl.'s Resp. ¶

34 (admitting Def.'s Stmt. ¶ 34).  As Pollard acknowledges, Vandenburg deferred to Leap's

technical knowledge to determine whether the candidates possessed the requisite technical

knowledge.  Def.'s Stmt. ¶¶ 30, 31, 34; Pl.'s Resp. ¶¶ 30, 31, 34.  Although Vandenburg

concurred with Leap in his determination that Pollard did not have the requisite experience to

manage the new LIS upgrade and train users, Def.'s Stmt. ¶ 37, Pollard acknowledges that it was

Leap, not Vandenburg, who ultimately concluded that she lacked the necessary technical

qualifications for the Project Manager position, *id.* ¶¶ 30, 31, 34; Pl.'s Resp. ¶¶ 30, 31, 34.

Indeed, far from showing discriminatory animus, it is undisputed that Vandenburg in fact

concluded that each of the four candidates he interviewed, including Pollard, displayed good

verbal and interpersonal skills and therefore forwarded all of their resumes, including Pollard's,

to Leap for his consideration.  Def.'s Stmt. ¶ 30; Pl.'s Stmt. ¶ 30 (admitting Def.'s Stmt. ¶ 30).

Pollard likely ignores Leap's role as the decision-maker in this instance because she has

explicitly conceded that Leap made the decision not to select her for the Project Manager

position *solely* based on her resume, and not her race and/or color, agreeing that:

> Leap declined to interview Plaintiff . . . because he believed she lacked significant
> LIS experience.  As [] Leap had never met Plaintiff, and thus did not know her
> race, he based this decision solely upon her resume.

Def.'s Stmt. ¶ 34 (emphasis added); Pl.'s Resp. ¶ 34 (admitting Def.'s Stmt. ¶ 34).  Pollard

similarly concedes that Leap did not know the race of Kopley or Townsend either, and therefore

also made his decision to select Kopley and Townsend on the basis of their resumes only.  Def.'s

Stmt. ¶ 31; Pl.'s Resp. ¶ 31 (admitting Def.'s Stmt. ¶ 31).  Pollard thus admits that Leap, the

decision-maker who actually declined to select her for the second round of interviews, did not

know her race and/or color (or the race and/or color of Kopley and Townsend) and therefore

made his decision solely on a non-discriminatory basis—*i.e.,* on the basis of their resumes.[15]

Moreover, Pollard *agrees* with Leap that Kopley and Townsend were better qualified for

the Project Manager position than was she.  As Pollard concedes, the Project Manager's primary

responsibility was to coordinate and maintain a new upgrade to the LIS system that was to be

installed in the near future.  Def.'s Stmt. ¶ 16; Pl.'s Resp. ¶ 16 (admitting Def.'s Stmt. ¶ 16).  In

particular, the position description required the Project Manager to maintain the LIS database,

facilitate LIS training for staff, audit and maintain the LIS system, and monitor the LIS system's

performance.  Def.'s Stmt. ¶ 21; Pl.'s Resp. ¶ 21 (admitting Def.'s Stmt. ¶ 21).[16]  Accordingly,

---

[15]Even assuming that Pollard had presented evidence of discriminatory animus on the part of Vandenburg, which she has not, evidence that Vandenburg was biased "is only relevant 'where the ultimate decision maker is not insulated from the subordinate' influence.'" *Vickers v. Powell*, 493 F.3d 186, 196 (D.C. Cir. 2007) (citing *Griffin v. Wash. Convention Ctr.*, 142 F.3d 1309, 1311-12 (D.C. Cir. 1998).  As Pollard has admitted that Leap made his decision not to select her *solely* on the basis of her resume, Pollard has conceded that no discriminatory bias, from Vandenburg or others, affected Leap's decision.

[16]The position description also provided that the minimum qualifications for Project Manager position included: an educational background in Computer Science or Medical Technology, strong interpersonal skills, basic knowledge of laboratory skills, and experience testing or troubleshooting new or existing LIS systems.  Def.'s Stmt. ¶ 22.  Plaintiff's Opposition incorrectly contends that Quest has argued that Pollard lacked these minimum qualifications for the position.  *See* Pl.'s Opp'n at 9-10.  To the contrary, "Quest concedes that Pollard met the minimum qualifications necessary for the position—educational background, general laboratory

Vandenburg and Leap agreed that they preferred a candidate with technical experience in LIS/laboratory instrument interfaces, LIS test file development, and LIS report maintenance and generation as well as experience training LIS users.  Def.'s Stmt. ¶ 23; Pl.'s Resp. ¶ 23 (admitting Def.'s Stmt. ¶ 23).  Pollard admits she did not have this necessary experience in "setting up the filing structure of a LIS, managing interfaces for producing or setting up the laboratory reports," which she concedes were the most important aspects of the Project Manager position, and that she also lacked any experience with the new LIS that Quest had chosen to install.  Def.'s Stmt. ¶¶ 35, 36; Pl.'s Resp. ¶¶ 35, 36 (admitting Def.'s Stmt. ¶¶ 35, 36).  She also candidly concedes that both Kopley's and Townsend's qualifications, as set forth in their resumes, rendered each more qualified for the Project Manager position.  Specifically, Pollard acknowledges that "Kopley's prior experience with the new LIS upgrade rendered her far more qualified for the Project Manager position and [] that Quest's offer to [] Kopley was not discriminatory."  Def.'s Stmt.¶ 41; Pl.'s Resp. ¶ 41 (admitting Def.'s Stmt. ¶ 41).  Pollard further admits that "Townsend's stated qualifications rendered him more qualified than she was," *see* Def.'s Stmt. ¶ 42; Pl.'s Resp. ¶ 42 (admitting Def.'s Stmt. ¶ 42); *see also* Def.'s Mot., Ex. 2, Pt. 3 (Pollard Dep.) 118:7-119:1 (acknowledging that Townsend's qualifications as set forth in his resume were superior), and that "Townsend was the second most qualified candidate" for the Project Manager position, *see* Def.'s Stmt. ¶ 39; Pl.'s Resp. ¶ 39 (admitting Def.'s Stmt. ¶ 39).  Indeed, Pollard admits that Quest offered the Project Manager position to Townsend because he was the second most qualified candidate.  Def.'s Stmt. ¶ 39; Pl.'s Resp. ¶ 39 (admitting Def.'s

---

and LIS knowledge requirements," but rather contends that Pollard "lacked the significant technical experience with LIS as preferred by both [] Vandenburg and [] Leap." *See* Def.'s Mot. at 16.

Stmt. ¶ 39).

Nonetheless, Pollard argues that Quest's asserted legitimate, non-discriminatory reasons for its conduct are pretextual for three reasons.  First, Pollard argues that Quest's proffered reasons are pretextual because Vandenburg and Leap created the position description for the Project Manager position *after* both Townsend and Kopley were interviewed and did so in order to tailor the position description to exclude Pollard and/or the other minority candidates.  *See* Pl.'s Opp'n at 5-7, 10-12.  Specifically, Pollard asserts that she met all of the qualifications for the job posting, as originally listed in the vacancy announcement, and was therefore qualified for the Project Manager position, but that Vandenburg and Leap collaborated after Townsend's interview to add new technical requirements—*i.e.*, requirements regarding the LIS upgrade that were not included in the vacancy announcement—to exclude Pollard and all other minority interview applicants from the position.  *Id.* at 5-6, 10-11.  Although a plaintiff may show that an employer's reasons are pretext by "demonstrat[ing] that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision," *Brady*, 520 F.3d at 495, the Court concludes that Pollard has failed to proffer sufficient evidence from which a reasonable jury could conclude that Quest's reasons are pretext for discrimination.

Although, as discussed above, there is some dispute as to the exact date on which the position description was created, *see supra* at 5-6, the Court finds that there is no evidence in the record to support Pollard's allegations that it was changed by Vandenburg and Leap *after* Townsend was interviewed.  As discussed above, Pollard claims that the position description was first drafted in August 2005—*i.e.*, after Townsend was interviewed on July 20, 2005.  *See* Pl.'s Resp. ¶ 20; Pl.'s Opp'n, Ex. C (EEOC Investigative Report).  As support for this claim, Pollard

directs the Court to: (1) the copy of the position description attached to Defendant's Motion, which is the copy signed by Townsend in October of 2005, that indicates the "Date Written" was August 22, 2005; and (2) Vandenburg's testimony in which he stated: "So I would surmise the posting predated the finalization of the position description."  Pl.'s Resp. ¶ 20; *see also* Def.'s Mot., Ex. 8 (Project Manager Position Description); Pl.'s Opp'n, Ex. H (Vandenburg Dep.) at 49:5-6.  As to the former, Quest explained that "each time a job description is revised or updated on the computer system in any way, the date in the 'Date Written' section is updated to reflect the then current date.'"  Def.'s Reply, Ex. 1 (Knapp Decl.) ¶ 6.  Accordingly, the fact that the "Date Written" reflects a date of August 22, 2005, does not affirmatively demonstrate that the position description was *created* on that date.  Rather, it demonstrates only that the position description was revised or updated in the computer system and therefore, as Pollard admits, shows only that the position description *could* have been drafted as late as August 2005.

Quest, however, has presented evidence that the position description was, in fact, drafted prior to August 22, 2005.  Specifically, Quest has proffered evidence that the position description, or at least a version of it, was composed as early as June 24, 2005.  *See id.* ¶ 7 (showing that the position description at issue had been printed on June 24, 2005).  In addition, both Vandenburg and Leap averred that the position description was not changed after they had interviewed either Pollard, Kopley or Townsend.  *See* Def.'s Reply, Ex. 2 (Vandenburg Decl.) ¶ 3; *id.*, Ex. 3 (Leap Decl.) ¶ 3.  Quite obviously, if the description was not *changed* after Townsend's interview, then it logically could not have been *created* after Townsend's interview. It is therefore evident from the record that the position description was *first created*, at the latest, on June 24, 2005, not on August 22, 2005 as Pollard asserts.

Whether the position description was *changed* as late as August 22, 2005 is a separate question.  Given that Pollard has directed the Court to a copy of the position description that indicates a "Date Written" of August 22, 2005 and that Quest has explained that the "Date Written" section is updated each time a job description is "revised or updated on the computer system in any way," Pollard has presented evidence sufficient to raise the possibility that the position description was changed on August 22, 2005.  However, both Vandenburg and Leap have confirmed that neither made any changes to the position description, nor are they aware of anyone else who made changes to the position description, *after* Townsend's interview was conducted on July 20, 2005.  *See* Def.'s Reply, Ex. 2 (Vandenburg Decl.) ¶ 3; *id.*, Ex. 3 (Leap Decl.) ¶ 3.  Pollard has offered no evidence to rebut or otherwise challenge Vandenburg's and Leap's sworn testimony.  Accordingly, although the position description may have been changed after the vacancy announcement was posted, there is no evidence from which a reasonable jury could conclude that either Vandenburg or Leap drafted or changed the position description after Townsend's interview.

Moreover, even if the position description had been changed after Townsend's interview, Pollard has not presented any evidence from which a reasonable jury could infer that the technical requirements listed in the position description were included for a discriminatory reason.  Indeed, to the contrary, Pollard repeatedly agrees with Quest that technical knowledge and experience, particularly with the LIS upgrade at issue, were important aspects of the Project Manager position.  For example, although Pollard argues in her briefing that "[t]here is no reason to believe . . . that the considerations established in the . . . position description were reasonably job related," Pl.'s Opp'n at 10, Pollard concedes that the "primary responsibility of the Project

35

Manager position was to coordinate and maintain a new upgrade to Quest's old Laboratory

Information System ('LIS')."[17]   *See* Def.'s Stmt. ¶ 16; Pl.'s Resp. ¶ (admitting Def.'s Stmt. ¶ 16).

Pollard also admits that "experience in 'setting up the filing structure of a LIS, managing

interfaces for producing or for setting up the laboratory reports' [] were the most important

aspects of the job."   *See* Def.'s Stmt. ¶ 35; Pl.'s Resp. ¶ 35 (admitting Def.'s Stmt. ¶ 35).

Similarly, to the extent Pollard claims that discriminatory animus may be inferred from the fact

that these technical requirements in the position description were not listed in the position's

vacancy announcement, Quest has explained that: "The Job Posting Bulletin (*i.e.*, the vacancy

announcement to which Pollard refers) . . . does not and could not contain all of the elements of

the job description for each position posted.  Indeed, every job description for every job contains

more requirements than the job posting does.  The job posting simply contains a summary of

some of the major requirements for the positions listed."  Def.'s Reply, Ex. 1 (Knapp Decl.) ¶ 4.

Accordingly, the record evidence in this case—as largely agreed to by Pollard—demonstrates

that the technical requirements in the position description were directly related to the most

important work-related aspects of the Project Manager position, and Pollard's assertions that the

technical requirements were added to exclude her from the position are wholly without support.

_____

[17]In her Opposition, Pollard states that: "Contrary to Defendant's representation, the LIS was not a newly installed system, but, instead, an upgrade from the previous position.  The relevance of this fact is significant because after the upgrade of the LIS, Plaintiff demonstrated proficiency in its operation and interaction."  Pl.'s Opp'n at 7.  First, Pollard is incorrect when she asserts that Quest argues LIS is a newly installed system.  To the contrary, as stated above, Quest has clearly explained that the Project Manager's job was to "coordinate and maintain a new *upgrade*" to the LIS system.  *See* Def.'s Stmt. ¶ 16 (emphasis added).  Second, Pollard's ability to efficiently operate the LIS upgrade as a user after its installation is not relevant to her ability to "coordinate and maintain" the LIS system, as she agreed was the Project Manager's primary duty.

As such, "[Pollard's] unsupported, personal speculation about the motivations of [Quest] personnel is, without more, simply not enough to show pretext." *Asghar v. Paulson*, 580 F. Supp. 2d 30, 37 (D.D.C. 2008); *see also Montgomery*, 546 F.3d at 708 ("The possibility that a jury might speculate in the plaintiff's favor under such circumstances is not sufficient to defeat summary judgment."); *Brown v. Small,* 2007 WL 158719, at *6 (D.D.C. Jan. 19, 2007) (holding that speculation about decision-maker's hidden motives is insufficient to counter the defendant's legitimate non-discriminatory reason).

Finally, Pollard has conceded that Quest's initial decision to offer the position to Kopley was not discriminatory.  Pl.'s Opp'n at 5 n1. ("Plaintiff's failure to promote claim only challenges [Quest]'s selection of Sean Townsend, not Jane Kopley, the other white comparator."); *see also* Def.'s Mot., Ex. 2, Pt. 3 (Pollard Dep.) 103:3-15 (admitting that she did *not* believe that Quest's decision to initially offer the Project Manager position to Kopley was discriminatory).  Indeed, as stated above, Pollard admits that "Kopley's prior experience with the new LIS upgrade rendered her far more qualified for the Project Manager position.  *See* Def.'s Stmt. ¶ 41; Pl.'s Resp. ¶ 41 (admitting Def.'s Stmt. ¶ 41).  Given that Kopley and Townsend went through the same interview process and were selected based on the same set of job requirements, Pollard's claim—*i.e.,* that the initial decision to select Kopley was not discriminatory, but the subsequent decision to select Townsend was discriminatory—makes little sense and lacks merit.

Second, Pollard alleges that certain inconsistencies between Vandenburg's and Leap's deposition testimony concerning the manner in which the position description was drafted demonstrates that Quest's proffered reasons are pretextual.  Pl.'s Opp'n at 11-12.  As the D.C.

Circuit observed in *Brady*, a plaintiff may try to cast doubt on an employer's asserted reasons by pointing to "changes and inconsistencies in [those] stated reasons."  520 F. 3d at 495 n.3.  The Court finds, however, that Pollard has not offered any evidence that Quests's proffered reasons have, in fact, materially changed and/or been inconsistent.  Specifically, Pollard alleges that Vandenburg testified that the position description was developed in collaboration with Leap and another individual named Gloria Lim using a prior position description as a template, but that Leap testified only that he and Vandenburg composed the position description without the assistance of others and that no template was used.[18]  Pl.'s Opp'n at 11.

Upon closer inspection, however, the Court finds nothing inconsistent about the testimony at issue. Contrary to Pollard's assertion, Leap did not testify that only he and Vandenburg composed the position description without the assistance of others, but rather that the position description was drafted by a "combination of [Vandenburg], myself and human resources."  *See* Def.'s Reply, Ex. 7 (Leap Dep.) at 21:5-8.  This is not materially inconsistent with Vandenburg's testimony that he and Leap drafted the position description along with assistance from Human Resources and Lim.  *See* Pl.'s Opp'n, Ex. H (Vandenburg Dep.) at 30:3-22; Def.'s Reply, Ex. 6 (Vandenburg Dep.) 24:4-25:14.  That Vandenburg specifically mentioned Lim by name, while Leap did not, is not in these circumstances the type of material inconsistency

---

[18]Pollard also alleges that "Leap discounted [] Vandenburg's deposition testimony that [Quest's] human resources department pre-authorized the position description," citing to Leap's deposition testimony at pages 16-19 for support.  *See* Pl.'s Opp'n at 12.  First, Pollard fails to include a citation to the portion of Vandenburg's deposition testimony in which he allegedly testified that the human resources department "pre-authorized" the job description.  *See id.* Second, although Pollard cites to the portion of Leap's deposition testimony she claims is relevant, Pollard has not actually provided that portion of Leap's deposition (*i.e.,* pages 16-19) to the Court.  *See id.*  Accordingly, there is no evidence in the record from which the Court can determine that Leap contradicted Vandenburg's testimony, as claimed.

that demonstrates pretext.  *See, e.g., Hamilton v. Paulson*, 542 F. Supp. 2d 37, 56 (finding that

minor inconsistencies in testimony "could not serve as a basis for a reasonable jury to infer

pretext on the part of the [defendant]").  In addition, in the testimony cited by Pollard, Leap does

not, as Pollard claims, state that no template was used.  *See generally* Pl.'s Opp'n, Ex. H (Leap

Dep.).  Indeed, as Quest points out, Leap testified later in his deposition that he in fact reviewed a

few existing position descriptions in composing the Project Manager position description at issue

here.  *See* Def.'s Reply, Ex. 7 (Leap Dep.) 30:12-17.  Accordingly, although Leap and

Vandenburg may recall the process of creating the position description with varying degrees of

specificity, the Court finds that these types of minor variances in testimony are not the type of

material inconsistency or contradictory testimony from which a reasonable jury could infer that

Quest's proffered reasons are pretextual.

Third, Pollard alleges that Quest "deliberately disregarded its policy" requiring position

descriptions to be drafted prior to the posting of the vacancy announcement, such that a

reasonable jury could infer Quest's proffered reasons are pretext for discrimination.  Pl.'s Opp'n

at 12.  The Court is persuaded, however, "that '[a]n employer's failure to follow its own

regulations and procedures, alone, may not be sufficient to support the conclusion that its

explanation for the challenged employment action is pretextual.'  Rather, the 'irregularities, even

if proven,' must 'indicate discriminatory hiring practices.'" *Hamilton*, 542 F. Supp. 2d at 48

(quoting *Fischbach v. D.C. Dep't of Corr.,* 86 F.3d 1180, 1183 (D.C.Cir.1996) and *Butler v.*

*Ashcroft,* 293 F. Supp. 2d 74, 80 (D.D.C.2003)).  Although, as discussed above, the date the

position description was created is in dispute, even assuming that the position description was

not drafted until after the vacancy announcement was posted—*i.e.,* that the position description

was created in violation of Quest's policy—Quest has demonstrated that the technical

qualifications set forth in the position description are reasonably related to the work of the

Project Manager position, and Pollard has not presented any evidence to support her allegations

that the position description was drafted with the intent to disqualify Pollard from the position.

*See supra* 32-37.  Moreover, given that Pollard has admitted that Quest's initial selection of

Kopley was not discriminatory, it is apparent that Pollard does not claim that the selection

process itself was tainted or biased.  Accordingly, the Court concludes that a reasonable jury

could not conclude that Quest's failure to follow policy in this instance, even if true, indicates

discriminatory hiring practices.[19]

 Finally, the Court notes that Quest has directed the Court to "evidence of [its] strong track

record in equal employment opportunity," which the D.C. Circuit has found may be considered in

evaluating the ultimate question of discrimination *vel non*.  *See Aka*, 156 F.3d at 1289.  As noted

above, Quest has a comprehensive anti-discrimination policy and conducts annual equal

employment opportunity training sessions.  *Id.* ¶ 3.  In addition, 70% of Quest's current

employees at the Providence location are African-American, as were 65% at the time of Pollard's

termination, and 100% of Quest's current managerial staff at the Providence location are African-

American, as were 50% at the time of Pollard's termination.  *Id*. ¶¶ 4, 5.  Although by no means

dispositive, Quest's "strong track record in equal employment opportunity" further emphasizes

---

[19]Because Pollard has conceded that Townsend and Kopley were more qualified for the
Project Manager position and has otherwise failed to present any evidence from which a
reasonable jury could infer that the technical requirements listed in the position description were
included for a discriminatory reason, Pollard's reliance on *Shaw v. Boorstin*, 517 F. Supp. 336
(D.D.C. 1981) and *Stodola v. Finley & Co.,* No.2:05-464, 2008 WL 835709 (N.D. Ind. Mar. 24,
2008) is misplaced.

Pollard's failure to present any evidence from which a reasonable jury could infer that she was rejected for the Project Manager position because of her race and/or color.  Accordingly, for the reasons stated above, the Court shall grant Defendant's Motion for Summary Judgment on Pollard's claim of disparate treatment under both Title VII and Section 1981.

       B.     *Pollard's Retaliation Claims*

Pollard next alleges a claim of retaliation in violation of both Title VII and Section 1981.  Specifically, Pollard alleges that she was given an inferior performance review in retaliation for her complaining that Quest's decision not to select her for the Project Manager position was discriminatory.  As explained above, Pollard received an "Achieves Expectations" rating in her 2005 performance evaluation, which resulted in a 3% merit increase.  Def.'s Stmt. ¶¶ 54, 59.

Quest has repeatedly proffered legitimate, non-retaliatory reasons justifying the performance review grade given to Pollard.  Specifically, Quest has asserted that Aglipay gave Pollard an "Achieves Expectations" rating "[b]ased upon her overall performance," and in particular, based on complaints that Aglipay had received from the Providence hospital staff regarding Pollard's attitude as well as Pollard's failure to meet the time pressures associated with her job.  *Id.* ¶¶ 53, 55.

Because Quest has proffered these legitimate, non-retaliatory reasons, *see Brady*, 520 F.3d at 493, whether Pollard has established a prima facie case of retaliation is "irrelevant." *Adeyemi,* 525 F.3d at 1226.  Thus, the court's inquiry collapses into the single question of whether Pollard has produced sufficient evidence for a reasonable jury to find that Quest's asserted non-retaliatory reasons were not the actual reason for the results of Pollard's performance evaluation, and that the real reason was based on retaliation.  *See Brady,* 520 F.3d at

493.  As with claims for discrimination, Pollard may establish liability for her retaliation claims in one of two ways—either by using a "single-motive" or "mixed-motive" theory.  *Fogg,* 492 F.3d at 451.  In the present case, as with her claims of disparate treatment, Pollard advances a "single-motive" case of retaliation, arguing that Quest's asserted reasons are a "pretext [for] retaliation."  *See* Pl.'s Opp'n at 15.

Because the strength of a plaintiff's prima facie case constitutes relevant evidence for determining retaliation *vel non*, *see Reeves*, 530 U.S. at 143, the Court first pauses to address Quest's assertion that Pollard has not established a prima facie case of retaliatory non-selection. *See* Def.'s Mot. at 27-29.  As discussed above, to establish a prima facie claim of retaliation, Pollard must show: (1) that she engaged in a statutorily protected activity; (2) that she suffered a materially adverse action; and (3) a causal connection exists between the two.  *Wiley,* 511 F.3d at 155.  Here, Quest asserts that Pollard cannot satisfy the second and third elements of her prima facie case.  *See* Def.'s Mot. at 36-37.

As to the second prima facie element, Quest asserts that the "Achieves Expectations" rating awarded to Pollard during the 2005 performance evaluation is not a materially adverse action because it was a satisfactory rating and had only a *de minimis* affect on Pollard's merit increase (*i.e.,* her 2005 merit increase of 3% was only slightly lower than her 2004 merit increase of 4%).  Def.'s Mot. at 27-29.  Pollard responds that the 2005 performance evaluation is a materially adverse action because it directly affected her compensation in the form of a lowered merit increase.  Pl.'s Opp'n at 13-14.

As the D.C. Circuit has observed, "'[a]dverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim," *Baloch v.*

42

*Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008), and a performance rating, even if

otherwise satisfactory, can be a materially adverse action when accompanied by a diminished

bonus or monetary award, *see Russell v. Principi*, 257 F.3d 815, 818-19 (D.C. Cir. 2001) (finding

that plaintiff had shown an adverse action where "the size of [plaintiff's] bonus was directly tied

to her performance rating; a higher rating would have automatically meant a larger bonus"); *cf*

*Weber v. Battista*, 494 F.3d 179, 185 (D.C. Cir. 2007) (finding that plaintiff had shown adverse

action where evidence in the record that annual performance evaluation affected award of

performance bonuses).   Here, Pollard has presented evidence that her merit increase pay is

directly affected by her annual performance evaluation.   *See* Pl.'s Opp'n at 13-14.   Specifically,

Aglipay testified at deposition as follows:

> Q.  Do you know anything about the merit increase pay for Quest Diagnostic
> Laboratories?
>
> * * *
>
> A.  It depends on your evaluation.
>
> Q.  And if an employee is given an excellent versus achieved expectation does that
> have an impact on their merit increase pay, if you know?
>
> A.  Yes.

Pl.'s Opp'n, Ex. H (Aglipay Dep.) 49:9-18.

Quest does not dispute that Pollard received a 4% merit increase as a result of her 2004

"Excellent" rating and that she subsequently received a 3% merit increase as a result of her 2005

"Achieves Expectations" rating, but rather suggests that this difference is so trivial as to not be

materially adverse.   Def.'s Mot. at 27-29.   The Court notes as an initial matter that, despite

Quest's assertion that the difference is "trivial," there is no evidence in the record as to the exact

monetary difference in compensation Pollard received as a result of the 1% decrease in her merit increase pay.  Accordingly, the Court is simply without the evidence to ascertain the validity of Quest's statement.  Regardless, it is clear that Pollard's overall merit pay was diminished to some extent as a result of the lower 2005 performance evaluation, and, as the D.C. Circuit has recognized, a satisfactory performance evaluation that results in a diminished bonus may be an adverse action.  *Russell,* 257 F.3d at 818-19 (finding that plaintiff had presented a prima facie case of discrimination based on her allegations that she was given a lower rating than she deserved for discriminatory reasons, even though she had received an "excellent" rating with an associated bonus of $807).  Accordingly, the Court cannot agree with Quest that Pollard has not established a materially adverse action.

Turning to the third prima facie element, Quest asserts that Pollard has not shown that there is a causal connection between the alleged adverse action and her protected activity because she has failed to provide any evidence that Aglipay knew of Pollard's discrimination complaints at the time she prepared the 2005 performance evaluation.  Def.'s Mot. at 29.  A plaintiff may establish the "causal component of the prima facie case . . . by showing that the employer had knowledge of the employee's protected activity, *and* that the adverse personnel action took place shortly after that activity."  *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985); *see also Hazward v. Runyon*, 14 F. Supp. 2d 120, 124-25 (D.D.C. 1998).[20]  As discussed above, *see supra*

---

[20] Of course, a plaintiff is not limited to establishing a causal connection only through evidence of the employer's knowledge of the employee's protected activity shortly followed by adverse action.  *See Hazward,* 14 F. Supp. 2d at 124 n.8.  A plaintiff may, for example, present direct evidence of retaliatory motive.  *Id.*  Pollard, however, has not presented any such evidence, but rather relies solely on her claim that the alleged retaliator was aware of the discrimination complaints prior to the 2005 performance evaluation.  *See* Pl.'s Opp'n at 13-15.

12, Pollard initially complained of discriminatory treatment to Knapp in October of 2005. *See* Pl.'s Reply, Ex. E (10/24/05 Email from Knapp to Vandenburg). Thereafter, on November 29, 2005, Pollard filed a Charge of Discrimination with the EEOC alleging race discrimination with respect to Quest's decision not to promote her into the Project Manager position. Def.'s Stmt. ¶ 49. Pollard's 2005 performance evaluation is dated January 12, 2006. *See* Def.'s Mot., Ex. 15 (2005 Performance Evaluation) at 7.

The Court agrees with Quest, however, that Pollard has not provided any evidence that Aglipay knew of Pollard's discrimination complaints prior to the completion of the 2005 performance evaluation. At deposition, Aglipay testified that she was not aware of Pollard's complaints of discrimination at the time she prepared the performance evaluation:

> Q. . . . The performance appraisal that was conducted by you on Ms. Pollard [*sic*] dated January 2006, right? At the time you had assessed her performance did anybody mention that Ms. Pollard was complaining of or she raised the issue of discrimination?
>
> A. No. I didn't hear anything.

Def.'s Reply, Ex. 4 (Aglipay Dep.) 59:3-8. Pollard has not provided any affirmative evidence to dispute Aglipay's own testimony that she had not heard about Pollard's discrimination claim at the time she prepared the 2005 performance evaluation.[21] The Court therefore agrees with Quest that Pollard "cannot establish a causal connection between the EEO activity and [her] non-selection for the [Project Manager] position because [she] has not sufficiently demonstrated that the selecting official, [Aglipay], knew of [her] prior EEO activity." *Henderson v. Rice*, 407

---

[21]As discussed above, Pollard's sole evidence on this point is an isolated excerpt of Aglipay's testimony, which the Court finds does not establish that she was aware of the complaints at the time of the performance evaluation. *See supra* 16-17.

F. Supp. 2d 47, 52 (D.D.C. 2005); *see also Holdbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999) (holding that the plaintiff failed to prove causation because the plaintiff failed to prove the employer knew of an EEO complaint).

Pollard nonetheless appears to contend that she has satisfied the causation element because "the alleged retaliatory actions took place after the Plaintiff initiated her Charge of Discrimination [and] [t]he record contains evidence that the alleged retaliator, [] Vandenburg, knew of the formal Charge of Discrimination at the time of these events and exercised discretion over Plaintiff's immediate supervisor." Pl.'s Opp'n at 15. As support for this claim, Pollard cites to *Hazward v. Runyon*, 14 F. Supp. 2d 120 (D.D.C. 1998). Pollard's reliance on *Hazward*, however, is misplaced. In that case, the court rejected the plaintiff's efforts to impute the knowledge of a supervisor to his subordinate, finding that evidence that the supervisor was aware of the complaints, without more, is insufficient to infer knowledge on behalf of others: "The bald fact that someone in a supervisory capacity over the plaintiff knew of the filing is insufficient to lead to a reasonable conclusion that others would also know, unless the plaintiff adduced evidence that this was the sort of information of which intermediate supervisors were required to inform their managers." *Hazward*, 14 F. Supp. 2d at 124 n.9. Pollard has provided no such evidence. To the contrary, Vandenburg testified at deposition that he had no input into or influence concerning Pollard's 2005 performance evaluation:

Q. Did you have any input into [] Pollard's supervisor giving her a score of 2.75 or the 2.5?

A. No, I did not.

Q. So this was strictly independent or strictly the decision and discretion of her immediate supervisor?

A.  Correct.

Def.'s Mot., Ex. 7 Pt. 2 (Vandenburg Dep.) 71:20- 72:3.  Accordingly, although Quest concedes

that Vandenburg was aware of Pollard's protected activity prior to Pollard's 2005 performance

review, *see* Def.'s Mot. at 28, the Court agrees that Pollard has not shown that *Aglipay* was aware

of Pollard's discrimination complaints or that Vandenburg's knowledge may be imputed to

Aglipay.

Turning now to the ultimate question of retaliation *vel non*, Quest asserts that Aglipay

gave Pollard an "Achieves Expectation" rating in her 2005 performance review based on

Pollard's overall performance and considered complaints from doctors and nurses as well as from

Pollard's co-workers and Pollard's failure to meet time pressures associated with her job.  *See*

Def.'s Stmt. ¶¶ 53, 55.  Pollard responds that Quest's proffered reasons are a "pretext [for]

retaliation" because: (1) Aglipay was unable, at deposition, to identify the names of the

individuals who complained to her regarding Pollard's attitude or to specify the number of

complaints she received concerning Pollard; and (2) Quests has not produced any written

documentation of the complaints at issue.  Pl.'s Opp'n at 15.  Noticeably, Pollard provides no

direct evidence contradicting Aglipay's assertion that she received complaints concerning

Pollard's attitude and that Pollard failed to meet time pressures associated with her work.

As to the first assertion, Pollard claims that "when pressed for the identifies of these

phantom staffers and the quantity of the purported criticism, [] Aglipay was mysteriously unable

to respond," and directs the Court to a portion of Aglipay's testimony as support for this claim

Pl.'s Opp'n at 15 (citing *id*., Ex. H (Aglipay Dep.) at 37:11-20).  However, as shown by a full

reproduction of the excerpted testimony, Pollard's characterization of Aglipay's testimony is

mistaken:

> Q.  Specifically what allegations were made regarding [] Pollard's attitude by staff?
>
> A.  The way she answered them back.
>
> Q.  She answered who back, ma'am?
>
> A.  Our coworkers.  Some of the staff.
>
> Q.  Was it the coworkers or was it the staff?
>
> A.  Some of the staff, nurses.
>
> Q.  We're talking about Providence Hospital staff, correct?
>
> A.  Yes, sir.

Pl.'s Opp'n, Ex. H (Aglipay Dep.) at 37:11-20). Contrary to Pollard's assertion, Plaintiff's counsel never "pressed" Aglipay for the specific names of the doctors, nurses, and other hospital staff that complained.  *See id.*  Moreover, although Aglipay testified that she could not remember with specificity the exact number of complaints, she was able to provide estimates as to the amount of complaints she received.  *See* Def.'s Reply, Ex. 4 (Aglipay Dep.) 31:21-40:19 (testifying that she had to speak to Pollard regarding the timeliness of her work more than five time but maybe less than ten times and that she had received at least "more than one" complaint from the Providence hospital staff concerning Pollard's attitude).  The mere fact that Aglipay could not recall with specificity the exact number of complaints she received during 2005 is not surprising, given the lapse of time, and certainly not evidence of "the type of 'shifting rationale,' or an after-the-fact statement that is required to establish that the defendant's [nonretaliatory] reason is a pretext."  *Jones v. Bernanke*, 493 F. Supp. 2d 18, 33 (D.D.C. 2007).

As to the second assertion, Aglipay explained at deposition that she generally would "just

talk to [Pollard] [*sic*] not to, you know, to be nice to the client," and that she could not recall

whether any of the complaints issued were ever put in writing or if she herself ever issued Pollard

a written letter of counseling.  Def.'s Mot., Ex. 13 (Aglipay Dep.) at 39:8-40-13.  Quest's

Director of Employee Services further explained that it is not necessarily common practice or

always appropriate for a supervisor to make written notations of performance concerns and/or

complaints in preparing an employee's performance evaluation.  Def.'s Mot., Ex. 5 (Knapp Dep.)

at 35:15-36:22.  Accordingly, in this instance, the Court finds that, absent speculation, a

reasonable jury would be unable to infer retaliatory animus merely from the fact that there is no

written documentation of the complaints at issue.  Put simply, Pollard's "factual proffer requires

too much speculation to create a genuine issue of fact about [Aglipay's] motivations."  *Carney*,

151 F.3d at 1094 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986) ("If the

[nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment

may be granted.") (internal citations omitted)).  Her own "unsupported, personal speculation

about the motivations of [Quest] personnel is, without more, simply not enough to show pretext."

*Asghar,* 580 F. Supp. 2d at 37.

Moreover, although Pollard has denied that Aglipay ever "inform[ed] me that I was the

subject of complaints or criticisms from Providence Hospital staff," Pl.'s Opp'n, Ex. B (Pollard

Decl.) ¶ 4, she has not similarly denied that she received complaints from Aglipay herself

regarding her failure to adequately handle the time pressures of her work nor has she presented

any evidence, other than her own speculation, contradicting Aglipay's testimony that such

complaints were in fact made.  Most significantly of all, Pollard now admits that Aglipay gave

her the overall "Achieves Expectation" rating "[b]ased on her overall performance."  Pl.'s Resp.

¶ 53 (admitting Def.'s Stmt. ¶ 53).

Accordingly, given the weakness of Pollard's evidence as to her prima facie case and her failure to provide any evidence from which a reasonable jury could infer that Aglipay provided Pollard with an "Achieves Expectations" rating for retaliatory reasons, the Court shall grant Defendant's Motion for Summary Judgment on Pollard's claim of retaliation under both Title VII and Section 1981.

## CONCLUSION

For the reasons set forth above, the Court shall GRANT Defendant's Motion for Summary Judgment.  This case is therefore DISMISSED in its entirety.  An appropriate Order accompanies this Memorandum Opinion.

Date:   February 17, 2009

_/s/_
COLLEEN KOLLAR-KOTELLY
United States District Judge